1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Jerry Darst                    :

        Plaintiff,             :
                                     Case No. 2:24-cv-1150
        vs.                    :     Judge Sarah D. Morrison
                                     Magistrate Judge
Meigs County, Ohio,            :     Chelsea M. Vascura
et al.,
                               :

        Defendants.            :


- - - - -

DEPOSITION OF JERRY DARST
VIA VIDEOCONFERENCE

- - - - -


Witness located at
Hilliard, OH 43026
September 3, 2025, 9:34 a.m.


- - - - -


Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:
3
          Willis Spangler Starling
4         4635 Trueman Blvd., #100
          Hilliard, OH 43026
5         By Jason E. Starling, Esq.
          (Via videoconference)
6

7   ON BEHALF OF DEFENDANTS:

8         Teetor Westfall, LLC
          200 East Campus View Boulevard, Ste. 200
9         Columbus, OH 43235
          By Matthew S. Teetor, Esq.
10        (Via videoconference)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                    Wednesday Morning Session

2                     September 3, 2025, 9:34 a.m.

3                    - - - - -

4               S T I P U L A T I O N S

5                    - - - - -

6        It is stipulated by counsel in attendance that

7    the deposition of Jerry Darst, the Plaintiff

8    herein, called by the Defendant for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel; that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                    - - - - -

18

19

20

21

22

23

24

4

1                          I N D E X

2     Examination By                               Page

3     Mr. Teetor - Cross                             5

4
      Exhibits                                     Page
5
      Exhibit A - OCRC Charge of Discrimination     14
6                 Employment

7     Exhibit B - Handwritten Notes                 36

8     Exhibit C - LinkedIn Post                     54

9     Exhibit D - OpenGovPay Salary Records for     56
                  Darst
10
      Exhibit E - Text Messages                     60
11
      Exhibit F - Geotex Pay Stubs                  97
12
      Exhibit G - BWC Paperwork                    100
13
      Exhibit H - BWC Paperwork Before Fitch       105
14
      Exhibit I - BWC Paperwork Before Fitch       108
15
      Exhibit J - Darst Dates Worked                89
16
      Exhibit K - Email                            114
17
      Exhibit L - Letter of Interest               116
18
      Exhibit M - Shift Bid Email                  122
19
      Exhibit N - Letter from Sheriff               89
20
      Exhibit O - Gallia Incident Report           128
21
      Exhibit P - GCSO Inter-Office Communication  135
22
      Exhibit Q - Email from Gill to Darst         137
23

24    (Exhibits attached electronically.)

5

1                          JERRY DARST

2       being first duly sworn, testifies and says as

3       follows:

4                       CROSS-EXAMINATION

5       BY MR. TEETOR:

6       Q.          All right.  Good morning.  My name's

7       Matt Teetor.  I'm here representing Meigs County

8       and Sheriff Fitch.

9                   If you could, please state your full

10      name and date of birth.

11      A.          Jerry Darst, and it's ███1971.

12      Q.          Thank you.  Is it okay if I call you

13      Jerry?

14      A.          Yes.

15      Q.          Thank you.  And feel free to call me

16      Matt.

17      A.          Okay.

18      Q.          Have you ever given a deposition

19      before?

20      A.          Yes, it's been a while.  But yes.

21      Q.          In what context did you previously give

22      a deposition?

23      A.          It was in my law enforcement career.

24      Q.          Were you a defendant?

6

1    A.        A witness, I guess you would say.

2    Q.        And was that in a criminal case or a

3    civil case?

4    A.        I think it was civil.

5    Q.        Do you know the nature of the case?

6    A.        Vaguely.

7    Q.        Tell me what you remember.

8    A.        It was an employee that had, I guess,

9    issues or whatever with the office.

10   Q.        Was it an employment discrimination

11   case like this one?

12   A.        No, not -- well, maybe it was.  I'm

13   trying to remember.  It's been, oh, my, probably

14   10, 15 years or so.  It's been several years ago.

15   Q.        Who was the employee?

16   A.        Amanda -- I'm trying to think of her

17   last name.  Amanda Posley, I believe was her name.

18   Q.        Do you know how to spell that?

19   A.        I do not.

20   Q.        And what was the office?

21   A.        It was the Gallia County Sheriff's

22   Office.

23   Q.        And you were identified as a witness in

24   that case?

7

```
 1    A.        Yes.

 2    Q.        What was your -- if you could summarize

 3    your relevant testimony in that case.

 4    A.        I was -- she made some statements, and

 5    I was a witness to those statements.

 6    Q.        What do you recall of the statements?

 7    A.        I think there was some derogatory

 8    remarks towards a supervisor.

 9    Q.        And you heard Ms. Posley make those

10    remarks?

11    A.        Yes.

12    Q.        And you were deposed as a result of

13    hearing those remarks made?

14    A.        Yes.

15    Q.        I presume you've testified in court

16    before?

17    A.        Correct.

18    Q.        All right.  So given that you have

19    given a deposition before and testified in court,

20    I assume you know kind of how this process works,

21    or at least understand generally.

22              The court reporter here is going to

23    take down everything we say.  You're doing a great

24    job so far, but sometimes as people get more
```

1   comfortable, they do uh-huhs and huh-uhs or

2   shoulder shrugs.  I'll try to remind you

3   throughout, but I'll ask you to try to make your

4   responses verbal for me.

5            If you need a take a break at any time,

6   just let me know.  And as we get through this and

7   everybody gets more comfortable, and I get more

8   tired, sometimes my brain works faster than my

9   mouth.

10           So if my questions don't make sense or

11  you don't understand them, please let me know and

12  I'll and rephrase.  I want to make sure my answers

13  are clear for you and that you understand them

14  when you're answering them?

15           Is that fair?

16  A.        Yes.

17  Q.        I don't think we need to go through

18  your entire educational history or work history,

19  but I'd like to start with your employment history

20  as a law enforcement officer.

21           Where did you first become employed as

22  a law enforcement officer?

23  A.        I first became employed in Gallia

24  County.

9

1    Q.        And when did that employment start?

2    A.        1995.

3    Q.        And when did that employment cease?

4    A.        2016, I think, '16 or '18 -- '16, I

5    think.  Maybe '18.  I'm sorry, yeah.  It's been --

6    Q.        So either 2016 or 2018?

7    A.        Yes, somewhere in that time frame.

8    Q.        And after Gallia County where did you

9    go to work?

10   A.        I went to Bridgeport Equipment and

11   Tools.

12   Q.        And I presume that's not a law

13   enforcement agency.  What did you do for

14   Bridgeport Equipment and Tools?

15   A.        I taught firearms and instructed an

16   indoor range, shooting range.

17   Q.        How long were you at Bridgeport

18   Equipment and Tools as a firearms and range

19   instructor?

20   A.        Approximately a year.

21   Q.        So would that be roughly 2018 to 2019?

22   A.        I believe so.  Without having to look

23   back, yeah.  I'm trying to be accurate with you.

24   My dates aren't real --

1  Q.          Do you recall how you were compensated

2  and what your rate of compensation was at

3  Bridgeport Equipment and Tools?

4  A.          I'm thinking it was like -- I know it

5  was less than what I made.  It was, like, 15,

6  maybe, 14 or $15 an hour.  I'm not 100 percent

7  sure.  I would have to look at my W-2s and stuff

8  again to see what those were.

9  Q.          But your best estimate as we sit here

10 today was 14 or $15 an hour?

11 A.          I believe that's correct, yeah.

12 Q.          Why did your employment at Bridgeport

13 Equipment and Tools cease?

14 A.          I got a law enforcement job at the

15 Village of Middleport Police Department.

16 Q.          When did you begin that employment?

17 A.          It was -- I would have to look, to be

18 honest with you, for the years.  I can't really

19 recall the actual years of when I was there and

20 stuff, to be honest with you.  I would have to

21 look back and reflect.

22 Q.          I think we just talked about, to the

23 best of your recollection, Bridgeport Equipment

24 and Tools was 2018 to 2019?

11

1    A.         I think so.  Once again, you know, I

2    don't want to give you 100 percent on those

3    because I'd rather look at some documentations to

4    tell you to be accurate on my years and my time.

5    It all kind of runs together, so I don't want to

6    mislead you and tell you I was there and I wasn't.

7    It would be a simple mistake.

8    Q.         When you left Bridgeport Equipment and

9    Tools, did you immediately go to work, start

10   working for the Village of Middleport?

11   A.         Yes.

12   Q.         Do you recall how long or up until what

13   time period you worked for the Village of

14   Middleport?

15   A.         I was probably at the Village of

16   Middleport for approximately maybe a year or two.

17   Q.         And why did your employment at the

18   Village of Middleport cease?

19   A.         I was offered a job at the Meigs County

20   Sheriff's Office.

21   Q.         When did that occur?

22   A.         As soon as I left the Village of

23   Middleport, I went there, and it was probably

24   whenever I started.  It was in -- I'm trying to

12

1    think back, '21, '22, somewhere in that, roughly.

2    I would have to look again to be accurate with

3    you, to give you an accurate date.

4    Q.          If the documentation I've seen

5    indicated that you started with Meigs County

6    August 2nd of 2022, does that seem accurate to

7    you?

8    A.          Yes.  If I seen that I could tell you,

9    but that sounds roughly in the area of that time

10   period.

11   Q.          And you stated you were offered a job

12   with Meigs County.  Did you apply for a position,

13   or did that offer come out of the blue?

14   A.          It come out of the blue.  I was asked

15   to apply and then I applied and they offered me

16   the job.

17   Q.          Who asked you to apply?

18   A.          There were several deputies.  Deputy

19   Hutton.  There was a few other deputies there at

20   the office at the time that asked me to apply.  I

21   think it was Gilkey, maybe, that was there.

22   Q.          I believe, is it Marty Hutton?

23   A.          Correct, yes.

24   Q.          And Bill Gilkey?

13

1    A.          Bill Gilkey.

2    Q.          Marty Hutton and Bill Gilkey asked you

3    to apply to the Meigs County Sheriff's Office?

4    A.          Said I should apply, yes.

5    Q.          And then you applied and your

6    application was accepted?

7    A.          Yes.

8    Q.          Since the Meigs County Sheriff's

9    Department, where have you been employed?

10   A.          You mean after the Meigs County?

11   Q.          Yes.

12   A.          I was at the Geotex Construction

13   Services.

14   Q.          And I noticed on this Zoom you are

15   wearing a Geotex shirt.  So is it safe to presume

16   that you are currently still employed at Geotex?

17   When did you become employed at Geotex?

18   A.          It was -- I'd have to look at the

19   documentation again.  I've been here probably

20   going on two years, maybe.  It looks like almost

21   two years.  I would have to look at the

22   documentation, again, to see what the actual dates

23   were for you.  You may know better than I.

24   Q.          From what I have seen, it appears that

14

1    you began sometime at the end of 2023.

2            Does that sound accurate?

3    A.        That's probably correct.

4    Q.        Coming up fairly soon, if not right

5    around your two-year anniversary of working at

6    Geotex?

7    A.        Yes.  Correct.

8    Q.        What is your current rate of

9    compensation at Geotex?

10   A.        I'm salary.

11   Q.        What is your salary?

12   A.        I think it's -- like, I think it's 78 a

13   year.

14   Q.        78,000?

15   A.        Yes, 78,000.  I'm sorry.

16   Q.        And I neglected to ask you, what was

17   your rate of compensation at the Meigs County

18   Sheriff's Office?

19   A.        It was hourly, and I think it was 18 --

20   18 and some change, I think.

21   Q.        I will share my screen with you and

22   show you what we'll mark as Defendant's Exhibit A.

23   I'll represent to you that I received this through

24   your attorney.  It's a two-page document, and it's

1    Bates-stamped Darst 000001 through 02.

2              Do you recognize this document?  I can

3    zoom in if you need.  Just let me know if you have

4    any trouble seeing any of the documents that I

5    attempt to show you today.

6    A.        Yes, that looks familiar.

7    Q.        What does it appear to be to you?

8    A.        It's a Ohio Civil Rights Commission

9    Charge of Discrimination of Employment.

10   Q.        And did you file this with the Ohio

11   Civil Rights Commission?

12   A.        Yes.

13   Q.        And it appears your signature is down

14   here on the bottom left of Darst 00001, dated

15   September 25th, 2023.

16             Is that accurate as to your

17   recollection, as to when you submitted this to the

18   Ohio Civil Rights Commission?

19   A.        Yes.

20   Q.        I'm zooming in on the section of the

21   first page of Exhibit A, where it indicates please

22   write a brief, but detailed statement of the facts

23   that you believe indicate an unlawful

24   discriminatory practice.

16

```
 1              Do you recall filling out this section
 2    before filing this charge with the Ohio Civil
 3    Rights Commission?
 4              MR. STARLING:  So I'm going to insert
 5    an objection of attorney-client privilege and work
 6    product.  This regards work with us and we drafted
 7    the charge narrative.  So I think we're going to
 8    get into communications with us or revisions of
 9    the charge that gets into attorney-client
10    privilege and work product.
11              I don't know how much you want to get
12    into it, Matt, but I thought I'd register that
13    objection.
14              So, Jerry, when you're responding to
15    Matt's question, don't get into any back-and-forth
16    communication with our office, revisions, things
17    like that.  You can just testify to the narrative
18    that's there, okay?
19              THE WITNESS:  Okay.
20    Q.        Mr. Darst, I did not ask you and I will
21    not be asking you about conversations with your
22    attorney.
23              My question was:  Did you write this
24    statement before it was submitted to the Ohio
```

17

1    Civil Rights Commission?

2    A.          I don't recall.

3    Q.          You did sign this document, correct?

4    A.          Yes, that is my signature.

5    Q.          And your signature is under a -- under

6    a disclaimer that says:  I declare under penalty

7    of perjury that I have read the above charge and

8    that it is true to the best of my knowledge,

9    information and belief, correct?

10   A.          Yes, that's what it says.

11   Q.          So when you signed this, you were

12   attesting that everything in this statement was

13   true to the best of your knowledge, information

14   and belief, correct?

15   A.          Yes.

16   Q.          And you read it before you signed it,

17   correct?

18   A.          Yes.

19   Q.          I'm looking here on the first line of

20   the second paragraph in that detailed statement in

21   the charge and it indicates:  On or about

22   February 9th, 2023, Captain Frank Stewart, my

23   supervisor, sent a group text to me and other

24   deputies asking how old we are.

18

```
 1              I want to ask you about that and
 2    understand what the context was for that
 3    particular text message.  What do you recall of
 4    that text?
 5    A.          That I was asked my age.
 6    Q.          And who else was on that group text?
 7    A.          All the other employees at our office,
 8    as I know of.
 9    Q.          Was it only you that was asked your age
10    or was everyone asked their age?
11    A.          I'm really not sure.
12    Q.          I'm sorry, I couldn't hear you.
13    A.          I'm really not sure.
14    Q.          When you signed this on February 25th
15    of 2023, you signed it attesting that it was true
16    to the best of your knowledge that Frank Stewart,
17    quote, sent a group text to me and the other
18    deputies asking how old we are.
19              Does that help refresh your
20    recollection as to whether it was just you or the
21    other deputies that were asked?
22    A.          Yeah, there was -- I'm sure there were
23    other deputies, I just don't know who they were.
24    I can't name who all was in the group text.
```

19

 1    Q.         Well, you just told me that it was

 2    every other employee, correct?

 3    A.         I believed it was.  I couldn't tell you

 4    100 percent sure who all was on the group text.

 5    Q.         And the request was for every employee

 6    to give their age, correct?

 7    A.         I'm not sure of that, no.

 8    Q.         The next line of this indicates, quote,

 9    additionally, Sheriff Scott Fitch called me old

10    man and old colonel on several occasions and also

11    said isn't it about time for you to hang it up,

12    old man.

13               When do you recall any such statements

14    from Sheriff Scott Fitch occurring?

15               MR. STARLING:  Objection.  Very

16    compound question.

17               But go ahead and answer.

18    A.         Can you ask that again, please.

19    Q.         Yes.  You put in here that Sheriff

20    Scott Fitch called you "old man," "old colonel" on

21    several occasions and then also said isn't it

22    about time you hang it up, old man, and I'm asking

23    when do you recall each of those instances

24    occurring?

20

1          MR. STARLING:  Objection.  Compound

2   question.

3          Go ahead and answer.

4   Q.        We can take it one by one because I

5   don't know how many times you're alleging that

6   occurred.

7          When is the first time that it

8   occurred?

9   A.        There was a -- I can't remember the

10  exact date and time.  It was a court hearing I

11  had, and I was setting in the hallway waiting for

12  -- excuse me -- for court and he come around and

13  seen me setting there and said there's the old

14  colonel.  That was the first time I recall.

15  Q.        And do you have an estimate as to when

16  that occurred?

17  A.        I do not.  It was -- I had a court

18  hearing date.

19  Q.        Do you recall any details about what

20  the court hearing was about?

21  A.        I do not.  I know there was a couple

22  troopers there with me -- wait a minute.  It was

23  about a case I had with a -- I arrested an

24  individual for -- I think it was maybe a drug

1    possession case or something.  I was testifying

2    for a grand jury, I think is right, to the best of

3    my recollection.

4    Q.        And you said there were a couple other

5    troopers there.  Who were they?

6    A.        I don't remember their names.  I know

7    their faces to see them.

8    Q.        Do you remember anyone else who was

9    present when Sheriff Fitch called you old colonel?

10   A.        I believe Patrolman Robert Fruth from

11   Pomeroy.

12   Q.        And besides Robert Fruth, you don't

13   recall any other individuals who were present?

14   A.        I do not.  There might have been some

15   court people there that I don't -- I can't be

16   honest with you to tell you who they were.

17   Q.        From the documentation I've seen, I

18   believe that Sheriff Fitch started at the Meigs

19   County Sheriff's Office on November 22nd of 2022

20   and you went on injury leave in January of 2023.

21             Do you have any idea -- I presume that

22   this occurred sometime in that time frame.  Am I

23   correct?

24   A.        Yes.

22

1    Q.         Do you have any idea whether it was in

2    November, December or January?

3    A.         I do not.

4    Q.         That was the first time he called you

5    old colonel.  Was there any other time he called

6    you old colonel?

7    A.         Yes.

8    Q.         Tell me about the next time.

9    A.         I was called out to do a search warrant

10   -- I was asked to come out and help, and the

11   suspect was arrested, and I wasn't actually

12   involved in, physically, the search.  I was

13   standing by to help do -- transport the

14   individuals that were arrested back to jail or

15   whatever they was wanting to do with -- I think it

16   was back to the office for questioning or to

17   transport.

18          Anyway, he brought a male suspect out

19   and Sheriff Fitch had ahold of him and said,

20   called him Davy, and you can go with the old

21   colonel.  And then I took the suspect and placed

22   him in my patrol car.

23   Q.         And the suspect, I want to make sure I

24   understand it, you said he called him Davy.  Was

1    it your understanding he -- Sheriff Fitch was

2    calling the suspect Davy?

3    A.        Yes.

4    Q.        Do you recall if Davy had a last name?

5    A.        I think Lawson, Davy Lawson, David

6    Lawson.

7    Q.        Is it safe to presume this also

8    happened in that time frame, November, December or

9    January of 2023?

10   A.        Yes.

11   Q.        Were there any other incidents where

12   Sheriff Fitch called you old colonel?

13   A.        No.

14   Q.        How about, you also allege here that he

15   called you old man?

16   A.        Yes.

17   Q.        In what instances do you recall where

18   he called you old man?

19   A.        It was when we were at the office.

20   Q.        Do you remember any details about what

21   occurred during that instance?

22   A.        It was just he and I at his office.

23   Q.        Is it safe to assume that also happened

24   during that November and December of 2022 or

24

1    January of 2023 time frame?

2    A.        Yes.

3    Q.        And you were in his office.  What

4    brought you into Sheriff Fitch's office at that

5    particular time?

6    A.        I think we had had -- I think we had a

7    departmental meeting around that time and maybe

8    discussion of me working my canine.

9    Q.        I want to make sure I understand the

10   circumstances here.  It was a departmental meeting

11   and after that meeting you went into his office to

12   discuss you working your canine.  Is that

13   accurate?

14   A.        Yes.

15   Q.        Did you ever work your canine for the

16   Meigs County Sheriff's Office?

17   A.        No.

18   Q.        And during this conversation talking

19   about your canine, in what context did he call you

20   old man?

21   A.        I'm trying to recollect how it actually

22   went verbatim.  I think it was somewhere in the

23   gist about doing that, and I think he reflected

24   isn't it about time for you to hang it up, old

25

```
1    man, or something, you know, reflecting that, I
2    think, that was it close for me to get out or
3    leave to that aspect.
4    Q.        So if I understand correctly, you were
5    talking to Sheriff Fitch about potentially working
6    your canine for Meigs County, and his response was
7    isn't it about time for you to hang it up, old
8    man?
9    A.        Yes.
10   Q.        What did you say in response to that?
11   A.        I'm trying to remember my exact -- I
12   think it was -- I think it was I've got several
13   years.  I loved what I do, and I love being a
14   deputy.  I'm pretty devoted to the sheriff's
15   office.
16   Q.        You didn't tell him, hey, don't call me
17   old man, that's inappropriate?
18   A.        I didn't.  I felt like it was, you
19   know, the boss, you know.
20   Q.        Did you ever tell him that you disliked
21   being called old colonel?
22   A.        I believe I expressed my, yeah,
23   concerns different occasions, like, I don't feel
24   like I'm wanted here, I think was one of the
```

26

1    comments I made.

2    Q.        When did you make those comments?

3    A.        I would have to look.  I'm not actually

4    100 percent sure.  I believe there was a text

5    message.

6    Q.        We talked about two times that he

7    called you old colonel, at the court hearing and

8    at this search warrant related to Davy Lawson.

9              Did you tell him at either of those

10   times or was it some other time?

11   A.        Some other time.  It wasn't in front

12   of, you know.

13   Q.        And I believe you already testified,

14   but correct me if I'm wrong, those were the only

15   two times he called you old colonel, correct?

16   A.        That I can recall, yes.

17   Q.        And then we've talked about the

18   discussion in his office between you and he about

19   working your canine for Meigs County and he made a

20   comment isn't it time -- isn't it about time for

21   you to hang it up, old man.

22   A.        Yes.

23   Q.        Were there any other times that he

24   called you old man?

27

1  A.          Not that I directly recall.

2  Q.          Moving on to the next sentence in this

3  charge.  It indicates other deputies called me

4  "pa," "grandpa," and asked me if I needed help

5  crossing the street.

6              Who were those deputies?

7  A.          Deputy Hutton, Deputy Perry, and I

8  believe Deputy Golsby.

9  Q.          Any others that you can recall?

10  A.          No, not that made comments.  They were

11  present during times, but no, I don't believe they

12  made comments.

13  Q.          So Marty Hutton, who we already talked

14  about.  And then what is Deputy Perry's first

15  name?

16  A.          I'm not sure.  I would have to --

17  Q.          And what is Deputy Golsby's last name?

18  A.          Golsby is the last name.

19  Q.          I'm sorry, first name?

20  A.          I believe Josh or Joshua.

21  Q.          What do you recall of Marty Hutton's

22  specific comments about your age?  Tell me what

23  occurred.

24  A.          He called me pa, grandpa.

28

1    Q.        When did this occur?

2    A.        I would have to look back and reflect

3    on that to be able to give you an exact frame.

4    But it was during my employment there.

5    Q.        Was it while you were on active duty or

6    why you were on medical leave?

7    A.        Active duty prior to the medical.

8    Q.        Besides calling you pa and grandpa, did

9    Deputy Hutton ever call you any other names?

10   A.        I believe the old man a time or two.

11   I'm trying to recall.  There were several comments

12   made about me being older than they were, old

13   enough to be his dad or old enough to be his

14   grandpa.

15   Q.        Did you ever report that to Sheriff

16   Fitch?

17   A.        No.

18   Q.        Did you ever tell Marty Hutton, hey, I

19   don't like you calling me that?

20   A.        Yes.

21   Q.        When did you tell him that?

22   A.        After they had called me that on

23   occasion.  I would have to look back to give you

24   an exact time when I said that.

29

1  Q.        When you say you'd have to look back,

2  what would you be looking back on to figure out

3  when you would have told Marty Hutton, hey, don't

4  call me grandpa or old man?

5  A.        There were times that were in the

6  patrol room and there were comments made.

7  Q.        But what specifically would you be

8  looking at to identify when this conversation took

9  place?

10 A.        To a schedule when I was working, what

11 day I was working, trying to remember exactly what

12 day I was there and it was.

13 Q.        For Deputy Perry, what specifically did

14 he say to you specifically about your age?

15 A.        The comments about the grandpa, all

16 were, to my recollection, just making

17 recommendation to my age.

18 Q.        So similar comments to Deputy Hutton?

19 A.        Correct.

20 Q.        Did you ever report what Deputy Perry

21 said to you to Sheriff Fitch?

22 A.        No.

23 Q.        Did you ever tell Deputy Perry, hey, I

24 don't appreciate that, knock it off?

30

1    A.        Yes.

2    Q.        And do you know when you did that or

3    would you have to look at these same schedules to

4    identify when that occurred?

5    A.        Same schedule, because a lot of times

6    when they were together they would be teasing me

7    about my age and/or, you know, if I needed help

8    crossing the road or different things, or I think,

9    too, there was a time about a Golden Buckeye card,

10   trying to remember exactly.

11   Q.        What specific comments about your age

12   did Josh Golsby make?

13   A.        About the Golden Buckeye card.

14   Q.        So you remember specifically he was the

15   one that made the comment about the Golden Buckeye

16   card?

17   A.        Yes.

18   Q.        Tell me what you recall of that

19   circumstance.

20   A.        We went out to eat at the Chinese

21   restaurant in Mason, West Virginia, which is right

22   across the bridge, and we was in a line waiting

23   for a seat, or to be seated, and he said you

24   should get a discount for us, you got the Golden

31

1    Buckeye card, don't you, an old man.

2    Q.        Do you recall when that situation

3    occurred?

4    A.        I don't.  Just like the others, I would

5    have to look to give you a correct date and time.

6    Q.        Did any of these comments occur before

7    Sheriff Fitch was the sheriff?

8    A.        I would have to look at the dates.  I'm

9    trying to reflect back.

10   Q.        Besides the comment about the Golden

11   Buckeye card, did Josh Golsby make any other

12   comments about your age?

13   A.        Yes.

14   Q.        What other comments did he make?

15   A.        Grandpa or pa, those type of remarks.

16   Q.        And did you report any of those remarks

17   to Sheriff Fitch?

18   A.        No.

19   Q.        Did you ever tell Deputy Golsby, hey,

20   knock it off, I don't want you calling me grandpa

21   or pa?

22   A.        Yes.

23   Q.        When you told Deputies Hutton, Perry

24   and Golsby, hey, knock it off, did their behavior

32

1    cease?

2    A.         I think it did at the present time, but

3    then it started back.  It was continual at

4    different intervals.

5    Q.         The next line of this charge that I'm

6    looking at starts:  One of my co-workers was

7    forced to resign due to his age and the other two

8    employees around my age are retiring.

9               Who was the co-worker who you allege

10   was forced to resign due to his age?

11   A.         Deon Jones.

12   Q.         And why do you believe that Deon Jones

13   was forced to resign due to his age?

14   A.         Just some remarks that he had made,

15   some statements he had made in passing.

16   Q.         What remarks or statements did he make

17   that led you to believe he was forced to resign

18   due to his age?

19   A.         I think he made the remarks that -- I'm

20   trying to recollect.  It was like all these kids

21   here, we're not welcome any longer, something to

22   that effect.

23   Q.         When did he make that remark to you?

24   A.         I'd have to check back.  I don't recall

33

1    exact --

2    Q.        When did he resign?

3    A.        It was -- I believe it was during.  I

4    would have to -- I don't remember his exact

5    resignation time.  I would have to look.

6    Q.        Can you give me your best estimate?

7    A.        I'd be afraid to.

8    Q.        Was it when you were still employed?

9    A.        Yeah, I was employed there prior to my

10   medical.

11   Q.        Was it while you were on medical leave

12   or while you were on active duty?

13   A.        Active duty.

14   Q.        Do you have any knowledge about any

15   discipline imposed upon Deon Jones?

16   A.        No.

17   Q.        It also says two other -- the other two

18   employees around my age are retiring.

19             Who were those employees?

20   A.        I think it was Bill Gilkey, I'm trying

21   to remember, there was a school resource officer,

22   Patterson.

23   Q.        So to the best of your recollection,

24   the other two employees around your age who were

34

1    retiring at the time that you signed and attested

2    to this charge were Bill Gilkey and a school

3    resource officer, which you believe their last

4    name is Patterson?

5    A.          Yeah, there was two Pattersons.  I

6    think both of them also -- I believe Sergeant

7    Gilkey was -- commented that he wasn't far from

8    retiring.

9    Q.          Do you know if Bill Gilkey did retire?

10   A.          I don't know for sure.

11   Q.          Do you know if he is still working at

12   the Meigs County Sheriff's Office?

13   A.          I do not know.

14   Q.          And I neglected to ask this:  At the

15   time that Dean Jones made these comments to you,

16   how old was he?

17   A.          I believe in his 50s.  I'm not 100

18   percent sure on his age.  Similar to my age, I

19   believe.

20   Q.          The last line in paragraph 2 of this

21   charge says:  I feel that I was terminated due to

22   my age.  Now, we've talked about the text

23   messages, the group text that Captain Stewart

24   sent.  We've talked about the comments made by

35

1    Sheriff Scott Fitch, and we talked about the

2    comments made by Deputy Hutton, Perry and Golsby.

3              Are there any other factors that you

4    believe that are not included in here lead you to

5    that feeling that you were terminated due to your

6    age?

7              MR. STARLING:  Objection.

8              Go ahead and answer.

9    A.        I believe, if I'm understanding right,

10   what you're asking is was there something other

11   than what's in here in this paragraph?

12   Q.        And what we just spent the last roughly

13   half hour talking about.

14             Is there anything else?

15   A.        Nothing, just the atmosphere that was

16   there.

17   Q.        Scrolling down to the second page of

18   Exhibit A, it indicates that -- well, the title of

19   this page is Case Options Intentions -- excuse me

20   -- Case Options and Intentions Questionnaire, and

21   at the bottom of it, it says:  Please check one if

22   applicable.  From what I received, what was

23   checked was I plan to request a full investigation

24   conducted by OCRC, which may include mediation.

36

1                   Do you see that?

2    A.          Yes.

3    Q.          And, again, I do not want to ask any

4    conversations you had with your attorney.  I want

5    to know from your personal knowledge was it your

6    intent when this charge was filed to have the OCRC

7    conduct a full investigation?

8                   MR. STARLING:  Objection.  Relevance.

9                   Go ahead and answer.

10   A.          Yes.

11   Q.          Do you know whether that occurred or

12   not?

13                  MR. STARLING:  Objection.  Relevance.

14                  Go ahead and answer.

15   A.          I do not.

16   Q.          We'll move on to what I'll mark as

17   Defendant's Exhibit B.  I will let you know this

18   is a five-page document that I also received from

19   your attorney.  It's Bates-stamped Darst 000034

20   through 38.  Scrolling through this, have you seen

21   this document before?  Do you recognize it?

22   A.          Yes.

23   Q.          What is it?

24   A.          It is notes to the recollection of

37

1    things that had transpired.

2    Q.        Are these your notes?

3    A.        Yes, that's my writing.

4    Q.        And when did you prepare these notes?

5    A.        I would have to -- after the incidents

6    took place or the conversations happened.

7    Q.        Well, I think to make notes of a

8    conversation, the conversation would have had to

9    have happened for you to be able to make notes

10   about it.

11            But my question is:  Do you recall when

12   actually you sat down and wrote these notes?

13            MR. STARLING:  Objection.  Asked and

14   answered.

15            Go ahead.

16   A.        After they took place.

17   Q.        Do you recall how long after they took

18   place that you sat down and wrote these notes?

19   A.        No.

20   Q.        Did you write these notes after you

21   were terminated from the Meigs County Sheriff's

22   Office?

23   A.        These notes here on these papers?

24   Q.        Yes, on all five of these pages.

1   A.          Okay.  I just seen the one.  I'm sorry.

2   Q.          And I can scroll through.

3   A.          Some of them I did and some of them I

4   did not.

5   Q.          I did notice on page 4 you signed your

6   name at the bottom.  And, again, on page 5 of

7   Exhibit B, you signed your name at the bottom.

8            Is it fair that the first four pages of

9   Exhibit B are notes you put together at the same

10  time and then the last page is notes you put

11  together at some other time?

12  A.          That looks correct, yeah.  If you can

13  scroll back.

14  Q.          Absolutely.  I'll let you take a look

15  at anything you want to take a look at.  I'm

16  making that assumption because you signed only

17  those two pages.

18  A.          It might have been that way, or I just

19  had them all together.  I just jotted things down.

20  I don't remember the exact -- I think it was after

21  the incidents took place, so...

22  Q.          Seeing these notes, and I'll let you

23  look at any of them, does it help you recall when

24  some of the incidents we talked about took place?

39

1    A.         It was during my active duty prior to

2    my injury.

3    Q.         And I think we already said that at

4    least the incidents involving Sheriff Fitch, the

5    court hearing, the search warrant and the meeting

6    you had at his office all occurred between

7    November and January, November of '22, December

8    of '22 and January of '23, correct?

9    A.         Yes.

10   Q.         This first paragraph here on page 1 of

11   Exhibit B, Darst 34, it provides:  I was at court

12   and Sheriff Scott Fitch had myself and other

13   deputies go on a search warrant.  The task force

14   was the ones doing the search warrant.  Sheriff

15   Fitch handed over a male prisoner to me and said

16   go with the old colonel, colonel put him in your

17   car.  Prisoner stated you're a colonel?  I said

18   No.

19              Did I read that accurately?

20   A.         Yes.

21   Q.         And is that the search warrant

22   involving David Lawson that we already discussed?

23   A.         Yes, that's what I reflected to,

24   correct.

1    Q.        The next paragraph on page 1 of

2    Exhibit B says:  Frank Stewart at the time was a

3    captain.  He sent out a group text asking my age,

4    stated that he needed for an auditor's report, but

5    they should have already had all my info for

6    insurance and payroll.

7              Did I read that correctly?

8    A.        Yes.

9    Q.        Does that help refresh your

10   recollection as to any of the context as to when

11   Captain Stewart sent out a text asking for ages?

12   A.        I don't know if I understand what

13   you're asking.

14   Q.        Does it refresh your recollection as to

15   when that group text occurred?

16   A.        No, the date and time, I'm not 100

17   percent.  I remember the text being sent out

18   asking for ages.

19   Q.        And in your notes, it indicates that he

20   said he needed that for an auditor's report,

21   correct?

22   A.        I think that's what might have been on

23   there, if I wrote that down.

24   Q.        So any reason, as we sit here today, to

1    believe that it wasn't related to an auditor's

2    report?

3    A.          I don't know what he would have needed

4    it for.  It was already readily available with my

5    date of birth and other things.  That's the only

6    reason.  I don't know why they would have needed

7    to have it.  They had all my payroll information.

8    They already had all that.  They knew my age.

9    Q.          The next paragraph indicates:  I was at

10   Court Common Pleas -- I was at court, Common Pleas

11   courtroom waiting to be called.  I was setting in

12   the hall with Patrolman Robert Fruth and Sheriff

13   Fitch come around the corner and said to me, well,

14   there's the old colonel, asked me if I was

15   testify.  I stated, yes, and he left.  Patrolman

16   Fruth asked if he always called you the old

17   colonel.  I said, yep, most of the time, whenever

18   he sees me.

19              Did I read that accurately?

20   A.          Yes.

21   Q.          And we've already talked about that

22   occurrence as well, correct?

23   A.          Correct.

24   Q.          Was that the only time that Robert

42

1   Fruth was present for Sheriff Fitch making

2   comments like that?

3           MR. STARLING:  Objection.  Vague and

4   ambiguous.

5           Go ahead and answer.

6   A.          I believe so.

7   Q.          As you sit here today, you're not aware

8   of any other time that Robert Fruth would have

9   witnessed Sheriff Fitch making any comments like

10  that?

11          MR. STARLING:  Objection.  Vague and

12  ambiguous.

13          Go ahead and answer.

14  A.          Not to my recollection.

15  Q.          The next paragraph:  Deputies called me

16  old man, grandpa, papa, dinosaur.  Is that

17  referring to Detectives Hutton, Perry and Golsby,

18  that we just talked about?

19  A.          Yes.

20  Q.          The last paragraph on page 1 of

21  Exhibit B:  Was told that they didn't have room

22  for dinosaurs here anymore.

23          Who told you that?

24  A.          I don't recall the exact -- I think it

43

1    was -- it was a combination of them.  It was

2    Hutton and Perry and Golsby.

3    Q.          So the three deputies we already talked

4    about?

5    A.          Correct.

6    Q.          Moving on to page 2 of Exhibit B:

7    Deputies stated that I was so old that I didn't

8    have computer, had stone to write on.

9               Which deputies told you that?

10   A.          The same three that we reflected to.

11   Q.          And one deputy asked if I needed help

12   crossing the street.

13              Are those the same deputies again?

14   A.          Yes.

15   Q.          Deputy called me dad.  Same deputies?

16   A.          Yes.

17   Q.          And the next entry on page 2, Exhibit B

18   is:  Deputy called dinosaur.  Same deputies?

19   A.          Correct.

20   Q.          The next entry:  I was going to lunch

21   and one of the deputies asked if I had my Golden

22   Buckeye card.  I believe you already testified

23   that was Deputy Golsby?

24   A.          Yes.

44

1    Q.            And then the next entry:  Deputy and

2    sheriff referred to me as old.  We talked about

3    the sheriff referring to you as old colonel in the

4    court hearing and at the search warrant involving

5    Davy Lawson and in his office.

6             Do these notes help you recall any

7    other times you were called old by Sheriff Fitch?

8    A.            Not that I recall.

9    Q.            The next entry states:  I don't think

10   that they wanted me there.  In that note, who is

11   the "they" that you were referring to?

12   A.            The employees at the sheriff's office,

13   Sheriff Fitch and them, his administration.

14   Q.            And what led you to think that?

15   A.            The comments that was made.

16   Q.            The next entry indicates:  Sheriff

17   Fitch let other deputies do light duty, but not

18   me, stated that he didn't have anything for me.

19             I presume this is in reference to when

20   you were on medical leave?

21   A.            Yes.

22   Q.            When did you -- or did you ask Sheriff

23   Fitch if you could go on light duty?

24   A.            Yes.

45

1    Q.        When did you make that request?

2    A.        I'm sorry.  Captain Stewart was who I

3    was -- not sheriff, it's Captain Stewart.

4    Q.        So you made a request for light duty to

5    Captain Stewart, not to Sheriff Fitch?

6    A.        Correct.  I went through the chain of

7    command.  That's who I was reflected to.

8    Q.        And was it Captain Stewart who told you

9    that they didn't have any light duty for you?

10   A.        He stated -- again, he stated that the

11   sheriff told him, it was in messages, text

12   messages, that he didn't have anything available

13   for me.

14   Q.        Do you recall when that request was

15   made?

16   A.        I do not.

17   Q.        It would have been sometime between

18   January and July of 2023?

19   A.        It was while I was on injury leave,

20   yes.

21   Q.        Your next entry says:  All deputies was

22   hired are a lot younger than I.  During your

23   employment and while Sheriff Fitch was the

24   sheriff, what deputies do you recall being hired?

1    A.         I believe there was a KJ Tracy, a Ben

2    Adams.

3    Q.         Any others that you can recall?

4    A.         No.

5    Q.         I couldn't hear the first name, but I

6    think you said Tracy?

7    A.         KJ Tracy.

8    Q.         KJ.  Thank you.  How old was KJ Tracy?

9    A.         I believe they're in their 20s, early

10   20s.

11   Q.         When you say they, are you referring to

12   KJ Tracy and Ben Adams?

13   A.         Yes.

14   Q.         And as you sit here today, you're not

15   aware of any other hires that occurred from the

16   time Sheriff Fitch came on board to the time you

17   were terminated?

18   A.         Correct.

19   Q.         On page 3 of Exhibit B, it lists

20   several individuals, some of whom we've talked

21   about, some of whom we have not.  I wanted to

22   specifically ask you about Sheriff Scott Fitch.

23   Next to it, it has November 22.  Is that because

24   that is when Sheriff Fitch became the sheriff of

47

1    Meigs County?

2    A.          I believe that's so.

3    Q.          And that was November 22 of 2022?

4    A.          I think so.  I would have to look back,

5    to be honest with you, to tell you.

6    Q.          And then you have three individuals

7    here, Bill Gilkey, Randy King and Donnie Molher.

8                Why are they listed in your notes?

9    A.          I just made who was -- the supervisors

10   were at the time.

11   Q.          And next to Brandy King it has SGT

12   period light duty.  Was Brandy King on light duty?

13   A.          Yes.

14   Q.          Do you know why?

15   A.          A medical issue.

16   Q.          Do you know what medical issue

17   specifically?

18   A.          I do not.

19   Q.          The next note:  Frank Stewart was at

20   the prosecutor's office when I was hired.  Why do

21   you have that in your notes?

22   A.          I'm not sure.  It was just where he was

23   working at the time.

24   Q.          Moving on to page 4 of Exhibit B.  At

48

1    the bottom it has witness, and you've listed

2    Robert Fruth, Josh Golsby and Cody Brooks.  We've

3    talked about Robert Fruth, and we've talked about

4    Josh Golsby.  Why -- what did Cody Brooks witness

5    in relation to this lawsuit?

6    A.         He was witness to some of -- actually I

7    forgot.  He witnessed some of the comments made to

8    me when we was at the jail.

9    Q.         Which jail?

10   A.         The Middleport jail.

11   Q.         And who made the comments that Cody

12   Brooks witnessed?

13   A.         The deputies that we discussed.

14   Q.         Marty Hutton, Josh Golsby and Deputy

15   Perry?

16   A.         Correct.

17   Q.         Do you know if Cody Brooks ever

18   reported those comments to Sheriff Fitch?

19   A.         Not that I know of.

20   Q.         What comments specifically did Cody

21   Brooks witness Marty Hutton, Josh Golsby and

22   Deputy Perry make?

23   A.         Them making fun of my age, old man, pa,

24   those comments, dinosaur.

49

1    Q.          When he witnessed that, did he tell

2    them, hey, stop it, knock it off?

3    A.          I don't know if he did or not.  I don't

4    recall.

5               MR. STARLING:  Sorry, what was the last

6    question?

7               MR. TEETOR:  I asked when Cody Brooks

8    witnessed those statements made by Marty Hutton,

9    Josh Golsby, Deputy Perry, did he tell them to

10   stop it or knock it off.

11              MR. STARLING:  Okay.  Thank you.

12   Q.          And, Jerry, your response was you don't

13   know if he did or not?

14   A.          That's correct, I don't recall.

15   Q.          All right.  Looking at the last page of

16   Exhibit B, it appears -- and I think we talked

17   about it earlier.  It appears because this page is

18   separately signed, that you may have made these

19   notes at a different time.

20              Is that a fair assumption?

21   A.          Possibly.  I don't actually recall.

22   Q.          And on these notes, the first paragraph

23   of page 5 of Exhibit B states:  Applied at

24   Middleport Police Department.  Monty Wood stated

50

1    that he didn't have any openings.

2              After you were terminated from the

3    Meigs County Sheriff's Office, did you apply at

4    the Middleport Police Department?

5    A.        Yes.

6    Q.        And who was Monty Wood?

7    A.        He was the chief.

8    Q.        When did you apply at Middleport?

9    A.        After I was at the Sheriff's Office.

10   Q.        What's your best estimate as to how

11   long before you applied at Middleport?

12   A.        Maybe a month.  I was needing work and

13   having employment, trying to find work.

14   Q.        So as we sit here today, your best

15   estimate would be sometime in August of 2023?

16   A.        It might have been.  Whenever I was

17   released from medical.

18   Q.        Do you recall when you were released to

19   return to full duty?

20   A.        That was -- I think it was about two

21   weeks before.  I would have to look to get the

22   doctor's stuff to tell you it all, to give you an

23   accurate, I would have to look at that to be safe.

24   Q.        You were released to full duty after

51

1    you were terminated from the Meigs County

2    Sheriff's Office, correct?

3    A.        I was on -- I was still under medical

4    and not released yet to return.  I was due to

5    return to work, and then I was terminated, I think

6    two weeks prior to being returned to work.

7    Q.        So you applied in Middleport Police

8    Department sometime in roughly August 2023?

9    A.        It might have been August or September.

10   I would have to look at the dates to give you --

11   Q.        Since August or September of 2023, have

12   you ever followed up with Middleport Police

13   Department to see if there are any openings?

14   A.        No.

15   Q.        And the next entry on page 5 of

16   Exhibit B says:  Gallipolis Police Department, no

17   return calls.  Who did you call at the Gallipolis

18   -- the Gallipolis Police Department to inquire

19   about potential employment?

20   A.        Chief Boyer.

21   Q.        Did Chief Boyer ever call you back?

22   A.        No.

23   Q.        When did you call Chief Boyer to

24   inquire about employment with Gallipolis?

52

1    A.        I would have to -- to give you an exact

2    time frame and an exact date, I would have to look

3    at -- yeah, I don't recall the exact date and

4    time.  I would have to look back to see if I can

5    figure.

6    Q.        Would it have been about the same time

7    you applied at Middleport?

8    A.        I think I applied at Middleport first

9    because I had been there and then I went to

10   Gallipolis.  I was trying to find a job anywhere.

11   I needed work and I was unemployed and didn't have

12   any income.  I've been in law enforcement for 30

13   years and I was trying to get a job, you know, to

14   support my family.

15   Q.        Did you know anybody who worked for the

16   Gallipolis Police Department?

17   A.        Yes.

18   Q.        Who?

19   A.        Justin Rice.

20   Q.        Anyone else?

21   A.        No.

22   Q.        Do you recall that Marty Hutton and

23   Josh Golsby, upon leaving Meigs County Sheriff's

24   Office went to work for the Gallipolis Police

53

1    Department?

2    A.          No, I wasn't aware.

3    Q.          Your next entry on page 5 of Exhibit B

4    states:  Jackson Police Department chief stated

5    not a good fit.  When do you recall applying for

6    the Jackson Police Department?

7    A.          I don't recall the date.

8    Q.          Safe to assume it was around the same

9    time as Middleport and Gallipolis?

10   A.          Yes.

11   Q.          And who was the chief there?

12   A.          I would have to look again.  I don't

13   remember his name.  I didn't know --

14   Q.          Did you make any inquiries as to why he

15   believed you were not a good fit for the Jackson

16   Police Department?

17   A.          No.

18   Q.          Did he make any statements that led you

19   to believe why he thought you were not a good fit

20   for the Jackson Police Department?

21   A.          No.

22   Q.          Your next entry here says:  I took a

23   heavy equipment class at Buckeye Hills and after

24   completing the class, about two years later I

54

1    found a job in Columbus as a safety specialist.

2              Did I read that accurately?

3    A.       Yes.

4    Q.       When did you begin your heavy equipment

5    class at Buckeye Hills?

6    A.       Sometime after I applied at these

7    places I couldn't find work.

8    Q.       Would that still have been in 2023?

9    A.       I believe so.  Yeah.

10   Q.       And the indication that you found a job

11   in Columbus as a safety specialist, is that your

12   role with Geotex?

13   A.       Yes.

14   Q.       I will show you what we'll mark as

15   Exhibit C.  I'll indicate to you that I obtained

16   this screenshot 9:47 yesterday, September 2nd,

17   2025.

18              Have you ever seen this post on

19   LinkedIn?

20   A.       I have not.

21   Q.       Do you know who Daniel Hicks is?

22   A.       Yes.

23   Q.       Was he one of your co-workers at

24   Geotex?

55

 1   A.         Yes.

 2   Q.         And this indicates that approximately

 3   one year ago you were promoted to the role as

 4   safety specialist.  Do you know what your role

 5   with Geotex was prior to that promotion?

 6   A.         I was just in the field, just like a

 7   laborer.  I think it was for about a month.

 8   Q.         So you were a laborer for about a month

 9   and then received a promotion to safety

10   specialist?

11   A.         Yes.

12   Q.         And as a safety specialist, what are

13   your job duties?

14   A.         Just drive around and check the jobs,

15   make sure they're compliant.

16   Q.         When you say make sure they're

17   compliant, what are you looking for them to be

18   compliant with?

19   A.         OSHA standards.

20   Q.         As part of your job duties as a safety

21   specialist for Geotex, are you required to lift

22   any heavy machinery or equipment?

23   A.         No.

24   Q.         Your role is primarily just inspecting

56

1   the job sites to make sure they comply with OSHA?

2   A.        Correct.

3   Q.        I will show you what we'll mark as

4   Defendant's Exhibit D.  I'll represent to you that

5   I obtained this yesterday at 9:50 a.m.,

6   September 2nd, 2025, and this is off the website

7   Opengovpay, and this is a search done for you,

8   Jerry Darst, and it indicates that you received

9   compensation in 2021 and 2022 from the Village of

10  Middleport and in 2022 and 2023 from Meigs County.

11            Does that refresh your recollection as

12  to when you worked for the Village of Middleport?

13  A.        I don't have my exact start dates, but

14  I was there during that time.  I would have to

15  look, to be honest with you.

16  Q.        Do you believe you would have worked

17  for the Village of Middleport prior to 2021?

18  A.        What's that?

19  Q.        Do you believe that you worked for the

20  Village of Middleport prior to 2021?

21  A.        I would have to look at the dates.

22  Q.        And I'll scroll to the second page of

23  Exhibit D.  It indicates that Jerry Darst was

24  employed by the Village of Middleport in the

57

1    calendar year 2021 and earned $16,914 by working

2    at the Village of Middleport.

3              Is that an accurate representation of

4    what you made working as a law enforcement officer

5    for the Village of Middleport in 2021?

6    A.        I would have to look at the W-2s.  I

7    don't know what this document means.

8    Q.        Do you have any reason to dispute that

9    you made $16,914 working for the Village of

10   Middleport in 2021?

11             MR. STARLING:  Objection.  Asked and

12   answered.  I'm also going to object to relevance.

13             Go ahead.

14   A.        I would have to see a W-2 to give you

15   an exact -- or maybe the amount.  I don't know

16   what this document is.  I have not seen this

17   document or where it's from.

18   Q.        But as you sit here today, is there any

19   reason to dispute the accuracy of this?

20             MR. STARLING:  Objection.  Asked and

21   answered.

22             Go ahead, Jerry.

23   A.        I don't know what this document is.

24   Q.        I'll go to the third page of Exhibit D.

58

```
1    This indicates that in the calendar year 2022 for
2    the Village of Middleport you earned $22,358
3    working for the Village of Middleport.
4             Any reason, as we sit here today, to
5    dispute the accuracy of this representation?
6             MR. STARLING:  Objection.  Relevance.
7             Go ahead and answer, Jerry.
8    A.       I don't know what this -- I mean, we
9    could have the W-2.  I'm sure you can have access
10   to those.  I don't even know what this document
11   is.
12   Q.       Well, I'll represent that I did ask for
13   tax information.  I did not receive it.  So I had
14   to look at the public records that are available
15   to me.
16            MR. STARLING:  I'm sorry, Matt, but we
17   object to the prior employers, and we are not
18   going to produce prior employer pay information.
19   It doesn't matter.
20   Q.       As you sit here today, any reason to
21   object to the accuracy of this representation?
22            MR. STARLING:  Objection.  Asked and
23   answered.
24            Go ahead, Jerry.
```

59

```
 1    A.          I don't know what the document is.

 2    Q.          Page 4 of Exhibit D, it indicates in

 3    the calendar year of 2022 for Meigs County you

 4    earned $13,273.  As we sit here today, any reason

 5    to dispute the accuracy of that representation?

 6    A.          I don't know what the document is or

 7    where it's from.

 8    Q.          I wasn't asking you whether you knew

 9    the document.  I'm asking if you have any reason

10    to dispute the information that is on the

11    document?

12                MR. STARLING:  Objection.  Asked and

13    answered.

14                Go ahead, Jerry.

15    A.          I don't know what the document is or

16    where it come to be.

17    Q.          Do you have an estimate of what you

18    made in 2022 while working as a deputy for Meigs

19    County?

20    A.          I don't.

21    Q.          And the last page of Exhibit D

22    indicates that in the calendar year of 2023, while

23    working as a deputy for Meigs County, you earned

24    $4,577.
```

1              As you sit here today, do you have any

2    reason to dispute the representation of this

3    document?

4    A.       I don't know what the document is or

5    where it come from.

6    Q.       Do you have any estimate as to what you

7    made in the calendar year of 2023 working for a

8    deputy -- working as a deputy for Meigs County?

9    A.       No.

10             MR. TEETOR:  We've been going about an

11   hour and a half.  Do you want to make a 15-minute

12   break?

13             MR. STARLING:  Yeah, why don't we do

14   that.

15             MR. TEETOR:  Sure.

16   A.       Thank you.

17             (A short recess is taken.)

18   BY MR. TEETOR:

19   Q.       Jerry, I will share with you my screen

20   again and will represent to you that what we'll

21   mark as Defendant's Exhibit E are text messages

22   that I received from your attorney.  They are

23   Bates-stamped Darst 000010 through 000029, and I

24   can scroll through them as slowly or quickly as

1    you need.  But do you generally recognize what

2    appear to be screenshots of text messages and

3    digital messages that were produced in this

4    lawsuit?

5    A.        Yes.

6    Q.        And we'll go through a good deal of

7    them.  The first page here, Darst 000010, it

8    indicates at the top that this is a correspondence

9    with Brandy.  I've assumed, but I want to know, is

10   this Brandy King?

11   A.        Yes.

12   Q.        And that was one of your supervisors at

13   Meigs County?

14   A.        Yes.

15   Q.        And it indicates that this text message

16   occurred September 26th at 4:21 p.m.  That was

17   before Sheriff Fitch was employed by the Meigs

18   County Sheriff's Office, correct?

19   A.        Yeah, I believe so.

20   Q.        And in this screenshot, it indicates

21   Perry is on his way to get Smith.

22             Is that the Deputy Perry we talked

23   about earlier?

24   A.        Yes.

1   Q.          And who is Smith?

2   A.          It must have been a prisoner.

3   Q.          And Perry was to take Smith to

4   Middleport.  Is that the Middleport jail we talked

5   about?

6   A.          Yes.

7   Q.          And then Brandy -- or excuse me -- I

8   want to make sure.  In this screenshot, the black

9   text, are those from you?

10  A.          Yes.

11  Q.          And then the lighter colored text, or

12  white, those are from Brandy?

13  A.          Yes.

14  Q.          The next portion of your text to Brandy

15  on September 26th says:  J called and confirmed it

16  with them, all is good to go.

17              Who is J?

18  A.          It must have been the jail.

19  Q.          So would that have been -- I know we're

20  talking about the Middleport jail here.  Would

21  that have been Cody Brooks or would that have been

22  someone else at the Middleport jail?

23  A.          I don't know who it had been at that

24  time.

63

1    Q.        And this is the only text that I
2    received in discovery between you and Brandy.
3              What relevance does this text have to
4    your lawsuit?
5    A.        I think where it says awesome, thank
6    you.
7    Q.        Brandy responded to you awesome, thank
8    you?
9    A.        Uh-huh.
10   Q.        And how is that relevant to your
11   lawsuit against Meigs County and Sheriff Fitch?
12   A.        I think it's just showing that I did my
13   job.
14   Q.        Down below here at the very bottom of
15   the screenshot, it indicates, Wednesday,
16   September 28th at 9:17 a.m. and suggests to me
17   that there were additional text messages between
18   you and Brandy, but I'll indicate to you that this
19   singular screenshot is the only correspondence
20   that I received from you between you and Brandy.
21             Did you text with Brandy additional
22   times other than Monday, September 26th, 2022?
23   A.        I don't know.
24   Q.        The next page of Exhibit E and

64

1    sequentially this is Darst 000011, so the next

2    page that was produced to me by your attorney in

3    this litigation, it indicates that this is a text

4    exchange between you and Bill.

5              I presume that is Bill Gilkey; is that

6    correct?

7    A.        Yes.

8    Q.        And it indicates that at least some of

9    these text messages, and am I correct in assuming

10   that the light-colored text messages here are from

11   Bill to you?

12   A.        Yes.

13   Q.        And some of these text messages were

14   received by you from Bill on October 17th and

15   October of 20th, correct?

16   A.        I believe that's what it says, yeah.

17   Q.        So that would have also been before

18   Sheriff Fitch was the sheriff at Meigs County,

19   correct?

20   A.        It may have been.  I don't see the year

21   on there, but --

22   Q.        Well, were you employed at Meigs County

23   in October of 2021?

24   A.        I don't believe so.  We would have to

1   look -- if you have that documentation.  We would

2   have to look at it to see.

3   Q.        Do you believe you were employed with

4   Meigs County in October of 2023?

5   A.        I was on I think it was injury leave.

6   I would have to look and see the dates again.

7   Q.        This screenshot shows text messages

8   received by you from Bill Gilkey on October 17th

9   and October 20th.

10           What relevance do these text messages

11   have to this lawsuit?

12   A.        I believe it's the, I'm glad to have

13   you, brother.  Thanks for all you do.

14   Q.        And at the bottom of that, I can see

15   the beginning of another text bubble.  Do you see

16   that, right underneath when do you testify?

17   A.        Okay.

18   Q.        Do you see that?

19   A.        I see something, yeah, but I don't

20   know --

21   Q.        Is it safe so assume that there were

22   additional text messages following when he asked

23   you when do you testify?

24   A.        I mean, there could have been.  I don't

66

1    know.  I don't want to assume.

2    Q.        We'll move on to the next page

3    sequentially that was produced to me in this

4    lawsuit and it's additional texts between you and

5    Bill, who I, again, presume is Gilkey.  And is it

6    safe to assume that the black text are from you

7    and the light-colored text are from Bill Gilkey?

8    A.        Yes.

9    Q.        And this particular screenshot doesn't

10   have any date on it, but you indicate I am good,

11   thanks, and Bill asked you did you fill out the

12   first report of injury out for your comp, and you

13   responded I think at the ER.

14            Do you know when this text exchange

15   occurred?

16   A.        It might have been when I was injured.

17   I don't know which injury or what it was referring

18   to for sure.

19   Q.        That's why I asked.  My understanding

20   is that you were injured twice while working at

21   Meigs County, once in October and again in -- once

22   in October of 2022 and January of 2023.  So I

23   wanted to know if you knew which of those two

24   incidents these texts are referring to?

1    A.          No, I don't for sure.

2    Q.          And for the record we're referring to

3    -- we're looking at Darst 000012.  And scrolling

4    on to the next page, Darst 000013, these are also

5    texts between you and Bill Gilkey?

6    A.          Yes.

7    Q.          And still safe to assume your texts are

8    in black and his texts are in white?

9    A.          Yes.

10   Q.          And so the record is clear, your text

11   are in the black bubbles and his text are in the

12   white bubbles, correct?

13   A.          Yes.

14   Q.          Looking at this screenshot, do you have

15   any idea when this text occurred about you wanting

16   to get back to work?

17   A.          Maybe if I was off injured or

18   something, me wanting to get back, as it says.

19   They had me on a -- did a Zoom, yeah.

20   Q.          Do you know if that was the October

21   2022 injury or the January 2023 injury?

22   A.          I'm not for sure.

23   Q.          I'll scroll on to Darst 000014.  This

24   appears to be texts that you had with Amanda

1    Larkin on October 21st, 2022 and then resuming on

2    November 17th, 2022; is that accurate?

3    A.          That's what it says, yes.

4    Q.          And is it accurate to say that Amanda

5    Larkin's texts are in white bubbles and your texts

6    is in a black bubble?

7    A.          Okay.

8    Q.          Is that accurate?

9    A.          I guess.  There's a -- I can't really

10   make that out.

11   Q.          I can zoom in if you need.

12   A.          Oh, okay.  It says K.

13   Q.          Yeah, that's the only response I saw in

14   a black bubble in this particular screenshot?

15   A.          Yeah.

16   Q.          And on October 21st -- well, first off,

17   before I ask that, who is Amanda Larkins?

18   A.          She is an administrative assistant.

19   Q.          Administrative assistant to who?

20   A.          That would be Frank -- I don't know

21   what her title or role was.  She was a clerk or

22   administrative assistant at the time.

23   Q.          So administrative assistant to the

24   sheriff's office?

69

```
 1    A.         Yes.  She was an employee at the

 2    sheriff's office.

 3    Q.         And on October 21st, 2022, she texted

 4    you:  Bill and Brandy have been made aware of the

 5    situation we discussed last night and it will be

 6    taken care of.

 7               I presume Bill and Brandy are Bill

 8    Gilkey and Brandy King; is that accurate?

 9    A.         Yes.

10    Q.         And what is the situation that Amanda

11    Larkins is referring to in this text?

12    A.         Some of the other guys that was hired

13    underneath me and before I was hired, that put

14    them as OIC, which is officer in charge, and they

15    had done some stuff or had some issues, so they

16    put me in charge, and it was different than the

17    contract because they was hired before me.  But

18    they put me as officer in charge because they had

19    some issues or mistakes with them, so they put me

20    as the OIC, officer in charge, on the shift.

21    Q.         Who were the other guys that you're

22    referring to that someone had issues with?

23    A.         It was Hutton.

24    Q.         Anyone else you can remember?
```

70

```
1    A.        No.
2    Q.        And what were the issues that they had
3    with Hutton?
4    A.        I really wasn't made aware.  I was just
5    told I was going to be the officer in charge, that
6    he wasn't being responsible for some things
7    anymore.
8    Q.        What things was Hutton not going to be
9    responsible for anymore?
10   A.        I wasn't made aware.  They didn't
11   express to me what that was, just that I was going
12   to be the OIC, making decisions on the shift.
13   Q.        Which shift was that?
14   A.        Evening or whenever I worked.
15   Q.        So on or about October 20th, 21st, when
16   you talked to Amanda Larkins about this situation
17   referred to in her text, you were becoming the
18   officer in charge for the evening shift?
19   A.        Or whenever I worked, that I would
20   be --
21   Q.        And how long were you under the title
22   of officer in charge for your shift?
23   A.        Until I had went out on injury leave,
24   and actually until I left, because I was still
```

1    technically employed, until I was physically not

2    working there.

3    Q.        Her next text to you says:  If possible

4    can you let Golsby know also.  I don't have his

5    number.

6              I presume that's Josh Golsby?  I'm

7    sorry, I couldn't hear you.

8    A.        Correct.

9    Q.        And this is Amanda Larkins telling you

10   to let Josh Golsby know that you will now be the

11   officer in charge for your shift?

12   A.        Yes.

13   Q.        And this exchange occurred before

14   Sheriff Fitch was appointed to sheriff of Meigs

15   County, correct?

16   A.        I think the last date there said

17   November, October, and then it says --

18   Q.        Yeah.

19   A.        It looks like it.  I can't remember

20   when he actually came in.

21   Q.        I'll show you the next page of your

22   interaction -- your text messages with Amanda

23   Larkins.  On November 17th, 2022, on page 6 of

24   Exhibit E, Darst 000015, you ask Amanda Larkins,

1    any word on a boss.  Do you see that?

2    A.        Yes.

3    Q.        So is it safe to assume that at this

4    point Sheriff Fitch has not been appointed sheriff

5    of Meigs County?

6    A.        Well, I think it says she forgot, down

7    here on the 17th, it's Fitch, LOL, so...

8    Q.        So as of November 17th, Sheriff Fitch

9    was not yet the sheriff of Meigs County?

10   A.        Prior to the 17th, is that what you're

11   asking?

12   Q.        Correct.

13   A.        Yeah, I don't know the exact date he

14   was appointed or gotten that title.  This was just

15   the conversation that she relayed to me that she

16   knew, is my understanding of it.  I don't know if

17   it was maybe the 15th and she didn't say -- that

18   was just the date that we was communicating.

19   Q.        I'll move on to the next page of

20   Exhibit E, Darst 000016.  It appears this is a

21   Facebook message exchange between you and Sheriff

22   Fitch.  Is that accurate?

23   A.        Uh-huh.  Yes, it appears to be, yes.

24   Q.        And then on November 17th, 2022, you

73

1   texted him via Facebook message congratulations.

2   A.        Yes.

3   Q.        And then three days later on

4   November 20th, 2022, you Facebook messaged him,

5   get time, maybe we can finish our talk.

6             Do you see that at the bottom of

7   Darst 000016?

8   A.        Yes.

9   Q.        What talk were you looking to finish

10  with Sheriff Fitch?

11  A.        This is probably the talk I talked to

12  you about where he made the statement about time

13  for me to hang it up, me using my dog, me trying

14  to work my canine.

15  Q.        So when you sent this text message to

16  him, had you already met him in his office to talk

17  about handling your canine from Meigs County, or

18  were you trying to set up a time to talk with him

19  about handling your canine from Meigs County?

20  A.        We had already spoken and we didn't get

21  to finish the conversation about working with my

22  dog.

23  Q.        Why did you not get to finish that

24  conversation?

74

1    A.          I don't know if he had something to do

2    or other people were -- what the -- I don't

3    recollect what the total reasoning was, but I know

4    there was a bunch of people that was there and it

5    was just -- it wasn't an official meeting.

6    Q.          Did you ever get to finish that

7    conversation?

8    A.          No.

9    Q.          It indicates underneath that last text

10   from you on November 20th, 2022 at 9:04 p.m., that

11   there was a response on November 20th at 9:44 p.m.

12               Do you see that?

13   A.          Okay.

14   Q.          Do you recall what that response was?

15   A.          I do not.

16   Q.          I'll represent to you, I did not

17   receive that response, because the next screenshot

18   I received, Darst 000017, was a text or Facebook

19   message, I can't tell -- I believe it's a text

20   from you to Scott, which I presume is Scott Fitch,

21   on December 24th wishing him Merry Christmas.

22               Did you continue to confer with Sheriff

23   Fitch via Facebook Messenger after November 20th,

24   2022?

1    A.        I don't know if I understand you.  I

2    mean, did I talk to him on and off other than

3    this?

4    Q.        Did you continue to talk to him via

5    Facebook Messenger?  Because if you look at Darst

6    000016, the bottom of that screenshot indicates

7    that there was a response, or some message sent,

8    at 9:44 p.m. on November 20th, but I do not have

9    that screenshot and I did not receive it from you

10   in discovery in this case.

11   A.        I don't know what that would have been

12   or if it was.  I don't even know what that is.

13   Q.        All right.  We'll look at Darst 000017.

14   In this screenshot, it shows that you wished him

15   happy birthday -- or, excuse me, Merry Christmas

16   on December 24th at 6:10 p.m. and he responded to

17   you, Merry Christmas, brother, be safe.

18             Do you see that?

19   A.        Yes.

20   Q.        And then after that is what indicates a

21   text message on December of 25th at 9:24 a.m.

22   saying Merry Christmas everyone.

23             Was this part of a group chat or was

24   this text directly with and only with Sheriff

1    Fitch?

2    A.          I don't remember.  It might have been

3    with everyone.  That's probably why the other one

4    wasn't on there.

5    Q.          And then the next text in this

6    screenshot is from Tuesday, February 7th, at

7    5:09 p.m. and it indicates the number 50.

8                Does that have any relevance to this

9    lawsuit?

10   A.          I don't know what it is referring to.

11   I can't speak for it.

12   Q.          Moving on to the next screenshot you

13   produced in discovery of this lawsuit, it's

14   Darst 000018.  It appears to be screenshots that

15   were taken January 16th of 2023 from a Deon.  Is

16   this the Deon Jones that we talked about earlier?

17   A.          I don't see that on my screen.

18   Q.          I'll attempt to share my screen again.

19   Can you see the page Bates-stamped 000018?

20   A.          All I'm seeing is the previous ones.

21   Q.          I don't know if we're having technical

22   difficulties here or what, but can we go off the

23   record for a minute?

24   A.          I see it now.

77

```
 1   Q.        Oh, okay.  Then we can stay on the
 2   record.
 3             Do you see Darst 000018?
 4   A.        I see where it says Deon.  It says
 5   January 16th.
 6   Q.        Correct.  That's what I'm asking you
 7   about.  Is that Deon Jones that we were talking
 8   about earlier?
 9   A.        Yes.
10   Q.        Again, is it safe to assume that the
11   text bubbles in black are your texts to Deon and
12   the text bubbles in white are his responses to
13   you?
14   A.        Yes.
15   Q.        And in response to you letting Deon
16   Jones know that you fell -- you hurt your shoulder
17   when you fell, he responded, let Donny know.
18             Who is Donny?
19   A.        Donny Mohler is the supervisor,
20   sergeant.
21   Q.        And what relevance does this text
22   exchange have to this lawsuit?
23   A.        I don't know, just that I was -- hurt
24   my shoulder, I guess.
```

78

1    Q.        I'll go down to the next screenshot

2    produced by you in this lawsuit, Darst 000019.

3    This appears to be a text exchange with someone

4    named Frank.  I'm assuming that's Frank Stewart?

5              THE REPORTER:  The witness was

6    disconnected.

7              MR. TEETOR:  If we can go off the

8    record.  I think we lost Jerry.

9              (A brief recess is taken.)

10   BY MR. TEETOR:

11   Q.        Okay.  Jerry, before the technical

12   difficulties, I was about to ask you a few more

13   questions about Exhibit E.  I'll presume sharing

14   my screen.  Just give me a moment.

15             And can you see down at the bottom

16   corner, this is Darst 000019?

17   A.        Yes.

18   Q.        Okay.  And the last one we looked at

19   was 18, and that was the text exchange with Deon

20   Jones.  So I'll represent to you this was the

21   first screenshot I received in discovery in this

22   matter relative to your conversation with Frank.

23             Is it fair to assume that that is Frank

24   Stewart?

79

1    A.        Yes.

2    Q.        And he was a captain for the Meigs

3    County Sheriff's Office?

4    A.        I believe so, or chief deputy,

5    synonymous.

6    Q.        Accurate representation, essentially

7    the sheriff is second in command?

8    A.        Correct.

9    Q.        And on this screenshot, the first

10   substantive texts we can read appear to be from

11   Monday, January 16th at 11:57.  It appears that

12   there was some sort of text from Frank that is cut

13   off in this screenshot.

14             Do you have any recollection as to what

15   that text says that appears to end in the words

16   last night?

17   A.        Unless it was where I hurt my shoulder.

18   Q.        Well, your texts are in the black

19   bubbles, correct?

20   A.        Yes.

21   Q.        And Captain Frank Stewart's texts are

22   in the white bubbles?

23   A.        Okay.

24   Q.        And you see the white bubble at the

80

1    very top that has the words last night in it?

2    A.          I do.

3    Q.          And it appears that that word bubble --

4    that text bubble is cut off, correct?

5    A.          I can't see anything else other than

6    last night.

7    Q.          Do you have any recollection as to what

8    that text said?

9    A.          I think it was a reference to where I

10   fell last night.  I don't know for sure.

11   Q.          I'll represent to you I have no idea

12   because I didn't receive that text from you in

13   discovery, so I wanted to see what you recalled.

14              Is it fair to assume that it was an

15   inquiry about your injury that occurred January

16   2023?

17   A.          Yeah.  I mean, we was talking about my

18   shoulder, my arm is sore.

19   Q.          And Captain Stewart advised you that

20   you, quote, may want to fill one out whenever you

21   come back in case anything comes out of it later,

22   then you're covered under workers' comp, and he's

23   referencing some sort of form.

24              Do you remember what form Captain

1    Stewart is referencing?

2    A.        Unless it's an injury report.  First

3    report of injury, I believe.

4    Q.        Is that a workers' compensation form?

5    A.        Yes.

6    Q.        And your response to Captain Stewart

7    also appears to be cut off.  I see the black text

8    bubble at the bottom.

9    A.        Yeah.

10   Q.        And I'll show you the next page.  It

11   does not have any black text bubble from you.

12            Do you know what your response to

13   Captain Stewart was when he advised you that you

14   should fill out one of these workers' compensation

15   forms?

16   A.        No, I mean, I assume I did.  I have the

17   documentation.

18   Q.        You still have these text messages?

19   A.        I don't know if I have those text

20   messages.

21   Q.        We'll move on to Darst 000020 in

22   Exhibit E.  And this is additional text

23   conversations with Captain Stewart, correct?

24   A.        Yes.

82

1    Q.         And this occurred January 20th, after

2    you were injured in January of 2023, correct?

3    A.         Yeah, I would have to look to see for

4    sure which one.

5    Q.         I'm not sure I understand what you mean

6    by that.  Can you explain.

7    A.         I'm not sure I know what you're asking

8    me.

9    Q.         You were injured prior to January 20th

10   of 2023, correct?

11   A.         I don't remember when the actual injury

12   was or the date.

13   Q.         If the documentation I have, and I'll

14   show it to you in a little bit, indicated

15   January 15th of 2023.

16             Any reason to dispute that?

17   A.         I would have to see it before I could

18   tell you.

19   Q.         In this text from Captain Stewart, it

20   indicates, hey, Jerry, I got your photos earlier.

21             What photos is he talking about?

22   A.         It must have been from where he had to

23   take photos of prisoners and they put them online.

24   Q.         So nothing related to this lawsuit?

1    A.          I don't believe so.  I don't recollect

2    it was.  I don't know what I had pictures of.

3    Q.          And in this text, Frank, Captain

4    Stewart says to you:  I will call you tomorrow

5    explain more, but I talked to the sheriff today.

6    He said he's not sure what we're going to do

7    because there is no light duty available.

8    Currently Ricky is on light duty training Tracy

9    for sex offenders and I think Fitch has him

10   helping her with other -- and I'll scroll to Darst

11   000021, because it completes his text to you -- I

12   think Fitch has him helping her with other things.

13   I will reach out to him again tomorrow before I

14   call you.  And you responded okay.

15               Is that accurate?

16   A.          Is it accurate I responded okay?

17   Q.          Is what I just relayed as far as this

18   text message accurate?

19   A.          Yes, I believe.

20   Q.          And we talked earlier that you had

21   inquired of Captain Stewart about light duty?

22   A.          If you could scroll back.  I'm just not

23   sure what we're going to do because there's no

24   light duty available.

84

1    Q.        That's what Captain Stewart told you?

2    A.        Uh-huh.

3    Q.        And then he went on to tell you:

4    Currently Ricky is on light duty training Tracy

5    for sex offenders.

6              Who is Ricky?

7    A.        That must have been another deputy,

8    Ricky Smith.

9    Q.        Do you recall Ricky Smith being on

10   light duty in January of 2023?

11   A.        I wasn't aware of his status.

12   Q.        Who is Tracy?

13   A.        I don't know Tracy.

14   Q.        As of January 20th, 2023, had you been

15   cleared by a doctor to return to work, whether on

16   light duty or full duty?

17   A.        I'd have to look at the notes.  I think

18   the reason I inquired about light duty is because

19   I was available for light duty.

20   Q.        As we sit here today, do you recall

21   whether you had been cleared by a doctor to return

22   to either full or light duty?

23            MR. STARLING:  Objection.  Asked and

24   answered.

1          Go ahead and answer.

2     A.          I'd would have to look at the documents

3     to give you an accurate.

4     Q.          We'll scroll on to the next page of

5     Exhibit E, Darst 000022.  Again, it appears that a

6     text from Captain Stewart to you was cut off.

7          Do you recall at all what that text

8     said?  The only part that's visible on

9     Darst 000022 is:  Day was busy, so I didn't get a

10    chance to reply.

11    A.          I don't want to elaborate on what it

12    says.

13    Q.          As you sit here today, you can't recall

14    anything that it says beyond what you can read?

15    A.          I don't remember what exactly was -- I

16    think he was checking about the light duty.

17    Q.          And then you get a text from Captain

18    Stewart on this screenshot, Darst 0022, it's a

19    text from him to you that says:  I need everyone's

20    age on December 31st, 2022 for a report I have to

21    turn into the auditor called a GAAP report.  If

22    you can text me that, it would be great.

23          Did I read that accurately?

24    A.          That's what it says, yes.

1    Q.        We talked earlier about a text that you

2    received from Captain Stewart about him filling

3    out an auditor's report.  That was in the charge

4    documents that we looked at and that you signed.

5              Is this that text message that you were

6    referring to?

7    A.        Yeah, I don't know.  When he said he

8    needed our ages in a group text, I don't know if

9    it was for the auditor's report or what the

10   reasoning was.  I knew they already had my age and

11   my information.  I didn't know what it was for.  I

12   don't know what a GAAP report is.

13   Q.        And on this Darst 22, it appears that

14   underneath his text there's an iMessage, but I

15   have not received the response or the next message

16   in this text chain.

17             Did you ask him what a GAAP report was?

18   A.        No.

19   Q.        Did you provide him with your age as of

20   December 31st, 2022?

21   A.        Yes.

22   Q.        Did you ask him anything about why he

23   was requesting your age for this GAAP report?

24   A.        No.

87

1    Q.          As you sit here today, you have no

2    understanding of what a GAAP report for an auditor

3    is or why Captain Stewart was completing one?

4    A.          Right.

5    Q.          We'll move on to Darst 000023.  This

6    appears to be text messages with MJ Hutton.  Is

7    that Marty Hutton that we talked about earlier?

8    A.          I believe so.

9    Q.          And the first text -- well, first off,

10   is it fair -- is it a fair representation that

11   Marty Hutton's texts are in the white text boxes

12   and your texts are in the black text boxes in this

13   screenshot?

14   A.          Yes.

15   Q.          And it indicates that this text was

16   sent on March 5th.  Do you have any idea what year

17   that would have been?

18   A.          I don't.

19   Q.          Were you employed at the Meigs County

20   Sheriff's Office in March of 2022?

21   A.          I believe we'd have to look to give you

22   the actual -- I might have been on injury leave.

23   Q.          As you sit here today you don't recall

24   -- well, strike that.

88

1              Marty's text to you on March 5th, did
2    he send that to you while you were employed at the
3    Meigs County Sheriff's Office?
4    A.          I don't remember which year that was or
5    if it was prior or during or for sure.
6    Q.          Well, your response to him on March 5th
7    was:  I want to soon as my shoulder is better.  I
8    would like a few more years.
9                Do you see that?
10   A.          Yes.
11   Q.          Does that help refresh your
12   recollection as to whether or not you were
13   employed with Meigs County when this text exchange
14   occurred?
15   A.          I don't want to tell you the year for
16   sure if I'm not real positive on it.
17   Q.          I'll represent to you, and we'll see a
18   document in a little bit, that you were employed
19   at Meigs County from August 2nd, 2022 to July of
20   2023, and I will show you that documentation.  But
21   let's assume that that's accurate.
22               Does that help you identify what year
23   this text exchange may have occurred?
24   A.          I don't know what you want me to say.

89

1    I mean, if I -- I'd tell you if I was 100 percent

2    sure if that's when I was off on my shoulder

3    injury, when that happened.  Yeah, if you have

4    documentation, I'd have to see it and tell you and

5    I'd be more than happy to tell you.

6              I'm not 100 percent sure if that was

7    2024 or 2023 or 2022.  I'm not sure when it was.

8    I don't want to tell you something that's

9    different and contradict myself later because it's

10   not true or accurate.

11   Q.        Sure.  We'll jump ahead real quick to

12   try and expedite this.  I'll show you what I will

13   label as Defendant's Exhibit J.

14             Have you ever seen this document

15   before?

16   A.        No, I have not.

17   Q.        This document indicates that your hire

18   date was August of -- August 2nd of '22 and your

19   last day worked was January 15th of 2023.

20   A.        Where is this -- there's no reference

21   where this document is from.

22   Q.        I'll show you another exhibit.  I'll

23   show you what we'll mark as Exhibit N.

24             Have you ever seen this document

1   before?

2   A.          It's hard to read.  Can you enlarge it.

3   Q.          Absolutely.

4   A.          Can you scroll up?

5   Q.          Absolutely.

6   A.          It appears to be, it looks like, the

7   letter that I received at my residence, in the

8   mail, terminating me.

9   Q.          And this letter is dated July 10th of

10  2023, correct?

11  A.          That's what it says, yes.

12  Q.          And the first line of this letter

13  indicates:  I recently reviewed your employment

14  file with the Meigs County Sheriff's Office.  It

15  indicates that you began your employment with the

16  Meigs County Sheriff's Office, MCSO, on

17  August 2nd, 2022.

18              Do you see that?

19  A.          Yes.

20  Q.          Does that refresh your recollection as

21  to the dates you worked for the Meigs County

22  Sheriff's Office?

23  A.          Yeah, I don't know what days exactly.

24  I would have to look at my documentation to tell

91

1    you what days I was off or worked, if those are

2    actually correct.

3    Q.        So as you sit here today, you have no

4    idea what dates you worked for the Meigs County

5    Sheriff's Office?

6              MR. STARLING:  Objection.  Asked and

7    answered.

8              Go ahead and answer.

9    A.        Once again, I'd have to look at the

10   documentation to see what actual days, physical

11   days, I was present, working or not.

12   Q.        That really wasn't my question.  My

13   question was not what would you need to look at.

14   My question was as you sit here right now, do you

15   know what days you worked at the Meigs County

16   Sheriff's Office?

17             MR. STARLING:  Objection.  Asked and

18   answered.

19             Go ahead and answer.

20   A.        Not without the proper --

21   Q.        And what documentation would you need

22   to look at to determine what dates you worked for

23   at the Meigs County Sheriff's Office?

24   A.        It would be my payroll.

92

1    Q.        We'll go back to Exhibit E,

2    Darst 000023.  On March 5th, Marty Hutton texted

3    you:  You plan on coming back to Meigs.  I'd ride

4    into the sunset if I were you, LOL.

5              Do you see that?

6    A.        I do.

7    Q.        Was Marty asking you or did you

8    interpret Marty as asking you if you were going to

9    return to work to Meigs County after your injury

10   on March 5th?

11   A.        I don't know what he was thinking or

12   getting at.  I don't want to assume for sure.

13   Q.        You responded to him:  I want to, as

14   soon as my shoulder is better.  I would like a few

15   more years.

16   A.        Okay.

17   Q.        Does that help you interpret what Marty

18   was asking you?

19   A.        That's why I responded to him, you

20   know, I want to -- I'd like to ride in to the

21   sunset one of these days, you know, retire.

22   Q.        Right.  Your next response to him was:

23   How's the PD life?  What police department was

24   Marty working for at the time of this text

1    exchange?

2    A.        I'm not sure where he was working at.

3    Q.        I will scroll down to Darst 000027 in

4    Exhibit E, and this is an additional, but undated

5    text exchange between you and Marty Hutton,

6    correct?

7    A.        That looks like it says July the 27th

8    of '23.

9    Q.        Well, it appears that that is the date

10   this was screenshotted, but there's no date

11   identifying when the text actually occurred.

12   A.        Yeah, I don't know if that's what that

13   is or not.

14   Q.        And you told Marty on -- at this point

15   in time that were uncertain about that you were,

16   quote, thinking about going back to Middleport.

17            Do you see that?

18   A.        Yes.

19   Q.        And Marty's response was:  Huh?  WTF,

20   why?  Your response was:  I don't think I'm

21   actually wanted there.

22            That there, is that in reference to

23   Meigs County or is that in reference to

24   Middleport?

94

1    A.          That would be Meigs County.

2    Q.          And Marty's response to you was:  Is it

3    because of the dog who makes you feel like that?

4    And your response is cut off, but it says:  I

5    called, no answer or call back, texted, and all I

6    can see is T-H.  I did not receive any more of

7    this text exchange with Marty, but I want to know,

8    do you recall what you responded to Marty when he

9    said who makes you feel like that?

10   A.          I believe it was just the general

11   sheriff's office atmosphere in general.

12   Q.          Well, when it says I called, no answer

13   or callback, are you referring to someone at Meigs

14   County or are you referring to contacting

15   Middleport about a job?

16   A.          I don't know what I was referring to

17   with that.

18   Q.          We'll scroll on to the next page,

19   Darst 000028, and this appears to be a group

20   message with MJ and J.  I'm assuming, but I would

21   like you to confirm, is that Marty Hutton and Josh

22   Golsby?

23   A.          I'm not -- I don't recall if J was

24   Golsby.  It might have been.  It could have been.

95

1    Q.       Earlier we discussed any Meigs County

2    sheriff deputies that would have made comments

3    about your age.  In this text shot, Darst 000028,

4    J, says:  You're like the asshole grandfather I've

5    always, and I believe that says wanted, LOL.

6           Does that refresh your recollection as

7    to who J might be?

8    A.       Yeah, it probably was Golsby, I

9    believe, or Perry.

10    Q.       So as you sit here today, J was either

11    Deputy Perry or Deputy Joshua Golsby?

12    A.       I guess that's who it was in a text.

13    Q.       And earlier you could not remember

14    Deputy Perry's first name.  Does this help refresh

15    your recollection?

16    A.       No.

17    Q.       Can you tell me when this text exchange

18    on Darst 000028 occurred?

19    A.       Was it attached with the other?

20    Q.       I don't know.

21    A.       I can't tell from what you have there.

22    Q.       I will show you the next page,

23    Darst 000029.  The only date I can make out is

24    September 24th, 20-something, but I cannot tell

1    what year that is.

2    A.          Yeah, I can't tell you either then.

3    That would be the time I was there employed.

4    Q.          So if you were employed at Meigs County

5    Sheriff's Office from August 2nd, 2022 to July of

6    2023, this would have been in September of 2022;

7    is that fair?

8    A.          I'd have to look if that's the right

9    dates or not.

10   Q.          Well, let's assume that those are the

11   right dates.

12   A.          I don't want to -- I don't want to tell

13   you and not be right.

14   Q.          If those are the right dates, would

15   this text exchange have occurred in September of

16   2022?

17               MR. STARLING:  Objection.

18               Go ahead and answer.

19   A.          I don't know.

20   Q.          We'll move on to what I'll mark as

21   Defendant's Exhibit G [sic].  I'll represent to

22   you that I received this in discovery from your

23   attorney, and it's Darst 000039 through Darst

24   000084.  These all appear to be some sort of pay

97

1    stubs from Geotex, and I can scroll through them

2    if you want, but do these -- does Exhibit F --

3    excuse me -- Exhibit F appear to be your pay stubs

4    from Geotex?  Let me know what you want to see or

5    if you want me to scroll through them page by

6    page.

7    A.          Can you blow them up so I can see the

8    name.

9    Q.          Do you see your name?

10   A.          Yes, looks like mine.

11   Q.          Is that your address?

12   A.          That is my address and my name, and it

13   appears to be a correct pay stub.

14   Q.          And I'll represent to you that after

15   having reviewed these they appear to be in reverse

16   chronological order.  So I will go down to

17   Darst 000084, and this is a pay date from 12-29 --

18   excuse me -- pay date on 12-29-2023, pay period

19   starting 12-18-2023, end period 12-24-2023.

20               Do you see that?

21   A.          Okay.

22   Q.          Does that refresh your recollection as

23   to when you began working at Geotex?

24   A.          December, the end of December probably.

98

 1    Okay.  If that's my first one.  I believe it is.

 2    Q.          Well, it appears that gross wages on

 3    year-to-date were $208.  So I would assume this

 4    was your first one.

 5              Any reason to dispute that?

 6    A.          Yeah, I don't have any reason to

 7    dispute that.

 8    Q.          And going to the first page of

 9    Exhibit F, Darst 000039, the pay date, 11-15-2024,

10    start period, 11-10-2024, and it indicates your

11    gross wages year-to-date were $56.751.96, correct?

12    A.          I believe so.

13    Q.          I believe you testified earlier, but

14    correct me if I'm wrong, at Geotex currently you

15    are making approximately $78,000 a year annually?

16    A.          Yeah, currently now.

17    Q.          When you were terminated from the Meigs

18    County Sheriff's Office, you were on medical

19    leave, correct?

20    A.          Correct.

21    Q.          And that was for an injury you

22    sustained.  Tell me about that injury.

23    A.          I fell and hurt my shoulder.

24    Q.          How did you fall?

99

1    A.        I lost my footing outside of the

2    Sheriff's Office going in to the office.

3    Q.        How did you lose your footing?

4    A.        There was an incline, I stepped up, I

5    went to step and then there was some -- where it

6    was cold and wet and had some slickness to the

7    blacktop, and I just misjudged it, went down and

8    put my arm out to catch myself.  Sergeant Jones

9    was there and actually seen me do it.  That's why

10   I asked him to get a hold of Donny Mohler was the

11   supervisor, contact him.

12   Q.        That was Deon Jones?

13   A.        Correct.

14   Q.        I think you said, was Donny there as

15   well?

16   A.        No.

17   Q.        Okay.  Just Deon Jones?

18   A.        Yes.

19   Q.        So was it an accurate representation

20   you slipped on ice or a wet spot?

21   A.        On the pavement.

22   Q.        Where did this fall occur?

23   A.        Outside of Meigs County Sheriff's

24   Office, the parking lot right outside the office.

100

1    Q.         What time of day did it occur?

2    A.         It was dark, evening, late night.

3    Q.         Were you reporting for duty or were you

4    already on shift?

5    A.         Already on shift.

6    Q.         After that injury, do you recall when

7    you were returned to active work, whether full

8    duty or light duty?

9    A.         No.

10   Q.         I will show you what we'll mark as

11   Defendant's Exhibit G.  I'll represent to you that

12   this is Bates-stamped MCSO 00003 and MCSO 4.

13             Have you ever seen this document

14   before?

15   A.         Will you scroll down.  Yeah, it appears

16   to be the -- yes.

17   Q.         You have seen this document before?

18   A.         Uh-huh.

19   Q.         And under injured worker's name here,

20   that's your name, Jerry Darst?

21   A.         Yes.

22   Q.         And the date of injury indicated on

23   this form is 1-15-23.

24             Do you see that?

1    A.         I do.

2    Q.         Does that refresh your recollection as

3    to the approximate dates that you worked for the

4    Meigs County Sheriff's Office?

5    A.         That's the day I was injured working,

6    yes.

7    Q.         And when you were injured working,

8    approximately how long had you been working --

9    when you were injured working on January 15th,

10   2023, approximately how long had you been working

11   at the Meigs County Sheriff's Office?

12   A.         Prior to getting hurt or what --

13   Q.         Yes.

14   A.         I don't know.  I would have to look

15   back.  Like I told you before, I would have to

16   look back and see what day I left Middleport and

17   got hired in the Sheriff's Office.  I would have

18   to look at the date to tell you for sure.

19   Q.         And this Exhibit G that you've seen

20   before is a Physician's Report of Work Ability,

21   and the date of the appointment/examination is

22   8-29-2023.

23         Do you see that?

24   A.         Yes.

1   Q.          And we just looked at Exhibit N, the

2   letter from the Sheriff, dated July 10th, 2023,

3   that terminated your employment with the Meigs

4   County Sheriff's Office effective immediately,

5   this appointment with Bureau of Workers'

6   Compensation on 8-29-2023 was after you had been

7   terminated from the Meigs County Sheriff's Office;

8   is that fair?

9   A.          This is the date after the letter, is

10  to what you're saying?

11  Q.          Correct.

12  A.          Yeah, this date is different than the

13  date of the letter, yeah.

14  Q.          And it's after that date, correct?

15  A.          I would have to see the letter again to

16  see what the date was.  I don't remember.

17  Q.          Sure.  I'll show you Exhibit N again.

18  It's dated July 10th, 2023, correct?

19  A.          Okay.  So yes.

20  Q.          And in this report it indicates that

21  your restrictions began January 15th of 2023,

22  correct?

23  A.          Okay.  Yes.

24  Q.          And it indicates that you were off work

1    with your estimated full duty return to work date,

2    September 29th, 2023.

3              Do you see that?

4    A.        Okay.

5    Q.        Does that help refresh your

6    recollection as to when you were released to

7    return to work?

8    A.        The 9-29, estimated, yes.  I don't know

9    if I actually returned then or not or before.  I

10   was off work until 9-29.  I think they reevaluate

11   it or something.  I'd have to see.  I had

12   some issues with my shoulders and stuff.

13   Q.        Moving on to the second page of

14   Exhibit G.  About the middle of the page it

15   indicates:  Vocational rehabilitation is a

16   voluntary program for an eligible injured worker

17   who needs assistance to remain at work or return

18   to work.  Is the injured worker currently able to

19   participate in a vocational rehabilitation

20   program, and this form indicates no.

21             Were you ever able to participate in a

22   vocational rehabilitation program during your

23   injury from January 15th, 2023?

24   A.        I don't understand.  It says no.

1   Q.          Well, it says no as of August 29th,

2   2023.  I'm asking if thereafter you were ever able

3   to participate in a rehabilitation program?

4   A.          I believe I did.

5   Q.          What rehabilitation program do you

6   believe you participated in?

7   A.          Now, when it says vocational

8   rehabilitation program, what are you referring to?

9   Q.          Well, I'm asking you if you

10  participated in one, and you said you believed you

11  did, and so I'm asking you what details you have

12  of that rehabilitation program.

13  A.          And I want to make sure that I'm

14  talking about the right thing.  So the vocational

15  rehabilitation, you mean physical therapy?

16  Q.          Did you participate in physical

17  therapy?

18  A.          I did.

19  Q.          And I have not received any of those

20  records.

21              When did you participate in physical

22  therapy?

23  A.          Once again, the dates, it's been -- I

24  would have to get the dates to be accurate with

1    you.

2    Q.          Well, you understand this is my only

3    opportunity to ask you questions about your case.

4    So to the best of your recollection as you sit

5    here today, when did you participate in physical

6    therapy?

7    A.          I don't want to tell you wrong and

8    mislead you.  I don't recall the actual dates I

9    participated in physical therapy.  I was there in

10   physical therapy and I don't -- -- it was assigned

11   to do that after and I was to return to work a

12   certain date, and I don't have the exact dates.  I

13   would have to look at the medical documentation to

14   give you that information.

15   Q.          What documentation would you need to

16   look at to be able to provide me with that

17   information?

18   A.          It would be the hospital documentation

19   from the workers' comp doctor.

20   Q.          I'll show you what we'll mark as

21   Defendant's Exhibit H and I'll represent to you

22   that this was produced by my client's in

23   discovery, and it's Bates-stamped MCSO 00013.  If

24   you need to review it, let me know, but my

1    question to you is:  Have you ever seen this

2    document before?

3    A.        Yes.

4    Q.        And this indicates that you were also

5    injured, date of injury, October 28th, 2022,

6    correct?

7    A.        That's what it says, date of injury,

8    10-28-2022.

9    Q.        As you sit here today, any reason to

10   dispute that?

11   A.        No.

12   Q.        And the employer's name on this is the

13   Meigs County Sheriff's Office.  Do you see that?

14   A.        I do.

15   Q.        And is that your signature right here

16   about two-thirds of the way down on Exhibit H?

17   A.        It is.

18   Q.        So as of August 28th, 2022, you were

19   also working at the Meigs County Sheriff's Office,

20   correct?

21   A.        From that document it appears so, yes.

22   Q.        Any reason to dispute what this

23   document says?

24   A.        No.

1    Q.        Does that refresh your recollection as

2    to the approximate dates that you worked at the

3    Meigs County Sheriff's Office?

4    A.        It reflects when I filled this out in

5    this incident, yes.

6    Q.        Yes, it refreshes your recollection as

7    to the approximate dates you worked at the Meigs

8    County Sheriff's Office?

9    A.        It reflects the date that this incident

10   happened, but other dates, it doesn't reflect

11   other dates or times.

12   Q.        Did you work in the Meigs County

13   Sheriff's Office for more than a year?

14   A.        I would have to see the exact dates of

15   -- the date of hire and the last date.

16   Q.        Do you recall being injured while

17   working for the Meigs County Sheriff's Office on

18   October 28th, 2022?

19   A.        October the 8th?

20   Q.        October 28th, 2022.

21   A.        This right here, this document, says

22   10-28 of '22 that I was injured.

23   Q.        Yes.  I'm asking you if you recall

24   being injured on that date?

1    A.          I do with this document, yes.

2    Q.          Tell me what occurred.

3    A.          I was placing a suspect in the vehicle,

4    he resisted and we went to the ground.

5    Q.          And what part of your body did you

6    injure?

7    A.          My ribs.

8    Q.          And do you recall how long you were on

9    medical leave as a result of this injury?

10   A.          I do not.

11   Q.          I will show you what we'll mark as

12   Defendant's Exhibit I.  For the record this is

13   Bates-stamped MCSO 00007 through 00009.

14              Have you ever seen this paperwork

15   before?

16   A.          You would have to blow it up.  I can't

17   hardly see it.  I think it says was seen in my

18   office on 11-11 of '22.

19   Q.          Yes.  And I can scroll through the rest

20   if you want.

21   A.          Okay.  It appears to be a workers' comp

22   form, yes.

23   Q.          And under Section 3B on the second page

24   of Exhibit I, it indicates that the injured worker

109

1    could not do the job held on the date of injury

2    for this period of restrictive duty, date,

3    10-28-2022.  Please estimate when the injured

4    worker should be able to return to the job held on

5    the date of injury for this period of restrictive

6    duty, 12-1-2022.

7              Do you see that?

8    A.        I do.

9    Q.        Any reason to dispute what's

10   represented in this Bureau of Workers'

11   Compensation document?

12   A.        No.

13   Q.        Does this refresh your recollection as

14   to when you returned to work for the Meigs County

15   Sheriff's Office after your injury on October 28th

16   of 2022?

17   A.        And I'd have to -- for sure, if I went

18   back on that date, I know it says estimated date.

19   They put a projected date, I think it was, to go

20   back, if I remember correctly, and I might have

21   returned then, but I would have to look and see

22   for sure.

23   Q.        If the paperwork I reviewed indicated

24   you returned to work on November 19th, 2022, do

110

1    you have any reason to dispute that or would that

2    be accurate?

3    A.        I would have to see it, look at it.

4    Q.        I'll show you what we'll mark as

5    Defendant's Exhibit J.  I previously showed you

6    this to hopefully refresh your recollection as to

7    when you actually worked for the Meigs County

8    Sheriff's Office.

9              This document indicates that the dates

10   in blue were your hire date and your last date

11   worked, and the dates in blue are August 2nd,

12   2022, and January 15th of 2023.

13             As you sit here today, do you have any

14   reason to dispute that those are the dates that

15   you began work and ended work with the Meigs

16   County Sheriff's Office?

17   A.        Yeah, I don't know if -- is this

18   document from the Sheriff's Office?

19   Q.        I'll represent to you that this

20   document was put together by Captain Stewart?

21   A.        I don't know.  I'd have to look at the

22   dates and get the doctor's documentation, and I'd

23   have to refer to these dates to match them up.

24   Q.        That's fine.  As you sit here today,

1    based on the knowledge you have, do you have any

2    reason to dispute these dates?

3    A.          Yes.

4    Q.          What is that reason?

5    A.          I don't have the doctor's documentation

6    to show if I was actually physically off these

7    dates or not and if this is the documentation from

8    them, if it's accurate or not.

9    Q.          Is it your understanding that Meigs

10   County sheriff deputies are initially hired on for

11   a one-year probationary period?

12   A.          I think it's 90 days.

13   Q.          Where did you develop that

14   understanding?

15   A.          From my interview.

16   Q.          Your interview with who?

17   A.          It was Major Trussell.

18   Q.          Anyone else?

19   A.          Brandy King was also present.

20   Q.          Have you ever reviewed the collective

21   bargaining agreement applicable to sheriff

22   deputies at the Meigs County Sheriff's Office?

23   A.          Yes.

24   Q.          Do you know what it says about the

112

1    length or duration of a probationary period for a

2    Meigs County sheriff deputy?

3    A.        I don't recall.  I would have to look

4    at it.

5    Q.        What is your understanding of the

6    purpose of a probationary period for a Meigs

7    County sheriff deputy?

8    A.        You're asking me what I believe is the

9    reasoning for somebody having a probationary

10    period?

11    Q.        Correct.

12    A.        If they're capable of doing their job.

13    Q.        So would it be fair to say that a

14    probationary period is for law enforcement

15    administration to evaluate the work performance of

16    someone before they become a full-fledged law

17    enforcement officer?

18    A.        Yes, work performance.

19    Q.        And is it fair to say that a

20    probationary period is also there to give the

21    administration the ability to evaluate work

22    performance before that law enforcement officer

23    becomes entitled to raise some privileges under a

24    collective bargaining agreement?

113

```
1   A.          Yeah, if that's what they deem so, I
2   guess.
3   Q.          Do you recall how many days -- and an
4   approximation or estimate is fine.  I won't hold
5   you to a specific number.  Do you recall
6   approximately how many days you worked from the
7   time that Sheriff Fitch was appointed sheriff to
8   the time you were injured in January of 2015 --
9   excuse me -- 2023?
10  A.          No.
11  Q.          If I were to represent to you that it
12  was approximately 35 days, would you have any
13  reason to dispute that?
14              MR. STARLING:  Objection.  Asked and
15  answered.
16  Q.          You can go ahead and answer.
17  A.          Hello?
18              MR. STARLING:  Yeah, can you hear us,
19  Jerry?
20              THE WITNESS:  I can now, yes.
21              MR. STARLING:  Why don't you repeat the
22  question.
23              MR. TEETOR:  Sure.
24  Q.          If I were to represent to you from the
```

1    documentation I have that you worked approximately

2    35 days between the time that Sheriff Fitch was

3    appointed the sheriff of Meigs County, Ohio and

4    you were injured on January 15th, 2023, would you

5    have any reason to dispute that?

6              MR. STARLING:  Objection.  Asked and

7    answered.

8              Go ahead and answer.

9    A.        I would have to look at documentation

10   to see that.

11   Q.        That's fine.  I will show you what we

12   will mark as Defendant's Exhibit K.  And represent

13   to you --

14             Sorry.  Can you see Exhibit K?

15   A.        Can you blow it up.  It will help me.

16   Q.        Sure.  I will represent to you that

17   this was produced in discovery in this case,

18   MCSO 00564.

19   A.        I couldn't read that first.  Can you

20   scroll back.  I didn't get to read it.

21   Q.        Sure.

22   A.        Okay.

23   Q.        And MCSO 00565, the substance of which

24   is on MCSO 564.

1          Do you recall receiving this email from

2     Captain Frank Stewart on Thursday, January 5th,

3     2023?

4     A.          I don't recall, but it looks like an

5     email that he had sent me, yeah.

6     Q.          And do you recall any of the context or

7     circumstances surrounding this email?

8     A.          Just that I can get a long-sleeved

9     shirt and two pair of BDU pants.

10    Q.          And you had made the request to

11    purchase those items?

12    A.          It says your purchase request is

13    approved, yes.

14    Q.          So you --

15    A.          I would have to see if I submitted a --

16    I'm sure I did.  I don't know, I guess.  It's what

17    it says.

18    Q.          Do you recall responding thanks?

19    A.          I don't recall, but if it says that.

20    Q.          On January 5th, 2023 did you have an

21    email address that was

22    Jerry.darst@Meigssheriff.org?

23    A.          That looks like it, yeah.

24    Q.          And this email exchange is

116

1    approximately 10 days before you were injured for

2    the second time, when you slipped on ice, correct?

3    A.          Well, I fell.  I don't know if it was

4    actually ice that caused the fall, but I fell,

5    yes.

6    Q.          And this email exchange is

7    approximately six months before you were

8    terminated by the Meigs County Sheriff's Office,

9    correct?

10   A.          I'd have to look at the dates prior to

11   that, but this says January 5th of '23.

12   Q.          So if you were terminated in July of

13   '23, roughly six months before your termination,

14   correct?

15   A.          Okay.

16   Q.          I'll show you what we'll mark as

17   Defendant's Exhibit L and represent to you and for

18   the record that this is MCSO 00561 through

19   MCSO 00563.

20               Do you recognize this document?

21   A.          It looks like a letter of interest.

22   Q.          Was it a letter of interest that you

23   submitted to Sheriff Fitch and Captain Stewart?

24   A.          Okay.

117

1    Q.        Was that a yes?

2    A.        Yes.  Sorry.

3    Q.        Do you recall submitting this form to

4    either Sheriff Fitch or Captain Stewart?

5    A.        Yes, vaguely.

6    Q.        Who did you submit it to?

7    A.        It says Sheriff Fitch and Captain

8    Stewart.

9    Q.        And this was while you were on medical

10   leave, correct?

11   A.        Yes, if that's right.  I would have to

12   see the dates again.

13   Q.        Well, we looked at documentation.  It

14   indicated you went on medical leave, January 15th

15   of 2023, when you were injured, correct?

16   A.        I would have to see it again to remind

17   me.

18   Q.        I'll show you again what we marked as

19   Exhibit G.  It indicates that your date of injury

20   right here on your BWC paperwork was January 15th

21   of 2023, correct?

22   A.        That's what it says, yes.

23   Q.        And were you injured on January 15th of

24   2023?

118

1    A.         It says date of injury, yes, if that's

2    my injury date.

3    Q.         So going back to Exhibit L, the letter

4    of interest that you submitted on March 27th of

5    2023, you were on medical leave when you submitted

6    this letter, correct?

7    A.         Yes.

8    Q.         At the time you submitted this letter,

9    March 27th or thereabouts of 2023, did you have

10   any suspicions that you were going to be

11   terminated as a result of your age?

12   A.         I don't know if I understand your

13   question.

14   Q.         You submitted this letter on March 27th

15   of 2023, correct?

16   A.         The dates says March 27th of 2023.

17   That's the date it was written or I did it, yes.

18   Q.         So sometime --

19   A.         I don't know if that's when I submitted

20   it or not, but it was sent in probably on or about

21   that date.

22   Q.         Fair.  At the time you submitted this

23   letter on or about March 27th of 2023, did you

24   have any suspicions that you were going to be

119

1    terminated due to your age?

2    A.          No.

3    Q.          When did you first believe that you

4    were not wanted at the Sheriff's Office because of

5    your age?

6    A.          It had been an ongoing issue.  I mean,

7    there were several incidents.  So to give you the

8    exact time that that -- this happened --

9    Q.          And, Mr. Darst, I want to be very clear

10   here.  I just asked you if at the time you

11   submitted this letter on or about March 27th of

12   2023, did you have any suspicions that you were

13   going to be terminated due to your age, and you

14   said no.

15           So my follow-up question was:  When did

16   you start believing that you were not wanted at

17   the Sheriff's Office due to your age?  You just

18   testified as of March 27th, 2023, or on or about

19   that date, you didn't have any suspicion.

20   A.          I said at the time of the letter that I

21   didn't have.  My answer is it was an ongoing issue

22   with them making remarks due to my age in

23   reference to it happened up and to the time of my

24   injury.  When I wrote this letter there was an

1    opening, and what I done was try to get into work.

2            Did I want to be there or have any idea

3    that I should be there?  Yes.  I had full

4    intentions of returning to work and doing my job.

5    I loved being a deputy sheriff.  I miss it

6    greatly.  I've been a deputy sheriff since 1995.

7    It's the only job I knew how to do.  I've never

8    had an issue before with this.  And I was injured,

9    yes, I wasn't working, and I was prepared to go

10   back, wanted to go back.  There was an opening.  I

11   was told I could apply and I applied.  I was

12   hesitant to do so, but they told me that I should

13   apply, and that's why I did it.

14           So do I have any recollection of

15   knowing when all this, no, I didn't know what

16   their intent was or why it was.  I knew that I was

17   on the verge because of my age, they made several

18   comments about my age and, you know, telling me to

19   quit and hang it up.  I just wanted to work.  All

20   I wanted was the job I loved doing.  That's all I

21   wanted.

22   Q.      Prior to submitting this letter on or

23   about March 27th, 2023, did you ever discuss the

24   possibility of becoming a detective with either

1   Captain Stewart or Sheriff Fitch?

2   A.        Did I make my -- that I loved being a

3   deputy and that I'd like to advance, do different

4   things, I certainly do, always have.

5   Q.        That was not my question.  My question

6   was:  Prior to submitting this letter, did you

7   have any conversations about becoming a detective?

8   A.        Yes.

9   Q.        When did those conversations occur and

10  with whom?

11  A.        I can't give you the exact dates or I

12  can't give the exact times, and it was just office

13  chitchat.

14  Q.        Who was the union representative for

15  sheriffs deputies during your employment with the

16  Meigs County Sheriff's Office?

17  A.        I think it was Rick Smith.  I'm not

18  totally sure, but I think it was Rick Smith.

19  Q.        Were you aware that there's a provision

20  in the collective bargaining agreement that

21  permits a mutual extension of an individual's

22  probationary period for up to four months?

23  A.        No.

24  Q.        Were you ever approached by either

1    Sheriff Fitch and/or Rick Smith about a request to

2    extend your probationary period for an additional

3    four months?

4    A.        No.

5    Q.        Do you recall declining any request to

6    extend your probationary period for four months?

7    A.        No.

8    Q.        Now, I want to make sure I understand

9    your testimony, because there are several things

10   that you've had trouble remembering today.  You

11   specifically remember that that did not happen or

12   do you not recall that that ever happened?

13   A.        I don't remember it.  I mean, I don't

14   recall it.  I don't remember it happening.  I

15   can't tell you for sure.  I don't remember.

16   Q.        So as you sit here today, you do not

17   know if that happened or not?

18             MR. STARLING:  Objection.  Asked and

19   answered.

20   Q.        You can go ahead and answer.

21   A.        I don't recall.

22   Q.        I'll show you what we'll mark

23   Defendant's Exhibit M.  For the record, this is

24   MCSO 00566 through 567.

123

```
 1              Do you recall receiving an email from
 2    Captain Stewart on April 17th, 2023 regarding
 3    another shift bid coming up soon?
 4    A.        Yeah.
 5    Q.        You do recall that?
 6    A.        Now I see it, yes.  That's what it
 7    says.
 8    Q.        Besides this email, do you recall any
 9    discussions you had with Captain Stewart about a
10    shift bid in roughly April of 2023?
11    A.        No.
12    Q.        Did you ever make any election or bids
13    for any potential shifts in -- in or around April
14    of 2023?
15    A.        I don't believe I did.
16    Q.        As a result of your injury from
17    January 15th of 2023, did you ultimately have
18    surgery?
19    A.        If you're referring to my shoulder
20    injury?
21    Q.        Yes.
22    A.        Yes.
23    Q.        Do you recall when that surgery took
24    place?
```

124

1    A.          I do not.

2    Q.          Your response to Captain Stewart in

3    Exhibit M on April 17th, 2023 indicates:  Workers'

4    comp sent out a email with a waiver form.  If the

5    County waives the appeal, I could schedule

6    surgery, then it's four to six weeks.  That's all

7    I am waiting on to my knowledge.

8              Do you recall sending that email?

9    A.          I don't.

10   Q.          Does that help refresh your

11   recollection at all as to approximately when your

12   surgery took place?

13   A.          Once again, I don't know exactly the

14   date my surgery took place.

15   Q.          I'm not asking for the exact date.  A

16   month would be helpful.

17   A.          Yeah, I'd have to look back.  To be

18   honest with you, I will have to look back to see

19   when actually the surgery took place.

20   Q.          If the documentation I had indicated

21   that your surgery was in May of 2023, as you sit

22   here today, any reason to dispute that?

23   A.          I'd have to look at the documentation

24   and see.

125

1    Q.          So as we sit here today, there's no

2    reason for you to dispute that?

3               MR. STARLING:  Objection.  Asked and

4    answered.

5    Q.          You can go ahead and answer.

6    A.          I would have to look at the

7    documentation from the hospital and see when it

8    was for sure.

9    Q.          All right.  I will move on to

10   Exhibit N, which we briefly looked at earlier.

11   You recall receiving this letter from Sheriff

12   Fitch on or around July 10th, 2023?

13   A.          Through the mail, yes.

14   Q.          And I can highlight it for you.  This

15   letter identified that, at least as reported to

16   Sheriff Fitch, there were, quote, some of the

17   deficiencies listed were dependability,

18   professionalism, lack of motivation, poor

19   attitude, timeliness of reports and uniform

20   appearance.

21              Do you see that?

22   A.          I do.

23   Q.          Now, I will presume that you dispute

24   those representations.  But would you agree with

126

1    me that there had been issues with your

2    dependability and ability to work during your

3    tenure with the Meigs County Sheriff's Office?

4    A.        No.

5    Q.        Why would you not agree with me?

6    A.        Are you referring to me being injured?

7    Q.        Yes.

8    A.        So me being -- an injury would be held

9    against me -- an accidental injury was held

10   against me?

11   Q.        I'm not saying that.  I'm asking were

12   there issues with you being dependable and being

13   able to work during your tenure with the Meigs

14   County Sheriff's Office?

15   A.        No.

16   Q.        If the documentation I have reflects

17   that over a period of slightly more than 11 months

18   you were able to work 97 days, it's your testimony

19   that that is not an issue of dependability?

20   A.        With unforeseen circumstances that were

21   beyond my control?

22   Q.        I'm not casting blame on you.  I'm just

23   saying that's an issue of dependability, correct?

24           MR. STARLING:  Objection.  That's been

1    asked and answered.

2              Go ahead and answer.

3    A.        Once again, it was unforeseen

4    circumstances beyond my control, that I couldn't

5    help.  But the other days I was there on time, I

6    did my work, and it was -- I've actually always

7    done work and I was always in uniform and I have

8    the pictures to prove that.

9              And actually the dependability, I

10   actually volunteered and went to Shop with a Cop,

11   my wife and I joined in and everything to do to be

12   team players.

13   Q.        You just mentioned you have pictures to

14   prove something.  I will represent to you I have

15   not received any pictures other than the

16   screenshots that we already looked at.

17             What pictures are you referring to?

18   A.        I believe when I was at the Shop with a

19   Cop, myself in a uniform.

20   Q.        And I don't want to know your

21   conversations with your attorney, but did you

22   provide those pictures to your attorney?

23   A.        I don't know if they received those or

24   not.

128

1    Q.        Have you ever had issues with

2    professionalism, poor attitude, timeliness of

3    reports or uniform appearance in your past

4    history?

5              MR. STARLING:  Objection.  Relevance.

6              Go ahead and answer.

7    A.        Yes.

8    Q.        I'll show you what we'll mark as

9    Defendant's Exhibit O.  And for the record this is

10   GCSO Darst 00246 through GCSO Darst 252, and it's

11   an incident report dated March 7th of 2018.

12             Have you seen this incident report

13   before?

14             MR. STARLING:  Before we go on, I'm

15   just going object to the entire exhibit as

16   irrelevant and improper character evidence under

17   Rule 404.  I'll keep a continuing objection on any

18   questions about this topic.

19             Go ahead, Jerry.

20             THE WITNESS:  You want me to respond to

21   this?

22             MR. STARLING:  Yeah, go ahead.

23   A.        Okay.  Yes, I've seen this before.

24   Q.        And in your own words, tell me what

1   occurred on March 7th of 2018.

2   A.          I was on injury leave.  I fell through

3   an abandoned train trestle on a call.  A week

4   later, I'd have to get dates or times, the chief

5   deputy shows up at my house unannounced, gives me

6   a letter that he had discovered training

7   deficiencies in my canine logs and was there to

8   take my dog and my car.

9           Now, I've never been wrote up, never

10  been suspended or never had a prior termination,

11  so what I -- I became upset, I was at my house, I

12  had been on injury leave and just the chief deputy

13  and the sergeant was there, and I called him a

14  dirty son of a bitch and told him to get the dog

15  and car and get off my property.  I knew what was

16  going on.  It was politics.

17          I was friends with the prior sheriff

18  and supported him and then we went to -- long

19  story short, we had a hearing, we went to

20  arbitration, I got my job back, was awarded my job

21  back, they appealed it, it went to a judge, the

22  FOP, the only time I filed a grievance was this

23  time.

24          The attorney from the FOP says we will

130

1    get your job back, you can go back to work, but

2    they're going to hound you from here on out, so

3    that's what I did.  She advised me it would

4    probably be best that I seek employment elsewhere

5    and that I take a settlement and get out.  So that

6    is basically it in a nutshell without going into

7    details verbatim.  We'd be here all day and

8    probably two or three more days going through all

9    the litigation.  And that's what happened.

10            If I had to do it over again, I would

11   have done some things differently.  But, yes, I

12   did call him a dirty son of a bitch.  I meant

13   that.  I was at my house and on my property, not

14   in duty, not in uniform, not working.  But at the

15   arbitration, they gave me a couple days off, okay,

16   we agreed to that, but it wasn't good enough for

17   them, they appealed it for the judge.

18            My understanding, the judge was just

19   supposed to say, the arbitration, was it fair and

20   just and did they go about the scopes and follow

21   the procedures properly, and the FOP assured me

22   that I would get my job back, but they didn't want

23   me there either.  It was a political thing.

24            In southeastern Ohio, if you've ever

1    been around, you'll come to find out, and that's

2    hence how they got this document, they're all in,

3    and it's -- well, it's political.  It's very

4    political.  You know, I've served under four,

5    going on five sheriffs, I never had trouble or a

6    problem, and I've got documentation here.

7             I can show you training, I can show you

8    my awards and ribbons that I had won, and never

9    had an issue until this, never had an issue.  And

10   the only two relevant things that I can tell you

11   that has happened in both these times is I had an

12   injury and workers' compensation claims on both,

13   both are synonymous.

14            And then age comments, I put up with

15   this prior.  All I wanted to do was go to work and

16   finish my career and do a good job.  I had several

17   years left, and I planned to be there and it was

18   devastating to me.  That's all I had ever done my

19   whole career.

20            So I've managed to put this behind me

21   and forget this part, you know, but it's been very

22   traumatic for me.  I don't know if you can see

23   them, but I can show you, I have three three-ring

24   binders full of my stuff and I've kept my things

132

1    the best I could over the years, and I've never

2    been treated as I've been treated this way.

3              So to answer your question, I'm very

4    familiar with this document and the process and I

5    was -- if I had known now, I would have made sure

6    that things would have been handled differently,

7    but I was very ignorant at the time of the process

8    and things and it is what it is today, but you

9    know.

10   Q.        I'd like to follow up on a few things

11   you said there.

12   A.        Sure.

13   Q.        First being you indicated if I'd stand

14   up, I could show you three-ring binders.  Do you

15   have three-ring binders in the room with you?

16   A.        I certainly do.

17   Q.        And did you put those binders together?

18   A.        Over the years, yes.

19   Q.        And those include documents relative to

20   Gallia County?

21   A.        Gallia County, Meigs County,

22   Middleport, over the year.  My training

23   certificates I've just kept, it's something I

24   started doing, everything I went to and did, I've

133

1    tried to keep the records on them.

2    Q.        And in those three-ring binders,

3    approximately how thick are they?

4    A.        They're probably five inches.

5    Q.        Each of the binders?

6    A.        Yeah, they're full.

7    Q.        I'll represent to you in the entirety

8    of the discovery of this case I've received 110

9    pages of documentation.  Do those binders contain

10   more than 110 pages?

11   A.        Probably.  Yeah.

12             MR. TEETOR:  All right.  Jason, I'll

13   ask for those binders to be produced.

14             MR. STARLING:  It depends on what's in

15   them.  I have to review them.  I didn't have them

16   prior to today.  I'll look through them and if

17   there's something relevant or responsive to your

18   document request, we would supplement with it.

19             MR. TEETOR:  I think we can make the

20   determinations of relevance after production.  But

21   I will ask that they be produced.

22             MR. STARLING:  Well, again, I'll review

23   them and tell you whether I think they're

24   responsive and discoverable.  I don't think prior

134

1    employment is responsive or discoverable for a

2    variety of reasons, but, like I said, I'll review

3    them and supplement, and if you want to ask

4    additional questions on something that we

5    supplement, I don't have a problem with that.

6    Q.        Looking at Exhibit O, I'm going to

7    fourth -- excuse me -- fifth page, M -- GCSO

8    Darst 00250.  And in this it's identifying that

9    your wife, Teresa, has stated that you were in

10   chronic pain due to your injury and that you were

11   having a very difficult time dealing with the fact

12   that you were not improving as fast as you thought

13   you should.

14             You mentioned that you fell through a

15   railroad trestle during your employment with

16   Gallia County.  Is that the injury that she is

17   likely referring to?

18   A.        Yes.

19   Q.        And what was that injury?

20   A.        You're asking what injury did I sustain

21   from falling through the trestle?

22   Q.        Correct.

23   A.        It was in my neck.

24   Q.        And have you made a full recovery from

135

1    that injury?

2              MR. STARLING:  I want to object to

3    vague and ambiguous.

4              Go ahead and answer.

5    A.         I've been working.  I haven't had

6    issues like I have had with it.  Am I 100 percent,

7    no.

8    Q.         At some point did the Gallia County

9    Sheriff's Office conclude that you had violated

10   Gallia County Sheriff's policy due to the

11   condition of your patrol cruiser?

12             MR. STARLING:  Objection.  Relevance,

13   violates Rule 404.

14             Go ahead and answer.

15   A.         No.

16   Q.         I'll show you what we'll mark as

17   Exhibit P.  I'll represent to you for the record

18   that this is GCSO Darst 00174 through 00177.

19             Have you ever seen this document

20   before?

21   A.         I don't recall seeing it, no.

22   Q.         In looking at conclusions on the last

23   page of document -- excuse me -- Exhibit P, the

24   last paragraph on GCSO Darst 00177 states:

1    Furthermore, upon examination of Deputy Darst's

2    patrol cruiser once it was turned over to the

3    administration on 3-7-2018, at the onset of this

4    administrative process, the condition in which

5    Deputy Darst's vehicle was found was unfit for

6    duty and in violation of Gallia County Sheriff

7    Office's Policy 7.10, Canine Operations, which

8    states under basic rules for a canine officer,

9    maintain uniforms and patrol vehicles interior's

10   clean and free of excessive hair and odors.

11            Were you ever made aware that the

12   Gallia County Sheriff's Office conclude that you

13   had violated policy due to the condition of your

14   patrol cruiser?

15   A.        No.

16   Q.        Was that ever an issue brought up

17   during the arbitration, where you fought your

18   termination with the Gallia County Sheriff's

19   Office?

20   A.        Yes.

21   Q.        So you were aware that that was a

22   finding of the Gallia County Sheriff's Office?

23   A.        During the arbitration.

24   Q.        Do you ever recall having prior issues

1    regarding timeliness of your reports while you

2    were employed at the Gallia County Sheriff's

3    Office?

4              MR. STARLING:  Objection.  Relevance

5    and Rule 404.

6              Go ahead and answer.

7    A.        Prior to the arbitration hearing?

8    Q.        Correct.

9    A.        I was never wrote up or reprimanded or

10   given any notification of any of these items until

11   the time that they was -- the arbitration.

12   Q.        I'll show you what we'll mark as

13   Exhibit Q.  I'll represent to you and for the

14   record, this is GCSO Darst 09010.

15             Do you recall ever receiving this email

16   from Joe Browning?

17   A.        No, I do not.

18   Q.        Who is Joe Browning?

19   A.        He was the sheriff.

20   Q.        The sheriff of Gallia County?

21   A.        Correct.

22   Q.        And he was the sheriff of Gallia County

23   in 2011?

24   A.        I believe so.  I would have to look

138

1    again and see what -- I've never seen this

2    documentation.  This wasn't even produced in the

3    arbitration.  Can I ask where you got this from?

4    Q.        Jerry, as part of the discovery in this

5    case I asked for medical records and

6    authorization, and I'll represent to you I did not

7    receive any.

8             As you sit here today, are you making a

9    claim for emotional damages in this case?

10           MR. STARLING:  I don't think that

11   question is properly directed to him.  That's a

12   question for a lawyer.  I'll instruct him not to

13   answer.  If you want to know what damages he's

14   seeking, you can send a contention interrogatory.

15   A.        Can I ask where this document come

16   from?  That was my question.

17   Q.        And I'm not being deposed here, so I'm

18   going to ask you the questions.  It's my

19   opportunity to do so about this lawsuit.

20   A.        Okay.  I've never seen this, and I

21   would be interested to see where that originated

22   from or how that come to be.

23   Q.        Have you seen any doctor for mental

24   health care in connection with this lawsuit or the

139

1    claims you've made in this lawsuit?

2              MR. STARLING:  You can answer that,

3    Jerry.  Go ahead.

4    A.         No.

5    Q.         Were you previously evaluated for

6    mental health issues while you were employed with

7    the Gallia County Sheriff's Office?

8              MR. STARLING:  You can answer that

9    Jerry.  Go ahead.

10   A.         No.

11   Q.         Besides -- I know we talked about the

12   Middleport Police Department, the Gallipolis

13   Police Department, the Jackson Police Department

14   and Geotex.

15             Besides those four employers, have you

16   sought employment with any other employer or

17   entity since July of 2023?

18   A.         I don't remember.  I'd have to -- I

19   just can't remember.

20   Q.         So as we sit here today, you cannot

21   identify any other employers or agencies?

22             MR. STARLING:  Objection.  Asked and

23   answered.

24             Go ahead.

1    A.        No.

2    Q.        Have you received payment, wages or any

3    compensation from any other individual or employer

4    besides Geotex since July 15th of 2023?

5    A.        No.

6    Q.        Have you completed your 2024 tax

7    returns?

8    A.        Yes.

9              MR. TEETOR:  Jason, I'll ask if we can

10   supplement discovery with those as well.

11             MR. STARLING:  I don't produce tax

12   returns.  All I will produce is W-2s or

13   information showing earned income.  Most of the

14   information on a tax return is completely

15   irrelevant.

16             MR. TEETOR:  Well, you did require

17   Sheriff Fitch to produce his, so I would ask that

18   you produce them.

19             MR. STARLING:  I'm telling you no.

20   I'll produce the earned income on them.  So like

21   everything else would be redacted.  Otherwise you

22   can have W-2s or K-1s or 1099s, anything showing

23   earned income.  If you can show me a case that

24   says you should figure out what tax deduction he

1  took or his rental or dividend interest income

2  that is somehow relevant to an employment case,

3  I'll reconsider.  But I doubt you're going to find

4  such a case.

5           MR. TEETOR:  You can produce the W-2s

6  and any K-9s and anything else and then we can

7  discuss it later.

8           MR. STARLING:  So not K-9s, K-1s, but,

9  yeah, anything showing earned income after he

10 worked for your client would be relevant, yeah,

11 except the complete tax return.

12          Remind me, Matt, if we entered into a

13 stipulated order about not subpoenaing or

14 contacting subsequent employers, did we reach an

15 agreement on that issue?

16          MR. TEETOR:  There's a protective order

17 in place, yeah.

18          MR. STARLING:  Okay.  Then -- sorry,

19 it's not my only case.  But, yeah, with that order

20 in place, there's no problem.  We'll just

21 supplement periodically with W-2s and such.

22 Probably the last time we did discovery we didn't

23 have all those quite yet, because they come out

24 January the following year.

142

```
 1              But, yeah, with his earned income
 2    following his termination by your client, we'd
 3    just continually supplement and update our
 4    expert's report on that.
 5    BY MR. TEETOR:
 6    Q.         Jerry, just a few more questions.  I
 7    believe we're almost done.
 8              Do you have any idea how old Sheriff
 9    Fitch is?
10    A.         No.
11              MR. STARLING:  Objection.  Relevance.
12              Sorry, go ahead.
13    A.         No, I don't.
14    Q.         Would it surprise you to learn he was
15    born the same year you were?
16              MR. STERLING:  Objection.  Relevance.
17              Go ahead.
18    A.         No.  He looks younger.
19    Q.         Jerry, what are you seeking out of this
20    lawsuit?
21              MR. STARLING:  Objection.  I think
22    that's an inappropriate contention question.  If
23    you're asking what his damages or what he's
24    seeking in terms of damages, that's appropriately
```

1    directed to us in contention interrogatories.

2              MR. TEETOR:  I think you're making an

3    inappropriate speaking objection.  You can object.

4    That can be on the record.

5    Q.          Jerry, can you please answer my

6    question.

7              MR. STARLING:  No, I'm going to

8    instruct him not to answer.  It's an inappropriate

9    contention question asking what damages he's

10   seeking.  We've already disclosed that.

11             MR. TEETOR:  Then we can take that up

12   with the judge later.

13             Thanks, Jerry.  That's all the

14   questions I have.  Thank you.  Have a good night.

15             MR. STARLING:  Hold on, let me think.

16   Let's take a five, ten-minute break, I'll see if I

17   have any questions for Jerry.  Okay.

18             (A short recess is taken.)

19             MR. STARLING:  I don't have any

20   questions.  I'm just going to put on the record

21   that he'll read and sign, Natalie.

22             I appreciate your time today, Natalie

23   and Matt.

24             So if you want to put this on the

144

1    record, too, Natalie.  What I'll do is, Jerry

2    brought his two binders that I haven't seen

3    before -- actually maybe it was three binders.

4    I'm having my paralegal go through and copy all

5    them, I'll review them, and if any are responsive

6    to your discovery requests, you know, I'll produce

7    those portions to you.

8             If I think any are nonresponsive or

9    objectionable, I'll tell you what I think have

10   objectionable so you'll know what I'm not

11   producing, and you can decide whether to challenge

12   it, or you can confer with me, do whatever, but

13   I'll be transparent about it.

14            Was there something else that you

15   wanted us to produce as well?

16            MR. TEETOR:  The 2024 tax returns.

17            MR. STARLING:  Yeah.  So here's the

18   choice on that.  If you want, on any of these

19   issues please confer with me because I've got the

20   case law on hand because it's a repeatedly

21   litigated issue on employment cases.  The two

22   options are, A, I can produce W-2s, K-1s, 1099s

23   from 2024 that he had.

24            The second option is producing the tax

145

1    return with, like, the first page with everything

2    redacted except the earned income, which I've done

3    before and had as a resolution when imposed by a

4    judge when we disputed the issue.

5            So it's up to you.  I mean, you can do

6    both, either or both.  I don't care.

7            MR. TEETOR:  Produce both.  That's

8    fine.

9            MR. STARLING:  We'll do that.

10           MR. TEETOR:  And as far as the binders,

11    am I correct to understand that you'll be

12    producing what you think is relevant and then a

13    privileged log for the rest?

14           MR. STARLING:  Well, if it's

15    privileged, yes.  So, for instance, I don't think

16    anything at his prior employment is relevant, and

17    so I would not produce prior employment.  It's not

18    relevant for wages because it doesn't have any

19    effect on his damages in this case.

20           It's also not relevant in terms of,

21    quote/unquote, performance or qualifications,

22    because there's a ton of federal courts have held

23    that violates Rule 404 and isn't even

24    discoverable.

 1          So I'm happy to meet and confer with

 2   and you send that case law if you want it to

 3   decide whether you want to challenge it or submit

 4   it to the magistrate judge, but my position is

 5   always that I don't produce prior employer

 6   information.  But I'll tell you what's there.

 7          So I'm not going to hide the ball and

 8   not tell you what's there from the prior employer

 9   in his binder.  I'll tell you what's there.  So if

10   you think it's enough or worthwhile to challenge,

11   you can do it.  That's what I mean by being

12   transparent.  But I'm not going to go through the

13   exercise of log unless there's privilege in there,

14   but I can't imagine there would be privilege in

15   there.

16          Does that make sense?

17          MR. TEETOR:  I think so.  I'll see what

18   you'll produce and then we can address it after.

19          MR. STARLING:  Well, yeah, so, for

20   instance, I'll do a cover letter saying here's our

21   supplement, here's what's included in the

22   supplement, of those binders here's what I am

23   declining to produce based upon the following

24   objections that we raised in our document request

147

1    or whatever, and then, you know, you can have a

2    phone call with me, confer with me and see if we

3    can resolve it if you dispute it.

4              If not, you know, by all means, it's

5    your prerogative on whether you want to submit it

6    to the magistrate judge.

7              MR. TEETOR:  Yeah, I think that's the

8    proper procedure.  That will work.

9              MR. STERLING:  Yeah, and if there are

10   things that we produce that you want to have a

11   little extra time on in a deposition with Jerry to

12   ask about, that's fine since we didn't produce

13   them before today.  If you have any questions

14   about what was produced or not produced, certainly

15   feel free to reach out to me.

16             MR. TEETOR:  Sure.  I'm looking at my

17   notes, I think the only other thing is we talked

18   about several snippets of text messages.  I would

19   like to see the actual text messages with those

20   individuals that we've already talked about

21   because --

22             MR. STERLING:  What do you mean the

23   actual text messages?  You're talking about, like,

24   native or --

148

 1              MR. TEETOR:  No, I don't need native,

 2     but I'd like the screenshots of the full

 3     conversations during the relevant time period.

 4     There's obviously have things that have been cut

 5     off.

 6              MR. STARLING:  Okay.  I'll talk to the

 7     client about that and see what we can do.

 8              All right.  Any other issues on

 9     documents?

10              On the medical records, our position

11     was there's none relevant because he's never seen

12     anybody for mental health.  Mental health records

13     would be relevant to emotional distress, whereas,

14     you know, like, going to a physical, where there's

15     no mental health consultation that occurred, would

16     not be relevant to emotional distress.

17              I mean, you're welcome to challenge

18     that if you want, but...

19              MR. TEETOR:  Like I said, I'll see

20     what's in your supplement and then we can talk.

21              MR. STERLING:  Well, I'm not

22     supplementing medical records.  I'm just telling

23     you right now I don't think there's anything

24     relevant, but I'm happy to send you case law on

149

1    that if you'd like and we can confer.

2              MR. TEETOR:  Okay.

3              MR. STARLING:  You let me know.  I'm

4    not going to put it together unless you want to

5    see it.

6              But the other thing -- I guess the last

7    thing, too, would be on the contention question,

8    I'm happy to send you case law on that and meet

9    and confer.  We obviously provided additional

10   disclosures in an expert's report.

11             There's case law in our initial

12   disclosures about how we don't have to disclose

13   the non-economic damages that he might request

14   from a jury because that's a matter of trial

15   strategy and work product.  So you make the call

16   on what you want to press on that.

17             MR. TEETOR:  Anything else?

18             MR. STARLING:  Nope, just making sure

19   we covered our bases.  Other than read and sign.

20             MR. TEETOR:  Sounds good.  I'll see

21   everybody at 3:00.

22                  (Signature not waived.)

23                     - - - - -

24        Thereupon, the foregoing proceedings

150

1          concluded at 2:02 p.m.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

151

1    State of Ohio      :        C E R T I F I C A T E
     County of Franklin: SS

2

3         I, Natalie Ward, a Notary Public in and for
     the State of Ohio, certify that Jerry Darst was by
     me duly sworn to testify to the whole truth in the

4    cause aforesaid; testimony then given was reduced
     to stenotype in the presence of said witness,

5    afterwards transcribed by me; the foregoing is a
     true record of the testimony so given; and this

6    deposition was taken at the time and place
     specified on the title page.

7

8         Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure, the witness and/or the parties
     have not waived review of the deposition

9    transcript.

10        I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,

11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties

12   hereto, or financially interested in the action.

13        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus,

14   Ohio, on September 18, 2025.

15

16

17

18

19        *Natalie Ward*

20   _____
     Natalie M. Ward, Notary Public - State of Ohio

21   My commission expires December 4, 2029.

22

23

24

```
                    Witness Errata and Signature Sheet
                     Correction or Change Reason Code
               1-Misspelling  2-Word Omitted  3-Wrong Word
                 4-Clarification  5-Other (Please explain)

      Page/Line          Correction or Change          Reason Code

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____

      _____     _____     _____
```

I, Jerry Darst, have read the entire transcript of
my deposition taken in this matter, or the same
has been read to me.  I request that the changes
noted on my errata sheet(s) be entered into the
record for the reasons indicated.

Date_____Signature_____

Ref: NW315348JD

**Exhibits**

**315348 Darst Exhibit A**
4:5 14:22
15:21 35:18

**315348 Darst Exhibit B**
4:7 36:17
38:7,9 39:11
40:2 42:21
43:6,17
46:19 47:24
49:16,23
51:16 53:3

**315348 Darst Exhibit C**
4:8 54:15

**315348 Darst Exhibit D**
4:9 56:4,23
57:24 59:2,
21

**315348 Darst Exhibit E**
4:10 60:21
63:24 71:24
72:20 78:13
81:22 85:5
92:1 93:4

**315348 Darst Exhibit F**
4:11 97:2,3
98:9

**315348 Darst Exhibit G**
4:12 96:21
100:11
101:19
103:14
117:19

**315348 Darst Exhibit H**
4:13 105:21
106:16

**315348 Darst Exhibit I**
4:14 108:12,
24

**315348 Darst Exhibit J**
4:15 89:13
110:5

**315348 Darst Exhibit K**
4:16 114:12,
14

**315348 Darst Exhibit L**
4:17 116:17
118:3

**315348 Darst Exhibit M**
4:18 122:23
124:3

**315348 Darst Exhibit N**
4:19 89:23
102:1,17
125:10

**315348 Darst Exhibit O**
4:20 128:9
134:6

**315348 Darst Exhibit P**
4:21 135:17,
23

**315348 Darst Exhibit Q**
4:22 137:13

———

**$**

**$13,273** 59:4
**$15** 10:6,10
**$16,914** 57:1,
9
**$208** 98:3
**$22,358** 58:2
**$4,577** 59:24
**$56.751.96**
98:11
**$78,000**
98:15

———

**0**

**000001** 15:1
**00001** 15:14
**000010** 60:23
61:7
**000011** 64:1
**000012** 67:3
**000013** 67:4
**000014** 67:23
**000015** 71:24
**000016** 72:20
73:7 75:6
**000017** 74:18
75:13
**000018**
76:14,19
77:3
**000019** 78:2,
16
**000020** 81:21
**000021** 83:11
**000022** 85:5,
9
**000023** 87:5
92:2
**000027** 93:3
**000028** 94:19
95:3,18
**000029** 60:23
95:23
**00003** 100:12
**000034** 36:19
**000039** 96:23
98:9
**00007** 108:13

**000084** 96:24
97:17
**00009** 108:13
**00013** 105:23
**00174** 135:18
**00177**
135:18,24
**0022** 85:18
**00246** 128:10
**00250** 134:8
**00561** 116:18
**00563** 116:19
**00564** 114:18
**00565** 114:23
**00566** 122:24
**02** 15:1
**09010** 137:14

———

**1**

**1** 39:10 40:1
42:20
**1-15-23**
100:23
**10** 6:14 116:1
**10-28** 107:22
**10-28-2022**
106:8 109:3
**100** 10:6 11:2
19:4 26:4
34:17 40:16
89:1,6 135:6
**1099s** 140:22
144:22
**10th** 90:9
102:2,18
125:12
**11** 126:17
**11-10-2024**
98:10
**11-11** 108:18
**11-15-2024**
98:9
**110** 133:8,10
**11:57** 79:11
**12-1-2022**
109:6
**12-18-2023**
97:19
**12-24-2023**
97:19
**12-29** 97:17
**12-29-2023**
97:18
**14** 10:6,10
**15** 6:14 10:5
**15-minute**
60:11
**15th** 72:17
82:15 89:19
101:9

102:21
103:23
110:12
114:4
117:14,20,
23 123:17
140:4
**16** 9:4
**16th** 76:15
77:5 79:11
**17th** 64:14
65:8 68:2
71:23 72:7,
8,10,24
123:2 124:3
**18** 9:4,5
14:19,20
78:19
**1995** 9:2
120:6
**19th** 109:24

———

**2**

**2** 34:20 43:6,
17
**2-26-1971**
5:11
**20-
something**
95:24
**2011** 39:23
**2015** 113:8
**2016** 9:4,6
**2018** 9:6,21
10:24
128:11
129:1
**2019** 9:21
10:24
**2021** 56:9,17,
20 57:1,5,10
64:23
**2022** 12:6
21:19 23:24
47:3 56:9,10
58:1 59:3,18
63:22 66:22
67:21 68:1,2
69:3 71:23
72:24 73:4
74:10,24
85:20 86:20
87:20 88:19
89:7 90:17
96:5,6,16
106:5,18
107:18,20
109:16,24
110:12
**2023** 14:1
15:15 17:22
18:15 21:20
23:9 24:1
45:18 50:15
51:8,11 54:8
56:10 59:22
60:7 65:4
66:22 67:21
76:15 80:16

82:2,10,15
84:10,14
88:20 89:7,
19 90:10
96:6 101:10
102:2,18,21
103:2,23
104:2
110:12
113:9 114:4
115:3,20
117:15,21,
24 118:5,9,
15,16,23
119:12,18
120:23
123:2,10,14,
17 124:3,21
125:12
139:17
140:4
**2024** 89:7
140:6
144:16,23
**2025** 54:17
56:6
**20s** 46:9,10
**20th** 64:15
65:9 70:15
73:4 74:10,
11,23 75:8
82:1,9 84:14
**21** 12:1
**21st** 68:1,16
69:3 70:15
**22** 12:1 39:7,
8 46:23 47:3
86:13 89:18
107:22
108:18
**22nd** 21:19
**23** 39:8 93:8
116:11,13
**24th** 74:21
75:16 95:24
**252** 128:10
**25th** 15:15
18:14 75:21
**26th** 61:16
62:15 63:22
**27th** 93:7
118:4,9,14,
16,23
119:11,18
120:23
**28th** 63:16
106:5,18
107:18,20
109:15
**29th** 103:2
104:1
**2:02** 150:1
**2nd** 12:6
54:16 56:6
88:19 89:18
90:17 96:5
110:11

**3**

**3** 46:19

**3-7-2018**
136:3

**30** 52:12

**31st** 85:20
86:20

**34** 39:11

**35** 113:12
114:2

**38** 36:20

**3:00** 149:21

**3B** 108:23

**4**

**4** 38:5 47:24
59:2 100:12

**404** 128:17
135:13
137:5
145:23

**4:21** 61:16

**5**

**5** 38:6 49:23
51:15 53:3

**50** 76:7

**50s** 34:17

**564** 114:24

**567** 122:24

**5:09** 76:7

**5th** 87:16
88:1,6 92:2,
10 115:2,20
116:11

**6**

**6** 71:23

**6:10** 75:16

**7**

**7.10** 136:7

**78** 14:12

**78,000** 14:14,
15

**7th** 76:6
128:11
129:1

**8**

**8-29-2023**
101:22
102:6

**8th** 107:19

**9**

**9-29** 103:8,
10

**90** 111:12

**97** 126:18

**9:04** 74:10

**9:17** 63:16

**9:24** 75:21

**9:44** 74:11
75:8

**9:47** 54:16

**9:50** 56:5

**9th** 17:22

**A**

**a.m.** 56:5
63:16 75:21

**abandoned**
129:3

**ability**
101:20
112:21
126:2

**Absolutely**
38:14 90:3,5

**accepted**
13:6

**access** 58:9

**accidental**
126:9

**accuracy**
57:19 58:5,
21 59:5

**accurate**
9:23 11:4
12:2,3,6
14:2 15:16
24:13 50:23
57:3 68:2,4,
8 69:8 72:22
79:6 83:15,
16,18 85:3
88:21 89:10
99:19
104:24
110:2 111:8

**accurately**
39:19 41:19
54:2 85:23

**active** 28:5,7
33:12,13
39:1 100:7

**actual** 10:19
13:22 82:11
87:22 91:10
105:8
147:19,23

**Adams** 46:2,
12

**additional**
63:17,21
65:22 66:4
81:22 93:4
122:2 134:4

149:9

**additionally**
19:9

**address**
97:11,12
115:21
146:18

**administratio
n** 44:13
112:15,21
136:3

**administrativ
e** 68:18,19,
22,23 136:4

**advance**
121:3

**advised**
80:19 81:13
130:3

**afraid** 33:7

**age** 18:5,9,
10 19:6
27:22 29:14,
17 30:7,11
31:12 32:7,
8,10,13,18
33:18,24
34:18,22
35:6 40:3
41:8 48:23
85:20 86:10,
19,23 95:3
118:11
119:1,5,13,
17,22
120:17,18
131:14

**agencies**
139:21

**agency** 9:13

**ages** 40:11,
18 86:8

**agree** 125:24
126:5

**agreed**
130:16

**agreement**
111:21
112:24
121:20
141:15

**ahead** 19:17
20:3 35:8
36:9,14
37:15 42:5,
13 57:13,22
58:7,24
59:14 85:1
89:11 91:8,
19 96:18
113:16
114:8
122:20
125:5 127:2
128:6,19,22
135:4,14
137:6 139:3,
9,24 142:12,
17

**ahold** 22:19

**allege** 23:14
32:9

**alleging** 20:5

**Amanda**
6:16,17
67:24 68:4,
17 69:10
70:16 71:9,
22,24

**ambiguous**
42:4,12
135:3

**amount**
57:15

**and/or** 30:7
122:1

**anniversary**
14:5

**annually**
98:15

**answering**
8:14

**answers**
8:12

**anymore**
42:22 70:7,9

**appeal** 124:5

**appealed**
129:21
130:17

**appearance**
125:20
128:3

**appears**
13:24 15:13
49:16,17
67:24 72:20,
23 76:14
78:3 79:11,
15 80:3 81:7
85:5 86:13
87:6 90:6
93:9 94:19
97:13 98:2
100:15
106:21
108:21

**applicable**
35:22
111:21

**application**
13:6

**applied**
12:15 13:5
49:23 50:11
51:7 52:7,8
54:6 120:11

**apply** 12:12,
15,17,20
13:3,4 50:3,
8 120:11,13

**applying**
53:5

**appointed**
71:14 72:4,
14 113:7
114:3

**appointment**

102:5

**appointment/
examination**
101:21

**approached**
121:24

**appropriately**
142:24

**approved**
115:13

**approximate**
101:3 107:2,
7

**approximatel
y** 9:20 11:16
55:2 98:15
101:8,10
113:6,12
114:1 116:1,
7 124:11
133:3

**approximatio
n** 113:4

**April** 123:2,
10,13 124:3

**arbitration**
129:20
130:15,19
136:17,23
137:7,11
138:3

**area** 12:9

**arm** 80:18
99:8

**arrested**
20:23 22:11,
14

**aspect** 25:3

**asshole** 95:4

**assigned**
105:10

**assistance**
103:17

**assistant**
68:18,19,22,
23

**assume** 7:20
23:23 53:8
65:21 66:1,6
67:7 72:3
77:10 78:23
80:14 81:16
88:21 92:12
96:10 98:3

**assumed**
61:9

**assuming**
64:9 78:4
94:20

**assumption**
38:16 49:20

**assured**
130:21

**atmosphere**
35:15 94:11

**attached**
95:19

**attempt** 15:5
76:18
**attested** 34:1
**attesting**
17:12 18:15
**attitude**
125:19
128:2
**attorney**
14:24 16:22
36:4,19
60:22 64:2
96:23
127:21,22
129:24
**attorney-
client** 16:5,9
**auditor**
85:21 87:2
**auditor's**
40:4,20 41:1
86:3,9
**August** 12:6
50:15 51:8,
9,11 88:19
89:18 90:17
96:5 104:1
106:18
110:11
**authorization**
138:6
**awarded**
129:20
**awards**
131:8
**aware** 42:7
46:15 53:2
69:4 70:4,10
84:11
121:19
136:11,21
**awesome**
63:5,7

― B ―

**back** 9:23
10:21 12:1
22:14,16
28:2,23
29:1,2 31:9
32:3,24
38:13 47:4
51:21 52:4
67:16,18
80:21 83:22
92:1,3 93:16
94:5 101:15,
16 109:18,
20 114:20
118:3
120:10
124:17,18
129:20,21
130:1,22
**back-and-
forth** 16:15
**ball** 146:7
**bargaining**
111:21

**112:24
121:20
based** 111:1
146:23
**bases**
149:19
**basic** 136:8
**basically**
130:6
**Bates-
stamped**
15:1 36:19
60:23 76:19
100:12
105:23
108:13
**BDU** 115:9
**began** 14:1
90:15 97:23
102:21
110:15
**begin** 10:16
54:4
**beginning**
65:15
**behavior**
31:24
**belief** 17:9,
14
**believed**
19:3 53:15
104:10
**believing**
119:16
**Ben** 46:1,12
**bid** 123:3,10
**bids** 123:12
**Bill** 12:24
13:1,2 33:20
34:2,9 47:7
64:4,5,11,14
65:8 66:5,7,
11 67:5
69:4,7
**binder** 146:9
**binders**
131:24
132:14,15,
17 133:2,5,
9,13 144:2,3
145:10
146:22
**birth** 5:10
41:5
**birthday**
75:15
**bit** 82:14
88:18
**bitch** 129:14
130:12
**black** 62:8
66:6 67:8,11
68:6,14
77:11 79:18
81:7,11
87:12

**blacktop**
99:7
**blame**
126:22
**blow** 97:7
108:16
114:15
**blue** 12:13,
14 110:10,
11
**board** 46:16
**body** 108:5
**born** 142:15
**boss** 25:19
72:1
**bottom**
15:14 35:21
38:6,7 48:1
63:14 65:14
73:6 75:6
78:15 81:8
**boxes** 87:11,
12
**Boyer** 51:20,
21,23
**brain** 8:8
**Brandy**
47:11,12
61:9,10
62:7,12,14
63:2,7,18,
20,21 69:4,
7,8 111:19
**break** 8:5
60:12
143:16
**bridge** 30:22
**Bridgeport**
9:10,14,17
10:3,12,23
11:8
**briefly**
125:10
**Brooks** 48:2,
4,12,17,21
49:7 62:21
**brother**
65:13 75:17
**brought**
22:18 24:4
136:16
144:2
**Browning**
137:16,18
**bubble** 65:15
68:6,14
79:24 80:3,4
81:8,11
**bubbles**
67:11,12
68:5 77:11,
12 79:19,22
**Buckeye**
30:9,13,15
31:1,11
43:22 53:23
54:5

**bunch** 74:4
**Bureau**
102:5
109:10
**busy** 85:9
**BWC** 117:20

― C ―

**calendar**
57:1 58:1
59:3,22 60:7
**call** 5:12,15
24:19 25:16
28:9 29:4
51:17,21,23
83:4,14 94:5
129:3
130:12
147:2
149:15
**callback**
94:13
**called** 19:9,
20 21:9
22:4,5,9,20,
24 23:12,15,
18 25:21
26:7,15,24
27:3,24
28:22 41:11,
16 42:15
43:15,18
44:7 62:15
85:21 94:5,
12 129:13
**calling** 23:2
28:8,19
31:20
**calls** 51:17
**canine** 24:8,
12,15,19
25:6 26:19
73:14,17,19
129:7 136:7,
8
**capable**
112:12
**captain**
17:22 34:23
40:3,11
45:2,3,5,8
79:2,21
80:19,24
81:6,13,23
82:19 83:3,
21 84:1
85:6,17 86:2
87:3 110:20
115:2
116:23
117:4,7
121:1 123:2,
9 124:2
**car** 22:22
39:17 129:8,
15
**card** 30:9,13,
16 31:1,11
43:22

**care** 69:6
138:24
145:6
**career** 5:23
131:16,19
**case** 6:2,3,5,
11,24 7:3
20:23 21:1
35:19,20
75:10 80:21
105:3
114:17
133:8 138:5,
9 140:23
141:2,4,19
144:20
145:19
146:2
148:24
149:8,11
**cases** 144:21
**casting**
126:22
**catch** 99:8
**caused**
116:4
**cease** 9:3
10:13 11:18
32:1
**certificates**
132:23
**chain** 45:6
86:16
**challenge**
144:11
146:3,10
148:17
**chance**
85:10
**change**
14:20
**character**
128:16
**charge** 15:9
16:2,7,9
17:7,21 27:3
32:5 34:2,21
36:6 69:14,
16,18,20
70:5,18,22
71:11 86:3
**chat** 75:23
**check** 32:24
35:21 55:14
**checked**
35:23
**checking**
85:16
**chief** 50:7
51:20,21,23
53:4,11 79:4
129:4,12
**Chinese**
30:20
**chitchat**
121:13
**choice**
144:18

**Christmas** 74:21 75:15, 17,22

**chronic** 134:10

**chronological** 97:16

**circumstance** 30:19

**circumstances** 24:10 115:7 126:20 127:4

**civil** 6:3,4 15:8,11,18 16:2 17:1

**claim** 138:9

**claims** 131:12 139:1

**class** 53:23, 24 54:5

**clean** 136:10

**clear** 8:13 67:10 119:9

**cleared** 84:15,21

**clerk** 68:21

**client** 141:10 142:12 148:7

**client's** 105:22

**close** 25:2

**co-worker** 32:9

**co-workers** 32:6 54:23

**Cody** 48:2,4, 11,17,20 49:7 62:21

**cold** 99:6

**collective** 111:20 112:24 121:20

**colonel** 19:10,20 20:14 21:9 22:5,6,21 23:12 25:21 26:7,15 39:16,17 41:14,17 44:3

**colored** 62:11

**Columbus** 54:1,11

**combination** 43:1

**comfortable** 8:1,7

**command** 45:7 79:7

**comment** 26:20 30:15 31:10

**commented** 34:7

**comments** 26:1,2 27:10,12,22 28:11 29:6, 15,18 30:11 31:6,12,14 34:15,24 35:2 42:2,9 44:15 48:7, 11,18,20,24 95:2 120:18 131:14

**Commission** 15:8,11,18 16:3 17:1

**Common** 41:10

**communicating** 72:18

**communication** 16:16

**communications** 16:8

**comp** 66:12 80:22 105:19 108:21 124:4

**compensated** 10:1

**compensation** 10:2 14:9, 17 56:9 81:4,14 102:6 109:11 131:12 140:3

**complete** 141:11

**completed** 140:6

**completely** 140:14

**completes** 83:11

**completing** 53:24 87:3

**compliant** 55:15,17,18

**comply** 56:1

**compound** 19:16 20:1

**computer** 43:8

**concerns** 25:23

**conclude** 135:9 136:12

**concluded** 150:1

**conclusions** 135:22

**condition** 135:11 136:4,13

**conduct** 36:7

**conducted** 35:24

**confer** 74:22 144:12,19 146:1 147:2 149:1,9

**confirm** 94:21

**confirmed** 62:15

**congratulations** 73:1

**connection** 138:24

**Construction** 13:12

**consultation** 148:15

**contact** 99:11

**contacting** 94:14 141:14

**contention** 138:14 142:22 143:1,9 149:7

**context** 5:21 18:2 24:19 40:10 115:6

**continual** 32:3

**continually** 142:3

**continue** 74:22 75:4

**continuing** 128:17

**contract** 69:17

**contradict** 89:9

**control** 126:21 127:4

**conversation** 24:18 29:8 37:8 72:15 73:21,24 74:7 78:22

**conversations** 16:21 36:4 37:6 81:23 121:7,9 127:21 148:3

**Cop** 127:10, 19

**copy** 144:4

**corner** 41:13 78:16

**correct** 7:17 10:11 12:23 14:3,7 17:3, 9,14,17 19:2,6 21:23 26:14,15 29:19 31:5 38:12 39:8, 24 40:21 41:22,23 43:5,19 45:6 46:18 48:16 49:14 51:2 56:2 61:18 64:6,9,15,19 67:12 71:8, 15 72:12 77:6 79:8,19 80:4 81:23 82:2,10 90:10 91:2 93:6 97:13 98:11,14,19, 20 99:13 102:11,14, 18,22 106:6, 20 112:11 116:2,9,14 117:10,15, 21 118:6,15 126:23 134:22 137:8,21 145:11

**correctly** 25:4 40:7 109:20

**correspondence** 61:8 63:19

**County** 5:7 6:21 8:24 9:8 11:19 12:5,12 13:3,8,10 14:17 21:19 24:16 25:6 26:19 34:12 37:21 47:1 50:3 51:1 52:23 56:10 59:3,19,23 60:8 61:13, 18 63:11 64:18,22 65:4 66:21 71:15 72:5,9 73:17,19 79:3 87:19 88:3,13,19 90:14,16,21 91:4,15,23 92:9 93:23 94:1,14 95:1 96:4 98:18 99:23 101:4, 11 102:4,7 106:13,19 107:3,8,12, 17 109:14 110:7,16 111:10,22 112:2,7 114:3 116:8

121:16 124:5 126:3, 14 132:20, 21 134:16 135:8,10 136:6,12,18, 22 137:2,20, 22 139:7

**couple** 20:21 21:4 130:15

**court** 7:15, 19,22 20:10, 12,17,20 21:15 26:7 39:5,11 41:10 44:4

**courtroom** 41:11

**courts** 145:22

**cover** 146:20

**covered** 80:22 149:19

**criminal** 6:2

**CROSS-EXAMINATION** 5:4

**crossing** 27:5 30:8 43:12

**cruiser** 135:11 136:2,14

**current** 14:8

**cut** 79:12 80:4 81:7 85:6 94:4 148:4

———
**D**
———

**dad** 28:13 43:15

**damages** 138:9,13 142:23,24 143:9 145:19 149:13

**Daniel** 54:21

**dark** 100:2

**Darst** 5:1,11 15:1,14 16:20 36:19 39:11 56:8, 23 60:23 61:7 64:1 67:3,4,23 71:24 72:20 73:7 74:18 75:5,13 76:14 77:3 78:2,16 81:21 83:10 85:5,9,18 86:13 87:5 92:2 93:3 94:19 95:3, 18,23 96:23

97:17 98:9
100:20
119:9
128:10
134:8
135:18,24
137:14

**Darst's**
136:1,5

**date** 5:10
12:3 20:10,
18 31:5
40:16 41:5
52:2,3 53:7
66:10 71:16
72:13,18
82:12 89:18
93:9,10
95:23 97:17,
18 98:9
100:22
101:18,21
102:9,12,13,
14,16 103:1
105:12
106:5,7
107:9,15,24
109:1,2,5,
18,19
110:10
117:19
118:1,2,17,
21 119:19
124:14,15

**dated** 15:14
90:9 102:2,
18 128:11

**dates** 9:24
13:22 31:8
51:10 56:13,
21 65:6
90:21 91:4,
22 96:9,11,
14 101:3
104:23,24
105:8,12
107:2,7,10,
11,14 110:9,
11,14,22,23
111:2,7
116:10
117:12
118:16
121:11
129:4

**David** 23:5
39:22

**Davy** 22:20,
24 23:2,4,5
26:8 44:5

**day** 29:11,12
85:9 89:19
100:1 101:5,
16 130:7

**days** 73:3
90:23 91:1,
10,11,15
92:21
111:12
113:3,6,12
114:2 116:1
126:18
127:5 130:8,
15

**deal** 61:6

**dealing**
134:11

**Dean** 34:15

**December**
22:2 23:8,24
39:7 74:21
75:16,21
85:20 86:20
97:24

**decide**
144:11
146:3

**decisions**
70:12

**declare** 17:6

**declining**
122:5
146:23

**deduction**
140:24

**deem** 113:1

**defendant**
5:24

**Defendant's**
14:22 36:17
56:4 60:21
89:13 96:21
100:11
105:21
108:12
110:5
114:12
116:17
122:23
128:9

**deficiencies**
125:17
129:7

**Deon** 32:11,
12 33:15
76:15,16
77:4,7,11,15
78:19 99:12,
17

**department**
10:15 13:9
49:24 50:4
51:8,13,16,
18 52:16
53:1,4,6,16,
20 92:23
139:12,13

**departmental**
24:7,10

**dependabilit**
**y** 125:17
126:2,19,23
127:9

**dependable**
126:12

**depends**
133:14

**deposed**
7:12 138:17

**deposition**
5:18,22 7:19
147:11

**deputies**
12:18,19
17:24 18:18,
21,23 27:3,6
31:23 39:13
42:15 43:3,
7,9,13,15,
18,21 44:17
45:21,24
48:13 95:2
111:10,22
121:15

**deputy** 12:18
25:14 27:7,
8,14,17 28:9
29:13,18,20,
23 31:19
35:2 43:11,
15,18,23
44:1 48:14,
22 49:9
59:18,23
60:8 61:22
79:4 84:7
95:11,14
112:2,7
120:5,6
121:3 129:5,
12 136:1,5

**derogatory**
7:7

**detailed**
15:22 17:20

**details** 20:19
23:20
104:11
130:7

**detective**
120:24
121:7

**Detectives**
42:17

**determinatio**
**ns** 133:20

**determine**
91:22

**devastating**
131:18

**develop**
111:13

**devoted**
25:14

**differently**
130:11
132:6

**difficult**
134:11

**difficulties**
76:22 78:12

**digital** 61:3

**dinosaur**
42:16 43:18
48:24

**dinosaurs**
42:22

**directed**
138:11
143:1

**directly** 27:1

75:24

**dirty** 129:14
130:12

**discipline**
33:15

**disclaimer**
17:6

**disclose**
149:12

**disclosed**
143:10

**disclosures**
149:10,12

**disconnecte**
**d** 78:6

**discount**
30:24

**discoverable**
133:24
134:1
145:24

**discovered**
129:6

**discovery**
63:2 75:10
76:13 78:21
80:13 96:22
105:23
114:17
133:8 138:4
140:10
141:22
144:6

**discriminatio**
**n** 6:10 15:9

**discriminator**
**y** 15:24

**discuss**
24:12
120:23
141:7

**discussed**
39:22 48:13
69:5 95:1

**discussion**
24:8 26:18

**discussions**
123:9

**disliked**
25:20

**dispute** 57:8,
19 58:5
59:5,10 60:2
82:16 98:5,7
106:10,22
109:9 110:1,
14 111:2
113:13
114:5
124:22
125:2,23
147:3

**disputed**
145:4

**distress**
148:13,16

**dividend**
141:1

**doctor**
84:15,21
105:19
138:23

**doctor's**
50:22
110:22
111:5

**document**
14:24 15:2
17:3 36:18,
21 57:7,16,
17,23 58:10
59:1,6,9,11,
15 60:3,4
88:18 89:14,
17,21,24
100:13,17
106:2,21,23
107:21
108:1
109:11
110:9,18,20
116:20
131:2 132:4
133:18
135:19,23
138:15
146:24

**documentati**
**on** 12:4
13:19,22
21:17 65:1
81:17 82:13
88:20 89:4
90:24 91:10,
21 105:13,
15,18
110:22
111:5,7
114:1,9
117:13
124:20,23
125:7
126:16
131:6 133:9
138:2

**documentati**
**ons** 11:3

**documents**
15:4 85:2
86:4 132:19
148:9

**dog** 73:13,22
94:3 129:8,
14

**Donnie** 47:7

**Donny**
77:17,18,19
99:10,14

**doubt** 141:3

**drafted** 16:6

**drive** 55:14

**drug** 20:24

**due** 32:7,10,
13,18 34:21
35:5 51:4
119:1,13,17,
22 134:10
135:10
136:13

duly 5:2
duration 112:1
duties 55:13, 20
duty 28:5,7 33:12,13 39:1 44:17, 23 45:4,9 47:12 50:19, 24 83:7,8, 21,24 84:4, 10,16,18,19, 22 85:16 100:3,8 103:1 109:2, 6 130:14 136:6

— E —

earlier 49:17 61:23 76:16 77:8 82:20 83:20 86:1 87:7 95:1,13 98:13 125:10
early 46:9
earned 57:1 58:2 59:4,23 140:13,20, 23 141:9 142:1 145:2
eat 30:20
educational 8:18
effect 32:22 145:19
effective 102:4
elaborate 85:11
election 123:12
eligible 103:16
email 115:1, 5,7,21,24 116:6 123:1, 8 124:4,8 137:15
emotional 138:9 148:13,16
employed 8:21,23 13:9,16,17 33:8,9 56:24 61:17 64:22 65:3 71:1 87:19 88:2, 13,18 96:3,4 137:2 139:6
employee 6:8,15 19:2, 5 69:1
employees 18:7 32:8

33:18,19,24 44:12
employer 58:18 139:16 140:3 146:5, 8
employer's 106:12
employers 58:17 139:15,21 141:14
employment 6:10 8:19 9:1,3 10:12, 16 11:17 15:9 28:4 45:23 50:13 51:19,24 90:13,15 102:3 121:15 130:4 134:1, 15 139:16 141:2 144:21 145:16,17
end 14:1 79:15 97:19, 24
ended 110:15
enforcement 5:23 8:20,22 9:13 10:14 52:12 57:4 112:14,17, 22
enlarge 90:2
entered 141:12
entire 8:18 128:15
entirety 133:7
entitled 112:23
entity 139:17
entry 43:17, 20 44:1,9,16 45:21 51:15 53:3,22
equipment 9:10,14,18 10:3,13,23 11:8 53:23 54:4 55:22
ER 66:13
essentially 79:6
estimate 10:9 20:15 33:6 50:10, 15 59:17 60:6 109:3 113:4
estimated 103:1,8

109:18
evaluate 112:15,21
evaluated 139:5
evening 70:14,18 100:2
everyone's 85:19
evidence 128:16
exact 20:10 25:11 28:3, 24 33:1,4 38:20 42:24 52:1,2,3 56:13 57:15 72:13 105:12 107:14 119:8 121:11,12 124:15
examination 136:1
excessive 136:10
exchange 64:4 66:14 71:13 72:21 77:22 78:3, 19 88:13,23 93:1,5 94:7 95:17 96:15 115:24 116:6
excuse 20:12 35:19 62:7 75:15 97:3,18 113:9 134:7 135:23
exercise 146:13
exhibit 14:22 15:21 35:18 36:17 38:7,9 39:11 40:2 42:21 43:6, 17 46:19 47:24 49:16, 23 51:16 53:3 54:15 56:4,23 57:24 59:2, 21 60:21 63:24 71:24 72:20 78:13 81:22 85:5 89:13,22,23 92:1 93:4 96:21 97:2,3 98:9 100:11 101:19 102:1,17 103:14 105:21 106:16 108:12,24 110:5 114:12,14

116:17 117:19 118:3 122:23 124:3 125:10 128:9,15 134:6 135:17,23 137:13
expedite 89:12
expert's 142:4 149:10
explain 82:6 83:5
express 70:11
expressed 25:22
extend 122:2,6
extension 121:21
extra 147:11

— F —

Facebook 72:21 73:1,4 74:18,23 75:5
faces 21:7
fact 134:11
factors 35:3
facts 15:22
fair 8:15 38:8 49:20 78:23 80:14 87:10 96:7 102:8 112:13,19 118:22 130:19
fairly 14:4
fall 98:24 99:22 116:4
falling 134:21
familiar 15:6 132:4
family 52:14
fast 134:12
faster 8:8
February 17:22 18:14 76:6
federal 145:22
feel 5:15 25:23 34:21 94:3,9 147:15
feeling 35:5
fell 77:16,17 80:10 98:23

116:3,4 129:2 134:14
felt 25:18
field 55:6
figure 29:2 52:5 140:24
file 15:10 90:14
filed 36:6 129:22
filing 16:2
fill 66:11 80:20 81:14
filled 107:4
filling 16:1 86:2
find 50:13 52:10 54:7 131:1 141:3
finding 136:22
fine 110:24 113:4 114:11 145:8 147:12
finish 73:5,9, 21,23 74:6 131:16
firearms 9:15,18
fit 53:5,15,19
Fitch 5:8 19:9,14,20 21:9,18 22:19 23:1, 12 25:5 28:16 29:21 31:7,17 35:1 39:4,12,15 41:13 42:1,9 44:7,13,17, 23 45:5,23 46:16,22,24 48:18 61:17 63:11 64:18 71:14 72:4, 7,8,22 73:10 74:20,23 76:1 83:9,12 113:7 114:2 116:23 117:4,7 121:1 122:1 125:12,16 140:17 142:9
Fitch's 24:4
five-page 36:18
follow 130:20 132:10
follow-up 119:15
footing 99:1, 3

**FOP** 129:22, 24 130:21

**force** 39:13

**forced** 32:7, 10,13,17

**foregoing** 149:24

**forget** 131:21

**forgot** 48:7 72:6

**form** 80:23, 24 81:4 100:23 103:20 108:22 117:3 124:4

**forms** 81:15

**fought** 136:17

**found** 54:1, 10 136:5

**fourth** 134:7

**frame** 9:7 21:22 23:8 24:1 28:3 52:2

**Frank** 17:22 18:16 40:2 47:19 68:20 78:4,22,23 79:12,21 83:3 115:2

**free** 5:15 136:10 147:15

**friends** 129:17

**front** 26:11

**Fruth** 21:10, 12 41:12,16 42:1,8 48:2, 3

**full** 5:9 35:23 36:7 50:19, 24 84:16,22 100:7 103:1 120:3 131:24 133:6 134:24 148:2

**full-fledged** 112:16

**fun** 48:23

___

**G**
___

**GAAP** 85:21 86:12,17,23 87:2

**Gallia** 6:21 8:23 9:8 132:20,21 134:16 135:8,10 136:6,12,18, 22 137:2,20,

22 139:7

**Gallipolis** 51:16,17,18, 24 52:10,16, 24 53:9 139:12

**gave** 130:15

**GCSO** 128:10 134:7 135:18,24 137:14

**general** 94:10,11

**generally** 7:21 61:1

**Geotex** 13:12,15,16, 17 14:6,9 54:12,24 55:5,21 97:1,4,23 98:14 139:14 140:4

**Gilkey** 12:21, 24 13:1,2 33:20 34:2, 7,9 47:7 64:5 65:8 66:5,7 67:5 69:8

**gist** 24:23

**give** 5:21 11:2 12:3 19:6 28:3,23 31:5 33:6 50:22 51:10 52:1 57:14 78:14 85:3 87:21 105:14 112:20 119:7 121:11,12

**glad** 65:12

**Golden** 30:9, 13,15,24 31:10 43:21

**Golsby** 27:8, 18 30:12 31:11,19,24 35:2 42:17 43:2,23 48:2,4,14,21 49:9 52:23 71:4,6,10 94:22,24 95:8,11

**Golsby's** 27:17

**good** 5:6 53:5,15,19 61:6 62:16 66:10 130:16 131:16 143:14 149:20

**grand** 21:2

**grandfather** 95:4

**grandpa** 27:4,24 28:8,14 29:4,15 31:15,20 42:16

**great** 7:23 85:22

**greatly** 120:6

**grievance** 129:22

**gross** 98:2, 11

**ground** 108:4

**group** 17:23 18:6,17,24 19:4 34:23 40:3,15 75:23 86:8 94:19

**guess** 6:1,8 68:9 77:24 95:12 113:2 115:16 149:6

**guys** 69:12, 21

___

**H**
___

**hair** 136:10

**half** 35:13 60:11

**hall** 41:12

**hallway** 20:11

**hand** 144:20

**handed** 39:15

**handled** 132:6

**handling** 73:17,19

**hang** 19:11, 22 24:24 25:7 26:21 73:13 120:19

**happen** 122:11

**happened** 23:8,23 37:6,9 89:3 107:10 119:8,23 122:12,17 130:9 131:11

**happening** 122:14

**happy** 75:15 89:5 146:1 148:24 149:8

**hard** 90:2

**he'll** 143:21

**health** 138:24 139:6 148:12,15

**hear** 18:12 46:5 71:7 113:18

**heard** 7:9

**hearing** 7:13 20:10,18,20 26:7 39:5 44:4 129:19 137:7

**heavy** 53:23 54:4 55:22

**held** 109:1,4 126:8,9 145:22

**helpful** 124:16

**helping** 83:10,12

**hesitant** 120:12

**hey** 25:16 28:18 29:3, 23 31:19,24 49:2 82:20

**Hicks** 54:21

**hide** 146:7

**highlight** 125:14

**Hills** 53:23 54:5

**hire** 89:17 107:15 110:10

**hired** 45:22, 24 47:20 69:12,13,17 101:17 111:10

**hires** 46:15

**history** 8:18, 19 128:4

**hold** 99:10 113:4 143:15

**honest** 10:18,20 21:16 47:5 56:15 124:18

**hospital** 105:18 125:7

**hound** 130:2

**hour** 10:6,10 35:13 60:11

**hourly** 14:19

**house** 129:5, 11 130:13

**How's** 92:23

**huh-uhs** 8:1

**hurt** 77:16,23 79:17 98:23 101:12

**Hutton** 12:19,22 13:2 27:7,13 28:9,18 29:3,18 31:23 35:2 42:17 43:2 48:14,21 49:8 52:22 69:23 70:3,8 87:6,7 92:2 93:5 94:21

**Hutton's** 27:21 87:11

___

**I**
___

**ice** 99:20 116:2,4

**idea** 21:21 22:1 67:15 80:11 87:16 91:4 120:2 142:8

**identified** 6:23 125:15

**identify** 29:8 30:4 88:22 139:21

**identifying** 93:11 134:8

**ignorant** 132:7

**imagine** 146:14

**imessage** 86:14

**immediately** 11:9 102:4

**imposed** 33:15 145:3

**improper** 128:16

**improving** 134:12

**inappropriate** 25:17 142:22 143:3,8

**inches** 133:4

**incident** 107:5,9 128:11,12

**incidents** 23:11 37:5 38:21,24 39:4 66:24 119:7

**incline** 99:4

**include** 35:24 132:19

**included** 35:4 146:21

income
52:12
140:13,20,
23 141:1,9
142:1 145:2

indication
54:10

individual
20:24 140:3

individual's
121:21

individuals
21:13 22:14
46:20 47:6
147:20

indoor 9:16

info 40:5

information
17:9,13 41:7
58:13,18
59:10 86:11
105:14,17
140:13,14
146:6

initial 149:11

initially
111:10

injure 108:6

injured
66:16,20
67:17 82:2,9
100:19
101:5,7,9
103:16,18
106:5
107:16,22,
24 108:24
109:3 113:8
114:4 116:1
117:15,23
120:8 126:6

injury 21:20
39:2 45:19
65:5 66:12,
17 67:21
70:23 80:15
81:2,3 82:11
87:22 89:3
92:9 98:21,
22 100:6,22
103:23
106:5,7
108:9 109:1,
5,15 117:19
118:1,2
119:24
123:16,20
126:8,9
129:2,12
131:12
134:10,16,
19,20 135:1

inquire
51:18,24

inquired
83:21 84:18

inquiries
53:14

inquiry 80:15

insert 16:4

inspecting
55:24

instance
23:21
145:15
146:20

instances
19:23 23:17

instruct
138:12
143:8

instructed
9:15

instructor
9:19

insurance
40:6

intent 36:6
120:16

intentions
35:19,20
120:4

interaction
71:22

interest
116:21,22
118:4 141:1

interested
138:21

interior's
136:9

interpret
92:8,17

interrogatori
es 143:1

interrogatory
138:14

intervals
32:4

interview
111:15,16

investigation
35:23 36:7

involved
22:12

involving
39:4,22 44:4

irrelevant
128:16
140:15

issue 47:15,
16 119:6,21
120:8
126:19,23
131:9
136:16
141:15
144:21
145:4

issues 6:9
69:15,19,22
70:2 103:12
126:1,12
128:1 135:6
136:24
139:6
144:19
148:8

items 115:11
137:10

J

Jackson
53:4,6,15,20
139:13

jail 22:14
48:8,9,10
62:4,18,20,
22

January
21:20 22:2
23:9 24:1
39:7,8 45:18
66:22 67:21
76:15 77:5
79:11 80:15
82:1,2,9,15
84:10,14
89:19 101:9
102:21
103:23
110:12
113:8 114:4
115:2,20
116:11
117:14,20,
23 123:17
141:24

Jason
133:12
140:9

Jerry 5:1,11,
13 16:14
49:12 56:8,
23 57:22
58:7,24
59:14 60:19
78:8,11
82:20
100:20
113:19
128:19
138:4 139:3,
9 142:6,19
143:5,13,17
144:1
147:11

Jerry.darst@
meigssheriff.
org 115:22

job 7:24
10:14 11:19
12:11,16
52:10,13
54:1,10
55:13,20
56:1 63:13
94:15 109:1,
4 112:12
120:4,7,20
129:20
130:1,22
131:16

jobs 55:14

Joe 137:16,
18

joined
127:11

Jones 32:11,

12 33:15
34:15 76:16
77:7,16
78:20 99:8,
12,17

Josh 27:20
30:12 31:11
48:2,4,14,21
49:9 52:23
71:6,10
94:21

Joshua
27:20 95:11

jotted 38:19

judge 129:21
130:17,18
143:12
145:4 146:4
147:6

July 45:18
88:19 90:9
93:7 96:5
102:2,18
116:12
125:12
139:17
140:4

jump 89:11

jury 21:2
149:14

Justin 52:19

K

K-1S 140:22
141:8
144:22

K-9S 141:6,8

kids 32:20

kind 7:20
11:5

King 47:7,11,
12 61:10
69:8 111:19

KJ 46:1,7,8,
12

knew 41:8
59:8 66:23
72:16 86:10
120:7,16
129:15

knock 29:24
31:20,24
49:2,10

knowing
120:15

knowledge
17:8,13
18:16 33:14
36:5 111:1
124:7

L

label 89:13

laborer 55:7,
8

lack 125:18

Larkin 68:1

Larkin's 68:5

Larkins
68:17 69:11
70:16 71:9,
23,24

late 100:2

law 5:23
8:20,22 9:12
10:14 52:12
57:4 112:14,
16,22
144:20
146:2
148:24
149:8,11

Lawson
23:5,6 26:8
39:22 44:5

lawsuit 48:5
61:4 63:4,11
65:11 66:4
76:9,13
77:22 78:2
82:24
138:19,24
139:1
142:20

lawyer
138:12

lead 35:4

learn 142:14

leave 21:20
25:3 28:6
33:11 44:20
45:19 65:5
70:23 87:22
98:19 108:9
117:10,14
118:5 129:2,
12

leaving
52:23

led 32:17
44:14 53:18

left 11:8,22
15:14 41:15
70:24
101:16
131:17

length 112:1

letter 90:7,9,
12 102:2,9,
13,15
116:21,22
118:3,6,8,
14,23
119:11,20,
24 120:22
121:6
125:11,15
129:6
146:20

letting 77:15

life 92:23

lift 55:21

light 44:17,
23 45:4,9

47:12 83:7,
8,21,24
84:4,10,16,
18,19,22
85:16 100:8
**light-colored**
64:10 66:7
**lighter** 62:11
**Linkedin**
54:19
**listed** 47:8
48:1 125:17
**lists** 46:19
**litigated**
144:21
**litigation**
64:3 130:9
**log** 145:13
146:13
**logs** 129:7
**LOL** 72:7
92:4 95:5
**long** 9:17
11:12 37:17
50:11 70:21
101:8,10
108:8
129:18
**long-sleeved**
115:8
**longer** 32:21
**looked** 78:18
86:4 102:1
117:13
125:10
127:16
**lose** 99:3
**lost** 78:8
99:1
**lot** 30:5
45:22 99:24
**love** 25:13
**loved** 25:13
120:5,20
121:2
**lunch** 43:20

---

**M**

---

**machinery**
55:22
**made** 7:4,13
10:5 26:1,19
27:10,12
28:12 29:6
30:15 32:14,
15,19 34:15,
24 35:2
44:15 45:4,
15 47:9
48:7,11
49:8,18
57:4,9 59:18
60:7 69:4
70:4,10
73:12 95:2
115:10
120:17

132:5
134:24
136:11
139:1
**magistrate**
146:4 147:6
**mail** 90:8
125:13
**maintain**
136:9
**Major** 111:17
**make** 7:9
8:3,10,12
22:23 24:9
26:2 30:12
31:11,14
32:16,23
37:7,9 45:1
48:22 53:14,
18 55:15,16
56:1 60:11
62:8 68:10
95:23
104:13
121:2 122:8
123:12
133:19
146:16
149:15
**makes** 94:3,
9
**making**
29:16 38:16
42:1,9 48:23
70:12 98:15
119:22
138:8 143:2
149:18
**male** 22:18
39:15
**man** 19:10,
12,20,22
23:15,18
24:20 25:1,
8,17 26:21,
24 28:10
29:4 31:1
42:16 48:23
**managed**
131:20
**March** 87:16,
20 88:1,6
92:2,10
118:4,9,14,
16,23
119:11,18
120:23
128:11
129:1
**mark** 14:22
36:16 54:14
56:3 60:21
89:23 96:20
100:10
105:20
108:11
110:4
114:12
116:16
122:22
128:8
135:16

137:12
**marked**
117:18
**Marty** 12:22
13:2 27:13,
21 28:18
29:3 48:14,
21 49:8
52:22 87:7,
11 92:2,7,8,
17,24 93:5,
14 94:7,8,21
**Marty's** 88:1
93:19 94:2
**Mason** 30:21
**match**
110:23
**Matt** 5:7,16
16:12 58:16
141:12
143:23
**Matt's** 16:15
**matter** 58:19
78:22
149:14
**MCSO** 90:16
100:12
105:23
108:13
114:18,23,
24 116:18,
19 122:24
**means** 57:7
147:4
**meant**
130:12
**mediation**
35:24
**medical**
28:6,7
33:10,11
44:20 47:15,
16 50:17
51:3 98:18
105:13
108:9 117:9,
14 118:5
138:5
148:10,22
**meet** 146:1
149:8
**meeting**
24:7,10,11
39:5 74:5
**Meigs** 5:7
11:19 12:5,
12 13:3,8,10
14:17 21:18
24:16 25:6
26:19 34:12
37:21 47:1
50:3 51:1
52:23 56:10
59:3,18,23
60:8 61:13,
17 63:11
64:18,22
65:4 66:21
71:14 72:5,9
73:17,19
79:2 87:19

88:3,13,19
90:14,16,21
91:4,15,23
92:3,9 93:23
94:1,13 95:1
96:4 98:17
99:23 101:4,
11 102:3,7
106:13,19
107:3,7,12,
17 109:14
110:7,15
111:9,22
112:2,6
114:3 116:8
121:16
126:3,13
132:21
**mental**
138:23
139:6
148:12,15
**mentioned**
127:13
134:14
**Merry** 74:21
75:15,17,22
**message**
18:3 26:5
61:15 72:21
73:1,15
74:19 75:7,
21 83:18
86:5,15
94:20
**messaged**
73:4
**messages**
34:23 45:11,
12 60:21
61:2,3 63:17
64:9,10,13
65:7,10,22
71:22 81:18,
20 87:6
147:18,19,
23
**Messenger**
74:23 75:5
**met** 73:16
**middle**
103:14
**Middleport**
10:15 11:10,
14,16,18,23
48:10 49:24
50:4,8,11
51:7,12
52:7,8 53:9
56:10,12,17,
20,24 57:2,
5,10 58:2,3
62:4,20,22
93:16,24
94:15
101:16
132:22
139:12
**mine** 97:10
**minute** 20:22
76:23

**misjudged**
99:7
**mislead** 11:6
105:8
**mistake** 11:7
**mistakes**
69:19
**MJ** 87:6
94:20
**Mohler** 77:19
99:10
**Molher** 47:7
**moment**
78:14
**Monday**
63:22 79:11
**month** 50:12
55:7,8
124:16
**months**
116:7,13
121:22
122:3,6
126:17
**Monty** 49:24
50:6
**morning** 5:6
**motivation**
125:18
**mouth** 8:9
**move** 36:16
66:2 72:19
81:21 87:5
96:20 125:9
**Moving** 27:2
43:6 47:24
76:12
103:13
**mutual**
121:21

---

**N**

---

**name's** 5:6
**named** 78:4
**names** 21:6
28:9
**narrative**
16:7,17
**Natalie**
143:21,22
144:1
**native**
147:24
148:1
**nature** 6:5
**neck** 134:23
**needed** 27:4
30:7 40:4,20
41:3,6 43:11
52:11 86:8
**needing**
50:12
**neglected**
14:16 34:14

**night** 69:5
79:16 80:1,
6,10 100:2
143:14
**non-economic** 149:13
**nonresponsive** 144:8
**note** 44:10
47:19
**notes** 36:24
37:2,4,7,9,
12,18,20,23
38:9,10,22
40:19 44:6
47:8,21
49:19,22
84:17
147:17
**notice** 38:5
**noticed** 13:14
**notification** 137:10
**November** 21:19 22:2
23:8,24 39:7
46:23 47:3
68:2 71:17,
23 72:8,24
73:4 74:10,
11,23 75:8
109:24
**number** 71:5
76:7 113:5
**nutshell** 130:6

**O**

**object** 57:12
58:17,21
128:15
135:2 143:3
**objection** 16:5,13
19:15 20:1
35:7 36:8,13
37:13 42:3,
11 57:11,20
58:6,22
59:12 84:23
91:6,17
96:17
113:14
114:6
122:18
125:3
126:24
128:5,17
135:12
137:4
139:22
142:11,16,
21 143:3
**objectionable** 144:9,10
**objections** 146:24

**obtained** 54:11 56:5
**occasion** 28:23
**occasions** 19:10,21
25:23
**occur** 11:21
28:1 31:6
99:22 100:1
121:9
**occurred** 20:6,8,16
21:22 23:21
27:23 30:4
31:3 36:11
39:6 40:15
46:15 61:16
66:15 67:15
71:13 80:15
82:1 88:14,
23 93:11
95:18 96:15
108:2 129:1
148:15
**occurrence** 41:22
**occurring** 19:14,24
**OCRC** 35:24
36:6
**October** 64:14,15,23
65:4,8,9
66:21,22
67:20 68:1,
16 69:3
70:15 71:17
106:5
107:18,19,
20 109:15
**odors** 136:10
**offenders** 83:9 84:5
**offer** 12:13
**offered** 11:19 12:11,
15
**office** 6:9,20,
22 11:20
12:20 13:3
14:18 16:16
18:7 21:19
22:16 23:19,
22 24:3,4,
11,16 25:15
26:18 34:12
37:22 39:6
44:5,12
47:20 50:3,9
51:2 52:24
61:18 68:24
69:2 73:16
79:3 87:20
88:3 90:14,
16,22 91:5,
16,23 94:11
96:5 98:18
99:2,24
101:4,11,17
102:4,7
106:13,19

**obtained** 107:3,8,13,
17 108:18
109:15
110:8,16,18
111:22
116:8 119:4,
17 121:12,
16 126:3,14
135:9
136:12,19,
22 137:3
139:7
**Office's** 136:7
**officer** 8:20,
22 33:21
34:3 57:4
69:14,18,20
70:5,18,22
71:11
112:17,22
136:8
**official** 74:5
**Ohio** 15:8,
10,18 16:2,
24 114:3
130:24
**OIC** 69:14,20
70:12
**older** 28:12
**one-year** 111:11
**ongoing** 119:6,21
**online** 82:23
**onset** 136:3
**Opengovpay** 56:7
**opening** 120:1,10
**openings** 50:1 51:13
**Operations** 136:7
**opportunity** 105:3
138:19
**option** 144:24
**options** 35:19,20
144:22
**order** 97:16
141:13,16,
19
**originated** 138:21
**OSHA** 55:19
56:1

**P**

**p.m.** 61:16
74:10,11
75:8,16 76:7
150:1
**pa** 27:4,24
28:8 31:15,

21 48:23
**pages** 37:24
38:8,17
133:9,10
**pain** 134:10
**pair** 115:9
**pants** 115:9
**papa** 42:16
**papers** 37:23
**paperwork** 108:14
109:23
117:20
**paragraph** 17:20 34:20
35:11 39:10
40:1 41:9
42:15,20
49:22
135:24
**paralegal** 144:4
**parking** 99:24
**part** 55:20
75:23 85:8
108:5
131:21
138:4
**participate** 103:19,21
104:3,16,21
105:5
**participated** 104:6,10
105:9
**passing** 32:15
**past** 128:3
**patrol** 22:22
29:6 135:11
136:2,9,14
**Patrolman** 21:10 41:12,
15
**Patterson** 33:22 34:4
**Pattersons** 34:5
**pavement** 99:21
**pay** 58:18
96:24 97:3,
13,17,18
98:9
**payment** 140:2
**payroll** 40:6
41:7 91:24
**PD** 92:23
**penalty** 17:6
**people** 7:24
21:15 74:2,4
**percent** 10:6
11:2 19:4
26:4 34:18

40:17 89:1,6
135:6
**performance** 112:15,18,
22 145:21
**period** 11:13
12:10 47:12
97:18,19
98:10 109:2,
5 111:11
112:1,6,10,
14,20
121:22
122:2,6
126:17
148:3
**periodically** 141:21
**perjury** 17:7
**permits** 121:21
**Perry** 27:7
29:13,20,23
31:23 35:2
42:17 43:2
48:15,22
49:9 61:21,
22 62:3
95:9,11
**Perry's** 27:14 95:14
**personal** 36:5
**phone** 147:2
**photos** 82:20,21,23
**physical** 91:10
104:15,16,
21 105:5,9,
10 148:14
**physically** 22:12 71:1
111:6
**Physician's** 101:20
**pictures** 83:2
127:8,13,15,
17,22
**place** 29:9
37:6,16,18
38:21,24
123:24
124:12,14,
19 141:17,
20
**places** 54:7
**placing** 108:3
**plan** 35:23
92:3
**planned** 131:17
**players** 127:12
**Pleas** 41:10
**point** 72:4
93:14 135:8

**police** 10:15
49:24 50:4
51:7,12,16,
18 52:16,24
53:4,6,16,20
92:23
139:12,13

**policy**
135:10
136:7,13

**political**
130:23
131:3,4

**politics**
129:16

**Pomeroy**
21:11

**poor** 125:18
128:2

**portion**
62:14

**portions**
144:7

**position**
12:12 146:4
148:10

**positive**
88:16

**Posley** 6:17
7:9

**possession**
21:1

**possibility**
120:24

**Possibly**
49:21

**post** 54:18

**potential**
51:19
123:13

**potentially**
25:5

**practice**
15:24

**prepare** 37:4

**prepared**
120:9

**prerogative**
147:5

**present** 21:9,
13 27:11
32:2 42:1
91:11
111:19

**press** 149:16

**presume**
7:15 9:12
13:15 21:21
23:7 44:19
64:5 66:5
69:7 71:6
74:20 78:13
125:23

**pretty** 25:14

**previous**
76:20

**previously**
5:21 110:5
139:5

**primarily**
55:24

**prior** 28:7
33:9 39:1
51:6 55:5
56:17,20
58:17,18
72:10 82:9
88:5 101:12
116:10
120:22
121:6
129:10,17
131:15
133:16,24
136:24
137:7
145:16,17
146:5,8

**prisoner**
39:15,17
62:2

**prisoners**
82:23

**privilege**
16:5,10
146:13,14

**privileged**
145:13,15

**privileges**
112:23

**probationary**
111:11
112:1,6,9,
14,20
121:22
122:2,6

**problem**
131:6 134:5
141:20

**procedure**
147:8

**procedures**
130:21

**proceedings**
149:24

**process** 7:20
132:4,7
136:4

**produce**
58:18
140:11,12,
17,18,20
141:5 144:6,
15,22 145:7,
17 146:5,18,
23 147:10,
12

**produced**
61:3 64:2
66:3 76:13
78:2 105:22
114:17
133:13,21
138:2
147:14

**producing**
144:11,24

145:12

**product**
16:6,10
149:15

**production**
133:20

**professionali
sm** 125:18
128:2

**program**
103:16,20,
22 104:3,5,
8,12

**projected**
109:19

**promoted**
55:3

**promotion**
55:5,9

**proper** 91:20
147:8

**properly**
130:21
138:11

**property**
129:15
130:13

**prosecutor's**
47:20

**protective**
141:16

**prove** 127:8,
14

**provide**
86:19
105:16
127:22

**provided**
149:9

**provision**
121:19

**public** 58:14

**purchase**
115:11,12

**purpose**
112:6

**put** 19:19
38:9,10
39:16 69:13,
16,18,19
82:23 99:8
109:19
110:20
131:14,20
132:17
143:20,24
149:4

_____

**Q**

**qualification
s** 145:21

**question**
16:15,23
19:16 20:2
37:11 49:6
91:12,13,14
106:1

113:22
118:13
119:15
121:5 132:3
138:11,12,
16 142:22
143:6,9
149:7

**questioning**
22:16

**Questionnair
e** 35:20

**questions**
8:10 78:13
105:3
128:18
134:4
138:18
142:6
143:14,17,
20 147:13

**quick** 89:11

**quickly**
60:24

**quit** 120:19

**quote** 18:17
19:8 80:20
93:16
125:16

**quote/
unquote**
145:21

_____

**R**

**railroad**
134:15

**raise** 112:23

**raised**
146:24

**Randy** 47:7

**range** 9:16,
18

**rate** 10:2
14:8,17

**reach** 83:13
141:14
147:15

**read** 17:7,16
39:19 40:7
41:19 54:2
79:10 85:14,
23 90:2
114:19,20
143:21
149:19

**readily** 41:4

**real** 9:24
88:16 89:11

**reason** 40:24
41:6 57:8,19
58:4,20
59:4,9 60:2
82:16 84:18
98:5,6
106:9,22
109:9 110:1,
14 111:2,4
113:13

114:5
124:22
125:2

**reasoning**
74:3 86:10
112:9

**reasons**
134:2

**recall** 7:6
10:1,19
11:12 16:1
17:2 18:3
19:13,23
20:14,19
21:13 23:4,
17 26:16
27:1,9,21
28:11 30:18
31:2 32:24
37:11,17
38:23 42:24
44:6,8
45:14,24
46:3 49:4,
14,21 50:18
52:3,22
53:5,7 74:14
84:9,20
85:7,13
87:23 94:8,
23 100:6
105:8
107:16,23
108:8 112:3
113:3,5
115:1,4,6,
18,19 117:3
122:5,12,14,
21 123:1,5,
8,23 124:8
125:11
135:21
136:24
137:15

**recalled**
80:13

**receive**
58:13 74:17
75:9 80:12
94:6 138:7

**received**
14:23 35:22
36:18 55:9
56:8 60:22
63:2,20
64:14 65:8
74:18 78:21
86:2,15 90:7
96:22
104:19
127:15,23
133:8 140:2

**receiving**
115:1 123:1
125:11
137:15

**recently**
90:13

**recess** 60:17
78:9 143:18

**recognize**
15:2 36:21
61:1 116:20

recollect
24:21 32:20
74:3 83:1

recollection
10:23 15:17
18:20 21:3
29:16 33:23
36:24 40:10,
14 42:14
56:11 79:14
80:7 88:12
90:20 95:6,
15 97:22
101:2 103:6
105:4 107:1,
6 109:13
110:6
120:14
124:11

recommenda
tion 29:17

reconsider
141:3

record 67:2,
10 76:23
77:2 78:8
108:12
116:18
122:23
128:9
135:17
137:14
143:4,20
144:1

records
58:14
104:20
133:1 138:5
148:10,12,
22

recovery
134:24

redacted
140:21
145:2

reevaluate
103:10

refer 110:23

reference
44:19 80:9
89:20 93:22,
23 119:23

referencing
80:23 81:1

referred 44:2
70:17

referring
42:17 44:3,
11 46:11
66:17,24
67:2 69:11,
22 76:10
86:6 94:13,
14,16 104:8
123:19
126:6
127:17
134:17

reflect 10:21
28:2 31:9
107:10

reflected
24:23 39:23
43:10 45:7

reflecting
25:1

reflects
107:4,9
126:16

refresh
18:19 40:9,
14 56:11
88:11 90:20
95:6,14
97:22 101:2
103:5 107:1
109:13
110:6
124:10

refreshes
107:6

register
16:12

rehabilitation
103:15,19,
22 104:3,5,
8,12,15

related 26:8
41:1 82:24

relation 48:5

relative
78:22
132:19

relayed
72:15 83:17

released
50:17,18,24
51:4 103:6

relevance
36:8,13
57:12 58:6
63:3 65:10
76:8 77:21
128:5
133:20
135:12
137:4
142:11,16

relevant 7:3
63:10
131:10
133:17
141:2,10
145:12,16,
18,20 148:3,
11,13,16,24

remain
103:17

remark 32:23

remarks 7:8,
10,13 31:15,
16 32:14,16,
19 119:22

remember
6:7,13 20:9
21:6,8 23:20
25:11 29:11
30:10,14
33:4,21
38:20 40:17
53:13 69:24

71:19 76:2
80:24 82:11
85:15 88:4
95:13
102:16
109:20
122:11,13,
14,15
139:18,19

remembering
122:10

remind 8:2
117:16
141:12

rental 141:1

repeat
113:21

repeatedly
144:20

rephrase
8:12

reply 85:10

report 28:15
29:20 31:16
40:4,20 41:2
66:12 81:2,3
85:20,21
86:3,9,12,
17,23 87:2
101:20
102:20
128:11,12
142:4
149:10

reported
48:18
125:15

reporter 7:22
78:5

reporting
100:3

reports
125:19
128:3 137:1

represent
14:23 56:4
58:12 60:20
74:16 78:20
80:11 88:17
96:21 97:14
100:11
105:21
110:19
113:11,24
114:12,16
116:17
127:14
133:7
135:17
137:13
138:6

representatio
n 57:3 58:5,
21 59:5 60:2
79:6 87:10
99:19

representatio
ns 125:24

representativ
e 121:14

represented
109:10

representing
5:7

reprimanded
137:9

request 19:5
35:23 45:1,
4,14 115:10,
12 122:1,5
133:18
146:24
149:13

requesting
86:23

requests
144:6

require
140:16

required
55:21

residence
90:7

resign 32:7,
10,13,17
33:2

resignation
33:5

resisted
108:4

resolution
145:3

resolve
147:3

resource
33:21 34:3

respond
128:20

responded
63:7 66:13
75:16 77:17
83:14,16
92:13,19
94:8

responding
16:14
115:18

response
25:6,10
49:12 68:13
74:11,14,17
75:7 77:15
81:6,12
86:15 88:6
92:22 93:19,
20 94:2,4
124:2

responses
8:4 77:12

responsible
70:6,9

responsive
133:17,24
134:1 144:5

rest 108:19
145:13

restaurant
30:21

restrictions
102:21

restrictive
109:2,5

result 7:12
108:9
118:11
123:16

resuming
68:1

retire 34:9
92:21

retiring 32:8
33:18 34:1,8

return 50:19
51:4,5,17
84:15,21
92:9 103:1,
7,17 105:11
109:4
140:14
141:11
145:1

returned
51:6 100:7
103:9
109:14,21,
24

returning
120:4

returns
140:7,12
144:16

reverse
97:15

review
105:24
133:15,22
134:2 144:5

reviewed
90:13 97:15
109:23
111:20

revisions
16:8,16

ribbons
131:8

ribs 108:7

Rice 52:19

Rick 121:17,
18 122:1

Ricky 83:8
84:4,6,8,9

ride 92:3,20

Rights 15:8,
11,18 16:3
17:1

road 30:8

Robert
21:10,12
41:12,24
42:8 48:2,3

role 54:12
55:3,4,24
68:21

room 29:6
42:21

132:15

roughly 9:21
12:1,9 35:12
51:8 116:13
123:10

Rule 128:17
135:13
137:5
145:23

rules 136:8

runs 11:5

_____

S
_____

safe 13:15
23:7,23
50:23 53:8
65:21 66:6
67:7 72:3
75:17 77:10

safety 54:1,
11 55:4,9,
12,20

salary 14:10,
11

sat 37:12,18

schedule
29:10 30:5
124:5

schedules
30:3

school 33:21
34:2

scopes
130:20

Scott 19:9,
14,20 35:1
39:12 46:22
74:20

screen 14:21
60:19 76:17,
18 78:14

screenshot
54:16 61:20
62:8 63:15,
19 65:7 66:9
67:14 68:14
74:17 75:6,
9,14 76:6,12
78:1,21
79:9,13
85:18 87:13

screenshots
61:2 76:14
127:16
148:2

screenshotte
d 93:10

scroll 38:2,
13 56:22
60:24 67:23
83:10,22
85:4 90:4
93:3 94:18
97:1,5
100:15
108:19
114:20

scrolling
35:17 36:20
67:3

search 22:9,
12 26:8
39:5,13,14,
21 44:4 56:7

seat 30:23

seated 30:23

section
15:20 16:1
108:23

seek 130:4

seeking
138:14
142:19,24
143:10

sees 41:18

send 88:2
138:14
146:2
148:24
149:8

sending
124:8

sense 8:10
146:16

sentence
27:2

separately
49:18

September
15:15 51:9,
11 54:16
56:6 61:16
62:15 63:16,
22 95:24
96:6,15
103:2

sequentially
64:1 66:3

sergeant
34:6 77:20
99:8 129:13

served 131:4

Services
13:13

set 73:18

setting
20:11,13
41:11

settlement
130:5

sex 83:9 84:5

SGT 47:11

share 14:21
60:19 76:18

sharing
78:13

sheriff 5:8
19:9,14,19
21:9,18
22:19 23:1,
12 24:4 25:5
28:15 29:21
31:7,17 35:1
39:4,12,14

41:12 42:1,9
44:2,3,7,13,
16,22 45:3,
5,11,23,24
46:16,22,24
48:18 61:17
63:11 64:18
71:14 72:4,
8,9,21 73:10
74:22 75:24
79:7 83:5
95:2 102:2
111:10,21
112:2,7
113:7 114:2,
3 116:23
117:4,7
120:5,6
121:1 122:1
125:11,16
129:17
136:6
137:19,20,
22 140:17
142:8

sheriff's 6:21
11:20 13:3,8
14:18 21:19
24:16 25:14
34:12 37:21
44:12 50:3,9
51:2 52:23
61:18 68:24
69:2 79:3
87:20 88:3
90:14,16,22
91:5,16,23
94:11 96:5
98:18 99:2,
23 101:4,11,
17 102:4,7
106:13,19
107:3,8,13,
17 109:15
110:8,16,18
111:22
116:8 119:4,
17 121:16
126:3,14
135:9,10
136:12,18,
22 137:2
139:7

sheriffs
121:15
131:5

shift 69:20
70:12,13,18,
22 71:11
100:4,5
123:3,10

shifts 123:13

shirt 13:15
115:9

shooting
9:16

Shop 127:10,
18

short 60:17
129:19
143:18

shot 95:3

shoulder 8:2

77:16,24
79:17 80:18
88:7 89:2
92:14 98:23
123:19

shoulders
103:12

show 14:22
15:5 54:14
56:3 71:21
81:10 82:14
88:20 89:12,
22,23 95:22
100:10
102:17
105:20
108:11
110:4 111:6
114:11
116:16
117:18
122:22
128:8 131:7,
23 132:14
135:16
137:12
140:23

showed
110:5

showing
63:12
140:13,22
141:9

shows 65:7
75:14 129:5

shrugs 8:2

sic 96:21

sign 17:3
143:21
149:19

signature
15:13 17:4,5
106:15
149:22

signed
17:11,16
18:14,15
34:1 38:5,7,
16 49:18
86:4

similar 29:18
34:18

simple 11:7

singular
63:19

sit 10:9
40:24 42:7
46:14 50:14
57:18 58:4,
20 59:4 60:1
84:20 85:13
87:1,23
91:3,14
95:10 105:4
106:9
110:13,24
122:16
124:21
125:1 138:8
139:20

sites 56:1

situation
31:2 69:5,10
70:16

slickness
99:6

slightly
126:17

slipped
99:20 116:2

slowly 60:24

Smith 61:21
62:1,3 84:8,
9 121:17,18
122:1

snippets
147:18

son 129:14
130:12

sore 80:18

sort 79:12
80:23 96:24

sought
139:16

sound 14:2

sounds 12:9
149:20

southeastern
130:24

speak 76:11

speaking
143:3

specialist
54:1,11
55:4,10,12,
21

specific
27:22 30:11
113:5

specifically
29:7,13,14
30:14 46:22
47:17 48:20
122:11

spell 6:18

spent 35:12

spoken
73:20

spot 99:20

stand 132:13

standards
55:19

standing
22:13

STARLING
16:4 19:15
20:1 35:7
36:8,13
37:13 42:3,
11 49:5,11
57:11,20
58:6,16,22
59:12 60:13
84:23 91:6,
17 96:17
113:14,18,

21 114:6
122:18
125:3
126:24
128:5,14,22
133:14,22
135:2,12
137:4
138:10
139:2,8,22
140:11,19
141:8,18
142:11,21
143:7,15,19
144:17
145:9,14
146:19
147:22
148:6 149:3,
18

**start** 8:19 9:1
11:9 56:13
98:10
119:16

**started** 11:24
12:5 21:18
32:3 132:24

**starting**
97:19

**starts** 32:6

**state** 5:9

**stated** 12:11
39:17 40:4
41:15 43:7
44:18 45:10
49:24 53:4
134:9

**statement**
15:22 16:24
17:12,20
73:12

**statements**
7:4,5,6
19:13 32:15,
16 49:8
53:18

**states** 44:9
49:23 53:4
135:24
136:8

**status** 84:11

**stay** 77:1

**step** 99:5

**stepped** 99:4

**STERLING**
142:16
147:9
148:21

**Stewart**
17:22 18:16
34:23 40:2,
11 45:2,3,5,
8 47:19
78:4,24
80:19 81:1,
6,13,23
82:19 83:4,
21 84:1
85:6,18 86:2
87:3 110:20
115:2

116:23
117:4,8
121:1 123:2,
9 124:2

**Stewart's**
79:21

**stipulated**
141:13

**stone** 43:8

**stop** 49:2,10

**story** 129:19

**strategy**
149:15

**street** 27:5
43:12

**strike** 87:24

**stub** 97:13

**stubs** 97:1,3

**stuff** 10:7,20
50:22 69:15
103:12
131:24

**submit** 117:6
146:3 147:5

**submitted**
15:17 16:24
115:15
116:23
118:4,5,8,
14,19,22
119:11

**submitting**
117:3
120:22
121:6

**subpoenaing**
141:13

**subsequent**
141:14

**substance**
114:23

**substantive**
79:10

**suggests**
63:16

**summarize**
7:2

**sunset** 92:4,
21

**supervisor**
7:8 17:23
77:19 99:11

**supervisors**
47:9 61:12

**supplement**
133:18
134:3,5
140:10
141:21
142:3
146:21,22
148:20

**supplementi
ng** 148:22

**support**
52:14

**supported**
129:18

**supposed**
130:19

**surgery**
123:18,23
124:6,12,14,
19,21

**surprise**
142:14

**surrounding**
115:7

**suspect**
22:11,18,21,
23 23:2
108:3

**suspended**
129:10

**suspicion**
119:19

**suspicions**
118:10,24
119:12

**sustain**
134:20

**sustained**
98:22

**sworn** 5:2

**synonymous**
79:5 131:13

---

**T**

**T-H** 94:6

**talk** 73:5,9,
11,16,18
75:2,4
148:6,20

**talked** 10:22
26:6,17
27:13 34:22,
24 35:1
38:24 41:21
42:18 43:3
44:2 46:20
48:3 49:16
61:22 62:4
70:16 73:11
76:16 83:5,
20 86:1 87:7
139:11
147:17,20

**talking** 24:18
25:5 35:13
62:20 77:7
80:17 82:21
104:14
147:23

**task** 39:13

**taught** 9:15

**tax** 58:13
140:6,11,14,
24 141:11
144:16,24

**team** 127:12

**teasing** 30:6

**technical**
76:21 78:11

**technically**
71:1

**Teeter** 5:5,7
49:7 60:10,
15,18 78:7,
10 113:23
133:12,19
140:9,16
141:5,16
142:5 143:2,
11 144:16
145:7,10
146:17
147:7,16
148:1,19
149:2,17,20

**telling** 71:9
120:18
140:19
148:22

**ten-minute**
143:16

**tenure** 126:3,
13

**Teresa** 134:9

**terminated**
34:21 35:5
37:21 46:17
50:2 51:1,5
98:17 102:3,
7 116:8,12
118:11
119:1,13

**terminating**
90:8

**termination**
116:13
129:10
136:18
142:2

**terms** 142:24
145:20

**testified**
7:15,19
26:13 43:22
98:13
119:18

**testifies** 5:2

**testify** 16:17
41:15 65:16,
23

**testifying**
21:1

**testimony**
7:3 122:9
126:18

**text** 17:23
18:3,4,6,17,
24 19:4 26:4
34:22,23
40:3,11,15,
17 45:11
60:21 61:2,
15 62:9,11,
14 63:1,3,
17,21 64:3,
9,10,13
65:7,10,15,
22 66:6,7,14
67:10,11,15
69:11 70:17

71:3,22
73:15 74:9,
18,19 75:21,
24 76:5
77:11,12,21
78:3,19
79:12,15
80:4,8,12
81:7,11,18,
19,22 82:19
83:3,11,18
85:6,7,17,
19,22 86:1,
5,8,14,16
87:6,9,11,
12,15 88:1,
13,23 92:24
93:5,11 94:7
95:3,12,17
96:15
147:18,19,
23

**texted** 69:3
73:1 92:2
94:5

**texts** 66:4,24
67:5,7,8,24
68:5 77:11
79:10,18,21
87:11,12

**therapy**
104:15,17,
22 105:6,9,
10

**thereabouts**
118:9

**thick** 133:3

**thing** 104:14
130:23
147:17
149:6,7

**things** 16:16
30:8 37:1
38:19 41:5
70:6,8 83:12
121:4 122:9
130:11
131:10,24
132:6,8,10
147:10
148:4

**thinking** 10:4
92:11 93:16

**thought**
16:12 53:19
134:12

**three-ring**
131:23
132:14,15
133:2

**Thursday**
115:2

**time** 8:5 9:7
11:4,13
12:9,20
19:11,22
20:7,10,14
21:22 22:4,
5,8 23:8
24:1,5,7,24
25:7 26:10,
11,20 28:10,

24 30:9 31:5
32:2 33:5
34:1,15
38:10,11
40:2,16
41:17,24
42:8 46:16
47:10,23
49:19 52:2,
4,6 53:9
56:14 62:24
68:22 73:5,
12,18 92:24
93:15 96:3
100:1 113:7,
8 114:2
116:2 118:8,
22 119:8,10,
20,23 127:5
129:22,23
132:7
134:11
137:11
141:22
143:22
147:11
148:3

**timeliness**
125:19
128:2 137:1

**times** 20:5
26:6,10,15,
23 27:11
29:5 30:5
44:7 63:22
107:11
121:12
129:4
131:11

**tired** 8:8

**title** 35:18
68:21 70:21
72:14

**today** 10:10
15:5 40:24
42:7 46:14
50:14 57:18
58:4,20 59:4
60:1 83:5
84:20 85:13
87:1,23 91:3
95:10 105:5
106:9
110:13,24
122:10,16
124:22
125:1 132:8
133:16
138:8
139:20
143:22
147:13

**told** 19:1
29:3 31:23
42:21,23
43:9 45:8,11
70:5 84:1
93:14
101:15
120:11,12
129:14

**tomorrow**
83:4,13

**ton** 145:22
**Tools** 9:11,
14,18 10:3,
13,24 11:9
**top** 61:8 80:1
**topic** 128:18
**total** 74:3
**totally**
121:18
**Tracy** 46:1,6,
7,8,12 83:8
84:4,12,13
**train** 129:3
**training** 83:8
84:4 129:6
131:7
132:22
**transparent**
144:13
146:12
**transpired**
37:1
**transport**
22:13,17
**traumatic**
131:22
**treated** 132:2
**trestle** 129:3
134:15,21
**trial** 149:14
**troopers**
20:22 21:5
**trouble** 15:4
122:10
131:5
**true** 17:8,13
18:15 89:10
**Trussell**
111:17
**Tuesday**
76:6
**turn** 85:21
**turned** 136:2
**two-page**
14:24
**two-thirds**
106:16
**two-year**
14:5
**type** 31:15

———

**U**

**Uh-huh** 63:9
72:23 84:2
100:18
**uh-huhs** 8:1
**ultimately**
123:17
**unannounce
d** 129:5
**uncertain**
93:15

**undated** 93:4
**underneath**
65:16 69:13
74:9 86:14
**understand**
7:21 8:11,13
18:2 22:24
24:9 25:4
40:12 75:1
82:5 103:24
105:2
118:12
122:8
145:11
**understandin
g** 23:1 35:9
66:19 72:16
87:2 111:9,
14 112:5
130:18
**unemployed**
52:11
**unfit** 136:5
**unforeseen**
126:20
127:3
**uniform**
125:19
127:7,19
128:3
130:14
**uniforms**
136:9
**union** 121:14
**unlawful**
15:23
**update** 142:3
**upset** 129:11

———

**V**

**vague** 42:3,
11 135:3
**vaguely** 6:6
117:5
**variety** 134:2
**vehicle**
108:3 136:5
**vehicles**
136:9
**verbal** 8:4
**verbatim**
24:22 130:7
**verge** 120:17
**Village** 10:15
11:10,13,15,
18,22 56:9,
12,17,20,24
57:2,5,9
58:2,3
**violated**
135:9
136:13
**violates**
135:13
145:23

**violation**
136:6
**Virginia**
30:21
**visible** 85:8
**vocational**
103:15,19,
22 104:7,14
**voluntary**
103:16
**volunteered**
127:10

———

**W**

**W-2** 57:14
58:9
**W-2S** 10:7
57:6 140:12,
22 141:5,21
144:22
**wages** 98:2,
11 140:2
145:18
**wait** 20:22
**waiting**
20:11 30:22
41:11 124:7
**waived**
149:22
**waiver** 124:4
**waives** 124:5
**wanted**
25:24 44:10
46:21 66:23
80:13 93:21
95:5 119:4,
16 120:10,
19,20,21
131:15
144:15
**wanting**
22:15 67:15,
18
**warrant** 22:9
26:8 39:5,
13,14,21
44:4
**wearing**
13:15
**website** 56:6
**Wednesday**
63:15
**week** 129:3
**weeks** 50:21
51:6 124:6
**West** 30:21
**wet** 99:6,20
**white** 62:12
67:8,12 68:5
77:12 79:22,
24 87:11
**wife** 127:11
134:9
**wished**
75:14

**wishing**
74:21
**witnessed**
42:9 48:7,12
49:1,8
**won** 131:8
**Wood** 49:24
50:6
**word** 72:1
80:3
**words** 79:15
80:1 128:24
**work** 8:18
9:9 11:9
16:5,6,10
24:15 50:12,
13 51:5,6
52:11,24
54:7 67:16
73:14 84:15
92:9 100:7
101:20
102:24
103:1,7,10,
17,18
105:11
107:12
109:14,24
110:15
112:15,18,
21 120:1,4,
19 126:2,13,
18 127:6,7
130:1
131:15
147:8
149:15

**worked**
11:13 52:15
56:12,16,19
70:14,19
89:19 90:21
91:1,4,15,22
101:3 107:2,
7 110:7,11
113:6 114:1
141:10

**worker**
103:16,18
108:24
109:4

**worker's**
100:19

**workers'**
80:22 81:4,
14 102:5
105:19
108:21
109:10
124:3
131:12

**working**
11:10 14:5
24:8,12 25:5
26:19 29:10,
11 34:11
47:23 57:1,
4,9 58:3
59:18,23
60:7,8 66:20
71:2 73:21
91:11 92:24
93:2 97:23

101:5,7,8,9,
10 106:19
107:17
120:9
130:14
135:5

**works** 7:20
8:8

**worthwhile**
146:10

**write** 15:22
16:23 37:20
43:8

**writing** 37:3

**written**
118:17

**wrong** 26:14
98:14 105:7

**wrote** 37:12,
18 40:23
119:24
129:9 137:9

**WTF** 93:19

———
**Y**
———

**year** 9:20
11:16 14:13
55:3 57:1
58:1 59:3,22
60:7 64:20
87:16 88:4,
15,22 96:1
98:15
107:13
132:22
141:24
142:15

**year-to-date**
98:3,11

**years** 6:14
10:18,19
11:4 13:20,
21 25:13
52:13 53:24
88:8 92:15
131:17
132:1,18

**yesterday**
54:16 56:5

**younger**
45:22
142:18

———
**Z**
———

**zoom** 13:14
15:3 67:19
68:11

**zooming**
15:20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Jerry Darst,                                        :

        Plaintiff,                       :

        v.                                     :        Case No. 2:24-cv-1150
                                           Judge Sarah D. Morrison
                                     :

Meigs County, Ohio, et al.,
                                     :

        Defendants.

- - - - -

**STATEMENT PURSUANT TO RULE 30(E) OF THE FEDERAL RULES OF CIVIL
PROCEDURE REGARDING WITNESS REVIEW OF THE DEPOSITION TRANSCRIPT**

1.  I am an employee of Spectrum Reporting LLC ("Spectrum").  I am the record custodian for all documents related to the facts stated herein.

2.  The purpose of this statement is to comply with Rule 30(e) of the Federal Rules of Civil Procedure.

3.  On September 3, 2025, a court reporter from Spectrum appeared at the deposition of Jerry Darst in the above-referenced action.  At the end of the deposition, the deponent and/or the parties did not waive the right to review and sign the deposition transcript.

4.  The deponent was notified directly or through counsel of the time allowed for reviewing the transcript and the procedure for doing so via a letter dated September 18, 2025.

5.  The time allowed for review of the transcript has expired, and the deponent has not signed the transcript.

Dated: October 21, 2025

*Sam Matten*
_____

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, OH  43215
800-635-9071 or 614-444-1000
transcripts@spectrumreporting.com

ref:  NW315348JD

OHIO CIVIL RIGHTS COMMISSION
CHARGE OF DISCRIMINATION
EMPLOYMENT

**Agency Use Only**

☐ FEPA

☐ EEOC

CHARGE NUMBER: (Agency Use Only)

Completely Fill in the Following

Jerry Darst
Name of Charging Party (First Middle Last)

Meigs County Sheriff's Office
Name of Company

4027 Kemper Hollow Road
Address

104 E 2nd Street
Address

| Gallipolis | OH | 45631 | Gallia | Pomeroy | OH | 45769 | Meigs |
|---|---|---|---|---|---|---|---|
| City | State | Zip Code | County | City | State | Zip Code | County |

740-612-7566/e-mail: jloyalk9@gmail.com
Telephone Number

740-992-3372
Telephone Number

7/15/23
Date(s) of Discrimination

20+
Total Number of Employees

8/2/22
Date of Hire

**I believe I was discriminated against because of my: (Please identify)**

☐ Race/Color _____

☐ Sex _____

☐ Disability

☐ Military Status

☑ Age (Over 40 years old only - List Date of Birth) ▮▮ 71

☐ Religion _____

☐ National Origin/Ancestry _____

☐ Retaliation _____

PLEASE NOTE: Under division (A) of section 4112.052 of the Ohio Revised Code, you are prohibited from bringing a civil action under this chapter unless one of the following applies:
(a)     The conditions stated in division (B)(1) of section 4112.052 of the Ohio Revised Code are satisfied;
(b)     An exception specified in division (B)(2) of section 4112.052 of the Ohio Revised Code applies.

**Type of Discrimination:**

☐ Demotion

☐ Failure to Hire

☐ Layoff

☐ Other (Specify) _____

☑ Discharge/Termination

☐ Forced to Resign

☐ Promotion

☐ Discipline

☐ Harassment/Sexual Harassment

☐ Reasonable Accommodation

Please write a brief but detailed statement of the facts that you believe indicate an unlawful discriminatory practice. Please write legibly.

I worked for Meigs County Sheriff's Office (the "County") as a Deputy Sheriff from August of 2022 until my termination on or about July 15, 2023.

On or about February 9, 2023, Captain Frank Stewart, my supervisor, sent a group text to me and the other deputies asking how old we are. Additionally, Sheriff Scott Fitch called me "old man," and "old colonel," on several occasions and also said, "isn't it about time for you to hang it up, old man?" Other deputies called me pa, grandpa, and asked if I needed help crossing the street. I am fifty-two years old. Deputy Fitch has hired several new deputies since I started with the County and they are all in their twenties or thirties. One of my coworkers was forced to resign due to his age and the other two employees around my age are retiring. With that in consideration, I was going to be the only remaining deputy over the age of forty. Without warning, the County terminated me for "unsatisfactory work performance." I feel that I was terminated due to my age.

For these reasons, I believe the County discriminated against because of my age which is in violation of the Age Discrimination in Employment Act and/or Ohio Revised Code Chapter 4112. I also believe that the supervisors and human resources employees involved in these actions aided and abetted the discrimination.

**EXHIBIT**

**Darst A**

I declare under penalty of perjury that I have read the above charge and that it is true to the best of my knowledge, information and belief. I will advise the agency(ies) if I change my address or telephone number and that I will cooperate fully with them in the processing of my charge in accordance to their procedures.

Jerry Darst (Sep 25, 2023 09:06 EDT)
Charging Party Signature

Sep 25, 2023
Date

Notary or Ohio Civil Rights Commission Representative

Subscribed and sworn to before me on this _____ day of _____ 20 ___

Notary or Commission Representative

DARST000001

## Case Options and Intentions Questionnaire

Ohio law, under ORC 4112.052(A), prohibits individuals from bringing a civil action (lawsuit) in state court until they have filed a charge with the Ohio Civil Rights Commission ("OCRC" or "Commission") and received a Notice of Right to Sue, with some exceptions[1]. However, if Charging Parties wish to bring a civil action in state court as soon as possible, they can request a Notice of Right to Sue immediately. If Charging Parties request a Notice of Right to Sue at the time of filing a charge of discrimination, the Commission can issue that notice after the expiration of 60 days from the date the charge was filed.

If the Charging Parties decide to bring a civil action in state court right away, during the 60-day waiting period, the Charging Parties can take advantage of the Commission's free and voluntary mediation program.

Charging Parties may decide to continue through the full OCRC investigation process and then decide to file a civil action in state court after the Commission makes an initial determination or otherwise dismisses the charge.

In order to process your charge effectively and efficiently, OCRC asks for Charging Parties to voluntarily inform the Commission of their intentions at the time of filing their charge(s). This information will not be shared with Respondents until all case records are made public. Any intentions stated below are not binding until you request and receive a Notice of Right to Sue, in writing. Please note that your case will not be impacted should your plans change.

Please check one, if applicable:

☐  I plan to request a Notice of Right to Sue (you will still need to officially request a Notice of Right to Sue in writing)

☐  I plan to request mediation, and if mediation is unsuccessful, I plan to request a Notice of Right to Sue

☑  I plan to request a full investigation conducted by OCRC, which may include mediation

---

[1] Exceptions are: 1) the person has received a Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC);
(2) The Commission fails to issue a Notice of Right to Sue within 45 days after one is requested and following the 60-day hold period;
(3) The civil action is seeking only injunctive relief; or
(4) The case has a Probable Cause finding and the Charging Party has withdrawn the case.

EXHIBIT

Darst B

- I was at court and Sheriff Scott Fitch had myself and other Deputies go on a search warrant. The Task Force was the ones doing the search warrant. Sheriff Fitch handed over a male prisoner to me and said "Go with the Old Colonel" Colonel put him in your car. Prisoner stated your a colonel "I said no" ~~threatened~~

Frank Stewart at the time was a captain he sent out a group text asking my age, stated that he needed for on Auditors report. But they should have already had all my info for insurance and payroll.

I was at court, Common Pleas Court room waiting to be called. I was setting in the hall with Patrolman Robert Fruth and Sheriff Fitch came around the corner and said tome Well there's "the Old Colonel" Ask me if I was testifying I stated yes, and he left Patrolman Fruth asked if he always called you the Old Colonel I said yep most of the time, whenever he sees me.

- Deputies - called me old man, Grandpa, paw paw Diansour

- Was told that they didn't have room for dianows here anymore.

- Deputies stated that I was so old that I didn't have computer. Had Stone to write on.

- One Deputy asked if I needed help crossing the Street

- Deputy called me Dad

- Deputy called me Diansour

- I was going to lunch and one of the Deputies asked if I had my golden Buckeye Card so we could get a discant.

Deputy + Sheriffs referred to me as Old

- I don't think that they wanted me there!

- Sheriff Fitch let other Deputies do light duty but not me. "Stated that he didn't have anything for me."

- All Deputies was hired. are alot younger than I

- Deputies stated you should retire bunch of Kids working hear now.

DARST000035

- Sheriff - Keith Wood - Hired me - No longer there
- Sheriff - Scott Fitch - (Nov 22)
- Scott Trussell - Chief Deputy (major) Hired me - No longer there
- Bill Gilkey - Lt.  } Day Shift
- Brordy King - Sgt.  } light Duty
- Donnie Mother - Sgt.  Midnights

- Frank Steward was at the prosecutors office when I was hired.

- I work without a direct supervisor most of the time. And some shift I was the Deputy in Charge.

- No verbals
- No write up's

- Went on injury leave and was terimanted - while on injury leave one week before my probation expired.

DARST000036

- All my training was up to date.
- I volunteer for events when asked.
- Uniform + Car was alway clean!
- Served the most papers when I worked.
- Never received a verbal or a written for anything
- Have more training than most at the Department
- Cert. to prove it. If needed.
- Always reported to work on time
- Alway reported to court on time
- Did a Zoom Court hearing while I was on injury leave.
- Was move to Officer in Charge over other Deputies.
- Had one week until probation was up before I was terinated.
- letter delivered by mail.

- Witness

Robert Fruth - Pomeroy Police Officer - 304-812-624

Josh Goldsby - Meigs Deputy Sheriff - 606-369-9267

Cody Brooks - Middleport Jailer - 740-508-6974

DARST000037

- Applied at Middleport Police Dept. Monty Wood Steted that he didn't have any openings

- Gallipolis Police Dept. No return calls

- Jackson Police Dept. Chief Steted not a good fit.

- I took a heavy equipment class at Buckeye Hills and after completing the class about two month later I found a job in Columbus as a Safety Specallist.

- After Meigs County and the Meigs County Sheriff Scott Fitch I felt that I was to old for Law enforcement and I couldn't find work close to home I went to Buckeye Hills and paid for my own training to find a job that would hire regardless of my age.





EXHIBIT

Darst C



OPENGOVPAY

Choose State    Jobs    Rankings

Home | Salary Records For Jerry Darst

# 4 Salary Records for Jerry Darst

There are 4 salary records associated with Jerry Darst. These records come from 2 different employers. The employer with the highest number of records is Meigs County, OH. The salary data spans the years 2021 to 2023.

## Filters

**State:**
Search In All States

**Year:**
All Years

**Employer:**
Start typing...

**Job Title:**
Start typing...

Jerry Darst    SEARCH

| Year | Employee | Job | Employer | |
|------|----------|-----|----------|---|
| 2023 | Jerry Darst II | Deputy | Meigs County | View Details & Salary › |
| 2022 | Jerry Darst II | Deputy | Meigs County | View Details & Salary › |
| 2022 | Jerry Darst II D | | Village of Middleport | View Details & Salary › |
| 2021 | Jerry Darst II D | | Village of Middleport | View Details & Salary › |

Privacy Policy  Contact



EXHIBIT

Darst D











**‹ Brandy ›**

Text Message
Mon, Sep 26 at 4:21 PM

Perry is on his way to get smith and take him to Middleport, j called and confirmed it with them , all is good to go

Awesome thank you

Please let licking county jail know we are enroute



Wed, Sep 28 at 9:17 AM

Text Message





EXHIBIT
Darst E

DARST000010



AT&T 🔋     3:32 PM     75% 🔋

<     **Bill** >     🎥

Glad to have you brother! Thanks for all you do!

Text Message
Mon, Oct 17 at 7:17 AM

Per 1. Long sleeve will be mandatory November 1st.

Thu, Oct 20 at 1:25 PM

Need unit for the trial tomorrow. 0830 till ?

When do you testify

  iMessage 

DARST000011



AT&T 📶 3:31 PM 75% 🔋

‹ **Bill** › 📹

I'm good thanks

Did you fill the first Report of injury out for your comp?

I think at the ER

Good deal.

I'm sorry, I know we are short staffed I will get on my feet soon

Nothing you can do. It's all good. Just get better

  iMessage 

DARST000012

.ıll AT&T 🛜     3:30 PM     76% 🔋

**‹ Bill ›**     🎥

Had court by zoom , went good bound over plus pleas coming next on him

That's awesome

Good job

Hope your starting to feel better

I just want to get back to work

I know buddy. Don't overdue it



iMessage



**‹** **Amanda Larkins** 📞 📹

OCT 21, 2022 AT 12:04 PM

**Bill and Brandy have been made aware of the situation we discussed last night and it will be taken care of.**

**If possible can you let Golsby know also? I don't have his number**



**Thank you Jerry!**

NOV 17, 2022 AT 7:38 AM

**Hey Jerry!!! I hope you're feel ⬇ better!!!**

   Aa  

DARST000014



.ıllı AT&T 📶       3:25 PM       77% 🔋

‹  🦁  **Amanda Larkins**    📞  🎥

🦁 **lol!!! If you need anything let me know!!!**

NOV 17, 2022 AT 10:19 AM

**Any word on a boss**

NOV 17, 2022 AT 10:37 AM

🦁 **Not yet.**

NOV 17, 2022 AT 2:43 PM

🦁 **So I completely forgot you asked me this. It's Fitch lol**

NOV 17, 2022 AT 3:20 PM

**I heard**
🦁

➕  📷  🖼️  🎤  **Aa**    😊  👍

.ıll AT&T 📶     3:23 PM     77% 🔋

<   **Scott Fitch**
    Active 8m ago     📞 📹



# Scott Fitch

### Facebook

## You're friends on Facebook

### NOV 17, 2022 AT 11:22 AM



### NOV 18, 2022 AT 8:58 AM



### NOV 20, 2022 AT 9:04 PM



### NOV 20, 20 ⬇ AT 9:44 PM



DARST000016



**July 27, 2023**
1:57 PM

**Scott** >

Sat, Dec 24 at 6:10 PM



**Delivered**

**Merry Christmas brother!! Be safe!**

Text Message
Sun, Dec 25 at 9:24 AM

**Merry Christmas everyone!!**

Tue, Feb 7 at 5:09 PM

**50**



DARST000017



**7:50**

January 16, 2023
12:28 AM

Edit

< Dion >

I hurt my shoulder when I fell

Let Donny know

I don't have his number, just the work cell and he don't use it

Let them know u saw me fall

Did you let Donny know or do you have his number

**Delivered**



iMessage

DARST000018



**‹ Frank ›**

last night

**Mon, Jan 16 at 11:57 AM**

Shoulder and arm is sore

Did you fill out a form?

No ,

May want to fill one out whenever you come back in case anything comes of it later then your covered under workers comp



iMessage

DARST000019



**‹ Frank ›**

**Fri, Jan 20 at 10:28 PM**

Hey Jerry I got your photos earlier. I just now got off work since 7:30 this morning. I will call you tomorrow to explain more but I talked to the Sheriff today. He said he's not sure what we're going to do because there is no light duty available. Currently Ricky is on light duty training Traci for sex offenders and I think fitch has him helping her with other

  iMessage 



AT&T 6:17 AM 68%

**Frank** ›

7:30 this morning. I will call you tomorrow to explain more but I talked to the Sheriff today. He said he's not sure what we're going to do because there is no light duty available. Currently Ricky is on light duty training Traci for sex offenders and I think fitch has him helping her with other things. I will reach out to him again tomorrow before I call you.

Ok

iMessage



DARST000021



**‹ Frank ›**

day was busy so I didn't get a chance to reply

No problem, just wanted keep you updated

Text Message
Tue, Feb 7 at 5:02 PM

I need everyone's age on December 31st, 2022 for a report I have to turn in to the auditor called a GAAP report. If you can text me that it would be great.

iMessage

  iMessage

DARST000022



.ıll AT&T 🛜          3:22 PM          77% 🔋

‹  🖼 **Mj Hutton**          📞  📹

MAR 05 AT 7:10 PM

**You plan on coming back to meigs. I'd ride into the sunset if I were you lol**

> I want to , soon as my shoulder is better I would like a few more years

> How's the PD life

**Slower than s.o life**



> Yea  not as busy it's different working a PD when  been at a SO for a while



➕  📷  🖼  🎤  **Aa**  🙂  👍



DARST000023

.ooll AT&T 📶    3:21 PM    77% 🔋

‹    **Mj Hutton**    📞  🎥

**bull shit**

**Yes yes it will soon**

**He got his own skeletons**

**Oh my yes**

**They all do. So idk why they judge so hard. When they do worse things**

**I don't know if it from bad to worse**

**Tbh I don't know who I'd vote for. None of them wort ↓ fuck**

➕  📷  🖼️  🎤    **Aa**    🙂  👍

DARST000024



**Mj Hutton**

doing half the work for way more pay

It's fine, No pay but I'll make it

Less stress in my mind and body

That's crazy man, sure would let Brandi do it for about a year

I know , and spiker and Ricky and they all was injured off duty



Tre and spiker and frank checked on me that



Aa



**Mj Hutton**

Yeah I didn't like it at first. Still not used to not being a deputy. However it's nice to because less bs.

I'm used to it now though and couldn't imagine going back to that stress

Yeah Perry said you been off for a minute

I'd retire if I was you lol. Bunch of kids coming there





MRI this week , I know it's not the same

    Aa  

DARST000026

7:49

July 27, 2023
3:13 PM

Edit

**Marty** >

Thanks brother yoh go

You to

I'm thinking about going back to Middleport

Huh wtf why?

I don't think I'm actually wanted there

Is it because of the dog

Who makes you feel like that ?

I called no answer or
call back, texted th...



DARST000027



**Mj, Jay**

Jay

**Awesome we about to eat good**

**Will someone tell talk ems**



Jay

**No**

**I told you Jerry I can't kill ya**

**I like having you around**

**Your like the asshole grandfather I've always wa...d .lol**

     Aa  

AT&T 3:25 PM 77%

< Mj, Jay

Because I'm the only one u can boss around

Mj

Oll paw paw

👍

Jay

Jerry your young enough to be my Dad 💀

So I can't call you paw paw

Mj

Yeah it's not pap pap it's... PAW

SEP 24, 202_ AT 1:30 PM

**EXHIBIT**

**Darst F**



**GEOTEX**
**Construction Services, Inc.**
*An Employee Owned Company*

**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 11/15/2024 | 11/10/2024 | |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,678.86 |
| Bool | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $744.32 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.08 | $3,182.60 |
| INSUR PAY2 | 0.00 | 0.00 | 0.00 | 2,579.29 | Columb | $0.00 | $58.18 |
| Phone | 0.00 | 0.00 | 0.00 | 750.00 | OHSWH | $31.93 | $1,275.65 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | | | |
| SALARY | 0.00 | 40.00 | 1,307.60 | 46,829.34 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,307.60 | $56,751.96 | **Total** | $248.41 | $9,939.61 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,533.75 |
| Health | $48.30 | $1,795.71 |
| 3rdSic | $0.00 | $2,579.29 |
| **Total** | $113.68 | $5,966.44 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.51 |
| Net Wages YTD | $40,845.91 |
| Gross Wages YTD | $56,751.96 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $945.51 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 11/8/2024 | 11/3/2024 | |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,558.72 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $726.06 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.07 | $3,104.52 |
| Phone | 0.00 | 0.00 | 0.00 | 750.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $31.93 | $1,243.72 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 45,521.74 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,307.60 | $52,865.07 | **Total** | $248.40 | $9,691.20 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,468.37 |
| Health | $48.30 | $1,747.41 |
| **Total** | $113.68 | $3,273.47 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.52 |
| Net Wages YTD | $39,900.40 |
| Gross Wages YTD | $52,865.07 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $945.52 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000040



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 11/1/2024 | 10/27/2024 | |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,438.58 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $707.80 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.08 | $3,026.45 |
| Phone | 0.00 | 0.00 | 75.00 | 750.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $31.93 | $1,211.79 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 44,214.14 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,382.60 | $51,557.47 | **Total** | $248.41 | $9,442.80 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,402.99 |
| Health | $48.30 | $1,699.11 |
| **Total** | $113.68 | $3,159.79 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $1,020.51 |
| Net Wages YTD | $38,954.88 |
| Gross Wages YTD | $51,557.47 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $1,020.51 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000041



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|----------|-------------|------------|
| 10/25/2024 | 10/20/2024 | |

| Earnings | | | | | Taxes | | |
|----------|------|-------|--------|----------|------|--------|------|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,318.44 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $689.54 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.08 | $2,948.37 |
| Phone | 0.00 | 0.00 | 0.00 | 675.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $31.93 | $1,179.86 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 42,906.54 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,307.60 | $50,174.87 | **Total** | $248.41 | $9,194.39 |

| Payroll Deductions | | |
|--------------------|--------|----------|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,337.61 |
| Health | $48.30 | $1,650.81 |
| **Total** | $113.68 | $3,046.11 |

| Wage Amounts | |
|--------------|------|
| Net Wages/Period | $945.51 |
| Net Wages YTD | $37,934.37 |
| Gross Wages YTD | $50,174.87 |

| Direct Deposit Information | | | | Miscellaneous | |
|------|---------|--------|--|---------------|--|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $945.51 | | Employee SSN | xxx-xx-1777 |

DARST000042



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 10/18/2024 | 10/7/2024 | 10/13/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $19.40 | $4,198.30 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $6.89 | $671.28 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $29.43 | $2,870.29 |
| Phone | 0.00 | 0.00 | 0.00 | 675.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $8.48 | $1,147.93 |
| SALARY | 0.00 | 16.00 | 523.04 | 41,598.94 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 16.00 | $523.04 | $48,867.27 | **Total** | $64.20 | $8,945.98 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $26.15 | $1,272.23 |
| Health | $48.30 | $1,602.51 |
| **Total** | $74.45 | $2,932.43 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $384.39 |
| Net Wages YTD | $36,988.86 |
| Gross Wages YTD | $48,867.27 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | | Amount | | |
| 44205146 | xxx9085 | | $384.39 | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000043



Goetex Construction Services
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 10/11/2024 | 9/30/2024 | 10/6/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,178.90 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $664.39 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.08 | $2,840.86 |
| Phone | 0.00 | 0.00 | 75.00 | 675.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $31.93 | $1,139.45 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 41,075.90 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| Total | | 40.00 | $1,382.60 | $48,344.23 | Total | $248.41 | $8,881.78 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,246.08 |
| Health | $48.30 | $1,554.21 |
| Total | $113.68 | $2,857.98 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $1,020.51 |
| Net Wages YTD | $36,604.47 |
| Gross Wages YTD | $48,344.23 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $1,020.51 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000044



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 9/20/2024 | 9/9/2024 | 9/15/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 0.00 | 1,000.00 | FWH | $120.14 | $4,058.76 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $18.26 | $646.13 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $78.08 | $2,762.78 |
| Phone | 0.00 | 0.00 | 0.00 | 600.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $31.93 | $1,107.52 |
| SALARY | 0.00 | 0.00 | 0.00 | 39,768.30 | | | |
| Vac | 0.00 | 40.00 | 1,307.60 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| Total | | 40.00 | $1,307.60 | $46,961.63 | Total | $248.41 | $8,633.37 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,180.70 |
| Health | $48.30 | $1,505.91 |
| Total | $113.68 | $2,744.30 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.51 |
| Net Wages YTD | $35,583.96 |
| Gross Wages YTD | $46,961.63 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $945.51 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000045



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 9/20/2024 | 9/9/2024 | 9/15/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| BONUS | 0.00 | 0.00 | 1,000.00 | 1,000.00 | FWH | $200.00 | $4,058.76 |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | MED | $14.50 | $646.13 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | SOC | $62.00 | $2,762.78 |
| Phone | 0.00 | 0.00 | 0.00 | 600.00 | Columb | $0.00 | $58.18 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | OHSWH | $24.18 | $1,107.52 |
| SALARY | 0.00 | 0.00 | 0.00 | 39,768.30 | | | |
| Vac | 0.00 | 0.00 | 0.00 | 1,307.60 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 0.00 | $1,000.00 | $46,961.63 | **Total** | $300.68 | $8,633.37 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $50.00 | $1,180.70 |
| Health | $0.00 | $1,505.91 |
| **Total** | $50.00 | $2,744.30 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $649.32 |
| Net Wages YTD | $35,583.96 |
| Gross Wages YTD | $46,961.63 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $649.32 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000046



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

## Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 9/13/2024 | 9/2/2024 | 9/8/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | FWH | $120.14 | $3,738.62 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | MED | $18.26 | $613.37 |
| Phone | 0.00 | 0.00 | 0.00 | 600.00 | SOC | $78.07 | $2,622.70 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | Columb | $0.00 | $58.18 |
| SALARY | 0.00 | 34.00 | 1,307.60 | 39,768.30 | OHSWH | $31.93 | $1,051.41 |
| Vac | 0.00 | 6.00 | 0.00 | 0.00 | | | |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,307.60 | $44,654.03 | **Total** | $248.40 | $8,084.28 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $1,065.32 |
| Health | $48.30 | $1,457.61 |
| **Total** | $113.68 | $2,580.62 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.52 |
| Net Wages YTD | $33,989.13 |
| Gross Wages YTD | $44,654.03 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $945.52 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000047



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 9/6/2024 | 8/26/2024 | 9/1/2024 |

### Earnings

| Earning | Rate | Units | Amount | YTD |
|---|---|---|---|---|
| Boot | 0.00 | 0.00 | 0.00 | 144.73 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 |
| Phone | 0.00 | 0.00 | 75.00 | 600.00 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 38,460.70 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 |
| **Total** | | 40.00 | $1,382.60 | $43,346.43 |

### Taxes

| Tax | Amount | YTD |
|---|---|---|
| FWH | $120.14 | $3,618.48 |
| MED | $18.26 | $595.11 |
| SOC | $78.08 | $2,544.63 |
| Columb | $0.00 | $58.18 |
| OHSWH | $31.93 | $1,019.48 |
| **Total** | $248.41 | $7,835.88 |

### Payroll Deductions

| Deduction | Amount | YTD |
|---|---|---|
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $999.94 |
| Health | $48.30 | $1,409.31 |
| **Total** | $113.68 | $2,466.94 |

### Wage Amounts

| | |
|---|---|
| Net Wages/Period | $1,020.51 |
| Net Wages YTD | $33,043.61 |
| Gross Wages YTD | $43,346.43 |

### Direct Deposit Information

| Bank | Account | Amount |
|---|---|---|
| 44205146 | xxx9085 | $1,020.51 |

### Miscellaneous

Employee ID  DAR2

Employee SSN  xxx-xx-1777

DARST000048



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 8/30/2024 | 8/19/2024 | 8/25/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | FWH | $120.14 | $3,498.34 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | MED | $18.26 | $576.85 |
| Phone | 0.00 | 0.00 | 0.00 | 525.00 | SOC | $78.08 | $2,466.55 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | Columb | $0.00 | $58.18 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 37,153.10 | OHSWH | $31.93 | $987.55 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| Total | | 40.00 | $1,307.60 | $41,963.83 | Total | $248.41 | $7,587.47 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $934.56 |
| Health | $48.30 | $1,361.01 |
| Total | $113.68 | $2,353.26 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.51 |
| Net Wages YTD | $32,023.10 |
| Gross Wages YTD | $41,963.83 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $945.51 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000049



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 8/23/2024 | 8/12/2024 | 8/18/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| Boot | 0.00 | 0.00 | 0.00 | 144.73 | FWH | $120.14 | $3,378.20 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | MED | $18.25 | $558.59 |
| Phone | 0.00 | 0.00 | 0.00 | 525.00 | SOC | $78.07 | $2,388.47 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | Columb | $0.00 | $58.18 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 35,845.50 | OHSWH | $31.93 | $955.62 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| Total | | 40.00 | $1,307.60 | $40,656.23 | Total | $248.39 | $7,339.06 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $869.18 |
| Health | $48.30 | $1,312.71 |
| Total | $113.68 | $2,239.58 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.53 |
| Net Wages YTD | $31,077.59 |
| Gross Wages YTD | $40,656.23 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $945.53 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000050



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 8/16/2024 | 8/5/2024 | 8/11/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| Boot | 0.00 | 0.00 | 144.73 | 144.73 | FWH | $120.14 | $3,258.06 |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | MED | $18.26 | $540.34 |
| Phone | 0.00 | 0.00 | 0.00 | 525.00 | SOC | $78.08 | $2,310.40 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | Columb | $0.00 | $58.18 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 34,537.90 | OHSWH | $31.93 | $923.69 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,452.33 | $39,348.63 | **Total** | $248.41 | $7,090.67 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $803.80 |
| Health | $48.30 | $1,264.41 |
| **Total** | $113.68 | $2,125.90 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $1,090.24 |
| Net Wages YTD | $30,132.06 |
| Gross Wages YTD | $39,348.63 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $1,090.24 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000051



**GEOTEX**
**Construction Services, Inc.**
*An Employee Owned Company*

Goetex Construction Services
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 8/9/2024 | 7/29/2024 | 8/4/2024 |

| | | Earnings | | | | Taxes | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $3,137.92 |
| Phone | 0.00 | 0.00 | 0.00 | 525.00 | MED | $18.26 | $522.08 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.07 | $2,232.32 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 33,230.30 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $31.93 | $891.76 |
| **Total** | | 40.00 | $1,307.60 | $37,896.30 | **Total** | $248.40 | $6,842.26 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $738.42 |
| Health | $48.30 | $1,216.11 |
| **Total** | $113.68 | $2,012.22 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.52 |
| Net Wages YTD | $29,041.82 |
| Gross Wages YTD | $37,896.30 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $945.52 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000052



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 8/2/2024 | 7/22/2024 | 7/28/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $3,017.78 |
| Phone | 0.00 | 0.00 | 75.00 | 525.00 | MED | $18.26 | $503.82 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.08 | $2,154.25 |
| SALARY | 0.00 | 0.00 | 1,307.60 | 31,922.70 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 40.00 | 0.00 | 0.00 | OHSWH | $31.93 | $859.83 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,382.60 | $36,588.70 | **Total** | $248.41 | $6,593.86 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $673.04 |
| Health | $48.30 | $1,167.81 |
| **Total** | $113.68 | $1,898.54 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $1,020.51 |
| Net Wages YTD | $28,096.30 |
| Gross Wages YTD | $36,588.70 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $1,020.51 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000053



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 7/26/2024 | 7/15/2024 | 7/21/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $2,897.64 |
| Phone | 0.00 | 0.00 | 0.00 | 450.00 | MED | $18.26 | $485.56 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.08 | $2,076.17 |
| SALARY | 0.00 | 32.00 | 1,307.60 | 30,615.10 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 8.00 | 0.00 | 0.00 | OHSWH | $31.93 | $827.90 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,307.60 | $35,206.10 | **Total** | $248.41 | $6,345.45 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $607.66 |
| Health | $48.30 | $1,119.51 |
| **Total** | $113.68 | $1,784.86 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.51 |
| Net Wages YTD | $27,075.79 |
| Gross Wages YTD | $35,206.10 |

| Direct Deposit Information | | | |
|---|---|---|---|
| Bank | Account | Amount | |
| 44205146 | xxx9085 | $945.51 | |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000054



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 7/19/2024 | 7/8/2024 | 7/14/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $2,777.50 |
| Phone | 0.00 | 0.00 | 0.00 | 450.00 | MED | $18.26 | $467.30 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.07 | $1,998.09 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 29,307.50 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $31.93 | $795.97 |
| **Total** | | 40.00 | $1,307.60 | $33,898.50 | **Total** | $248.40 | $6,097.04 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $542.28 |
| Health | $48.30 | $1,071.21 |
| **Total** | $113.68 | $1,671.18 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $945.52 |
| Net Wages YTD | $26,130.28 |
| Gross Wages YTD | $33,898.50 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $945.52 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000055



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 7/12/2024 | 7/1/2024 | 7/7/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $2,657.36 |
| Phone | 0.00 | 0.00 | 0.00 | 450.00 | MED | $18.26 | $449.04 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.08 | $1,920.02 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 27,999.90 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $31.93 | $764.04 |
| **Total** | | 40.00 | $1,307.60 | $32,590.90 | **Total** | $248.41 | $5,848.64 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $476.90 |
| Health | $48.30 | $1,022.91 |
| **Total** | $113.68 | $1,557.50 |

| Wage Amounts | | |
|---|---|---|
| Net Wages/Period | | $945.51 |
| Net Wages YTD | | $25,184.76 |
| Gross Wages YTD | | $32,590.90 |

| Direct Deposit Information | | | |
|---|---|---|---|
| Bank | Account | | Amount |
| 44205146 | xxx9085 | | $945.51 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000056



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 7/5/2024 | 6/24/2024 | 6/30/2024 |

| Earnings | | | | | Taxes | | |
|----------|------|-------|--------|-------|------|--------|------|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $120.14 | $2,537.22 |
| Phone | 0.00 | 0.00 | 75.00 | 450.00 | MED | $18.26 | $430.78 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $78.08 | $1,841.94 |
| SALARY | 0.00 | 40.00 | 1,307.60 | 26,692.30 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $31.93 | $732.11 |
| **Total** | | 40.00 | $1,382.60 | $31,283.30 | **Total** | $248.41 | $5,600.23 |

| Payroll Deductions | | |
|--------------------|--------|--------|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $65.38 | $411.52 |
| Health | $48.30 | $974.61 |
| **Total** | $113.68 | $1,443.82 |

| Wage Amounts | |
|--------------|------|
| Net Wages/Period | $1,020.51 |
| Net Wages YTD | $24,239.25 |
| Gross Wages YTD | $31,283.30 |

| Direct Deposit Information | | | | Miscellaneous | |
|------|---------|--------|---|---------------|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $1,020.51 | | Employee SSN | xxx-xx-1777 |

DARST000057



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 6/28/2024 | 6/17/2024 | 6/23/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $2,417.08 |
| Phone | 0.00 | 0.00 | 0.00 | 375.00 | MED | $16.10 | $412.52 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,763.86 |
| SALARY | 0.00 | 32.00 | 1,153.85 | 25,384.70 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 8.00 | 0.00 | 0.00 | OHSWH | $27.46 | $700.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,153.85 | $29,900.70 | **Total** | $207.38 | $5,351.82 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $57.69 | $346.14 |
| Health | $44.11 | $926.31 |
| **Total** | $101.80 | $1,330.14 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $844.67 |
| Net Wages YTD | $23,218.74 |
| Gross Wages YTD | $29,900.70 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $844.67 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000058



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 6/21/2024 | 6/10/2024 | 6/16/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $2,322.06 |
| Phone | 0.00 | 0.00 | 0.00 | 375.00 | MED | $16.09 | $396.42 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $1,695.06 |
| SALARY | 0.00 | 32.00 | 1,153.85 | 24,230.85 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 8.00 | 0.00 | 0.00 | OHSWH | $27.46 | $672.72 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,153.85 | $28,746.85 | **Total** | $207.38 | $5,144.44 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $57.69 | $288.45 |
| Health | $44.11 | $882.20 |
| **Total** | $101.80 | $1,228.34 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $844.67 |
| Net Wages YTD | $22,374.07 |
| Gross Wages YTD | $28,746.85 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $844.67 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000059



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 6/14/2024 | 6/3/2024 | 6/9/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $2,227.04 |
| Phone | 0.00 | 0.00 | 0.00 | 375.00 | MED | $16.09 | $380.33 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,626.25 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 23,077.00 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $645.26 |
| Total | | 40.00 | $1,153.85 | $27,593.00 | Total | $207.37 | $4,937.06 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $57.69 | $230.76 |
| Health | $44.11 | $838.09 |
| Total | $101.80 | $1,126.54 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $844.68 |
| Net Wages YTD | $21,529.40 |
| Gross Wages YTD | $27,593.00 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $844.68 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000060



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 6/7/2024 | 5/27/2024 | 6/2/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $2,132.02 |
| Phone | 0.00 | 0.00 | 75.00 | 375.00 | MED | $16.09 | $364.24 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,557.45 |
| SALARY | 0.00 | 32.00 | 1,153.85 | 21,923.15 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 8.00 | 0.00 | 0.00 | OHSWH | $27.46 | $617.80 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,228.85 | $26,439.15 | **Total** | $207.37 | $4,729.69 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $57.69 | $173.07 |
| Health | $44.11 | $793.98 |
| **Total** | $101.80 | $1,024.74 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $919.68 |
| Net Wages YTD | $20,684.72 |
| Gross Wages YTD | $26,439.15 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $919.68 | | Employee SSN | xxx-xx-1777 |

DARST000061



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 5/31/2024 | 5/20/2024 | 5/26/2024 |

| Earnings | | | | | Taxes | | |
|----------|------|-------|--------|-------|-------|--------|-------|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $2,037.00 |
| Phone | 0.00 | 0.00 | 0.00 | 300.00 | MED | $16.09 | $348.15 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $1,488.65 |
| SALARY | 0.00 | 30.00 | 1,153.85 | 20,769.30 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 10.00 | 0.00 | 0.00 | OHSWH | $27.46 | $590.34 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,153.85 | $25,210.30 | **Total** | $207.38 | $4,522.32 |

| Payroll Deductions | | |
|--------------------|--------|--------|
| Deduction | Amount | YTD |
| 401K | $0.00 | $57.69 |
| 401k R | $57.69 | $115.38 |
| Health | $44.11 | $749.87 |
| **Total** | $101.80 | $922.94 |

| Wage Amounts | |
|--------------|--------|
| Net Wages/Period | $844.67 |
| Net Wages YTD | $19,765.04 |
| Gross Wages YTD | $25,210.30 |

| Direct Deposit Information | | | Miscellaneous | |
|------|---------|--------|---------------|------|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $844.67 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000062



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 5/24/2024 | 5/13/2024 | 5/19/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $88.09 | $1,941.98 |
| Phone | 0.00 | 0.00 | 0.00 | 300.00 | MED | $16.09 | $332.06 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,419.84 |
| SALARY | 0.00 | 24.00 | 1,153.85 | 19,615.45 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 16.00 | 0.00 | 0.00 | OHSWH | $25.74 | $562.88 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| Total | | 40.00 | $1,153.85 | $24,056.45 | Total | $198.72 | $4,314.94 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| 401K | $57.69 | $57.69 |
| 401k R | $57.69 | $57.69 |
| Health | $44.11 | $705.76 |
| Total | $159.49 | $821.14 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $795.64 |
| Net Wages YTD | $18,920.37 |
| Gross Wages YTD | $24,056.45 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $795.64 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000063



**Geotex Construction Services**
1025 Slimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 5/17/2024 | 5/6/2024 | 5/12/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,853.89 |
| Phone | 0.00 | 0.00 | 0.00 | 300.00 | MED | $16.09 | $315.97 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,351.04 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 18,461.60 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $537.14 |
| **Total** | | 40.00 | $1,153.85 | $22,902.60 | **Total** | $207.37 | $4,116.22 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $661.65 |
| **Total** | $44.11 | $661.65 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $18,124.73 |
| Gross Wages YTD | $22,902.60 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $902.37 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000064



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 5/10/2024 | 4/29/2024 | 5/5/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,758.87 |
| Phone | 0.00 | 0.00 | 0.00 | 300.00 | MED | $16.09 | $299.88 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $1,282.24 |
| SALARY | 0.00 | 24.00 | 1,153.85 | 17,307.75 | Columb | $0.00 | $58.18 |
| Vac | 0.00 | 16.00 | 0.00 | 0.00 | OHSWH | $27.46 | $509.68 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | | | |
| **Total** | | 40.00 | $1,153.85 | $21,748.75 | **Total** | $207.38 | $3,908.85 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $617.54 |
| **Total** | $44.11 | $617.54 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.36 |
| Net Wages YTD | $17,222.36 |
| Gross Wages YTD | $21,748.75 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $902.36 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000065



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 5/3/2024 | 4/22/2024 | 4/28/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,663.85 |
| Phone | 0.00 | 0.00 | 75.00 | 300.00 | MED | $16.09 | $283.79 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,213.43 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 16,153.90 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $482.22 |
| Total | | 40.00 | $1,228.85 | $20,594.90 | Total | $207.37 | $3,701.47 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $573.43 |
| Total | $44.11 | $573.43 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $977.37 |
| Net Wages YTD | $16,320.00 |
| Gross Wages YTD | $20,594.90 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $977.37 | Employee ID | DAR2 | |
| | | | Employee SSN | xxx-xx-1777 | |



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 4/26/2024 | 4/15/2024 | 4/21/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,568.83 |
| Phone | 0.00 | 0.00 | 0.00 | 225.00 | MED | $16.10 | $267.70 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $1,144.63 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 15,000.05 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $454.76 |
| **Total** | | 40.00 | $1,153.85 | $19,366.05 | **Total** | $207.39 | $3,494.10 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $529.32 |
| **Total** | $44.11 | $529.32 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.35 |
| Net Wages YTD | $15,342.63 |
| Gross Wages YTD | $19,366.05 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $902.35 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000067



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 4/19/2024 | 4/8/2024 | 4/14/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,473.81 |
| Phone | 0.00 | 0.00 | 0.00 | 225.00 | MED | $16.09 | $251.60 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,075.82 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 13,846.20 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $427.30 |
| **Total** | | 40.00 | $1,153.85 | $18,212.20 | **Total** | $207.37 | $3,286.71 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $485.21 |
| **Total** | $44.11 | $485.21 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $14,440.28 |
| Gross Wages YTD | $18,212.20 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $902.37 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000068



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 4/12/2024 | 4/1/2024 | 4/7/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,378.79 |
| Phone | 0.00 | 0.00 | 0.00 | 225.00 | MED | $16.09 | $235.51 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $1,007.02 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 12,692.35 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $399.84 |
| Total | | 40.00 | $1,153.85 | $17,058.35 | Total | $207.37 | $3,079.34 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $441.10 |
| Total | $44.11 | $441.10 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $13,537.91 |
| Gross Wages YTD | $17,058.35 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $902.37 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000069



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 4/5/2024 | 3/25/2024 | 3/31/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,283.77 |
| Phone | 0.00 | 0.00 | 75.00 | 225.00 | MED | $16.09 | $219.42 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $938.22 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 11,538.50 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $372.38 |
| **Total** | | 40.00 | $1,228.85 | $15,904.50 | **Total** | $207.38 | $2,871.97 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $396.99 |
| **Total** | $44.11 | $396.99 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $977.36 |
| Net Wages YTD | $12,635.54 |
| Gross Wages YTD | $15,904.50 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $977.36 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000070



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 3/29/2024 | 3/18/2024 | 3/24/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,188.75 |
| Phone | 0.00 | 0.00 | 0.00 | 150.00 | MED | $16.09 | $203.33 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $869.41 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 10,384.65 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $344.92 |
| **Total** | | 40.00 | $1,153.85 | $14,675.65 | **Total** | $207.37 | $2,664.59 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $352.88 |
| **Total** | $44.11 | $352.88 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $11,658.18 |
| Gross Wages YTD | $14,675.65 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $902.37 | | Employee SSN | xxx-xx-1777 |

DARST000071



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 3/22/2024 | 3/11/2024 | 3/17/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $1,093.73 |
| Phone | 0.00 | 0.00 | 0.00 | 150.00 | MED | $16.09 | $187.24 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $800.61 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 9,230.80 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $317.46 |
| Total | | 40.00 | $1,153.85 | $13,521.80 | Total | $207.38 | $2,457.22 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $308.77 |
| Total | $44.11 | $308.77 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.36 |
| Net Wages YTD | $10,755.81 |
| Gross Wages YTD | $13,521.80 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $902.36 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000072



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 3/15/2024 | 3/4/2024 | 3/10/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $998.71 |
| Phone | 0.00 | 0.00 | 0.00 | 150.00 | MED | $16.09 | $171.15 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $731.80 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 8,076.95 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $290.00 |
| Total | | 40.00 | $1,153.85 | $12,367.95 | Total | $207.37 | $2,249.84 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $264.66 |
| Total | $44.11 | $264.66 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $9,853.45 |
| Gross Wages YTD | $12,367.95 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $902.37 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000073



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 3/8/2024 | 2/26/2024 | 3/3/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| **Earning** | **Rate** | **Units** | **Amount** | **YTD** | **Tax** | **Amount** | **YTD** |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $903.69 |
| Phone | 0.00 | 0.00 | 0.00 | 150.00 | MED | $16.09 | $155.06 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $663.00 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 6,923.10 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $262.54 |
| **Total** | | 40.00 | $1,153.85 | $11,214.10 | **Total** | $207.37 | $2,042.47 |

| Payroll Deductions | | |
|---|---|---|
| **Deduction** | **Amount** | **YTD** |
| Health | $44.11 | $220.55 |
| **Total** | $44.11 | $220.55 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $8,951.08 |
| Gross Wages YTD | $11,214.10 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| **Bank** | **Account** | **Amount** | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $902.37 | | Employee SSN | xxx-xx-1777 |

DARST000074



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 3/1/2024 | 2/19/2024 | 2/25/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $808.67 |
| Phone | 0.00 | 0.00 | 75.00 | 150.00 | MED | $16.10 | $138.97 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $594.20 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 5,769.25 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $235.08 |
| **Total** | | 40.00 | $1,228.85 | $10,060.25 | **Total** | $207.39 | $1,835.10 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $176.44 |
| **Total** | $44.11 | $176.44 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $977.35 |
| Net Wages YTD | $8,048.71 |
| Gross Wages YTD | $10,060.25 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $977.35 | | Employee SSN | xxx-xx-1777 |

DARST000075



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 2/23/2024 | 2/12/2024 | 2/18/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $713.65 |
| Phone | 0.00 | 0.00 | 0.00 | 75.00 | MED | $16.09 | $122.87 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $525.39 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 4,615.40 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $207.62 |
| Total | | 40.00 | $1,153.85 | $8,831.40 | Total | $207.37 | $1,627.71 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $132.33 |
| Total | $44.11 | $132.33 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $7,071.36 |
| Gross Wages YTD | $8,831.40 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $902.37 | | Employee SSN | xxx-xx-1777 |



**GEOTEX**
**Construction Services, Inc.**
*An Employee Owned Company*

Goetex Construction Services
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 2/16/2024 | 2/5/2024 | 2/11/2024 |

| \_\_\_ Earnings \_\_\_ | | | | | \_\_\_ Taxes \_\_\_ | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $618.63 |
| Phone | 0.00 | 0.00 | 0.00 | 75.00 | MED | $16.09 | $106.78 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.81 | $456.59 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 3,461.55 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $180.16 |
| **Total** | | 40.00 | $1,153.85 | $7,677.55 | **Total** | $207.38 | $1,420.34 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $88.22 |
| **Total** | $44.11 | $88.22 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.36 |
| Net Wages YTD | $6,168.99 |
| Gross Wages YTD | $7,677.55 |

| Direct Deposit Information | | |
|---|---|---|
| Bank | Account | Amount |
| 44205146 | xxx9085 | $902.36 |

| Miscellaneous | |
|---|---|
| Employee ID | DAR2 |
| Employee SSN | xxx-xx-1777 |

DARST000077



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 2/9/2024 | 1/29/2024 | 2/4/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $95.02 | $523.61 |
| Phone | 0.00 | 0.00 | 0.00 | 75.00 | MED | $16.09 | $90.69 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $68.80 | $387.78 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 2,307.70 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $27.46 | $152.70 |
| **Total** | | 40.00 | $1,153.85 | $6,523.70 | **Total** | $207.37 | $1,212.96 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| Health | $44.11 | $44.11 |
| **Total** | $44.11 | $44.11 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $902.37 |
| Net Wages YTD | $5,266.63 |
| Gross Wages YTD | $6,523.70 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | Employee ID | DAR2 |
| 44205146 | xxx9085 | $902.37 | | Employee SSN | xxx-xx-1777 |

DARST000078



**Geotex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 2/2/2024 | 1/22/2024 | 1/28/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $100.31 | $428.59 |
| Phone | 0.00 | 0.00 | 75.00 | 75.00 | MED | $16.73 | $74.60 |
| REG | 26.00 | 0.00 | 0.00 | 2,743.00 | SOC | $71.54 | $318.98 |
| SALARY | 0.00 | 40.00 | 1,153.85 | 1,153.85 | Columb | $0.00 | $58.18 |
| VEHREI | 0.00 | 0.00 | 0.00 | 150.00 | OHSWH | $28.78 | $125.24 |
| Total | | 40.00 | $1,228.85 | $5,369.85 | Total | $217.36 | $1,005.59 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| | | |
| Total | $0.00 | $0.00 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $1,011.49 |
| Net Wages YTD | $4,364.26 |
| Gross Wages YTD | $5,369.85 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $1,011.49 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |



**GEOTEX**
**Construction Services, Inc.**
*An Employee Owned Company*

Goetex Construction Services
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 1/26/2024 | 1/15/2024 | 1/21/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $72.61 | $328.28 |
| REG | 26.00 | 35.50 | 923.00 | 2,743.00 | MED | $13.38 | $57.87 |
| VEHREI | 0.00 | 0.00 | 50.00 | 150.00 | SOC | $57.22 | $247.44 |
| | | | | | Columb | $12.68 | $58.18 |
| | | | | | OHSWH | $21.88 | $96.46 |
| Total | | 35.50 | $973.00 | $4,141.00 | Total | $177.77 | $788.23 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| | | |
| Total | $0.00 | $0.00 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $795.23 |
| Net Wages YTD | $3,352.77 |
| Gross Wages YTD | $4,141.00 |

| Direct Deposit Information | | | | Miscellaneous | |
|---|---|---|---|---|---|
| Bank | Account | Amount | | | |
| 44205146 | xxx9085 | $795.23 | | Employee ID | DAR2 |
| | | | | Employee SSN | xxx-xx-1777 |

DARST000080



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|---|---|---|
| 1/19/2024 | 1/8/2024 | 1/14/2024 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 0.00 | 0.00 | 1,248.00 | FWH | $83.53 | $255.67 |
| REG | 26.00 | 39.00 | 1,014.00 | 1,820.00 | MED | $14.71 | $44.49 |
| VEHREI | 0.00 | 0.00 | 50.00 | 100.00 | SOC | $62.87 | $190.22 |
| | | | | | Columb | $25.35 | $45.50 |
| | | | | | OHSWH | $24.60 | $74.58 |
| **Total** | | 39.00 | $1,064.00 | $3,168.00 | **Total** | $211.06 | $610.46 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| **Total** | $0.00 | $0.00 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $852.94 |
| Net Wages YTD | $2,557.54 |
| Gross Wages YTD | $3,168.00 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $852.94 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

**Direct Deposit Earnings Statement**

| Pay Date | Start Period | End Period |
|----------|--------------|------------|
| 1/12/2024 | 1/1/2024 | 1/7/2024 |

| Earnings | | | | | Taxes | | |
|----------|------|-------|--------|--------|-------|--------|--------|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 8.00 | 208.00 | 1,248.00 | FWH | $83.53 | $172.14 |
| REG | 26.00 | 31.00 | 806.00 | 806.00 | MED | $14.70 | $29.78 |
| VEHREI | 0.00 | 0.00 | 50.00 | 50.00 | SOC | $62.87 | $127.35 |
| | | | | | Columb | $20.15 | $20.15 |
| | | | | | OHSWH | $24.60 | $49.98 |
| **Total** | | 39.00 | $1,064.00 | $2,104.00 | **Total** | $205.85 | $399.40 |

| Payroll Deductions | | |
|--------------------|--------|-----|
| Deduction | Amount | YTD |
| **Total** | $0.00 | $0.00 |

| Wage Amounts | |
|--------------|--------|
| Net Wages/Period | $858.15 |
| Net Wages YTD | $1,704.60 |
| Gross Wages YTD | $2,104.00 |

| Direct Deposit Information | | | Miscellaneous | |
|----------------------------|---------|--------|---------------|---------|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $858.15 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000082



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 1/5/2024 | 12/25/2023 | 12/31/2023 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| Earning | Rate | Units | Amount | YTD | Tax | Amount | YTD |
| HOLDAY | 26.00 | 40.00 | 1,040.00 | 1,040.00 | FWH | $88.61 | $88.61 |
| | | | | | MED | $15.08 | $15.08 |
| | | | | | SOC | $64.48 | $64.48 |
| | | | | | OHSWH | $25.38 | $25.38 |
| **Total** | | 40.00 | $1,040.00 | $1,040.00 | **Total** | $193.55 | $193.55 |

| Payroll Deductions | | |
|---|---|---|
| Deduction | Amount | YTD |
| **Total** | $0.00 | $0.00 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $846.45 |
| Net Wages YTD | $846.45 |
| Gross Wages YTD | $1,040.00 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| Bank | Account | Amount | | |
| 44205146 | xxx9085 | $846.45 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000083



**Goetex Construction Services**
1025 Stimmel Rd.
Columbus, OH 43223
(614) 444-5690

Jerry Darst
4027 Kemper Hollow Rd
Gallipolis, OH 45631

### Direct Deposit Earnings Statement

| Pay Date | Start Period | End Period |
|---|---|---|
| 12/29/2023 | 12/18/2023 | 12/24/2023 |

| Earnings | | | | | Taxes | | |
|---|---|---|---|---|---|---|---|
| **Earning** | **Rate** | **Units** | **Amount** | **YTD** | **Tax** | **Amount** | **YTD** |
| REG | 26.00 | 8.00 | 208.00 | 208.00 | MED | $3.02 | $3.02 |
| | | | | | SOC | $12.90 | $12.90 |
| | | | | | OHSWH | $1.76 | $1.76 |
| **Total** | | 8.00 | $208.00 | $208.00 | **Total** | $17.68 | $17.68 |

| Payroll Deductions | | |
|---|---|---|
| **Deduction** | **Amount** | **YTD** |
| **Total** | $0.00 | $0.00 |

| Wage Amounts | |
|---|---|
| Net Wages/Period | $190.32 |
| Net Wages YTD | $190.32 |
| Gross Wages YTD | $208.00 |

| Direct Deposit Information | | | Miscellaneous | |
|---|---|---|---|---|
| **Bank** | **Account** | **Amount** | | |
| 44205146 | xxx9085 | $190.32 | Employee ID | DAR2 |
| | | | Employee SSN | xxx-xx-1777 |

DARST000084

2023-08-30 15:30     cardio/gen surg 7403958620 >> Sedgwick02          P 2/7

Received 8/30/2023
10:31:00 AM
ImageFax ID:
8031916
Sedgwick MCO



**Ohio** | Bureau of Workers' Compensation     ~~SCANNED~~ 8/30/2023     **Physician's Report of Work Ability (MEDCO-14)**

5 Pages split from original

## Instructions

- Use this form to provide detailed information about the injured worker's ability to work. Add comments to Section 4 or attach additional information as necessary. BWC uses the information to support a request for temporary total compensation.
- The treating physician must submit this form each time they see the injured worker unless they:
  - Have been awarded permanent and total disability.
  - Have returned to work without restrictions within seven days of the injury.
  - Are being treated after the treating physician has released them to their former position of employment (i.e., full duty job) held on the date of injury without restrictions.
- While you may use an equivalent physician-generated document (e.g., office notes, treatment plan) to the MEDCO-14, it must contain, at a minimum, the required data elements. If you've previously submitted equivalent data, indicate the date of the report on the form (e.g., 5/15/2021, office note).

**Note:** Physician assistants and nurse practitioners may complete this form; however, they may only certify temporary disability for the first six weeks after the date of injury. Subsequent periods of temporary disability require a co-signature by the treating physician.

- Fax form to the managed care organization if the employer is state-fund or to the employer if self-insured.
- **Important:** Failure to provide complete information may delay compensation payments to the injured worker.

| Injured worker name Jerry Darst 81286682 23-104733 | | Claim number 23-104733 | Date of injury 01/15/2023 |
|---|---|---|---|
| Date of *last* appointment/examination | Date of *this* appointment/examination 8/29/2023 | Date of *next* appointment/examination 9/28/2023 | |

### 1  Submission type (Select one of the options below.)

- ☐ Initial MEDCO-14, *Proceed to Section 2.*
- ☐ Subsequent MEDCO-14, <u>no</u> changes *Proceed to Section 6.*
- ☒ Subsequent MEDCO-14, <u>with changes.</u> Check the appropriate box "Reporting changes from the last evaluation" or "No changes" in each section.

### 2  Job description and work status          ☐ Reporting changes from last evaluation ☐ No changes

- Have you reviewed the injured worker's job description? ☒ Yes ☐ No
  - If yes, who provided the job description? ☒ Injured worker ☐ Employer ☐ MCO/BWC
- Does the injured worker have any physical or health restrictions **related to the allowed conditions in the claim** on the date of this exam? ☒ Yes ☐ No
  - If yes, are the restrictions: ☐ Permanent? ☒ Temporary?
  - If no, check the box to indicate the injured worker is released to return to full duty as of the date of this exam. ☐ *Proceed to Section 6.*
- If there are restrictions, can the injured worker return to their full duty job held on the date of injury as of the date of this exam? ☐ Yes ☒ No
  - If yes, *Proceed to Section 6.*
  - If no, provide date restrictions began 1 / 15 /2023 and estimated full duty return-to-work date 9 / 29 / 2023  off work *Proceed to Section 3.*

### 3  Disability information          ☐ Reporting changes from last evaluation ☐ No changes

Complete the chart below for all work-related allowed conditions being treated.

| Narrative description of the work-related allowed condition | Site/Location if applicable | ICD code | Is the condition preventing full duty release to the job injured worker held on the date of injury? |
|---|---|---|---|
| Strain of muscle, Fascia and tendon at neck level | | S16.1XXA | ☒ Yes ☐ No |
| Sprain anterior shoulder | Left shoulder | S43.492A | ☒ Yes ☐ No |
| Superior glenoid labrum lesion of left shoulder | Left shoulder | S43.432A | ☒ Yes ☐ No |
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |

List all other conditions that **impact treatment** of the conditions listed above (e.g., co-morbidities or not yet allowed conditions).

BWC-3914 (Rev. July 5, 2022)
**MEDCO-14**

**EXHIBIT**

**Darst G**

MCSO 00003

2023-08-30 15:30          cardio/gen surg 7403958620 >> Sedgwick02          P 3/7

| Injured worker name<br>Mary Carol Sedgwick | Claim number<br>23-104733 | Date of injury<br>01/15/2023 |
|---|---|---|

## Abilities, clinical findings, and recovery progression    ☐ Reporting changes from last evaluation ☒ No changes

- Is the injured worker taking prescribed medication for the allowed conditions that may be a safety hazard? ☐ Yes ☐ No
- Dominant hand: ☐ Right ☐ Left
- Circle the injured worker's physical abilities for the activities in the chart below and provide comments as necessary.

| Frequency scale | | Strength level (lbs.) | | Body side indicator | |
|---|---|---|---|---|---|
| N = Never | | S = Sedentary  0-10 | | L = Left | |
| S = Seldom  0-1 hour | | L= Light  0-20 | | R = Right | |
| O = Occasional 1-3 hours | | M = Medium  0-50 | | B = Both | |
| F = Frequent  3-8 hours | | H = Heavy  0-100 | | | |
| C = Constant  6-8 hours | | VH = Very heavy >100 | | *Indicate limitations ONLY | |

| Activity | Frequency | Activity | Strength | Frequency | Activity | Side |
|---|---|---|---|---|---|---|
| Sit | N S O F C | Floor lift (0-17") | S L M H VH | N S O F C | Front/Lateral reach | L R B |
| Stand/Walk | N S O F C | Knee lift (18-29") | S L M H VH | N S O F C | Overhead reach | L R B |
| Climb stairs | N S O F C | Waist lift (30-36") | S L M H VH | N S O F C | Wrist flex/extension | L R B |
| Squat/Kneel | N S O F C | Chest lift (37-60") | S L M H VH | N S O F C | Grasp | L R B |
| Crawl | N S O F C | Overhead lift (>60") | S L M H VH | N S O F C | Finger manipulation | L R B |
| Twist | N S O F C | Push/Pull | S L M H VH | N S O F C | Keyboarding | L R B |
| Bend/Stoop | N S O F C | Carry | S L M H VH | N S O F C | Operate foot controls | L R B |

- Injured worker can work _____ hours per day and _____ hours per week.
- Are there any functional restrictions based only on the allowed psychological conditions? ☐ Yes ☒ No
  o If yes, describe any functional restrictions in comments below and reference the MEDCO-16 as needed.
- Provide your clinical and objective findings supporting your medical opinion. List barriers to return to work, reason(s) for delayed recovery, and proposed treatment plan (e.g., modalities, therapies, surgery), including estimated duration of each treatment or indicate if all or part of this information is in office notes (include date(s) of notes).
Comments:




**Health and Behavioral Assessment:** (HBA evaluates cognitive, emotional, social, and behavioral barriers that might impact physical health problems and treatments which are associated with the allowed physical injury in the claim.)
- Is the injured worker's recovery not progressing, or progressing slower than expected? ☐ Yes ☒ No
- Do cognitive, emotional, social, or behavioral barriers exist that may be interfering with expected healing? ☐ Yes ☒ No
**Vocational rehabilitation** is a voluntary program for an eligible injured worker who needs assistance to remain at work or return to work. Is the injured worker currently able to participate in a vocational rehabilitation program? ☐ Yes ☒ No

## Maximum medical improvement (MMI) status    ☐ Reporting changes from last evaluation ☐ No changes

MMI is a treatment plateau (static or well-stabilized) at which no fundamental functional or physiological change can be expected within reasonable medical probability, in spite of continuing medical or rehabilitative procedures. Has the work-related injury(s) or occupational disease reached MMI based on the definition above? ☐ Yes ☒ No
- If yes, give MMI date: ____/____/____. Note: An injured worker may need supportive treatment to maintain his or her level of function after reaching MMI. So, periodic medical treatment may still be requested and, if approved, provided.

## Treating physician's signature – mandatory (See exceptions at the top of the form.)

I certify the information on this form is correct to the best of my knowledge. I am aware that any person who knowingly makes a false statement, misrepresentation, concealment of fact, or any other act of fraud to obtain payment as provided by BWC, or who knowingly accepts payment to which that person is not entitled, is subject to felony criminal prosecution and may be punished, under appropriate criminal provisions, by a fine or imprisonment or both.

| Treating physician's name (Print legibly.)<br>Tina Perkins, CNP | Address, city, state, nine-digit ZIP code<br>280 Pattonsville Road |
|---|---|
| Treating physician's signature | Jackson, Ohio 45640 |
| BWC provider (PEACH) number<br>1276966-0001 | Date<br>6/28/2023 | Telephone number<br>740-395-8835 | Fax number<br>740-395-8620 |

BWC-3914 (Rev. July 5, 2022)
**MEDCO-14**

MCSO 00004

**EXHIBIT**
**Darst H**

# Ohio | Bureau of Workers' Compensation

## First Report of an Injury, Occupational Disease or Death

**WARNING:** Any person who obtains compensation from BWC or self-insuring employers by knowingly misrepresenting or concealing facts, making false statements or accepting compensation to which he or she is not entitled, is subject to felony criminal prosecution for fraud. (R.C. 2913.48)

By signing this form, I
- Elect to only receive compensation and/or benefits that are provided for in this claim under Ohio workers' compensation laws;
- Waive and release my right to receive compensation and benefits under the workers' compensation laws of another state for the injury or occupational disease, or death resulting from an injury or occupational disease, for which I am filing this claim;
- Agree that I have not and will not file a claim in another state for the injury or occupational disease or death resulting from an injury or occupational disease for which I am filing this claim;
- Confirm that I have not received compensation and/or benefits under the workers' compensation laws of another state for this claim, and that I will notify BWC immediately upon receiving any compensation or benefit from any source for this claim.

| Last name, first name, middle initial | | Social Security number | | Marital status | Date of birth |
|---|---|---|---|---|---|
| Darst | | | | ☑ Single ☐ Married ☐ Divorced ☐ Separated ☐ Widowed | 1971 |

| Home mailing address | | | Sex ☑ Male ☐ Female | Number of dependants: 2 |
|---|---|---|---|---|

| City Gallipolis | State OH | 9-digit ZIP code 45631 | Country if different from USA | Department name Mng's Cw |

| Wage rate $ Per: ☐ Year ☐ Other | ☑ Hour ☐ Month ☐ Week | What days of the week do you usually work? ☑Sun ☑Mon ☐Tues ☐Wed ☑Thu ☑Fri ☑Sat | Regular work hours From __ to __ |
|---|---|---|---|

Have you been offered or do you expect to receive payment or wages for this claim from anyone other than the Ohio Bureau of Workers' Compensation? ☐Yes ☑No If yes, please explain.  Occupation or job title

| Employer name | Mng's County Shop HS Office |
|---|---|

| Mailing address (number and street, city or town, state, ZIP code and county) | E Main Str E, 2nd St, Pomeroy OH 45769 |
|---|---|

Location, if different from mailing address

Was the place of accident or exposure on an employer's premises? ☑Yes ☐No
(If no, give exact accident location, street address, city, state and ZIP code)

| Date of injury/disease 10-28-22 | Time of injury/disease 11 ☐a.m. ☑p.m. | If fatal, give date of death | Time employee began work 2:15 ☐a.m. ☑p.m. | Date last worked | Date returned to work |
|---|---|---|---|---|---|

| Date hired 2022 | State where hired OH | Date employer notified 10-28-22 | State where supervised OH |
|---|---|---|---|

Description of accident (Describe the sequence of events that directly injured the employee, or caused the disease or death.)

Placing suspect in vehicle causing Altercation falling to ground

Type of injury/disease and part(s) of body affected (For example: sprain of lower left back)

Right side body

By the application release of information – I am applying for a claim under the Ohio Bureau of Workers' Compensation Act for work-related injuries that I did not inflict. I affirm that I elect to receive compensation and benefits under Ohio's workers' compensation laws for my claim, and I waive and release any right to file for and receive compensation and benefits under the laws of any other state or any individual. I request payment for compensation and/or medical benefits as allowable, and authorize direct payment to me/my medical providers. I also authorize any provider who attends, treats or examines me, the Ohio State Board of Pharmacy, the Ohio Department of Job and Family Services and the Ohio Rehabilitation Services Commission to release medical, psychological, psychiatric, pharmacovigilant, vocational and social information. I understand this may include personally identifiable information that is causally or historically related to my physical or mental injuries related to this claim. I recognize that any claim filed...

| Injured worker signature | Date 11/28/22 | E-mail address laval k@gmail.com | Telephone number 7(1-612-7366 | Work number |
|---|---|---|---|---|

| Health-care provider name | | Telephone number ( ) | Fax number ( ) | Initial treatment date |
|---|---|---|---|---|

| Street address | | City | | State | 9-digit ZIP code |
|---|---|---|---|---|---|

Diagnosis(es): Include ICD code(s)

Right Rib Fracture
Chest wall Contusion

| Will the incident cause the injured worker to miss eight or more days of work? ☐ Yes ☑No | Is the injury causally related to the industrial incident? ☐ Yes ☐No |
|---|---|

| E code | | 11-digit BWC provider number | Date |
|---|---|---|---|

Health-care provider signature

| Employer policy number | Check if ☐ Employer is self-insuring ☐ Injured worker is owner/partner/member of firm | Federal ID number | Manual number |
|---|---|---|---|

| Telephone number ( ) | Fax number ( ) | E-mail address | | |
|---|---|---|---|---|

Was employee treated in an emergency room? ☐ Yes ☐ No     Was employee hospitalized overnight as an inpatient? ☐ Yes ☐ No

If treatment was given away from work site, provide the facility name, street address, city, state and ZIP code

| ☐ Certification - The employer certifies that the facts in this application are correct and valid. | ☐ Rejection - The employer rejects the validity of this claim for the reason(s) listed below. | For self-insuring employers only ☐ Clarification - The employer clarifies and allows the claim for the condition(s) below. ☐ Medical only ☐ Lost time |
|---|---|---|

| Employer signature and title | | Date | OSHA case number |
|---|---|---|---|

BWC-1101 (Rev. 2/05/2013)
FROI-1 (Combines C-1, C-2, C-3, C-6, C-50, OD-1, OD-1-22)

This form meets OSHA 301 requirements

MCSO 00013

DARST, Jerry D, II (id #91280682, dob: ____1971)

**Return to Work / School**

Patient: DARST, JERRY D
DOB: ____971
Address: 4027 KEMPER HOLLOW RD
GALLIPOLIS, OH 45631-8680

Date: 11/11/2022
Patient ID: 91280682

Note to patient:

☑ Was seen in my office on: _11-11-22_____

___ May return to work/school on: _____

___ May not return to work/school on: _____

___ Work limitations: _____

___ May not participate in physical education: _____

___ May return to physical education: _____

___ Limitations for physical education: _____

___ May not participate in jury duty: _____

Sincerely,

_Holley Reception_

EXHIBIT

Darst I

**Ohio** | **Bureau of Workers' Compensation**

[Print or Fax]

**Physician's Report of Work Ability**

| Injured worker name | Claim number |
|---|---|
| JERRY DARST #91280682 MEIGS COUNTY SHERIFFS OFFICE/SEDGWICK | 22-189806 |

| Date of injury | Date of last appointment/examination | Date of this appointment/examination | Date of next appointment/examination |
|---|---|---|---|
| 10/28/2022 | | 11/11/2022 | |

**MEDCO-14 submission** (Select one of the options below)

1.
- ☐ I have never completed a MEDCO-14. *Proceed to section 2.*
- ☐ I have previously completed a MEDCO-14, and all of the information remains the same. *Proceed to and complete section 8.*
- ☒ I have previously completed a MEDCO-14, and I am providing updates appropriately checking Yes or No on each section.

**Employment/Occupation** (Complete this section and proceed to section 3.)  (Updates Yes ☒ No ☒)

2. Have you reviewed the description of the injured worker's job held on the date of injury (former position of employment)? Yes ☐ No ☐
If yes - please indicate who (select all sources) provided the job description ☐ Injured worker ☐ Employer ☐ MCO ☐ BWC

**Work status/injured worker's capabilities**  (Updates Yes ☒ No ☐)

3A. Does the injured worker have any physical or health restrictions related to allowed conditions in the claim? Yes ☒ No ☐
If yes, are the restrictions: ☐ Permanent ☒ Temporary *Proceed to section 3B.*
If no, please check the box to indicate the injured worker is released to work as of the date of this exam. ☐ *Proceed to section 8.*

3B. If there are restrictions, can the injured worker return to the full duties of his/her job held on the date of injury (former position of employment)? Yes ☐ No ☒
If yes, please check the box to indicate that the injured worker is released to work as of the date of this exam. ☐ *Proceed to section 8.*
If no, please indicate when the injured worker could not do the job held on the date of injury for this period of restricted duty.
Date: **10/28/2022** .
Please estimate when the injured worker should be able to return to the job held on the date of injury for this period of restricted duty.
Date: **12/1/2022** *Proceed to section 3C.*

3C. Please indicate which of the activities listed below the injured worker can perform (even if the response to 3B is No.)
If the injured worker is not released to the former position of employment but may return to available and appropriate work with restrictions, please indicate the possible return to work date: _____.
The injured worker can perform simple grasping with: ☐ Left hand ☐ Right hand ☐ Both
The injured worker can perform repetitive wrist motion with: ☐ Left hand ☐ Right hand ☐ Both
The injured worker's dominant hand is: ☐ Left ☐ Right
The injured worker can perform repetitive actions to operate foot controls or motor vehicles with: ☐ Left foot ☐ Right foot ☐ Both
If the injured worker is taking prescribed medications for the allowed conditions in this claim, can the injured worker safely:
*Operate heavy machinery: ☐ Yes ☐ No *Drive: ☐ Yes ☐ No *Perform other critical job tasks as defined by any source listed above in section 2: ☐ Yes ☐ No

| Activity | N | O | F | C | Activity | N | O | F | C | Lifting/carrying | N | O | F | C | Pushing/pulling | N | O | F | C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bend | ☐ | ☐ | ☐ | ☐ | Reach above shoulder | ☐ | ☐ | ☐ | ☐ | 0 - 10 lbs. | ☐ | ☐ | ☐ | ☐ | 0 to 25 lbs. | ☐ | ☐ | ☐ | ☐ |
| Squat/kneel | ☐ | ☐ | ☐ | ☐ | Type/keyboard | ☐ | ☐ | ☐ | ☐ | 11 - 20 lbs. | ☐ | ☐ | ☐ | ☐ | 26 to 40 lbs. | ☐ | ☐ | ☐ | ☐ |
| Twist/turn | ☐ | ☐ | ☐ | ☐ | Work with cold substances | ☐ | ☐ | ☐ | ☐ | 21 - 40 lbs. | ☐ | ☐ | ☐ | ☐ | 41 to 60 lbs. | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ | Work with hot substances | ☐ | ☐ | ☐ | ☐ | 41 - 60 lbs. | ☐ | ☐ | ☐ | ☐ | 61 to 100 lbs. | ☐ | ☐ | ☐ | ☐ |
| | | | | | | | | | | 61 - 100 lbs. | ☐ | ☐ | ☐ | ☐ | 100 + lbs. | ☐ | ☐ | ☐ | ☐ |

How many total hours can the injured worker work: ____ per week ____ per day?
In an eight-hour workday, how many total hours can the injured worker: Sit: ____ hours ☐ Continuously ☐ With break
Walk: ____ hours ☐ Continuously ☐ With break  Stand: ____ hours ☐ Continuously ☐ With break

Does the injured worker have any functional restrictions based only on allowed psychological conditions? ☐ Yes ☐ No  If Yes,
please describe in space provided below. Note: If Yes is indicated please reference the MEDCO-16 as needed.
Additionally, in this space, please provide any additional information addressing the injured worker's capabilities and/or job accommodations which may not be addressed above.

| Injured worker name | Claim number | Date of injury |
|---|---|---|
| JERRY DARST #91280682 MEIGS COUNTY SHERIFFS DEPT/SEDGWICK | 22-189806 | 10/28/2022 |

**Disability information (If 3B above is "NO" or dates updated - all 4A fields, including site/location if applicable must be completed)** (Updates Yes ☐ No ☒)

Complete the chart below and furnish the narrative description of the diagnosis(es), site/location, if applicable, and International Classification of Diseases (ICD) code(s) for the condition(s) being treated due to the work-related injury/disease. Please indicate if the condition is preventing the injured worker from returning to job duties he/she held on the date of injury.

**4A**

| Narrative description of the work-related allowed condition | Site/location if applicable | ICD code | Is the condition preventing full duty release to the job injured worker held on the date of injury |
|---|---|---|---|
| | | | Yes ☐ No ☐ |
| | | | Yes ☐ No ☐ |
| | | | Yes ☐ No ☐ |
| | | | Yes ☐ No ☐ |
| | | | Yes ☐ No ☐ |

**4B** List all other relevant conditions that impact treatment of the conditions listed above (e.g., co-morbidities or not yet allowed conditions):

**Clinical findings: You can reference office notes in lieu of writing clinical findings below.** (Updates Yes ☒ No ☐)

**5** The injured worker is progressing: ☒ As expected ☐ Better than expected ☐ Slower than expected
Provide your clinical and objective findings supporting your medical opinion outlined on this form. List barriers to return to work and reason, for the injured worker's delay in recovery.

**Maximum medical improvement (MMI)** (Updates Yes ☐ No ☒)

**6** MMI is a treatment plateau (static or well-stabilized) at which no fundamental functional or physiological change can be expected within reasonable medical probability, in spite of continuing medical or rehabilitative procedures. Has the work-related injury(s) or occupational disease reached MMI based on the definition above? Yes ☐ No ☐
If yes, give MMI date: _____. If no, please provide the proposed treatment plan, including estimated duration of each treatment (attach additional sheet if necessary).

Note: An injured worker may need supportive treatment to maintain his or her level of function after reaching MMI. Thus, periodic medical treatment may still be requested and provided.

**Vocational rehabilitation** (Updates Yes ☐ No ☒)

**7** Vocational rehabilitation is an individualized and voluntary program for an eligible injured worker who needs assistance in safely returning to work or in retaining employment. This program can be tailored around an injured worker's restrictions and may provide job seeking skills or necessary retraining. Is the injured worker a candidate for vocational rehabilitation services focusing on return to work?
Yes ☐ No ☐ If no, please explain why and provide your recommendations to help the injured worker return to employment.

**Treating physician signature - mandatory**

**8** I certify the information on this form is correct to the best of my knowledge. I am aware that any person who knowingly makes a false statement, misrepresentation, concealment of fact or any other act of fraud to obtain payment as provided by BWC, or who knowingly accepts payment to which that person is not entitled, is subject to felony criminal prosecution and may be punished, under appropriate criminal provisions, by a fine or imprisonment or both.

| Treating physician's name (please print legibly) | Address, city, state, nine-digit ZIP code |
|---|---|
| JOHN ELLISON, DO | JOHN ELLISON, DO |
| Treating physician's signature | 1051 4TH AVENUE |
| | GALLIPOLIS, OH 45631 |

| BWC provider (Peach) number | Date 11/11/2022 | Telephone number 740-446-5244 | Fax number 740-446-5625 |
|---|---|---|---|

BWC-3914 (Rev. Aug. 21, 2015)
**MEDCO-14**

**EXHIBIT**

**Darst J**

# Jerry Darst Dates Worked
## Ran out of Sick Time of 1/20/2023

 Blue = Hire Date/Last Date Worked   Green = Worked   Red = Scheduled, but did not work

August 2nd, 2022-January 15th, 2022   98 Days   25 Days – Has not worked since 1/15/23

## 2022





## 2023




















### Federal holidays 2022

| | | | |
|---|---|---|---|
| Jan 1 | New Year's Day | Jun 19 | Juneteenth |
| Jan 17 | Martin Luther King Day | Jun 20 | Juneteenth (obs.) |
| Feb 21 | Presidents' Day | Jul 4 | Independence Day |
| May 30 | Memorial Day | Sep 5 | Labor Day |
| | | Oct 10 | Columbus Day |
| Nov 11 | Veterans Day | | |
| Nov 24 | Thanksgiving Day | | |
| Dec 25 | Christmas Day | | |
| Dec 26 | Christmas Day (obs.) | | |

### Federal holidays 2023

| | | | |
|---|---|---|---|
| Jan 1 | New Year's Day | Jun 19 | Juneteenth |
| Jan 2 | New Year's Day (obs.) | Jul 4 | Independence Day |
| Jan 16 | Martin Luther King Day | Sep 4 | Labor Day |
| Feb 20 | Presidents' Day | Oct 9 | Columbus Day |
| May 29 | Memorial Day | | |
| Nov 10 | Veterans Day (obs.) | | |
| Nov 11 | Veterans Day | | |
| Nov 23 | Thanksgiving Day | | |
| Dec 25 | Christmas Day | | |

© Calendarpedia®   www.calendarpedia.com   Data provided 'as is' without warranty

MCSO 00050



**From:** Jerry darst <jerry.darst@meigssheriff.org>
**Sent:** Thursday, January 5, 2023 5:06 PM
**To:** Frank Stewart <frank.stewart@meigssheriff.org>
**Subject:** Re: Purchase Request

Thanks

Get Outlook for iOS

**From:** Frank Stewart <frank.stewart@meigssheriff.org>
**Sent:** Thursday, January 5, 2023 4:53:07 PM
**To:** Jerry darst <jerry.darst@meigssheriff.org>
**Subject:** Purchase Request

Jerry,

Your purchase request is approved. You can go ahead and order the 1 long sleeve shirt and 2 pair of BDU pants. Please get me an invoice for these items. Thanks!

--
Captain Frank Stewart
Meigs County Sheriff's Office
Major Crimes Task Force
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-4658
Fax: (740) 992-2654



MCSO 00564

Email: frank.stewart@meigssheriff.org

Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone.

MCSO 00565

March 27, 2023

Sheriff  S.Fitch
Captain  F. Stewart

Dear Sheriff S.Fitch and Captain F.Stewart,

       I am interested in applying for the Detective position assigned to work as a Major Crimes Task Force Agent for Meigs County Sheriffs Office. I have a total of 30 years of law enforcement experience and I am confident I would be an asset to the Sheriffs Office as a detective for the Major Crimes Task Force.

**Some of my Achievements include:**

- Gallia County "Lawman of the year Award"
- Gallia County Sheriffs Office "Deputy of the Year Award"
- Gallia County Sheriffs Office "Life Saving Award"
- Gallia County Sheriffs Office "Safe Driving Award"
- Gallia County Sheriffs Office "Citation of Merit" Sheriffs award for several Drug and Cash Seizures
- "Looking Beyond the Ticket Award" for criminal casework developed out of routine traffic stops. Tri -State Law Enforcement Conference, West Virginia Traffic Safety Office and Ohio Governors Highway Safety Office.

**Some of my training includes:**

Basic and Advanced SWAT training with Tactical Defense

SWAT Management and Supervision with the Ohio Peace Officer Training Commission and Dynamics Unlimited Incorporated

Miranda Interviews and Custodial and Non-Custodial Interviews training with the Athens city prosecutors office

Legal  Tactics training with Magloclen

Patrol Response to the Suspicious Death and Homicide Training with Investigator David Newman- Inside the Tape

Clandestine Laboratories awareness regeneration and safety with Gallia County EMA

Auto Theft training with the Ohio Auto Theft Investigators Association

Drug Identification training with the Ohio Peace Officer Training Commission

Advanced Street Drug training with the Ohio Peace Officer Training Commission



EXHIBIT

L

MCSO 00561

Criminal Patrol and Drug Interdiction training with Shaun Smart

Biological Evidence Collection and Retention with Ohio Attorney Generals Office

Interrogations and Confessions training with the Ohio Attorney Generals Office

Explosives and Explosive Devices the Bureau of Alcohol, Tobacco, and Firearms,

Laws of Arrest/Search and Seizure training with the Ohio Attorney Generals Office

Officer involved shooting training Ohio Peace Officer Training Academy

Responding to the active Shooter training with FourKiller Consulting

Active Shooter Training with Tactical Defense Institute "TDI"

Incident Response to Terrorist Bombings Performance Level Training Course with New Mexico Tech Energetic Materials Research and Testing Center

Prevention and Response to Suicide Bombing Incidents Performance Level Training course New Mexico Tech Energetic Materials Research and Testing Center

Raid Tactics Training with Tactical Defense Institute "TDI"

Field Officer Training with Southern Police Institute

New Supervisor Training  with Texas State Technical College

First Line Supervisor Training with Texas State Technical College

Human Trafficking Training with Buckeye State Sheriffs Association


I spent fifteen years as a Swat Team operator and five of those years as the team commander, in that role I was responsible for team assignment, team deployment, along with raid surveillance and raid planning.


I have been a K-9 handler for the past 10 years which has consisted of working two different K-9's and I currently have a K9 certified with the Ohio Peace Officer Training Commission and The Office of the Attorney General which is still current for tracking, article search, Marijuana, Cocaine, Heroin, Methamphetamines, and their derivatives. I am also a member of the K9 Professionals Canine Handlers "NAPCH"

I believe with my past experiences and training, along with my great working relationship with all the agencies already involved with the Major Crimes Task Force that I would be a very valuable asset to Meigs County and their citizens. I would appreciate the opportunity to further discuss my professional background in greater detail with you if you choose to do so I can be contacted through phone (740) 612-7566 or through email jloyalk9@gmail.com.

Sincerely,
Jerry Darst
Deputy Jerry Darst

MCSO 00563



**From:** Jerry darst <jerry.darst@meigssheriff.org>
**Sent:** Monday, April 17, 2023 3:52 PM
**To:** Frank Stewart <frank.stewart@meigssheriff.org>
**Subject:** Re: Shift bid

Workers comp sent out a email with a wavier form if the county waives the appeal I can schedule surgery and then it's 4-6 weeks that's all I am waiting on to my knowledge

Get Outlook for iOS

---

**From:** Frank Stewart <frank.stewart@meigssheriff.org>
**Sent:** Monday, April 17, 2023 3:24:07 PM
**To:** Jerry darst <jerry.darst@meigssheriff.org>
**Subject:** Shift bid

Hey Jerry,

Were going to have another shift bid coming up soon, I wanted to check and see if you had a return to work date yet or if you had any updates.


--
Captain Frank Stewart
Meigs County Sheriff's Office
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-4658



MCSO 00566

Fax: (740) 992-2654
Email: frank.stewart@meigssheriff.org

Confidentiality Notice: This message is intended for use only by the individual or entity to whom or which it is addressed and may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by telephone.

MCSO 00567



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

July 10,2023

Jerry Darst
4270 Kemper Hollow Rd.
Gallipolis, Ohio 45631

Dear Mr. Jerry Darst,

I recently reviewed your employment file with the Meigs County Sheriff's Office. It indicates that you began employment with the Meigs County Sheriff's Office (MCSO) on August 2, 2022. According to the Collective Bargaining Agreement (CBA) between the Meigs County Sheriff's Office and the Ohio Patrolmen's Benevolent Association Article 11: Section 11.4., the probationary period for a newly hired employee shall begin on the first day for which the employee receives compensation for the new classification from the Department and shall continue for a period of one (1) calendar year. The section also states that the employer should give the individual assistance to enable him to qualify for his new position. A newly hired employee may be removed at any time during his probationary period. New hire probationary removals shall not be appealable to the grievance procedure.

This would mean that your probationary period would end on August 1, 2023. As the Sheriff I have the responsibility to review all employees' job performance and decide if their work has been satisfactory during their probationary period and their suitability to be retained for employment.

According to MCSO records it indicates that you have only worked 97 days as of this time during your probationary period to be evaluated. Having limited performance to evaluate is difficult and to compound it most of your days worked were prior to me being appointed as Sheriff. Therefore, I must rely on current supervisors and employees for an accurate evaluation.

In discussing your work performance with staff that worked with you during your time at MCSO it was reported that your work performance was unsatisfactory. Some of the deficiencies listed were dependability, professionalism, lack of motivation, poor attitude, timeliness of reports and uniform appearance.

I appreciate your time at MCSO but based off the evaluation of your work performance while employed at the MCSO during your probationary period, I am terminating your employment with the MCSO, effective immediately.

This determination was not entered into lightly and is final and not open for discussion.

You have 15 days from the date of receipt of this letter to schedule an appointment with Captain Frank Stewart to return all your issued equipment back to MCSO.



EXHIBIT
Darst N

MCSO 00054



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

If you have any questions, please contact Captain Frank Stewart.


Respectfully,

Scott Fitch
MCSO Sheriff


CC:  Captain Frank Stewart
     Personnel file

| ORI NUMBER: OH0270000 | INCIDENT NUMBER: 18-0351 | | REPORT DATE: 03/07/2018 00:00:00 | PAGE: 1 |
|---|---|---|---|---|

## GALLIA COUNTY SHERIFF'S OFFICE

## OHIO UNIFORM INCIDENT REPORT

**ADMINISTRATIVE**

| AGENCY NAME: GALLIA COUNTY SHERIFF'S OFFICE | | | | | | | | *INCIDENT NUMBER: 18-0351 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *GEOCODE: 5 | | | | | | | | *CLEARANCES: U - Unknown | | | |
| TOD: 03/07/2018 18:30:00 | | ☑ INCIDENT (NON-CRIMINAL) | | | | | | | | | |
| TOA: 03/07/2018 19:00:00 | | ☐ OFFENSE | | | | | | *CLEARANCE DATE: | CLEARED BY: | | |
| TOC: 03/07/2018 19:20:00 | | | | | | | | - | | | |

| *REPORT DATE/TIME | | | | *INCIDENT OCCURRED FROM | | | | *INCIDENT OCCURRED TO | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | TIME | MONTH | DAY | YEAR | TIME | MONTH | DAY | YEAR | TIME |
| 03 | 07 | 2018 | 00:00:00 | 03 | 07 | 2018 | 00:00:00 | | | | |

| *INCIDENT LOCATION (Street, Apt., City, State, Zip): | 4027 Kemper Hollow Road, Gallipolis, OH, 45631 |
|---|---|

**VICTIM**

| *NO. 1 | *TOTAL VICTIMS: 2 | *VICTIM TYPE: | P - Police Officer | |
|---|---|---|---|---|

| NAME (Last, First, Middle): | JOHNSON, TROY S | |
|---|---|---|
| ADDRESS (Street, Apt., City, State, Zip): | | HOME PHONE: |
| EMPLOYER NAME AND ADDRESS (Street, Apt., City, State, Zip): | Gallia County Sheriff's Office 18 Locust St., Gallipolis, OH, 45631 | PHONE: (740) 446-1221 |

| *AGE: 46 D.O.B: 1971 | *SEX: M - Male | *RACE: W - White | *ETHNICITY: U - Unknown |
|---|---|---|---|
| HGT: 5'9" | WGT: 180 | HAIR: BRO - Brown | EYES: BRO - Brown |
| OCCUPATION: Deputy Sheriff | | SSN: | *RESIDENT STATUS: Resident |

| VICTIM INJURED? ☐ Y ☑ N | 0 - None | IF INJURED, DESCRIBE INJURIES: |
|---|---|---|

| *AGG. ASSAULT/ HOMICIDE CIRC.: | *VICTIM/SUSPECT RELATIONSHIP: 1 - DARST II, JERRY D - Employee | *VICTIM/OFFENSE LINK: |
|---|---|---|

OFFICER CIRCUMSTANCE: 11 - All Other

OFFICER ASSIGNMENT TYPE:
OFFICER ORI:

| My signature verifies that the information on this report is accurate and true | DATE: |
|---|---|



EXHIBIT
Darst O

ORI NUMBER: OH0270000 INCIDENT NUMBER: 18-0351 REPORT DATE: 03/07/2018 00:00:00 PAGE: 2

**VICTIM**

*NO. 2 *TOTAL VICTIMS: 2 *VICTIM TYPE: P - Police Officer

NAME (Last, First, Middle): DARST III, COIT V

ADDRESS (Street, Apt., City, State, Zip): — HOME PHONE:

EMPLOYER NAME AND ADDRESS (Street, Apt., City, State, Zip): Gallia County Sheriff's Office, 18 Locust St., Gallipolis, OH, 45631 — PHONE: (740) 446-1221

*AGE: 55 *SEX: M - Male *RACE: W - White *ETHNICITY: U - Unknown
D.O.B.: /1963

HGT: 5'6" WGT: 200 HAIR: BRO - Brown EYES: BLU - Blue

OCCUPATION: Deputy Sheriff SSN: *RESIDENT STATUS: Resident

VICTIM INJURED? ☐Y ☒N 0 - None — IF INJURED, DESCRIBE INJURIES:

*AGG. ASSAULT/ HOMICIDE CIRC.: *VICTIM/SUSPECT RELATIONSHIP: 1 - DARST II, JERRY D - Employee *VICTIM/OFFENSE LINK:

OFFICER CIRCUMSTANCE: 11 - All Other

OFFICER ASSIGNMENT TYPE:

OFFICER ORI:

My signature verifies that the information on this report is accurate and true — DATE:

**NAME / DESCRIPTIVES**

*NO. 1 ADULT ☒ JUVENILE ☐ UNKNOWN ☐ CATEGORY: 1 - Suspect CHARGES FILED? ☐Y ☒N

NAME (Last, First, Middle): DARST II, JERRY D — SSN:

ALIAS: GANG AFFILIATION:

ADDRESS (Street, Apt., City, State, Zip): — HOME PHONE:

EMPLOYER NAME AND ADDRESS (Street, Apt., City, State, Zip): Gallia County Sheriff's Office — PHONE:

PLACE OF BIRTH: DL#/STATE: OCCUPATION/SCHOOL: Deputy Sheriff

*AGE/ 47 *SEX: M - Male *RACE: W - White *ETHNICITY: U - Unknown *HEIGHT: 5'10" *WEIGHT: 230 *HAIR: BRO - Brown *EYES: BLU - Blue
*D.O.B.: /1971

SUSPECTED OF USING: ☐ ALCOHOL ☐ DRUGS MARITAL STATUS: M - Married *RESIDENT STATUS: 1 - Resident

SCARS, MARKS, TATOOS:

ADDITIONAL DESCRIPTION:

POTENTIAL INJURIES?

| ORI NUMBER: OH0270000 | INCIDENT NUMBER: 18-0351 | REPORT DATE: 03/07/2018 00:00:00 | PAGE: 3 |
|---|---|---|---|



<table>
<tr><td colspan="8">*NO. 2   ADULT ☑   JUVENILE ☐   UNKNOWN ☐   CATEGORY: 1 - Suspect</td><td colspan="2">CHARGES FILED? ☐ Y  ☑ N</td></tr>
</table>

| | | | | | | |
|---|---|---|---|---|---|---|
| NAME (Last, First, Middle): | DARST, JUSTIN DELMER | | | | SSN | |
| ALIAS: | | GANG AFFILIATION: | | | | |
| ADDRESS (Street, Apt., City, State, Zip): | | | | | | HOME PHONE: |
| EMPLOYER NAME AND ADDRESS (Street, Apt., City, State, Zip): | | | | | | PHONE: |
| PLACE OF BIRTH: | DL#/STATE : | | | OCCUPATION/SCHOOL: | | |

| *AGE/ 19 | *SEX: | *RACE: | *ETHNICITY: | *HEIGHT: | *WEIGHT: | *HAIR: | *EYES: |
|---|---|---|---|---|---|---|---|
| *D.O.B.: /1998 | M - Male | W - White | U - Unknown | 5 ' 11" | 175 | BRO - Brown | BRO - Brown |

| SUSPECTED OF USING: ☐ ALCOHOL ☐ DRUGS | MARITAL STATUS: S - Single | *RESIDENT STATUS: 1 - Resident |
|---|---|---|

SCARS, MARKS, TATOOS:

ADDITIONAL DESCRIPTION:

POTENTIAL INJURIES?

*NAME / DESCRIPTIVES*

ORI NUMBER: OH0270000    INCIDENT NUMBER: 18-0351    REPORT DATE: 03/07/2018 00:00:00    PAGE: 4

| | *LOSS CODE: | QUANTITY: | DESCRIPTION: | | | | *PROP CODE: | *VALUE: |
|---|---|---|---|---|---|---|---|---|
| | 7 - Recovered | 1.000 | Canine Unit "Thunder" | | | | 67 - Law Enforcement | 5,000 |
| **PROPERTY** | VICT. NO.: | VEH NO.: | MAKE/BRAND: | | | MODEL: | | DATE RECOVERED: |
| | | SERIAL NUMBER: | | NCIC NUMBER: | | | OTHER NUMBER: | |

| | *LOSS CODE: | QUANTITY: | DESCRIPTION: | | | | *PROP CODE: | *VALUE: |
|---|---|---|---|---|---|---|---|---|
| | 7 - Recovered | 1.000 | 2016 Ford Explorer | | | | 67 - Law Enforcement | 18,000 |
| **PROPERTY** | VICT. NO.: | VEH NO.: | MAKE/BRAND: Ford | | | MODEL: Explorer | | DATE RECOVERED: 03/07/2018 |
| | | SERIAL NUMBER: Unknown | | NCIC NUMBER: | | | OTHER NUMBER: | |

**NARRATIVE:**

On March 7, 2018, at approximately 1900 hrs. Sgt. Coit (Scott) Darst and myself arrived at [    ] in Springfield Township. This address is the residence of Deputy Jerry Darst, who is a Deputy with the Gallia County Sheriff's Office and who is assigned to the canine unit. At this time, Jerry Darst was off work due to an injury he received while on duty a few days prior.

The purpose of this visit was to serve Deputy Darst with a letter that had been signed by Sheriff Matt Champlin. The letter advised Jerry that training deficiencies had been identified with his canine unit and due to those deficiencies, he was to relinquish control of the canine unit. At 1821 hrs. this same date, I called Jerry Darst to ascertain if he was going to be home, however I did not receive an answer. At 1824 hrs., Jerry Darst called me back. I advised him that I need to come to his residence and that I had a paper for him. He advised that he would be home.

Upon arriving at the residence, Sgt. Darst and I made contact with Justin Darst, Jerry Darst's son. Justin was standing in the driveway working on a white and brown Dodge pickup truck. I asked him if his dad was home and he said that he was inside and that he would be out shortly.

Within a minute, Jerry exited a door from the house into the garage and walked toward myself and Sgt. Darst. I asked him how he was feeling and he said not good. Jerry's wife, Teresa L. Darst, came out of the house and stood beside Jerry. I opened the envelop and handed him the letter. After reading the letter, Jerry thrust the letter back in my hand and asked if we were firing him. I stated, no, you are not fired. He asked what this was about and I stated that it had to do with a training issue with Thunder, the canine unit. Jerry stated that all his paperwork was in the computer and that there should not be anything missing. He then stated, so you are here for the car? I replied yes, and the dog.

At this time Jerry turned back toward the house and took a few steps and stopped. Jerry turned back around and pointed his finger at me and started yelling at me. He stated that he was sick of this bullshit and that I and the Sheriff were no good fuckers. He stated that we were dirty and had been out to get him from the very beginning and that he had, had enough of us. He made several other comments using profanity and then told me to get the fuck off of his property. He repeated this several more times as Sgt. Darst and I stood there. I told him that we would leave once we recovered his car and canine Thunder.

Jerry walked back into the house yelling the whole way. Teresa stayed with Sgt. Darst and myself. I tried to explain to Teresa that it was a training issue and that Jerry is blowing this out of proportion. She said she understood and commented that he had been like that all day and that he had a blow up

| ORI NUMBER: OH0270000 | INCIDENT NUMBER: 18-0351 | REPORT DATE: 03/07/2018 00:00:00 | PAGE: 5 |
|---|---|---|---|

earlier with them. She stated that he was in chronic pain due to his injury and that he was having a very difficult time dealing with the fact that he was not improving as fast as he thought he should. Teresa then asked if I had ever experienced chronic pain. I stated that I had and I knew what it was like.

At this time Justin Darst began engaging us with a hostile tone. I was leaning up against a truck and he told me to get off of his truck. I complied with his request and he started yelling about what right did we have to take their dog. Teresa attempted to calm him down, however he kept making comments.

About this time, Jerry exited the house and was holding a phone. He was still yelling and cussing at us and I could hear the voice of a female on the phone (possibly it was on speaker phone). Jerry returned to the house and Teresa followed him. Justin remained out side and walked toward his truck and grabbed an object that I later learned was a gun. Sgt. Darst ordered Justin to put it away and to go inside. Justin refused to comply and I could see the gun in his hand. Sgt. Darst gave him several more commands to put the gun away. Justin finally placed the gun in his right rear jean pocket and kept his hand on the gun the whole time.

Teresa came out of the house with Thunder and took him to the side of the house to pee. Jerry's daughter, Jerilyn came out of the house and followed Teresa and Jerilyn began to cry. Justin followed Teresa to the side of the house and when he turned his back to me, I could see his hand on the gun.

Justin walked over to me and stated that by us taking Thunder, we were taking one of their family members. He stated that he wanted me to know what it was like to lose a family member. He asked me if I heard him and he repeated himself and he asked me if I understood what he meant. I did not reply.

After a short time, Teresa put Thunder in the car and brought us food and medicine for the dog. Teresa gave me her cell phone number and I told her I would check back with her that evening about his status. She asked where he was going and I told her I could not tell her that information. She asked if they could see him and I stated that I could not answer that question at that time.

I got in the patrol car and left the residence with Sgt. Darst following me.

| REPORTING OFFICER: Johnson, Troy | BADGE NO.: 27-2 | DATE: 03/08/2018 16:55 |
|---|---|---|

ORI NUMBER: OH0270000    INCIDENT NUMBER: 18-0351    REPORT DATE: 03/07/2018 00:00:00    PAGE: 6

**INVESTIGATOR NOTE:**

**NARRATIVE**

ON 03-07-20018 AT OR ABOUT 1800 HRS AS I MARKED UP FOR DUTY, CHIEF DEPUTY TROY
JOHNSON ADVISED ME HE HAD SOMETHING TO DO AND NEEDED MY ASSISTANCE. I
PICKED CHIEF JOHNSON UP AT HIS RESIDENCE AND HE ADVISED ME THAT HE HAD A
LETTER FROM THE SHERIFF MATT CHAMPLIN TO DEPUTY JERRY DARST AND WE WERE
GOING TO DELIVER THE LETTER TO DEPUTY DARST AND PICK UP HIS VEHICLE AND K-9
THUNDER FROM HIS RESIDENCE ON KEMPER HOLLOW. WE ARRIVED AT DEPUTY
DARST'S RESIDENCE AT 4027 KEMPER HOLLOW, JERRY'S SON JUSTIN DARST WAS
WORKING ON HIS TRUCK IN THE DRIVEWAY NEXT TO THE GARAGE. MYSELF AND THE
CHIEF JOHNSON WALKED UP TO JUSTIN AND CHIEF JOHNSON ASKED IF HIS DAD WAS
HOME, AND JUSTIN REPLIED "HE WAS INSIDE AND WOULD BE OUT IN A SECOND". A
SHORT TIME LATER, JERRY CAME OUT OF THE HOUSE AND THRU THE GARAGED TO
WHERE WE WERE STANDING. CHIEF JOHNSON ASKED JERRY HOW HE WAS FEELING
AND HE REPLIED "NOT SO GOOD". JERRY'S WIFE TERESA DARST CAME OUT OF THE
HOUSE ABOUT THE TIME THAT THE CHIEF JOHNSON OPENED THE LETTER AND HANDED
IT TO JERRY. AFTER JERRY READ THE LETTER, HE SHOVED THE LETTER BACK TO CHIEF
JOHNSON AND HE ASKED, "ARE YOU FIRING ME"? CHIEF JOHNSON REPLIED "NO YOU ARE
NOT FIRED" AND JERRY ASKED THEN WHAT'S THIS ALL ABOUT THEN? CHIEF JOHNSON
TOLD JERRY THAT THIS IS ABOUT TRAINING ISSUES WITH HIS K-9. JERRY TOLD CHIEF
JOHNSON THAT ALL OF HIS PAPERWORK ON HIS TRAINING WAS IN THE COMPUTER AND
THERE SHOULDN'T BE ANYTHING MISSING. JERRY ASKED CHIEF JOHNSON IF HE WAS
HERE FOR HIS CAR AND CHIEF JOHNSON REPLIED "YES AND FOR THE DOG".

AT THAT TIME, JERRY GOT EXTREMELY UPSET AND TURNED AS IF HE WAS WALKING INTO
THE GARAGE AND STOPPED. HE TURNED AND CAME BACK TO WHERE WE WERE
STANDING AND POINTED HIS FINGER AT US AND STARTED CUSSING AND YELLING. JERRY
SAID "LET ME TELL YOU SOMETHING, THIS IS BULLSHIT, I KNOW IT AND YOU KNOW IT. YOU
AND THE SHERIFF ARE NO GOOD MOTHER FUCKERS. YOU GUYS ARE DIRTY AND HAVE
BEEN OUT TO GET ME FROM THE VERY BEGINNING AND YOU KNOW IT. I'VE HAD ENOUGH
OF IT AND YOU DIRTY SONS OF BITCHES CAN GET THE FUCK OFF OF MY PROPERTY,
NOW. JERRY TOLD US TO GET OFF OF HIS PROPERTY A COUPLE OF MORE TIMES AS ME
AND CHIEF JOHNSON STOOD THERE. CHIEF JOHNSON TOLD JERRY THAT WE WOULD
LEAVE WHEN WE GET THE CAR AND THE K-9.

JERRY TURNED AND STARTED THRU THE GARAGE TOWARD HIS DOOR CUSSING AS HE
WALKED AWAY FROM US. CHIEF JOHNSON TRIED TO EXPLAIN TO TERESA THAT IT WAS A
TRAINING ISSUE AND THAT JERRY WAS BLOWING IT OUT OF PROPORTION AND TERESA
SAID THAT HE UNDERSTOOD. TERESA SAID THAT JERRY HAS BEEN LIKE THIS ALL DAY
AND HAD BLOWN UP ON THEM EARLIER. TERESA SAID HE'S IN A LOT OF PAIN AND IS
HAVING A VERY HARD TIME DEALING WITH IT RIGHT NOW. TERESA TOLD JUSTIN TO GO
GET EVERYTHING OUT OF YOUR DAD'S CAR, AT WHICH TIME HE DID.

TERESA SAID SHE WOULD GO AND GET THUNDER AND WENT BACK INSIDE THE HOUSE,
AS CHIEF JOHNSON AND I STOOD THERE WAITING ON TERESA TO RETURN WITH
THUNDER. AS WE WERE STANDING THERE, JUSTIN STARTED TELLING ME "SCOTT YOU
KNOW MY DAD THINKS A LOT OF YOU AND RESPECTS YOU AND SO DID I, AND YOU GO
AND DO THIS TO HIM? THAT'S BULLSHIT, WHAT YOU'RE DOING IS WRONG, YOUR FUCKING

| ORI NUMBER: OH0270000 | INCIDENT NUMBER: 18-0351 | REPORT DATE: 03/07/2018 00:00:00 | PAGE: 7 |

WRONG TO DO THIS TO HIM, YOU NO BETTER THAN THEM. I'LL NEVER RESPECT YOU AGAIN FOR DOING THIS".

ABOUT THAT TIME, JERRY CAME BACK OUT TO US HOLDING A CELL PHONE. HE CONTINUED TO YELL AND CUSS AT US WHILE HOLDING THE CELL PHONE SO WHOEVER WAS ON THE OTHER END COULD HEAR WHAT WAS GOING ON ABOUT US BEING THERE TO TAKE THE CAR AND THUNDER. AFTER A FEW MOMENTS, JERRY TURNED AND STOMPED OFF BACK INTO THE HOUSE.

A FEW SECONDS AFTER JERRY AND TERESA WENT BACK INTO THE HOUSE. JUSTIN MOVED FROM THE FRONT OF HIS TRUCK TOWARD WHERE WE WERE STANDING. AS HE WALKED FROM AROUND THE FRONT OF THE TRUCK, I NOTICED THAT JUSTIN HAD PICK SOMETHING UP OFF OF THE FRONT OF THE TRUCK. AS HE TOOK A FEW STEPS, I NOTICED A SMALL HAND GUN IN HIS RIGHT HAND. JUSTIN CAME OVER AND LEANED UP AGAINST A TRUCK WITH HIS RIGHT HAND BEHIND HIS BACK AND JUST STOOD THERE ANGRY AND VERY UPSET. AS JUSTIN WAS STARING ME DOWN, I TOLD JUSTIN, "JUSTIN, YOU NEED TO PUT IT AWAY AND GO INSIDE. I TOLD JUSTIN SEVERAL MORE TIMES HE NEEDED TO PUT IT UP NOW. AT WHICH TIME JUSTIN PUT IT IN HIS RIGHT BACK POCKET. CHIEF JOHNSON LOOKED AT ME AND ASKED DO YOU SEE SOMETHING? IN A LOW TONE VOICE, I TOLD CHIEF JOHNSON THAT HE HAS A GUN.

A FEW MOMENTS LATER, TERESA CAME BACK OUT WITH THUNDER TO ALLOW HIM TO GO TO THE BATH ROOM BEFORE LOADING HIM UP IN THE CAR. JERRY'S DAUGHTER, JERILYN CAME OUT AS TERESA HAD THUNDER AROUND THE HOUSE TO GO TO THE BATH ROOM AND SHE BEGAN TO GET UPSET AND CRY AS WELL. AS TERESA AND CHIEF WENT TO PUT THUNDER INTO THE CAR, JUSTIN CAME OVER AND STOOD WITH HIS ARMS FOLDED IN FRONT OF HIM. AS CHIEF JOHNSON CAME BACK UP, TERESA WENT BACK INTO THE HOUSE TO GET THE DOG FOOD AND CHIEF JOHNSON STOOD BY ME. JUSTIN SAID BY YOU GUYS TAKING THUNDER, YOU ARE TAKING ONE OF OUR FAMILY MEMBERS. JUSTIN STATED I WANT YOU TO KNOW WHAT IT WAS LIKE TO LOSE A FAMILY MEMBER. JUSTIN ASKED CHIEF JOHNSON IF HE HEARD HIM, BUT CHIEF JOHNSON NEVER REPLIED. ABOUT THAT TIME, TERESA CAME OUT WITH TWO BAGS OF DOG FOOD AND ADVISED CHIEF JOHNSON ON WHAT THEY FEED THUNDER AND THAT HE HAS MEDICINE THAT THE VET GAVE HIM FOR A SKIN PROBLEM. I TOOK AND PUT THE DOG FOOD IN THE FRONT SEAT AS TERESA WENT BACK INSIDE.
AFTER GETTING EVERYTHING WE CAME FOR, WE LEFT THE RESIDENCE.

| REPORTING OFFICER: Darst, Coit | BADGE NO.: 27-20 | DATE: 03/12/2018 15:38 |
| Reporting    Johnson, Troy | BADGE NO: 27-2 | DATE: 03/08/2018 |

FOLLOW-UP?  ☐ Y  ☒ N   If yes, follow-up Assignment:

# GALLIA COUNTY SHERIFF
## INTER-OFFICE COMMUNICATION

Date _____3/5/2018_____                                              File No. _____

To;   N/A

From: N/A

Subject: Administrative Investigation

---

## Summary of Events

March 5, 2018

While performing an administrative review of K9 training records, I began a review of Dep. Jerry Darsts 2017 training records as it pertains to the K9 Thunder. In reviewing these records, numerous deficiencies in documentation were located. These same deficiencies have previously been addressed with Dep. Darst in a meeting on 2/8/2017 when, after performing a training observation with Dep. Darst and K9 Thunder, I identified that this K9 team was not proficient as to meet the standards set forth by the State of Ohio and at that time, the team was taken out of service and scheduled for training to meet proficiency. During the time that the K9 team was out of service for retraining, Dep. Darst was provided with a new agency report form with which to document the training and use of the K9 team, which he was directed to use. Dep. Darst was also provided a sample of documentation to illustrate what a completed report should look like and what specific details needed to be in these reports to support the training methods utilized and the proficiencies of his K9 or the deficiencies in his K9 and any corrective actions taken to remedy those deficiencies. In the most recent review of Dep. Darst's documentation, the following issues have been identified:

1.) Failure to properly document weather conditions.
2.) Falsely documenting amount of time utilized to complete training activities.
3.) Failure to articulate specific details regarding training activities and K9 performance.
4.) Failure to document drug training weights and or packaging materials.
5.) Failure to show corrective or remedial actions taken after documenting deficiencies.
6.) Failure to train in areas in which the K9 team is qualified to perform.

Please see the attached details as it refers to these deficiencies on an itemized report basis.



**EXHIBIT**

**Darst P**

K1-0001    No narcotics or weights listed. This report reflects the date in which I placed the unit out of service for retraining due to deficiencies. 8 hours of time documented.

K1-0002    With trainer, weather details deficient, no narcotics details listed. 8 hours of training documented.

K1-0003    With trainer, weather details deficient, 8 hours of training documented.

K1-0004    With trainer, weather details deficient, 8 hours of training document.

K1-0005    With trainer, weather details deficient, 8 hours of training document.

2725-T-03132017    Weather details deficient, documented 2 hours of training, only exercise completed was obedience.

2725-T-03212017    With trainer, weather details deficient.

2725-T-03272017    With trainer, weather details deficient.

2725-T-04022017    Weather details deficient, documented 5 hours of training, only exercise completed was obedience.

2725-T-04252017    5 hours of training documented, only training exercises completed were obedience and tracking.

2725-T-04272017    With trainer proficient.

2725-T-05052017    OSP to pick up training aids for K9

2725-T-05082017    3 hours of training documented. Weather deficient, only activity documented is a track.

2725-T-05222017    5 hours of training documented. Weather deficient, only activity documented is obedience.

2725-T-06132017    5.5 hours of training with training group. Weather proficient. Trainings documented are Aggression, and narcotics. Narrative states building narcotics will everything found, but no narcotic types, weights or packaging are documented. Narrative states (3) vehicle narcotic finds completed but no narcotics types, weights or packaging are documented.

2725-T-2017    Certification of K9

2725-T-07052017    4 hours of training documented. Weather deficient, activities performed were obedience and an article search.

2725-T-07232017    4 hours of training documented. Weather deficient, obedience and a public demonstration conducted.

2725-T-07262017    7.14 hours of training document, some with trainer. Weather deficient. Obedience, Aggression and article searches documented.

2725-T-08052017    5 hours of training documented training, weather deficient.

2725-T-08052017    5 hours documented, weather deficient. Activities trained were tracking and obedience.

2725-T-080602017    This record contains two separate documents which conflicting hours. The first record indicates that the unit trained from the hours of 10 a.m. to 3 p.m. The second document indicates that the unit trained from the hours of 12 p.m. to 3 p.m. Both records are mirror images of each other with the exception of the discrepancy in hours trained. Weather is deficient in this record and the activities trained are documented as a track and obedience.

2725-T-08132017    5 hours documented. Weather deficient, activities documented for training are a track and obedience.

2725-T-08232017    9 hours documented. Weather proficient. Training was conducted with trainer and activities documented are narcotics, building search and article search. No supporting documentation for narcotics weights or packaging are documented.

2725-T-09272017    8 hours documented. Weather proficient. Activities trained are listed as narcotics, building search, tracking, and article search.

2725-T-1062017    2 hours documented. Weather proficient, activities completed were obedience and an article search.

2725-T-10112017    7 hours documented. With trainer, no weather documented. Narcotics training documented, but no details for narcotics or weights and packaging are documented. Only details listed for the activity is "Narcotics sniff free search area. All finds" Building search (for suspect) documented, details to document canine's performance are deficient.

2725-T-10232017    7 hours documented. Weather deficient. Narcotics training documented, no narcotic packaging listed. Aggression work documented, details for this activity are deficient. Article search performed.

2725-T-1182017    9 hours documented with trainer. Weather deficient. Narcotics and tracking are the documented trainings accomplished.

2725-T-11222017    5 hours documented. Weather deficient. Obedience and tracking documented.

GCSO DARST 00176

| | |
|---|---|
| 2725-T-12/10/2017 | 5 hours documented. Weather deficient, training completed were a track and obedience. |
| 2725-T-12142017 | 9 hours documented with trainer. Weather deficient. (1) narcotics find completed and article search conducted. |
| 2725-T-12172017 | 3 hours documented. No weather details documented. Obedience, only activity documented. |
| 2725-T-162018 | 4 hours documented. Weather deficient, obedience and tracking documented trainings. |
| 2725-T-1142018 | 8 hours documented. No weather details documented. Training activities documented are tracking, (2) narcotics finds and obedience. |
| 2725-T-1-152018 | 5 hours documented. Weather deficient. Only training documented is obedience work. |
| 2725-T-282018 | 8 hours documented. Weather proficient. Obedience and narcotics are documented training. |

Based upon these findings of deficiencies, on this date, an order is being served on Deputy Darst directing him to tender the possession of his assigned police service dog "Thunder" for administrative review.

## CONCLUSION:

After reviewing Dep. Darst's training records it has been determined that, he is deficient in his documentation of clear and articulable facts of his training including weather conditions, weights, packaging and descriptions of narcotics used for training, specific details pertaining to the exercises completed and an illustration of the canine's performance on each exercise to support the proficiency of the canine team. These deficiencies were previously addressed with Dep. Darst and he was provided with an illustrative model of what his training documentation is required to contain. In addition, after a review of Dep. Darst's training records, several records have been located which contain documentation of time trained which appears to be inconsistent or exuberant in nature when compared to the activities which are documented. This brings into question not only the proficiency of the canine unit as a whole, but the integrity of how the hours allotted for training were actually utilized.

Furthermore, upon an examination of Dep. Darst's patrol cruiser once it was turned over to the Administration on 3/7/2018, at the onset of this administrative process, the condition in which Dep. Darst's vehicle was found was unfit for duty and in violation of Gallia County Sheriff's Office Policy 7.10 *"Canine Operations"* which states under *Basic Rules for Canine Officer* "maintain uniforms and patrol vehicles interiors clean and free of excessive hair and odors."

Page 1 of 1

## Joe Browning

| | |
|---|---|
| **From:** | cgill2712@gmail.com on behalf of Chris Gill [cgill@gallianet.net] |
| **Sent:** | Monday, March 21, 2011 5:40 AM |
| **To:** | Jerry Darst |
| **Cc:** | Joe Browning |
| **Subject:** | Reports |

Jerry,

I have asked several times. I even came in to help you filter through your reports. 11-193,11-248,11-281, and 11-323 are still out. Get them done asap!! You will have until Thursday to have them turned in. Like I said before, I know you are on a busy shift, however you must get your work done. These reports range from January 31st through February 20th. It is now March 21st. The Sheriff allows 3 days for reports to be turned in unless otherwise needed because of there nature or political sensitivity.

--
Sgt. C.A. Gill
Gallia County Sheriff's Office
18 Locust Street
Gallipolis OH, 45631
(740)-446-4614

3/21/2011



**EXHIBIT**
**Darst Q**

GCSO DARST 01090