1              IN THE UNITED DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5   JERRY DARST,

6        Plaintiff,

7

8     vs.              Case No. 2:24-CV-01150-SDM-CMV

9

10  MEIGS COUNTY, OHIO,

11       Defendant.

12              ~~~~~~~~~~~~~~~~~~~~

13

14          Videoconference Deposition of
                SHERIFF SCOTT FITCH
15
                September 5, 2025
16                 10:00 a.m.

17              Taken via Zoom at:
            Meigs County Sheriff's Office
18              104 E. 2nd Street
                Pomeroy, Ohio 45769
19

20

21

22  Court Reporter - Michele A. Durig, RPR

23

24

25



SHERIFF SCOTT FITCH                        September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                          2

```
 1    APPEARANCES VIA ZOOM:

 2

 3    On behalf of the Plaintiff:

 4        Jason E. Starling, Esq.
          Willis Spangler Starling
 5        4635 Trueman Blvd., Suite 100
          Hilliard, Ohio 43026
 6        Phone:  (614) 586-7915
          Email:  jstarling@willisattorneys.com
 7

 8

 9    On behalf of the Defendant:

10        Matthew Teetor, Esq.
          Teetor Westfall
11        200 E. Campus View Blvd., Suite 200
          Columbus, Ohio 43235
12        Phone:  (614) 412-4000
          Email:  mteetor@teetorlaw.com
13

14    ALSO PRESENT:

15        Abby Bates - Paralegal
16        Willis Spangler Starling

17

18

19

20

21

22

23

24

25
```



```
 1                       I N D E X

 2
                         WITNESS
 3
                                               Page
 4
                  SHERIFF  SCOTT  FITCH
 5

 6   Examination By Attorney Starling              4

 7

 8                       EXHIBITS

 9   Exhibit            Description           Page

10   Exhibit 1          Organizational Chart for    19
                        the Meigs County
11                      Sheriff's Office
     Exhibit 2          Union Contract, 2021 to     34
12                      2024
     Exhibit 3          Arbitration Between the      39
13                      FOP and Gallia County
                        Sheriff's Office
14   Exhibit 4          Written Reprimand           53
     Exhibit 5          Job Application for         64
15                      Meigs County Sheriff's
                        Office
16   Exhibit 6          Jerry Darst's Personnel     68
                        File
17   Exhibit 7          Code of Conduct for the     72
                        Meigs County Sheriff's
18                      Office
     Exhibit 8          Written Reprimand to        90
19                      Marty Hutton
     Exhibit 9          Written Reprimand to Ian    93
20                      Fennell
     Exhibit 10         Termination Letter to       97
21                      Jerry Darst

22

23

24

25
```



1    COURT REPORTER:  Counsel, please identify

2 yourselves for the record.  State who you represent

3 and identify if anyone else is in the room with you.

4    Also, please stipulate to the remote taking of

5 deposition and the remote administration of oath.

6    ATTORNEY STARLING:  Thank you, Michele.

7    This is Jason Starling from the law firm of

8 Willis Spangler Starling on behalf of the plaintiff.

9 And with me is Abby Bates, my paralegal.

10    Oh, and I stipulate to the taking of the

11 deposition remotely via Zoom.  Thank you.

12    ATTORNEY TEETOR:  And this is Matthew Teetor

13 on behalf of Meigs County and Sheriff Scott Fitch.

14    I'm in the room with Sheriff Fitch.  And I

15 also stipulate.

16       *  *  *

17    SHERIFF SCOTT FITCH,

18 having been duly sworn, was examined and testified as

19 follows:

20       EXAMINATION

21 BY ATTORNEY STARLING:

22  Q.  All right, Sheriff, my first question for you

23 is an easy one.  Have you ever been deposed before?

24  A.  Yes, sir.

25  Q.  How many times before?



1      A.   Oh, one, two -- I think maybe three previous

2    times.

3      Q.   What were those three previous depositions

4    for?

5      A.   One, if I recall, was back in the mid-'90s in

6    Washington County, Ohio in reference to a shooting

7    incident that occurred with the Washington County

8    Sheriff's Office Special Response Team.

9           The second would have been in a individual in

10   Meigs County while employed at BCI with, I want to say

11   his name was, the defendant, was Robert Six.  And it

12   was out of a search warrant situation.  I was giving a

13   deposition in that case.  The other time would have

14   been in a Nelsonville, Ohio case.  And -- oh, so it

15   would be four times.  And then not too long ago in a

16   case in Marietta, Washington County, Ohio.

17     Q.   What was the Nelsonville Case about?

18     A.   It was about an incident with an interaction

19   with an individual and his wife where we had towed a

20   motorcycle.

21     Q.   What was the case in Marietta about?

22     A.   It's in reference to alleged emotional abuse,

23   I believe, is what they allege.

24     Q.   What who alleged?

25     A.   Zach Collins, I believe, and Alex Pyles.



1      Q.  In any of these cases where you gave a

2  deposition, were you sued personally?

3      A.  I believe the Washington County one is one

4  that I was sued personally.

5      Q.  Is that the Marietta case, or am I confusing

6  it?

7      A.  Yes.  Yes.  Marietta, Washington County, Ohio.

8  Yes, sir.

9      Q.  What were the claims in that Marietta case?

10     A.  Basically that I caused them emotional abuse

11 in the three-minute interaction I had with them

12 playing a prank on them.

13     Q.  What was the prank?

14     A.  They were brought into an office, and I teased

15 them about being a ladies' man and the female clients

16 liking them and them flirting with them.

17     Q.  Okay.  Were these employees of yours at the

18 time?

19     A.  No.

20     Q.  Were they coworkers?

21     A.  No.

22     Q.  What relation did they have to you, if any?

23     A.  None.

24     Q.  Okay.  How were you bringing them into an

25 office and playing a prank on them, then?



1      A.  I didn't bring them into my office.  I stopped

2   at an office where my girlfriend at the time was

3   working.

4      Q.  Did you know these two individuals before you

5   played a prank on them?

6      A.  No.

7      Q.  You played a prank on complete strangers?

8      A.  Yes.

9      Q.  And they ended up suing you?

10      A.  Yes.

11      Q.  Do you know what the specific causes of action

12   in that lawsuit were?

13      A.  That I caused them emotional stress.

14      Q.  Do you know if it was filed in state or

15   federal court?

16      A.  State.

17      Q.  Do you know which state court?

18      A.  Marietta Common Pleas -- or Washington County

19   Common Pleas Court.

20      Q.  Do you know when it was filed?

21      A.  No, sir.

22      Q.  Can you give me an approximate date?

23      A.  Sometime, I believe, around the -- earlier

24   this year, in 2025, I believe.  Maybe '24, I'm not

25   certain.  Fall of '24.



1      Q.  At the time you played this prank on these two

2   individuals, were you the sheriff of Meigs County?

3      A.  Yes.

4      Q.  Did they sue you in your official capacity as

5   sheriff?

6      A.  Yes.

7      Q.  Do you know where that lawsuit stands today?

8      A.  Waiting on a summary judgment from the judge.

9      Q.  All right.  So your lawyers in the case have

10  filed a motion for summary judgment?

11     A.  Yes.

12     Q.  And it hasn't been ruled on yet?

13     A.  Correct.

14     Q.  How long ago was your last deposition?

15     A.  Several months ago.  That was the one where

16  I'm referring to in Washington County.

17     Q.  All right.  Well, given that recency, you're

18  probably pretty well-versed in depositions.

19         But what I'm going to do is go through what

20  lawyers call the ground rules; is that fair?

21     A.  Sure.

22     Q.  All right.  So a deposition is a

23  question-and-answer session, as you are obviously

24  seeing right now.  I ask a question, you give an

25  answer, and then we proceed that way until done.  Make

 1  sense?

 2      A.  Yes.

 3      Q.  Okay.  As we go through this question-answer

 4  session, particularly because we're on Zoom, if you

 5  don't hear any part of my question, please tell me,

 6  and I'll either repeat it or have the court reporter

 7  read it back to you.  Okay?

 8      A.  Okay.

 9      Q.  If you don't understand any part of my

10  question, please tell me and I'll either explain it or

11  change the question or do something else to help you

12  understand it.  Okay?

13      A.  Yes, sir.

14      Q.  With those two instructions, is it fair to say

15  that if you answer one of my questions you both fully

16  heard it and fully understood it?

17      A.  Yes, sir.

18      Q.  Okay.  As we're going through this deposition,

19  if you realize any prior answer you gave me to any

20  question at any time during this deposition was

21  incorrect or inaccurate or incomplete in any way, you

22  should feel free to raise that issue with me and we

23  can revisit the topic.  All right?

24      A.  Yes, sir.

25      Q.  I like to tell witnesses I'm deposing that



1  this is not the Spanish Inquisition.  I'm not here to

2  hold you under the bright lights and make you crack

3  until you give me the answer I want.  So if you need a

4  break at any time, that's fine.

5          There's a couple caveats to that.

6          Number one, if I have a question pending, I'm

7  going to want you to answer that before we take the

8  break.

9          And, two, if there's a line of questioning I

10  want to complete before we take a break, I may want to

11  do that, but I'm not going to unreasonably hold you.

12          Fair?

13      A.  Yes.

14      Q.  All right.  Again, because we're on Zoom and

15  because our court reporter here is taking down

16  everything everyone says, we have to be careful not to

17  talk over each other, which means I have to finish my

18  question completely and you have to finish your answer

19  completely.  Can we do that?

20      A.  Yes, sir.

21      Q.  All right.  It also means that you have to

22  answer verbally.  Nodding heads or shaking heads or

23  saying "huh-uh," "uh-huh," things like that, or other

24  nonverbal cues, can't be taken down effectively by our

25  court reporter, so you have to answer every question



1  affirmatively.  Make sense?

2      A.  Yes, sir.

3      Q.  Is there anything about these instructions

4  that you don't understand?

5      A.  No, sir.

6      Q.  All right.  Do you understand that the

7  testimony you're giving today is under oath and

8  subject to penalties of perjury?

9      A.  Yes, sir.

10      Q.  All right.  This is what they call a discovery

11  deposition.  So it's my opportunity to find out what

12  you know about the case that I've filed on behalf of

13  my client.

14          Your testimony is being taken down, again, by

15  the court reporter into a written transcript.  That

16  written transcript can be used in a variety of ways in

17  this case.

18          For instance, it can be attached to motions

19  that are written by either of the parties.  It could

20  be filed in the docket -- or, excuse me, on the docket

21  for this case.  And, additionally, when it comes to

22  trial, it's possible that it could be read to the

23  judge or jury.  Do you understand that?

24      A.  Yes, sir.

25      Q.  All right.  Is there anything preventing you



 1  from giving truthful testimony today?

 2      A.  No, sir.  The only thing I would like to say,

 3  I apologize in advance for me clearing my throat.  I

 4  have some allergies that is going on, so please excuse

 5  me for that.

 6      Q.  All right.  You're perfectly fine.  I don't

 7  even think that would show up on the transcript.  So

 8  if you need to clear your throat, sneeze, do whatever,

 9  you're perfectly okay to do that, and we'll work

10  through it, okay?

11      A.  Yes, sir.  Thank you.

12      Q.  All right.  Is there anything negatively

13  affecting your memory today?

14      A.  No, sir.

15      Q.  What is your current home address?  And we can

16  place this under seal, if needed, because you're a law

17  enforcement officer.

18      A.  40620 Bentz Cemetery Road, Pomeroy, Ohio

19  45769.

20      Q.  Does anyone live there with you?

21      A.  Yes.  My girlfriend Candice Walker.

22      Q.  Anyone else?

23      A.  No, sir.

24      Q.  How old is Candice?

25      A.  I believe she's 47.



1    Q.  I won't show her this transcript, with you not

2  being quite sure about it.

3    A.  Yes, sir.  Thank you.

4    Q.  I appreciate your answer.

5        How long have you lived there?

6    A.  I've lived there since I built that in

7  approximately 2010.  So, 15 years.

8    Q.  Any plans to move in the near future?

9    A.  No, sir.

10   Q.  Have you ever been the plaintiff in a lawsuit?

11   A.  No, sir.

12   Q.  Now, we talked about one instance when you

13  were a defendant in a lawsuit.

14       Any other instances when you were a defendant

15  in a lawsuit?

16   A.  Just the times that I talked about giving the

17  deposition.  Again, the one -- the first one I talked

18  about was in Washington County back in the mid '90s.

19  I -- if memory serves me -- and, again, that's been

20  30 years ago -- I believe that everyone that was there

21  was initially named, but I believe I was shortly

22  dropped thereafter the initial filing of the lawsuit.

23  So I don't know how you want to classify that.  If I

24  was initially named, but then got dropped with many

25  more of the people that was there initially.



1         Same goes with the Mr. Six lawsuit.  I think I

2    was initially named initially.  Like oftentimes, at

3    least in my experience, a lot of people that are there

4    are originally named, and then ultimately they get

5    dismissed.  I believe that was the case.

6         I was named in the one in Washington County

7    and Nelsonville.

8         And there was another one, I guess I should

9    say, that just got a disposition on a settlement that

10   was in Meigs County that occurred, like, several weeks

11   after I was sheriff.  But that was settled.  And I

12   wasn't -- I wasn't found to be at fault in any of that

13   or any judgment against me.

14        Q.  What was that case that settled?

15        A.  It was a Caleb Ellis case.

16        Q.  What does that mean?

17        A.  It was -- well, I believe they paid the money

18   off because it was cheaper to, -- the insurance -- to

19   pay it off as opposed to hear it through to the trial.

20        Q.  Well, who is Caleb Ellis?

21        A.  He's a Meigs County resident.

22        Q.  What did he sue you for?

23        A.  He sued the department for, I believe it was a

24   4th Amendment claim.

25        Q.  So allegation that you violated his



1  constitutional rights?

2      A.  Well, not me personally, but two deputies

3  violated his constitutional rights, yes, sir.

4      Q.  Which two deputies?

5      A.  Marty Hutton -- he goes by MJ Hutton -- and

6  Deputy Golsby.

7      Q.  Okay.  Sorry.  There may be pauses or times

8  when I take notes here or look through things on my

9  electronic notes.  So I'm not trying to create an

10  awkward silence here.

11      A.  I understand, sir.

12      Q.  It won't show up in the transcript, so it's

13  perfectly fine, okay?  Make sense?

14      A.  Yes.

15      Q.  All right.  Have you ever been arrested

16  before?

17      A.  No, sir.

18      Q.  I take it you've never been convicted of a

19  crime before, then?

20      A.  No, sir.

21      Q.  As a law enforcement officer, have you

22  testified in court before?

23      A.  Yes, sir.

24      Q.  I take it that's been many times?

25      A.  Yes, sir.



SHERIFF SCOTT FITCH                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                    16

1        Q.  Any times when you testified in person in
2    court for a civil case?
3        A.  No, sir, not that I recall.
4        Q.  All right.  Do you know what an affidavit is?
5        A.  Yes, sir.
6        Q.  What is it to you?
7        A.  A sworn statement of facts, or a sworn
8    statement.
9        Q.  When you say "sworn," that means sworn under
10   penalty of perjury, right?
11       A.  Yes, sir.
12       Q.  Have you signed an affidavit having anything
13   to do with this case filed by Jerry Darst?
14       A.  No, sir, not that I believe.
15       Q.  Do you know of anyone else who has signed an
16   affidavit having anything to do with this case filed
17   by Jerry Darst?
18       A.  I would assume Jerry Darst did, but I have not
19   seen that.
20       Q.  Anyone other than Jerry?
21       A.  No, sir.
22       Q.  Do you know what a declaration is?
23       A.  Not exactly.
24       Q.  All right.  I'll tell you that a declaration
25   is basically the same thing as an affidavit, but you



 1  don't have to have it notarized when you sign it, and

 2  it's only useable in federal court.  Does that sound

 3  familiar to you?

 4       A.  Yes, sir.

 5       Q.  All right.  Are you aware of anyone who has

 6  signed a declaration having anything to do with this

 7  case filed by Jerry Darst?

 8       A.  No, sir.

 9       Q.  Are you currently employed, sir?

10       A.  Yes, sir.

11       Q.  By whom?

12       A.  Meigs County.

13       Q.  And I take it you're the elected sheriff there

14  in Meigs County; is that right?

15       A.  Yes, sir, I am.

16       Q.  How long have you done that?

17       A.  I've served as a sheriff -- as the elected

18  sheriff since November of 2024, which my first day as

19  the elected sheriff, I believe, started the first week

20  of January of 2025.

21           I've been -- I was appointed sheriff, I

22  believe it was November 22nd of 2023.  And I served

23  out the remainder of the previous sheriff's term from

24  November 22nd of 2023 to January of 2025, where I was

25  now serving my term.



SHERIFF SCOTT FITCH                          September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                           18

1        Q.   Who appointed you sheriff?

2        A.   The Meigs County Commissioners.

3        Q.   Do you know why there was a vacancy to appoint

4   you sheriff?

5        A.   Yes.   The previous sheriff was under

6   investigation by the state auditor's office for misuse

7   of county funds.

8        Q.   Do you know what happened with that

9   investigation?

10        A.   Ultimately, he was indicted, and he pled

11   guilty to some lesser included charges, I believe, one

12   of which was a felony.

13        Q.   Who was that prior sheriff?

14        A.   Keith Wood.

15        Q.   All right.   Let's talk a little bit about the

16   Meigs County Sheriff's Office, okay?

17        A.   Yes, sir.

18        Q.   You're at the top; right?

19        A.   Yes, sir.

20        Q.   Who is directly underneath you?

21        A.   A Captain Frank Stewart.

22        Q.   Now, I'm just talking about currently.   Is

23   Captain Frank Stewart currently the captain underneath

24   you?

25        A.   Yes, sir, he is.



SHERIFF SCOTT FITCH                          September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                          19

1        Q.  Okay.  And then who is under Frank Stewart?

2        A.  Staff Lieutenant Bill Gilkey.

3        Q.  Anyone else?

4        A.  I mean, in the chain of command, Bill Gilkey

5    would be the third in command.  Then I have

6    lieutenants that share the same rank, the equivalent

7    rank.  And then sergeants.  And then deputies.

8        Q.  All right.  I'm going to share our first

9    exhibit in the Zoom deposition.  And we'll mark this

10   Exhibit 1, okay?

11       A.  Yes, sir.

12           (Exhibit 1, Organizational Chart for the Meigs

13   County Sheriff's Office, was marked for

14   identification.)

15   BY ATTORNEY STARLING:

16       Q.  I'm going to do what's called screen sharing.

17   I don't know if you've ever seen that in a Zoom

18   meeting.

19       A.  Yes, sir.

20       Q.  I'll go ahead and do it right now.  Okay.  Can

21   you see my screen share?

22       A.  Yes, sir, I can.

23       Q.  Do you recognize Exhibit 1?

24       A.  Yes, sir, I do.  It's an organizational chart

25   for the Meigs County Sheriff's Office.  It's a little



1  outdated, but, yeah, at one time, this was accurate.

2      Q.  All right.  Is it accurate when it comes to

3  the positions that are reflected in Exhibit 1?

4      A.  With the exception of Bill Gilkey.  It's got

5  him and Brandy King listed as lieutenants.  Brandy

6  King is still a lieutenant.  Bill Gilkey is a staff

7  lieutenant.  Also, Tylun Campbell to the right is a

8  lieutenant now.  And there are several other

9  lieutenants.  Rick Smith and Donnie Mohler, has them

10  listed as sergeants.  They are also lieutenants.

11      Q.  Okay.  So folks may have been promoted or

12  moved around to different positions, but when you look

13  at the structure of the job titles, that's about

14  right, fair?

15      A.  That's basically -- yes, sir, it's basically

16  the same with the difference of rank.

17      Q.  All right.  That's helpful.

18          Do you know a man named Jerry Darst?

19      A.  I do.

20      Q.  And who is Jerry Darst?

21      A.  A former deputy at the Meigs County Sheriff's

22  Office.  I believe he's working outside of law

23  enforcement now, to the best of my knowledge.  Lives

24  in Gallia County.  Gallia County resident, the last I

25  knew.



1        Q.   Okay.   Did he ever work for the Meigs County

2   Sheriff's Office?

3        A.   Yes, sir, he did.

4        Q.   And when did he work for Meigs County

5   Sheriff's Office?

6        A.   I believe he was hired around August 2nd or

7   3rd of August '23 -- 2023.

8        Q.   Do you know what his job title was when he was

9   hired in?

10       A.   Deputy sheriff.

11       Q.   Do you know who hired him in?

12       A.   That would have been the previous

13  administration.  I don't know if Keith Wood actually

14  hired him -- he would have ultimately had to swear him

15  in -- or Major Scott Trussell.  One of those two, I'm

16  assuming, or both.

17       Q.   Do you know anything about Jerry Darst's

18  background as a law enforcement officer prior to Meigs

19  County?

20       A.   I knew he worked at the Gallia County

21  Sheriff's Office and I believe Middleport Police

22  Department located in Meigs County prior to Meigs

23  County.

24       Q.   Do you know how long he worked at those

25  locations?



1        A.  No, sir, I don't.  I know he was at Gallia

2   County for a number of years, but uncertain of the

3   dates.

4        Q.  Do you know how long he's been a law

5   enforcement officer?

6        A.  No, sir, I don't.

7        Q.  Do you know when Jerry Darst's employment as a

8   deputy in Meigs County ended?

9        A.  I believe it was in -- it was shortly

10  after -- like the following -- of 2024, I want to say

11  it was the summer of -- July of 2024.  Or, I'm sorry.

12  '23.  I guess, let me back up, sir, for clarification.

13        I believe Jerry was -- I said I was

14  appointed -- I believe I was appointed in

15  November 22nd of 2022, I believe.  Yes, because this

16  will be three years.  So when I say Jerry was

17  employed, it would have been August 2nd of 2022.

18        So, yes, July of 2023 would have been when his

19  employment was terminated.

20        Q.  Okay.  You just said his employment was

21  terminated.  That's whys he's no longer with the Meigs

22  County Sheriff's Office?

23        A.  Yes, sir.  He failed to make the satisfactory

24  grades for making probation.

25        Q.  All right.  Well, we'll get into that.  But



```
 1   what I'd like to start with is, do you know who made

 2   the decision to terminate Jerry Darst's employment?

 3        A.   Ultimately, it was my decision.

 4        Q.   Did anyone else participate in that decision?

 5        A.   Yes, sir.

 6        Q.   Who did?

 7        A.   Frank Stewart, Bill Gilkey, Brandy King, Don

 8   Mohler.

 9        Q.   Hold on.  Slow down.

10        A.   I'm sorry.

11        Q.   We have Frank Stewart; right?

12        A.   Yes, sir.

13        Q.   Bill Gilkey; right?

14        A.   Yes, sir.

15        Q.   Who else?

16        A.   Brandy King.

17        Q.   And who next?

18        A.   Don Mohler.

19        Q.   Who next?

20        A.   Rick Smith.

21        Q.   Who else?

22        A.   JR Perry.

23        Q.   Who else?

24        A.   Steve Heater.

25        Q.   Anyone else?
```



1        A.   Matt Champlin.

2        Q.   Who else?

3        A.   That's it, sir, to the best of my knowledge.

4        Q.   How did these people participate in the

5   decision to fire Jerry Darst from Meigs County

6   Sheriff's Office?

7        A.   I spoke with them in reference to Jerry's

8   abilities and job performance as a deputy sheriff for

9   Meigs County.

10       Q.   Is that the only way they participated?

11       A.   Yes, sir.

12       Q.   Did they tell you that they thought Jerry

13  should be fired?

14       A.   They said that his job performance was

15  unsatisfactory and that he should -- in their opinion,

16  he should not make it through probation, that he

17  should be terminated.

18       Q.   Okay.  Let's start with Frank Stewart.  How

19  many times did you talk with Frank Stewart about

20  whether to terminate Jerry Darst, or honestly, Jerry

21  Darst, in general?

22       A.   Approximately three to four times.  Maybe a

23  couple times about the termination.

24            I talked to him multiple times about Jerry

25  Darst throughout his employment at Meigs County



 1   Sheriff's Office in reference to Captain Stewart would

 2   forward me paperwork that Jerry was getting from a

 3   physician where he was on leave.

 4        Q.   Okay.  We'll talk about that.

 5            Let's talk about the times you discussed

 6   terminating Jerry Darst with Frank Stewart, okay?

 7        A.   Okay.  Yes, sir.

 8        Q.   And you said there were a couple of times that

 9   you talked to Frank Stewart about that topic; is that

10   right?

11        A.   Yes, sir.

12        Q.   What did you guys talk about, specifically?

13        A.   I basically told him that we was coming up on

14   one year, which is the probationary period at the

15   Meigs County Sheriff's Office, per the collective

16   bargaining agreement.  And, ultimately, a decision has

17   to be made.  I told him that I did not think that I

18   was able to have enough evaluation time for him.  That

19   in talking with other supervisors at the sheriff's

20   office, Jerry's job performance was unsatisfactory in

21   the limited time that he was evaluated.

22            I told him that I wanted to try to reach out

23   to the union to see if they would extend his

24   probationary period so I could have a better

25   opportunity to evaluate his job performance.



1      Q.  Anything else you and Frank Stewart talked

2  about concerning Jerry Darst and terminating his

3  employment?

4      A.  I got Frank's opinion on what he viewed as far

5  as Jerry Darst's job performance as a deputy sheriff.

6      Q.  And what was that opinion?

7      A.  Less than satisfactory.

8      Q.  Did he say why?

9      A.  Yeah.  He said Jerry's appearance was sloppy.

10 He lacked professionalism with interacting with

11 citizens.  His reports were often tardy and poorly

12 written.  And he knew that other supervisors had

13 complained to him about Jerry's performance before

14 also.

15     Q.  Anything else that Frank Stewart mentioned

16 about Jerry Darst's alleged poor job performance?

17     A.  No, sir, not that I recall.

18     Q.  Anything else that you recall being said by

19 either you or Frank Stewart in any of these

20 conversations about terminating Jerry Darst?

21     A.  No, sir, not that I recall.

22     Q.  Now, you said you had some other

23 communications with Frank Stewart about Jerry Darst

24 and I guess Jerry Darst's employment; is that right?

25     A.  Yes, sir.



1        Q.  What were those other communications?

2        A.  Captain Stewart would just keep me updated on

3    the status of Mr. Darst and send me copies of

4    documents that Jerry supplied him reference when he

5    could return to work from an injury.

6        Q.  Any other communications that you and Frank

7    Stewart had about Jerry Darst?

8        A.  Not that I recall.  No, sir.

9        Q.  All right.  What did you and Bill Gilkey talk

10   about concerning Jerry Darst?

11       A.  I inquired of Bill Gilkey about Jerry Darst's

12   job performance, because he was here the whole time,

13   same as with Frank Stewart, prior to me being sheriff,

14   being appointed, and got his opinion on Jerry Darst's

15   job performance.

16       Q.  And what was Bill Gilkey's opinion?

17       A.  Less than satisfactory.  And, in his opinion,

18   Jerry should not be made a full-time employee and not

19   make probation.

20       Q.  Did he say why?

21       A.  Pretty much similar to Frank Stewart.  Did

22   really bad reports.  They were late.  Grammatical

23   errors.  Didn't take the time to check them.  Was slow

24   getting the calls.  Had a poor attitude.  He didn't

25   like his appearance.  Thought it was sloppy.



1      Q.  Did he give you any specific examples?

2      A.  I think he did, but I don't recall.

3      Q.  Do you recall any specific examples at all

4   that --

5      A.  No, sir, not -- just -- just the generalities.

6   I don't recall any specific examples.

7      Q.  Okay.  Anything else that you and Bill Gilkey

8   talked about concerning Jerry Darst?

9      A.  No, sir.

10     Q.  Now, going back to Frank Stewart specifically,

11  did he give you any specific examples of Jerry Darst's

12  alleged poor job performance?

13     A.  He may have.  I don't recall.

14     Q.  As far as you know, that's a no, you don't

15  have any that you can share with me today?

16     A.  I don't recall any that I can share, correct.

17     Q.  Let's go to Brandy King.  What did you and

18  Brandy King discuss concerning Jerry Darst?

19     A.  His job performance as a deputy sheriff.

20     Q.  Anything other than his job performance?

21     A.  No, sir.

22     Q.  All right.  What did Brandy King tell you

23  about Jerry Darst's job performance?

24     A.  That his reports were horrible.  Similar to

25  the same things.  Jerry Darst was -- didn't have a



 1  very good work ethic.  Acted like he didn't want to be

 2  here.  Unsatisfactory performance all around.

 3       Q.   So you mentioned allegedly horrible reports.

 4       A.   Yes.

 5       Q.   Work ethic, right?

 6       A.   Yes.

 7       Q.   What other specifics did Brandy King tell you?

 8       A.   Those are the two main ones that I recall.

 9       Q.   Did Brandy King give you any specific

10  examples?

11       A.   She's the one that I think ultimately checked

12  the reports, and so she was the one that just

13  basically -- I don't know if she gave me any

14  specifics, but she said his reports were constantly

15  late and they had to be returned to him to fix.

16       Q.   All right.  Do you still have any of Jerry

17  Darst's reports that he did while he was employed by

18  the Meigs County Sheriff?

19       A.   We should have all of them, sir.

20       Q.   Do you have any emails where these

21  issues -- alleged issues -- with Jerry Darst's report

22  might be discussed?

23       A.   Not that I'm aware of, sir.

24       Q.   Any text messages where these alleged problems

25  with Jerry Darst's report would be discussed?



1      A.  No, sir.

2      Q.  As far as you know, this was all done verbally

3   in terms of discussing what was supposedly wrong with

4   Jerry Darst's reports?

5      A.  Yes, sir.

6      Q.  Did Brandy King tell you how the reports were

7   allegedly horrible?

8      A.  I believe she mentioned grammatical errors,

9   stylistic errors, lack of information, lack of

10  details.

11     Q.  Anything else?

12     A.  Other than them not being done in a timely

13  manner, no.

14     Q.  Anything else you and Brandy King talked about

15  concerning Jerry Darst?

16     A.  No, sir.

17     Q.  All right.  Don Mohler was the next one you

18  mentioned.  Do you recall that name?

19     A.  Yes, sir.

20     Q.  What did you and Don Mohler talk about

21  concerning Jerry Darst?

22     A.  Jerry Darst's job performance while as a

23  deputy sheriff.

24     Q.  Anything other than his job performance?

25     A.  No, sir.



 1      Q.   What specifically about Jerry Darst's job
 2   performance?
 3      A.   Just that he was less than satisfactory, did a
 4   less than satisfactory job.  That he didn't have a lot
 5   of time to work with him directly, but he didn't have
 6   a good representation within the department of being a
 7   good deputy, and he wasn't impressed with anything
 8   that he saw out of Jerry Darst.
 9      Q.   Anything else that Don Mohler told you?
10      A.   No, sir, not that I recall.
11      Q.   Did Don Mohler give you any specific examples
12   or explain what he meant by "less than satisfactory
13   job"?
14      A.   I don't recall.  He may have.
15      Q.   You can't name any, sitting here today?
16      A.   No, sir.
17      Q.   Anything else that you and Don Mohler talked
18   about concerning Jerry Darst?
19      A.   No, sir.
20      Q.   Was it Rick Smith who you mentioned next?
21      A.   Yes.
22      Q.   What did you and Rick Smith talk about
23   concerning Jerry Darst?
24      A.   Rick Smith was a union representative, the
25   primary union representative for the Meigs County



 1  Sheriff's Office, the deputies.

 2          And I brought him in, and I told him that I

 3  had been -- the Jerry Darst probationary period was

 4  coming to an end, and that I had limited time to

 5  evaluate him.  And based off what I had observed,

 6  based off what other supervisors observed, Jerry's job

 7  performance was less than satisfactory.  And if I had

 8  to make a determination at that time, he would not be

 9  retained as employment at the Meigs County Sheriff's

10  Office.

11          I requested that -- from Rick Smith -- to

12  contact Mr. Darst and ask if he would be willing to

13  voluntarily extend his probationary period for four to

14  six months to have a better opportunity to evaluate

15  his performance.

16      Q.  How did Rick Smith respond?

17      A.  He was very appreciative that I would offer

18  that extension to a deputy sheriff and a union member.

19  Said he understood completely.  And said he would

20  contact Jerry Darst and let me know what his answer

21  was.

22      Q.  Do you know whether he contacted Jerry Darst?

23      A.  Yes.  He advised he did.  As well as their

24  union attorney, Mark Volcheck.

25      Q.  Okay.  And did he tell you what he discussed



1  with those two individuals?

2      A.  That he told Jerry Darst that my evaluation

3  based off my personal observations and other

4  supervisors at the Meigs County Sheriff's Office was

5  less than satisfactory and that his job was in

6  jeopardy and asked if he would be willing to extend

7  his probationary period so we could have a better

8  opportunity to evaluate his job performance.

9      Q.  Okay.  Did Rick Smith tell you how Jerry Darst

10  allegedly responded?

11      A.  I think Jerry said that he wasn't -- I know he

12  said he wasn't willing to extend his probationary

13  period.  That I was going to have to make a decision

14  based off what he had -- what I had.

15      Q.  Did Rick Smith tell you what he talked about

16  with the union attorney?

17      A.  I believe it was the same facts.  That he

18  contacted Mr. Volcheck and explained to him our

19  meeting.  And I believe Mr. Volcheck instructed him to

20  contact Jerry and ask him if he would

21  voluntarily -- the union was okay with it if Jerry

22  was.

23      Q.  Okay.  Anything else that you and Rick Smith

24  talked about concerning Jerry Darst?

25      A.  No, sir.



1      Q.  All right.  Now that you've mentioned the

2   union that represented the deputies, I'm going to

3   share with you what we'll mark as Exhibit 2, okay?

4      A.  Yes, sir.

5           (Exhibit 2, Union Contract, 2021 to 2024, was

6   marked for identification.)

7   BY ATTORNEY STARLING:

8      Q.  Can you see Exhibit 2?

9      A.  Yes, sir.

10     Q.  And what is Exhibit 2?

11     A.  It's a cover letter for the collective

12  bargaining agreement between the Meigs County

13  Sheriff's Office and the deputies' union, which is the

14  Ohio Patrol Benevolent Association.  And as you're

15  scrolling through there, it's the union contract from

16  the '21 -- 2021 through 2024.

17     Q.  All right.  I want to turn to page 1 of the

18  union contract.

19     A.  Okay.

20     Q.  And do you see where it says, "Article 2,

21  Union Recognition"?

22     A.  Yes, sir, I do.

23     Q.  And it looks like the employer recognizes the

24  union as the sole exclusive bargaining representative

25  for full-time deputies, full-time sergeants and



```
 1  lieutenants, and full-time civilian dispatchers; is

 2  that correct?

 3       A.  Yes, sir.

 4       Q.  All right.  And this was the union contract

 5  that was in place with Meigs County Sheriff's Office

 6  during the time that Jerry Darst was employed there;

 7  is that right?

 8       A.  Yes, sir.

 9       Q.  And, as a result, Jerry Darst was covered by

10  this union contract, was he not?

11       A.  Yes, sir, he was.

12       Q.  And that was the case, even though he was a

13  probationary employee; correct?

14       A.  Yes, sir.

15       Q.  We'll come back to that, but I'm going to stop

16  share for now.

17       A.  Okay.

18       Q.  Now, the next person you mentioned talking to

19  about Jerry Darst and potentially terminating his

20  employment was JR Perry; is that right?

21       A.  Yes.

22       Q.  What did you and JR Perry talk about?

23       A.  JR worked on -- he was a deputy, but sometimes

24  was the shift -- senior deputy on shift, so kind of a

25  supervisor.  It was in Jerry's job performance as a
```



SHERIFF SCOTT FITCH                                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                      36

1  deputy sheriff.

2      Q.  And what did JR Perry tell you about that job

3  performance?

4      A.  That he really liked Jerry, but he wasn't a

5  very good deputy.

6      Q.  Did he say why?

7      A.  Lazy.

8      Q.  Anything else?

9      A.  Didn't like working with him on a shift

10 because he would take extra time at calls instead of

11 backing them up so he wouldn't have to go to

12 additional calls.

13     Q.  Anything else?

14     A.  No.

15     Q.  Anything else that you and JR Perry talked

16 about concerning Jerry Darst?

17     A.  No, sir, not that I recall.

18     Q.  It seems that the next person you told me you

19 talked to about Jerry Darst was Steve somebody?

20     A.  Steve Heater.

21     Q.  Yeah, that sounds right.  What did you and

22 Steve Heater talk about concerning Jerry Darst?

23     A.  I contacted Steve Heater.  He runs a K-9

24 training facility and certified Jerry Darst's dog.  I

25 can't recall Jerry Darst's dog at the time.  But his



1   K-9 that he had.  I believe Jerry owned it or

2   purchased it from Gallia County in one of his previous

3   positions.  And Jerry had approached me about possibly

4   becoming a K-9 handler and that he had a K-9 already

5   purchased, he already had the equipment, that it just

6   needed to be approved by me.

7           I asked him if he was certain if the dog was

8   up to date and currently certified through the State

9   of Ohio.  Jerry kind of gave me a nondefinitive

10  answer, so I reached out to Steve Heater, which is

11  where Mr. Darst trained twice a month, every other

12  week, every other Thursday, actually, about Steve --

13  about Jerry and the K-9 and if he was certified.

14      Q.  Okay.  And what did you learn by reaching out

15  to Steve Heater?

16      A.  Steve Heater said that it's his professional

17  opinion as a 20-year K-9 instructor that the dog was

18  ruined.  That the dog was not certified.  That Jerry

19  had to -- all he had to do was continue to work, but

20  when Jerry showed up for training, he wanted to sit

21  around and talk while the others trained.

22          And he would not recommend me having Jerry as

23  a K-9 handler, and certainly not recommend me having

24  Jerry as a K-9 handler with the current K-9 in

25  question.



 1        Q.  All right.  Anything else you and Steve Heater
 2   talked about concerning Jerry Darst?
 3        A.  No, sir.
 4        Q.  I think the last person you talked to is Matt
 5   Champlin?
 6        A.  Yes, sir.  The Gallia County Sheriff.
 7        Q.  Okay.  What did you and Matt Champlin talk
 8   about?
 9        A.  Because Matt was his previous employer, I
10   asked him if Jerry did a good job at Gallia County
11   Sheriff's Office as a deputy.
12        Q.  And what -- how did Mr. Champlin respond?
13        A.  After laughing at me, he said he was going to
14   refrain from giving all details, but that Jerry was a
15   horrible employee.  And that he spoke to Keith Wood
16   about saying that he should not hire Jerry Darst when
17   Jerry Darst had applied.  Keith woods, I think, had
18   contacted him about Jerry Darst as being a former
19   employer.  And he said he strongly advised Keith Wood
20   not to hire Jerry Darst because Jerry was a poor
21   deputy and sued everybody for no apparent reason.
22        Q.  Anything else that you and Matt Champlin
23   talked about concerning Jerry Darst?
24        A.  No, sir, not that I recall.
25        Q.  Do you know how long Jerry Darst was at Gallia



```
 1   County Sheriff's Office?
 2        A.  No, sir.  I know it was an extended period of
 3   time, but not certain of the dates.
 4        Q.  Do you know why Jerry Darst's employment ended
 5   at Gallia County Sheriff's Office?
 6        A.  I believe it was because he was terminated by
 7   the Gallia Sheriff.
 8        Q.  And then did you know that Jerry Darst grieved
 9   and arbitrated that termination?
10        A.  I do believe I recall that, yes, sir.
11        Q.  Do you know the outcome of that arbitration?
12        A.  I think Jerry got a few thousand dollars,
13   ultimately, and got his -- some of his back pay or
14   something of that nature.  But I know that it was
15   appealed to the common pleas court in Gallia County,
16   and they upheld the termination.
17        Q.  All right.  Did you -- I'm going to enter into
18   our record here what we'll call Exhibit 3, so give me
19   a minute here.
20        A.  Okay.
21            (Exhibit 3, Arbitration Between the FOP and
22   Gallia County Sheriff's Office, was marked for
23   identification.)
24   BY ATTORNEY STARLING:
25        Q.  I'll go ahead and screen share.  Okay.  Can
```



```
 1   you see Exhibit 3 on my screen share, Sheriff?

 2        A.  I can see it, but it's very small.  And my

 3   eyesight -- I'm a little older, so my eyesight is not

 4   that good.

 5        Q.  I'm old as well, Sheriff, so we'll suffer

 6   together.  Can you see it now?

 7        A.  Yes, sir, I do.

 8        Q.  According to the caption, it seems to read

 9   that it's a arbitration between the FOP and Gallia

10   County Sheriff's Office.  Do you see that?

11        A.  Yes, sir.

12        Q.  All right.  Do you know if it's Jerry Darst's

13   arbitration award from when he arbitrated his

14   termination with the Gallia County Sheriff's Office?

15        A.  Yes, I see his name listed there, yes, sir.

16        Q.  And then let's go down to the award.  I'll

17   spare you the details.

18        A.  Okay.

19        Q.  But if you look at the award, it says, "The

20   grievance is sustained in part, denied in part.  The

21   employer had just cause to discipline the grievant

22   Jerry Darst, but did not have just cause to terminate

23   him."

24             Do you see that?

25        A.  Yes, sir.
```



1         Q.   And they required the employer to return the

2    grievant to duty after his medical leave of absence.

3    Do you see that?

4         A.   Yes, sir.

5         Q.   All right.  So Jerry Darst should never have

6    been terminated, according to this arbitrator from the

7    Gallia County Sheriff's Office, right?

8         A.   According to that document, yes, he should

9    have only been suspended for 21 days.

10        Q.   And you understand that it sounds like Gallia

11   County Sheriff's Office appealed this arbitration

12   award, right?

13        A.   As memory serves me, yes, sir.

14        Q.   And then there was some kind of deal on appeal

15   where Jerry took money to leave?

16        A.   Yes.

17        Q.   Do you know anything about Jerry supporting

18   the opponent or political opponent of the Gallia

19   County Sheriff?

20        A.   No, sir, I do not.

21        Q.   All right.  Now, you said when you spoke to

22   Matt Champlin, the Gallia County Sheriff, he said

23   something about Jerry suing everybody?

24        A.   Something about Jerry being -- filing

25   frivolous lawsuits.  Something to that effect, yes,



 1   sir.

 2        Q.  Can you elaborate on what was discussed

 3   concerning that topic?

 4        A.  I don't know if Matt gave me specifics or not.

 5   He just basically said that Jerry was very sue happy,

 6   something to that effect.

 7        Q.  Did you take that into consideration when you

 8   were deciding whether to fire Jerry Darst?

 9        A.  No.

10        Q.  Okay.  Any other specifics that you recall

11   discussing with any of the people we've talked about

12   concerning Jerry Darst or the reasons for terminating

13   him?

14        A.  No, sir, not that I recall.

15        Q.  So we've talked about everything you can

16   remember having talked about with anyone where you're

17   thinking about or discussing terminating Jerry Darst;

18   fair?

19        A.  Yes, sir, fair.

20        Q.  All right.  But you ultimately made the

21   decision to fire Jerry Darst from the Meigs County

22   Sheriff's Office; is that right?

23        A.  Yes, sir.

24        Q.  What were your specific reasons that you

25   relied upon?



1        A.  The input of the supervisors that was here for
2  Jerry Darst's entire tenure as a deputy sheriff in
3  Meigs County.  My personal observations.
4        Q.  Anything else?
5        A.  Just his overall performance.  Those were the
6  determining factors.
7        Q.  Anything else?
8        A.  No, sir.
9        Q.  All right.  You said input from the other
10  people.  What specifically?  What specifically that
11  was given to you by the other people formed your
12  decision to terminate Jerry Darst?
13        A.  The fact that they all said that if they was
14  in my shoes, they did not feel that he is worthy to
15  make probation and should not be retained as a deputy
16  sheriff with the Meigs County Sheriff's Office with
17  the specifics I testified to earlier.  Poor
18  performance, tardiness, appearance, work ethic,
19  attitude, things of that nature.
20        Q.  Anything else besides those specific -- you
21  listed poor appearance, tardiness, appearance, work
22  ethic, and attitude?
23        A.  Just overall professionalism.
24        Q.  Anything else?
25        A.  Not that I can recall, no, sir.



SHERIFF SCOTT FITCH                                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                    44

1        Q.  Okay.  I'm trying to get at the specific
2   reasons, right?
3        A.  Yes, sir.
4        Q.  You understand my questions on that regard?
5        A.  Yes.
6        Q.  All right.  And of the specific reasons you've
7   given me, I'm going to list them, and you tell me if
8   there's any others, okay?
9        A.  Okay.
10       Q.  We've listed poor performance, tardiness,
11  appearance, work ethic, attitude, and professionalism;
12  correct?
13       A.  Yes, sir.
14       Q.  Any other specific reasons why you terminated
15  Jerry Darst's employment?
16           ATTORNEY TEETOR:  Objection.  Asked and
17  answered.
18       A.  No, sir.
19       Q.  What do you mean by "poor performance"?
20       A.  I think it's self-explanatory.  Just not going
21  to the calls.  The duties assigned to a deputy
22  sheriff.  Responding to calls in a timely manner.
23  Handling the calls appropriately.  Completing your
24  reports thoroughly and accurately, grammatically and
25  stylistically correct.  Turning them in on time.



```
 1   Being punctual.  Appearing professional.  Having a
 2   professional attitude.  Being proactive and having a
 3   good work ethic.  Making arrests.  Issuing citations.
 4   Just the normal things that a deputy sheriff is
 5   required to do on a daily basis.
 6        Q.  Are you saying Jerry Darst failed on all of
 7   those things in your view?
 8        A.  I'm saying that, yes, that it was less than
 9   satisfactory.
10        Q.  He did all that in 97 days?
11        A.  I would say deputies do all those things on a
12   daily basis, on each day -- each shift they work.
13        Q.  All right.  Anything else you mean by "poor
14   performance"?
15        A.  Not that I -- not specifically, I can't -- no.
16        Q.  All right.  Do you have any specific examples
17   of when Jerry Darst exhibited poor performance, in
18   your view?
19        A.  Not specific, no, sir.
20        Q.  Like, you can't give me a date when he wrote a
21   crappy report?
22        A.  No, sir.
23        Q.  You can't give me a date or an instance that
24   you recall specifically of a poor response to a call?
25        A.  No, sir.
```



1      Q.   All right.  You just have these general

2   issues.  You don't have any specific instances that

3   you can recall that you can give me?

4      A.   Not as far as reporting, no, sir.

5      Q.   About any of these issues that you listed in

6   poor performance, any specific examples you can

7   describe for me?

8      A.   Yes.  The interaction I had with Jerry on his

9   attitude.

10     Q.   Sure.

11     A.   I'm sorry?

12     Q.   Sure.  Go ahead.  Tell me about that specific

13   instance.

14     A.   Jerry's just had a poor attitude.  I tried to

15   create -- I tried to change the culture when I became

16   sheriff to be more proactive and less reactive.  Jerry

17   was a little reluctant to that culture that I was

18   trying to implement.  He was, we should just sit

19   around and respond to calls and handle them as they

20   come in, as opposed to being out of the office and

21   patrolling.  I'm a big -- I believe in high visibility

22   in remote areas of the county.

23          Jerry was of the opinion he should just sit in

24   the office and wait for a call to come in and then

25   respond because the office is located in the center of



1  the county and, therefore, it would help reduce

2  response time if he happened to be on one end of the

3  county and got a call to the other.

4         His appearance was atrocious.  I told him

5  multiple times he needed to shine his shoes, clean his

6  shoes.  His cruiser was always dirty.  There was trash

7  and debris in his car.  His uniform wasn't ever

8  pressed or looked neat.  The gun belt and stuff that

9  he had was just not in good condition.  So, yeah, his

10  appearance was not good at all.

11      Q.  Okay.  At what point in time did you observe

12  these appearance issues that you claim?

13      A.  Through my -- the 30-some days Jerry was

14  employed, worked here while I was the sheriff.

15      Q.  All right.  And you allegedly told Jerry these

16  were issues?

17      A.  Yes.

18      Q.  Did you ever write him up?

19      A.  No, sir.

20      Q.  Did you ever put anything in writing to

21  document at all that you had expressed these issues to

22  Jerry Darst?

23      A.  No, sir.

24      Q.  All right.  How about the attitude issues you

25  say you observed?  Did you ever express to Jerry Darst



 1  that there was a problem with his attitude?

 2      A.  Yes.  I told him multiple times I wanted

 3  proactive deputies.  That I wanted deputies that's

 4  going to go out there and be professional to the

 5  public, treat people with respect.

 6          Response time was a big issue when I first

 7  took over.  That we needed to be out in the county.

 8  And visibility.  And I told him as well as pretty much

 9  everybody in the department multiple times that that's

10  what the expectations was.

11      Q.  Did you ever write Jerry Darst up for

12  allegedly having a poor attitude?

13      A.  No, sir.

14      Q.  Do you have any documentation at all that you

15  had warned or admonished Jerry Darst in any way about

16  his attitude?

17      A.  No, sir.

18      Q.  All right.  Any other alleged performance or

19  behavioral issues with Jerry Darst that you personally

20  observed other than attitude or appearance?

21      A.  I read several of his reports.  And I

22  concurred -- after hearing the reports from the other

23  supervisors, I reviewed a bunch of Jerry's reports.

24  They were just not satisfactory.  They were poorly

25  written.  You could tell they were very short in



1  nature and they didn't describe the entire

2  circumstances.  The basics.  The who, what, when,

3  where reporting 101 of law enforcement.

4       Q.  Did you ever tell Jerry Darst your opinion on

5  this?

6       A.  Yes.  I told him that we needed -- him and,

7  again, about everybody else.  Because that was a thing

8  that we were struggling with, was details in the

9  report.  That's something the prosecutor commonly said

10 we needed to make improvements on.  So, yes, I talked

11 to Jerry Darst about being more detailed, getting his

12 reports done more timely, and doing more thorough

13 reports and double-checking his reports for

14 grammatical errors.

15      Q.  Can you give me an example of a report done by

16 Jerry Darst that was allegedly tardy?

17      A.  No, sir, not specifically.

18      Q.  You have no example of that?

19      A.  No, sir.

20      Q.  You can't say on X date, you know, Jerry Darst

21 did this report about this incident and it came in

22 late?

23      A.  No, sir.

24      Q.  Can you give me a specific example of a report

25 that Jerry Darst did that you say was poorly written?



SHERIFF SCOTT FITCH                                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                      50

1       A.  No, sir.

2       Q.  You can't tell me, like, on X date this report

3   about Y incident was poorly written for these reasons,

4   X, Y and Z?  You can't tell me that?

5       A.  No, sir.

6       Q.  Did you ever write Jerry Darst up for having a

7   poor report?

8       A.  No, sir.

9       Q.  Do you have any documentation, any discipline

10  of Jerry Darst for having a poor report?

11      A.  No, sir.

12      Q.  All right.  Any other alleged performance or

13  behavioral issues with Jerry Darst that you personally

14  observed?

15      A.  Not that I recall specifics right now, no,

16  sir.

17      Q.  All right.  You said Jerry Darst was tardy; is

18  that right?

19      A.  That was what was told to me, yes.

20      Q.  Like he showed up late to work; is that what

21  you mean by that?

22      A.  Well, I believe, if I'm not mistaken, that he

23  was late getting in the office.  I don't know if he

24  was tardy for being in the county.  There's a

25  difference.  Used to be deputies was required to be in



1    the county ten minutes before the start of their shift

2    and then be on scene.  For that and I believe some

3    court appearances or some training that I believe he

4    was said to have been late on.  It may have been some

5    K-9 training as well.

6        Q.  Okay.  So you're saying there are various

7    instances when Jerry Darst was allegedly late to some

8    work function he should have been at on time?

9        A.  Yes, sir.

10       Q.  Can you give me any specific examples of dates

11   or specific functions he was late to?

12       A.  No, sir.

13       Q.  You have nothing you can tell me about, hey,

14   on X date, Jerry Darst was supposed to be in this

15   location doing this job, and he was, you know, Y

16   minutes late?  You can't tell me that?

17       A.  No, sir.  And part of the reason why is, when

18   I first got appointed sheriff, obviously it was a

19   trying time for the department.  It was a stressful

20   time for the department.  And I had a lot of -- Meigs

21   County Sheriff's Office previously had never had an

22   FTO program.  A regimented FTO program, which stands

23   for Field Training Officer Program.

24           I have since implemented an FTO training

25   program where we get weekly reports or actually



 1   biweekly reports of performances, what was observed,

 2   what was not observed.  It's the state model that Ohio

 3   recommends for officers to go through.

 4        At the time Jerry was hired, the Meigs County

 5   Sheriff's Office never had any FTO program in place.

 6   So, therefore, I didn't have the documentations and

 7   things that, for example, I would now for a

 8   probationary agent.

 9        Q.  So you're saying you were incapable of writing

10   up Jerry Darst for any of these alleged infractions

11   that you've been talking about today?

12        A.  No, sir, I'm not saying that at all.

13        Q.  Okay.  So you agree with me, you had surely an

14   opportunity to write up Jerry Darst if he was doing

15   something wrong or violating the rules, including

16   tardiness; right?

17        A.  I could have, yes.  But I elected to --

18   because he was a probationary agent and because I was

19   a newly appointed sheriff, I found that every

20   leadership course or training I've ever had, a new

21   employer, when they come into office, being

22   heavy-handed with discipline is not something that

23   normally transforms well to the continuity and the

24   culture of the department.

25        I believe in talking with people the first



 1  time -- depending on the severity of things.  But if
 2  guys are not doing what they need to be doing, then I
 3  believe in sitting them down and talking to them
 4  man-to-man.  That's just the way I was raised, and
 5  that's the way I wanted to be treated when I was a
 6  deputy sheriff throughout my career.
 7      Q.  Remind me again when you were appointed
 8  sheriff.
 9      A.  November 22nd of 2022.
10      Q.  All right.  I'm going to share with you what
11  we'll call Exhibit 4.  And I'm going to screen share
12  it for you.
13          (Exhibit 4, Written Reprimand, was marked for
14  identification.)
15  BY ATTORNEY STARLING:
16      Q.  Can you see it?
17      A.  Yes, sir.
18      Q.  Do you recognize Exhibit 4?
19      A.  Yes, sir.
20      Q.  This is a written reprimand, is it not?
21      A.  Yes, sir.
22      Q.  And the date reads December 14, 2022; right?
23      A.  Yes, sir.
24      Q.  And there's this big label at the top that
25  says "Meigs County Sheriff's Office," and then it says



```
 1   your name, Sheriff Scott Fitch; right?
 2        A.  Yes, sir.
 3        Q.  And December 14, 2022 would have been a month
 4   after you were appointed; right?
 5        A.  Approximately, yes.
 6        Q.  And that would have been the time when you
 7   just started as sheriff in that time of turmoil you
 8   testified to; right?
 9        A.  Yes, sir.
10        Q.  And it would have been during that time period
11   where you said you don't want to come in so
12   heavy-handed, according to these leadership courses,
13   and start disciplining people; right?
14        A.  Absolutely.
15        Q.  And despite that testimony that you just gave
16   us, we now have a written reprimand, it appears, of
17   Marty Hutton sitting in front of you as Exhibit 4; is
18   that right?
19        A.  Yes, sir.  If you've had an opportunity -- I'm
20   sorry?
21        Q.  Okay.  It's okay.  We'll get to your
22   explanation.  But this is a written reprimand of Marty
23   Hutton; is that right?
24        A.  Yes, which was -- I'm sorry, which was a
25   non-probationary deputy.
```



 1      Q.  Okay.  Well, he was still a new employee of
 2   yours; correct?
 3      A.  He was a long -- a tenured deputy at the Meigs
 4   County Sheriff's Office.  But, yes, he was -- I mean,
 5   I was a new sheriff, yes.
 6      Q.  Okay.  And regardless of whether probationary
 7   or non-probationary, your management courses tell you
 8   don't come in and be so heavy-handed on discipline
 9   when you're talking to a new group of employees whose
10   boss you just became; right?
11      A.  Yes.
12      Q.  Okay.  Well, here, clearly you had the
13   capability of writing up Marty Hutton for some kind of
14   wrongdoing; is that right?
15      A.  Yes, sir.
16      Q.  And if you look down there at the bottom of
17   Exhibit 4, there's a signature of sheriff.  Do you see
18   that?
19      A.  Yes, sir.
20      Q.  Is that your signature?
21      A.  That's my signature.
22      Q.  And then next to it there's a date, which
23   appears to be December 14th, 2022; is that right?
24      A.  Yes, sir.
25      Q.  Is that the date you signed this Exhibit 4?



1      A.  Yes, sir.

2      Q.  So, you know, a month into your tenure, you're

3  fully capable of disciplining Marty Hutton with a

4  written reprimand; right?

5      A.  Yes, sir.  But if you review that very

6  document that you've listed as Exhibit 4, you'll see

7  that those instances, the majority of them, was prior

8  to me becoming sheriff.

9          So the difference with Mr. Hutton was, this

10  was an ongoing problem before -- prior to me becoming

11  sheriff.

12      Q.  All right.

13      A.  This wasn't just an incident of absenteeism

14  based off my tenure as sheriff.  This was previous

15  instances.

16      Q.  Okay.  Are you saying that all these alleged

17  performance issues that you identified with Jerry

18  Darst were not ongoing, but instead isolated?

19      A.  No, they were ongoing in his few months being

20  at work at the sheriff's office.

21      Q.  All right.  And are you saying they didn't

22  precede your tenure, unlike Marty Hutton?

23      A.  Oh, no, they certainly did.  No, sir, I'm not

24  saying that at all.

25      Q.  All right.  So there's not much of a



 1  difference between Marty Hutton's alleged failures

 2  here and the alleged failures of Jerry Darst; right?

 3          ATTORNEY TEETOR:  Objection.

 4      A.  Well, yeah, Jerry Darst was never -- I never

 5  mentioned absenteeism or sick leave abuse as any of

 6  Jerry's deficiencies.

 7      Q.  Okay.  Sheriff, my question -- you know, you

 8  were sitting there trying to distinguish for me by

 9  saying, well, he's not probationary.  And we

10  established that that wasn't an issue in terms of

11  being able to issue a written reprimand.

12          And then you talked about how these

13  absenteeism issues from Marty Hutton preceded your

14  time as sheriff.  And, you know, that's no different

15  than what you're claiming for Jerry Darst; right?

16          ATTORNEY TEETOR:  Objection.

17      A.  The difference is, I think Marty Hutton had

18  already been disciplined for absenteeism.  So he had

19  already had kind of his verbal warnings.  So there

20  wasn't -- I consider that a huge distinction.

21      Q.  Didn't you testify to me earlier that you gave

22  verbal warnings to Jerry Darst, because you talked to

23  him about some of these issues?

24      A.  I talked to him kind of more as a coaching

25  method when somebody is in the field training as



1  opposed to warning them or disciplining them verbally.

2  There's a big difference.

3      Q.  What's the difference between coaching an

4  employee on alleged performance issues and verbally

5  warning them?

6      A.  Well, they're -- it's a teaching versus

7  discipline.

8          The one's a teaching method where you try to

9  correct the behavior without having to resort to

10  discipline.

11         The other one obviously is, when that has

12  failed, then you elevate that to discipline in the

13  form of written reprimands or verbal reprimands or

14  suspension or termination.

15     Q.  Right.  So this notion of progressive

16  discipline.  Do you understand that term?

17     A.  Absolutely.

18     Q.  Okay.  We'll get to that.

19         All right.  Now you talked about Jerry Darst's

20  appearance.

21     A.  Uh-huh.

22     Q.  Have we exhausted that discussion?  Have you

23  told me everything that you personally observed about

24  that?

25     A.  Yes, sir.



1        Q.   Any specific instances you can give me where,

2   hey, on this date, I came outside, looked in Jerry

3   Darst's patrol -- or cruiser -- and it was messy?

4        A.   No, sir.

5        Q.   Can't give me a date or anything like that?

6        A.   No, sir.

7        Q.   No details whatsoever?

8        A.   Other than the details I provided earlier, no,

9   sir.

10       Q.   Just that it was messy?

11       A.   Yes.  Dirty, messy, unclean.

12       Q.   In what way was it dirty or messy?

13       A.   Well, the way any vehicle would be.  Obviously

14   we patrol back roads in this county, so there's -- but

15   you can tell when you see a vehicle multiple days and

16   it stays -- and it looks like it hasn't been cleaned,

17   then that would be considered dirty.

18            Looking inside when there's cups and chip bags

19   and candy wrappers and things laying around throughout

20   the car, that would be the interior being dirty.

21       Q.   Okay.  So are you saying to me on some

22   particular occasion you observed Jerry Darst's cruiser

23   needing a car wash?

24       A.   Yes.

25       Q.   Okay.  When?  Where?



1          A.   Where?   At the Meigs County Sheriff's Office.

2               When?   Sometime between November 22nd and the

3    time he went off on leave within the 97 days he worked

4    while I was the sheriff.

5          Q.   At some nondescript time that you can't

6    remember; is that fair?

7          A.   Correct.

8          Q.   All right.   We talked about work ethic.   Do

9    you recall that?

10         A.   Uh-huh.   Yes.

11         Q.   Can you give me any specific instances of what

12   you mean by that?

13         A.   For where Jerry Darst was less than

14   satisfactory?

15         Q.   Yeah.   Any specific --

16         A.   I can't give specific dates or times.

17         Q.   Can you give a description of any incident

18   where you observed his work ethic not being

19   satisfactory?

20         A.   Like I mentioned earlier, Jerry just wanted to

21   sit in the office.   He didn't want -- he didn't want

22   to go out.   His philosophy and ideology of a deputy

23   sheriff was to sit around and wait on a call as

24   opposed to wanting to out and be proactive, be

25   visible, try to be, like I said, much more proactive



1  as opposed to reactive, interact with the county, the

2  citizens.

3      Q.  All right.  Can you give me a date and time

4  when you observed this?

5      A.  No, sir, other than the range that I've

6  previously given you.

7      Q.  Yeah.  Some nondescript time when he worked

8  there; right?

9      A.  Yes, sir.

10     Q.  Okay.  You talked about attitude; right?

11     A.  Yes, sir.

12     Q.  Any specific examples you can give there of

13 instances when Jerry exhibited a bad attitude?

14     A.  Like I had stated earlier, when I would talk

15 to him about the new vision of the sheriff's office

16 and how we wanted to move forward and change our

17 culture and ideology on our approach to things, Jerry

18 was not very receptive at all to it.

19     Q.  Okay.  Can you tell me when any of those

20 conversations occurred?

21     A.  Still the time that Jerry worked between

22 November 22nd and whenever he went off on leave.

23     Q.  So no idea what date?

24     A.  No, sir.  Not specific date.

25     Q.  Can you tell me anyone else who was allegedly



1   there when you had these conversations?

2        A.  On a couple of the occasions, I know that

3   Captain Frank Stewart and Bill Gilkey was present.

4        Q.  And where --

5        A.  And there was others around, but I don't

6   recall who they was.

7        Q.  All right.  And where did these conversations

8   allegedly take place?

9        A.  One was in -- that I recall -- was in Captain

10  Stewart's office.  I had several conversations with

11  Jerry inside my office out in what's known as the

12  deputy's briefing room, just inside the sheriff's

13  office.

14       Q.  Okay.  And you don't know when these happened

15  at all?

16       A.  Other than that time range that I gave you

17  from November -- the end of November of '22 to January

18  of '23.

19       Q.  Right.  Some nondescript time when Jerry

20  worked there?

21       A.  Yes.  Can't give an exact date or time.

22       Q.  All right.  You mentioned professionalism.  Do

23  you recall that?

24       A.  Yes.

25       Q.  What do you mean by that?



 1      A.  The way you treat people and interact with
 2   people.  Your appearance is part of your
 3   professionalism.  The way you handle yourself.  The
 4   way you talk with people and the way you interact.
 5   Jerry lacked professionalism, for sure.
 6      Q.  Any specific instances of lack of
 7   professionalism that you can describe for me?
 8      A.  I observed him several times dealing with
 9   people that would come in and do walk-in reports.
10   They would walk in off the street to come in and file
11   a report, and observed him interacting with citizens.
12   And Jerry was -- he just didn't present himself very
13   professional.  He was nice enough.  But he didn't come
14   off as very professional.  He didn't appear very
15   professional.  He didn't appear that he -- with any
16   confidence or that he knew the law.
17           And, honestly, he kind of gave me the
18   impression that they were bothering him, that he
19   didn't have time to fool with them.  And that's not
20   something that I think is -- you know, people take the
21   time to come in and file a report, they deserve our
22   full attention.
23      Q.  Okay.  Anything else you mean by
24   "professionalism"?
25      A.  No, sir.



1       Q.  Any other instances of alleged lack of

2    professionalism that you can describe for me?

3       A.  No, other than the things I stated earlier

4    with his appearance and the way he carries himself.

5       Q.  I'm going to mark what we'll call Exhibit 5.

6           ATTORNEY TEETOR:  Can we take about a five- or

7    ten-minute break for restroom?

8           ATTORNEY STARLING:  Yeah.  Why don't we come

9    back at 11:25?  That's fine.  Thank you.

10          (Off the record.)

11   BY ATTORNEY STARLING:

12      Q.  All right, Sheriff, before we switch topics

13   here, I just want to ask you, any other reasons for

14   firing Jerry Darst that we haven't talked about today?

15      A.  No, sir, not that I recall.

16      Q.  Any other specific instances of those reasons

17   that we haven't talked about today?

18      A.  No, sir.

19      Q.  Okay.  I'm going to mark another exhibit for

20   you.  Give me a minute here.

21      A.  Okay.

22      Q.  This one, I believe, is Exhibit 5.  I'll

23   screen share it with you.

24          Can you see it, Sheriff?

25          (Exhibit 5, Job Application for Meigs County



1  Sheriff's Office, was marked for identification.)

2       A.  Yes, sir.

3       Q.  All right.  Do you recognize Exhibit 5?

4       A.  Yes, sir.

5       Q.  What is Exhibit 5?

6       A.  It looks like an early-on job application for

7  qualifications for a Meigs County sheriff.

8       Q.  All right.  For a deputy sheriff; right?

9       A.  Yes.

10      Q.  All right.  Is this an accurate list of

11  qualifications for being a deputy sheriff in your

12  office?

13      A.  It appears to be, yes, sir.

14      Q.  All right.  I want to go through the first

15  hashmark here.  It says, "Must be a high school

16  graduate or equivalent."  Do you see that?

17      A.  Yes.

18      Q.  Did Jerry Darst have that qualification?

19      A.  I would assume because he was hired prior to

20  my being appointed.

21      Q.  Any reason to believe he wasn't a high school

22  graduate?

23      A.  No, sir.

24      Q.  All right.  Let's go to the second one here.

25  It says, "Must possess a current Ohio Peace Officer



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
66

1  Training certificate."  Do you see that?

2       A.  Yes.

3       Q.  Did Jerry Darst have that certificate when he

4  was employed by Meigs County Sheriff?

5       A.  I would assume so, again, because he was

6  employed prior to my starting.

7       Q.  All right.  You don't have any reason to

8  believe he didn't have that certificate; right?

9       A.  Correct.

10      Q.  All right.  And then if we go to the third

11  hashmark here, it says, "Must possess a valid Ohio

12  driver's license."  Do you see that?

13      A.  Yes.

14      Q.  And to your knowledge, did Jerry Darst have a

15  valid Ohio driver's license when working for your

16  office?

17      A.  I assume he did, yes.

18      Q.  No reason to dispute it, right?

19      A.  Correct.

20      Q.  If we go to the next listing here, it says,

21  "Have a clean driving record."  Do you see that?

22      A.  Yes.

23      Q.  To your knowledge, did Jerry Darst have a

24  clean driving record when he worked for the Meigs

25  County Sheriff?



 1      A.  I have no knowledge of Jerry Darst's driving
 2  history or record.
 3      Q.  Any reason to believe he didn't have a clean
 4  driving record?
 5      A.  No.
 6      Q.  The next one listed here says, "Must not have
 7  been convicted of any felony crime or serious
 8  misdemeanor crime."  Do you see that?
 9      A.  Yes, sir.
10      Q.  To your knowledge, has Jerry Darst ever been
11  convicted of a felony crime or serious misdemeanor?
12      A.  No, sir, not to my knowledge.
13      Q.  All right.  And I want to differentiate
14  between the listings here on this posting or
15  Exhibit 5, okay?
16      A.  Okay.
17      Q.  Now, up here where I'm highlighting, it looks
18  like we have qualifications and then those five hash
19  points that we went through; right?
20      A.  Yes.
21      Q.  And then, below it, we have duties and several
22  other hashmarks.  Do you see that?
23      A.  Yes, sir.
24      Q.  So the first five that we talked about were
25  the qualifications; is that right?



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                               68

```
1        A.  Correct.

2        Q.  And then the other listings or items that

3   follow duties are the job duties of the deputy sheriff

4   position; is that right?

5        A.  Correct.

6        Q.  I'm going to go ahead and mark what we'll call

7   Exhibit 6.  And I'll screen share it with you, okay?

8        A.  Yes, sir.

9            (Exhibit 6, Jerry Darst's Personnel File, was

10  marked for identification.)

11  BY ATTORNEY STARLING:

12       Q.  And this is several pages.  I'm going to

13  scroll through them and ask you if you recognize the

14  exhibit, all right?

15       A.  Yes, sir.

16       Q.  All right.  Have you seen the seven pages of

17  Exhibit 6?

18       A.  Yes.

19       Q.  Is this Jerry Darst's personnel file from the

20  Meigs County Sheriff's Office?

21       A.  It appears to be, yes, sir.  Those are

22  documents that all should be in his personnel file.

23       Q.  All right.  I want to start with page 1 of his

24  personnel file.  It says, "Appointment of Deputy

25  Sheriff Commission."  Do you see that?
```



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                              69

1        A.  Yes, sir.

2        Q.  And this is the appointment of Jerry Darst to

3   serve as a deputy sheriff for the Meigs County

4   Sheriff's Office; is that right?

5        A.  Yes.

6        Q.  And that date of appointment was November 22,

7   2022; is that correct?

8        A.  Correct.

9        Q.  And it says, "Signature of appointing

10  authority."  Do you see that portion?

11       A.  Yes.

12       Q.  Is that your signature there?

13       A.  Yes, sir, it is.

14       Q.  And it says, "By signing below, I hereby swear

15  or affirm that the above-named individual is appointed

16  to the above position pursuant to the authority vested

17  in me by 311.04 of the Ohio Revised Code, and that the

18  individual has personally appeared before me and

19  signed this oath in my presence."  Do you see that?

20       A.  Yes, sir.

21       Q.  Before you gave Jerry Darst this commission,

22  did you ensure he met those qualifications we went

23  over in Exhibit 5?

24       A.  Actually, no.  Everyone was issued that.  Upon

25  being appointed sheriff, everyone that was currently



1  employed at the Meigs County Sheriff's Office took

2  that very same oath and signed that very same paper on

3  my first day.  So I was relying upon all previous

4  employees that they had already met those

5  qualifications.

6      Q.  Okay.  Did you have to do anything as sheriff

7  before reappointing them to check and ensure that they

8  met those qualifications?

9      A.  No, sir.

10     Q.  All right.  Fair enough.  I'm going to go down

11  to, looks like page 5 here.  Do you see that?

12     A.  Yes, sir.

13     Q.  This appears to be a criminal history record

14  check for Jerry Darst; is that correct?

15     A.  Yes, sir.

16     Q.  And it says, "Completed date, July 18, 2022."

17  Do you see that?

18     A.  Yes, sir.

19     Q.  If we continue on, it shows that there's no

20  record of convictions for this individual; is that

21  right?

22     A.  Correct.

23     Q.  All right.  So as far as you know from Jerry

24  Darst's personnel file here, he had no criminal

25  convictions while he worked for the Meigs County



1    Sheriff's Office?

2        A.  Correct.

3        Q.  Any other documents in Jerry Darst's personnel

4    file other than these seven pages?

5        A.  I don't have Jerry Darst's personnel file

6    readily available with me right here, but probably

7    not.  That seems to be a true and accurate

8    representation of what would be in his personnel file.

9        Q.  It seems to be or is, to the best of your

10   knowledge?

11       A.  To the best of my knowledge, it is.

12       Q.  All right.  I appreciate that.  Would written

13   reprimands or other documentation of discipline be in

14   a personnel file at the Meigs County Sheriff's Office?

15       A.  Yes, sir.

16       Q.  All right.  So is it fair to say that because

17   Jerry Darst's personnel file does not have any such

18   written reprimands or other documentation of

19   discipline, he never received any formal discipline

20   while he was employed by your office?

21       A.  Correct.  Jerry Darst did not receive any

22   formal discipline at least -- well, the time -- as to

23   my knowledge, not prior either, but definitely not

24   while I was the sheriff.

25       Q.  Okay.  The only discipline he got was you



 1   firing him in, what, July of 2023 or August of 2023?

 2    A. Correct. And I wouldn't necessarily define

 3   that as discipline, but, correct.

 4    Q. You wouldn't define termination of employment

 5   as discipline?

 6    A. No. Just unsatisfactorily met his

 7   probationary requirements, as I seen them. I mean, I

 8   guess you could -- one view of would be termination

 9   would be a form of discipline. It was just, he just

10   didn't make probation.

11    Q. All right. I'm going to go ahead and screen

12   share with you Exhibit 7.

13    A. Okay.

14     (Exhibit 7, Code of Conduct for the Meigs

15   County Sheriff's Office, was marked for

16   identification.)

17   BY ATTORNEY STARLING:

18    Q. Do you recognize Exhibit 7?

19    A. Yes.

20    Q. What is Exhibit 7?

21    A. It's an old policy and procedure for the Meigs

22   County Sheriff's Office that appears to have been

23   implemented under Sheriff Keith Wood on 4/24/17 that

24   outlines -- "conduct themselves professionally and

25   responsibly and above reproach at all times. Shall



 1  follow control of rules and policies" -- yes, policies

 2  and procedures code of conduct.

 3      Q.  All right.  So this is the code of conduct for

 4  Meigs County Sheriff's Office; right?

 5      A.  It was at that time Jerry was terminated.

 6      Q.  This was in place at the time Jerry was

 7  terminated?

 8      A.  Yes.  I believe -- we have all new policies

 9  and procedures.

10      Q.  Okay.

11      A.  I'm sure the one we have now is very similar,

12  but that -- on the old form that was done by the

13  previous administration.

14      Q.  Well, I think what I'm concerned with is which

15  code of conduct was in place when Jerry was

16  terminated.  And are you telling me this code of

17  conduct was in place when he was terminated?

18      A.  Yes, sir.

19      Q.  I want to go through it, then.

20      A.  Okay.

21      Q.  Because we've got some types of misconduct

22  that are listed here, all right?

23      A.  Okay.

24      Q.  So one of the types of misconduct listed here

25  is Section 2.05.6, Unsatisfactory Performance.  Do you



1  see that?

2      A.  Yes, sir.

3      Q.  Would anything that Jerry Darst did poorly, in

4  your opinion, as a Meigs County deputy sheriff, fit

5  under this unsatisfactory performance category?

6          ATTORNEY TEETOR:  Objection.

7      A.  Can you make that a little larger so I can see

8  it, please, and read it?

9      Q.  Absolutely.  Can you see it now?

10     A.  Yes.  Thank you.  Give me just one moment.

11         Okay.  I've read it.

12     Q.  Would anything that Jerry Darst did that led

13 to his termination according to you constitute

14 unsatisfactory performance?

15         ATTORNEY TEETOR:  Same objection.

16     A.  Yes.

17     Q.  What things that Jerry Darst allegedly did

18 would constitute unsatisfactory performance, in your

19 opinion?

20     A.  Pretty much everything I've already told you

21 previously.  Poor reports, timeliness, tardiness,

22 thoroughness of reports, attitude, appearance,

23 professionalism, work ethic.

24     Q.  All right.  So all of those reasons that you

25 listed for firing Jerry Darst, they fall under this



```
 1   Section 2.05.6 for unsatisfactory performance; is that
 2   right?
 3        A.  Correct.
 4        Q.  There's another category here, 2.05.13,
 5   Reporting for Duty.  Do you see that?
 6        A.  Yes, sir.
 7        Q.  All right.  And would anything that Jerry
 8   Darst did, according to you, fall under this category
 9   of reporting for duty?
10        A.  At least not -- I had reports of him not being
11   in the office in a timely fashion.  So, yes.
12        Q.  All right.  Let me --
13        A.  As well as -- I'm sorry.  It also touched on
14   the uniform appearance.
15        Q.  Okay.  Go ahead and finish your answer.  I
16   didn't mean to cut you off.
17        A.  No, no, no.  That section there also talked
18   about uniform appearance.  And, I mean, I talked about
19   Jerry's appearance and professionalism when he
20   reported for duty at the Meigs County Sheriff's Office
21   also.
22        Q.  All right.  If we look up at the top of this
23   code of conduct policy, it applies to all personnel at
24   the Meigs County Sheriff's Office; right?
25        A.  Correct.
```



1      Q.   Whether probationary or non-probationary?

2      A.   Correct.

3      Q.   All right.  And then I also want to refer you

4    to this Section 2.05.21, Personal Appearance.  Do you

5    see that?

6      A.   Yes, sir.

7      Q.   Would that apply to anything that Jerry Darst

8    allegedly did, according to you?

9      A.   Yes, sir.

10     Q.   What?

11     A.   The fact that his uniform was never neat.  His

12   boots were dirty.  They weren't shined.  His leather

13   gear and nylon gear that he carried was often dirty.

14   His uniform was, like I said, it just wasn't kept very

15   professional.  It was never pressed.  It just didn't

16   have a good appearance.

17     Q.   All right.  There's another section here,

18   2.05.26, Departmental Reports.  Do you see that?

19     A.   Yes, sir.

20     Q.   Would that apply to anything that Jerry Darst

21   allegedly did, according to you?

22     A.   He didn't submit his reports on time, which

23   was reported to me.  I believe that they were

24   truthful.  I've never alleged that they were not

25   truthful.  They were not complete, again, because they



 1 | didn't have details.  A lot of his reports would be
 2 | two or three sentences.  But I never -- I never
 3 | thought of Jerry falsely or improperly filing a
 4 | report.
 5 |     Q.  Well, I understand that, but it sounds like
 6 | you're saying this section applied for the timeliness
 7 | of the reports and the completeness of the reports; is
 8 | that fair?
 9 |     A.  Correct.  Yes, sir.
10 |     Q.  All right.  If we go down to Section 2.05.36,
11 | it says, "Disciplinary System."  Do you see that?
12 |     A.  Yes, sir.
13 |     Q.  And it talks about Group I, Group II, and
14 | Group III offenses; do you see that?
15 |     A.  Yes, sir.
16 |     Q.  All right.  What is your understanding of the
17 | Group I, Group II and Group III offenses under the
18 | code of conduct?
19 |     A.  Group I is relatively minor in nature of
20 | misconduct.
21 |         Group II is a little more severe.
22 |         And Group III would be defined as very
23 | serious.
24 |     Q.  And there's progressive discipline depending
25 | on where the infraction falls in Group I, Group II, or



```
 1   Group III; is that right?
 2        A.  Yes.
 3        Q.  If we go down here, we can see that Group I
 4   offenses have a progressive discipline, four-step
 5   process; right?
 6        A.  Yes, sir.
 7        Q.  So for a first offense of a Group I, you get a
 8   verbal or written reprimand.  That has to be recorded
 9   or signed by the employee; is that right?
10        A.  Yes, sir.
11        Q.  For a second offense of Group I, you get up to
12   a three-day suspension without pay; is that right?
13        A.  Yes.
14        Q.  And then for a third offense of Group I
15   offenses, you get up to a ten-day suspension without
16   pay or reduction in classification?
17        A.  Yes, sir.
18        Q.  And then for fourth offense, you get up to and
19   including termination of employment; is that right?
20        A.  Yes, sir.
21        Q.  And then it gives examples of Group I
22   offenses.  Do you see these examples?
23        A.  Yes, sir, I do.
24        Q.  And I want to direct your attention to a few
25   of them.
```



```
 1            First off, we'll start down here on number 17,
 2    Inefficiency.  And it gives examples in parenthesis.
 3    Lack of application or effort on the job,
 4    unsatisfactory performance, failure to maintain
 5    required performance standards, et cetera?
 6        A.  Yes, sir.
 7        Q.  And you previously described all your issues
 8    with Jerry Darst as being unsatisfactory performance;
 9    is that fair?
10        A.  Yes, sir.
11        Q.  So would you agree with me that all the
12    reasons that you gave for terminating Jerry Darst
13    would fall under Group I offenses?
14        A.  Yes, sir.
15        Q.  All right.  If we go back up to the
16    progressive discipline here, you did not follow this
17    with respect to Jerry Darst, did you?
18        A.  No, he was never issued verbal or a written
19    reprimand.
20        Q.  So I'm correct, you did not follow the code of
21    conduct's progressive disciplinary policy with respect
22    to Jerry Darst?
23        A.  He was not issued discipline.
24        Q.  All right.  You did not go through the first,
25    second, third, and fourth offense steps with Jerry
```



1    Darst; right?

2         A.   Correct.  I elected to try to coach and teach

3    Mr. Darst.  But, again, the issue was, it was

4    only -- he only worked for about six weeks under my

5    tenure.  So really didn't have a lot of time to issue

6    verbal or written reprimands.

7         Q.   Okay.  So you're saying you were rushing too

8    fast to terminate him to have time to go through the

9    step process?

10        A.   No, sir, that's not what I said.  It's just,

11   Jerry Darst only worked, like, 34 days under me as the

12   sheriff.  And I was trying to give him -- like I

13   stated earlier, I was trying to give him the benefit

14   of the doubt and teach him and coach him before we got

15   to the disciplinary portions.  But he was fully aware

16   of his deficiencies.

17        Q.   Right.  I understand and appreciate your

18   explanations, but I just want to be very clear for the

19   record.  So I'm going to ask you a series of

20   questions, starting with this one:  We both agree that

21   this code of conduct policy we've been reviewing

22   applied to Jerry Darst when he worked for you;

23   correct?

24        A.   Yes, sir.  Yes.

25        Q.   And to repeat your testimony earlier, you



 1  agree that everything you claim that Jerry Darst did

 2  that led to his termination were all Group I offenses;

 3  correct?

 4       A.  Yes, sir.

 5       Q.  And you agree you never issued a verbal or

 6  written reprimand as a first offense for any of those

 7  alleged shortcomings for Jerry Darst; right?

 8       A.  Yes, sir.

 9       Q.  And you agree that you never issued a second

10  offense for any of those alleged shortcomings for

11  Jerry Darst by suspending him for three days; right?

12       A.  Yes, sir.

13       Q.  And you agree that you never issued a third

14  defense for Jerry Darst for his alleged shortcomings

15  which would have been a ten-day suspension; right?

16       A.  Yes, sir.

17       Q.  You just skipped straight to the fourth

18  offense, up to and including termination; right?

19       A.  Well, the progressive discipline, in my

20  opinion, is different with a probationary officer.

21       Q.  All right.  We'll get to your explanation in a

22  second.  But just -- I appreciate that answer.  I just

23  need an answer to my question.  My question is:  You

24  just skipped straight to fourth offense, termination

25  of employment; correct?



SHERIFF SCOTT FITCH                              September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                              82

```
 1            ATTORNEY TEETOR:  Objection.  Asked and
 2    answered.
 3            Go ahead.
 4       A.  Yes.
 5       Q.  So you did not follow the step progressive
 6    discipline in the code of conduct policy; correct?
 7            ATTORNEY TEETOR:  Objection.  Asked and
 8    answered.
 9            Go ahead.
10       A.  Jerry was not ever given a verbal or written
11    reprimand, so there was no, quote, "discipline."
12       Q.  I understand that.  We already went through
13    those questions.  I need a response to my question,
14    though.  My question is:  You did not follow this code
15    of conduct policy when you skipped straight to
16    termination for Jerry Darst?  Yes or no?
17            ATTORNEY TEETOR:  Objection.  Asked and
18    answered.
19            You can go ahead.
20       A.  Correct.  It did not apply.
21       Q.  You're now telling me that this code of
22    conduct policy does not apply to probationary
23    employees; is that your explanation?
24       A.  No, sir.
25       Q.  I thought we established earlier with your
```



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                               83

1  testimony if you go back up to the policy that it
2  applies to all employees; right?
3      A.  Yes, sir.
4      Q.  Is there anywhere in this code of conduct
5  policy where it says it does not apply to probationary
6  employees?
7      A.  No, sir.
8      Q.  All right.  Let's go to the union contract.
9  And I'm going to take you to Article 9 and refresh
10 your memory with the union contract as Exhibit 2.  Do
11 you see Article 9 in the union contract?
12     A.  Yes, sir.  Can you make that a little bigger,
13 please?
14     Q.  Absolutely.
15     A.  There you go.  Thank you.
16     Q.  Do you see it?
17     A.  Yes, sir, I do.
18     Q.  Article 9 is entitled Discipline, is it not?
19     A.  Yeah.  It outlines the progressive discipline
20 for just cause, and it's a form of disciplinary
21 actions.
22     Q.  And Article 9 is entitled Discipline; correct?
23     A.  Correct.
24     Q.  And as we established earlier, Jerry Darst,
25 despite being a probationary employee, was within the



 1  bargaining unit and represented by union; right?

 2      A.  Yes, sir.

 3      Q.  And, therefore, covered by the union contract;

 4  right?

 5      A.  Yes, sir.

 6      Q.  That's why you went and talked to Rick Smith

 7  about extending his probationary period, because you

 8  had to consult with the union; right?

 9      A.  Yes, sir.

10      Q.  All right.  Now, Section 9.1 of the union

11  contract says, "No employee shall be reduced in pay or

12  position, suspended, discharged, removed, or otherwise

13  disciplined, except for just cause."  Do you see that?

14      A.  Yes, sir.

15      Q.  And then if we go down to Section 9.3, it

16  says, "Written reprimands shall cease to have force

17  and effect 12 months following their effective date,

18  providing there's no intervening disciplinary action

19  taken during that time period"; right?

20      A.  Yes, sir.

21      Q.  So under the union contract, when we look at

22  that code of conduct, you've got prior discipline that

23  falls off after 12 months, and it doesn't aggravate

24  the next step; fair?

25      A.  Correct.



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                  85

 1        Q.  Now, Section 9.6 says, "Whenever the employer

 2   determines that an employee may be suspended, reduced

 3   in pay or position, or terminated for disciplinary

 4   reasons, a disciplinary conference will be scheduled

 5   to give the employee an opportunity to offer an

 6   explanation of the alleged misconduct."  Do you see

 7   that?

 8        A.  Yes, sir.

 9        Q.  Did you ever have a disciplinary conference

10   with Jerry Darst?

11        A.  No, sir, never had an opportunity.

12        Q.  All right.  Why do you say you never had an

13   opportunity?

14        A.  Because, as I previously testified, I think

15   Jerry only worked 34 days for me with the time of me

16   being appointed sheriff.

17        Q.  All right.  Well, you also testified earlier

18   that you claimed to have verbally approached Jerry and

19   told him about these issues you were observing?

20        A.  Correct.  We had multiple conversations.

21        Q.  Right.  So you had a chance to have a

22   conversation, but not a chance to have a disciplinary

23   conference?

24        A.  No.  Like I just stated earlier, sir, is I

25   chose to try to coach Jerry and teach Jerry because



```
 1   it's an adjustment when there's a new sheriff.  And

 2   trying to get him to change his ways through that

 3   procedure, like I did -- like I did other deputies.

 4       Q.  All right.  Well, let's talk about his

 5   termination.

 6       A.  Okay.

 7       Q.  At some point, you made a decision to fire

 8   him; right?

 9       A.  Absolutely.

10       Q.  What was -- do you recall what date?

11       A.  It was in July of 2023.  I don't remember the

12   exact date.

13       Q.  All right.  Did you have a disciplinary

14   conference with Jerry then?

15       A.  No, sir.

16       Q.  Okay.  So you did not follow the collective

17   bargaining agreement, specifically Section 9.6, when

18   you chose to fire Jerry Darst; is that right?

19            ATTORNEY TEETOR:  Objection.

20            You can answer.

21       A.  No, I followed the probationary agent, I

22   believe it's Section 11.4.

23       Q.  Is there anything in this 9.6 or Section 9

24   that says probationary employees don't get

25   disciplinary conferences?
```



SHERIFF SCOTT FITCH                          September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                          87

 1          ATTORNEY TEETOR:  Objection.

 2          You can answer.

 3     A.   No, sir, not that I can see.

 4     Q.   Have you ever given a disciplinary conference

 5 to a probationary employee before?

 6     A.   I'm not sure, sir.

 7     Q.   Possible, you're just not sure?

 8     A.   I'm just not sure.

 9     Q.   Do you know if any of your predecessors have

10 ever given a disciplinary conference with a

11 probationary employee?

12     A.   I have no idea what they did or did not do.  I

13 was not a member of the Meigs County Sheriff's Office

14 prior to being appointed sheriff.

15     Q.   Okay.  So if we go down to Section 11.4 in the

16 collective bargaining agreement, do you see that in

17 front of you?

18     A.   Yes, sir.

19     Q.   This section talks about probationary

20 employees and the period of probation; is that right?

21     A.   Yes, sir.

22     Q.   And it says it continues for a period of

23 one year; right?

24     A.   Yes.

25     Q.   It does say, "Newly hired employees may be



1  removed any time during this probationary period";

2  right?

3       A.  Yes.

4       Q.  And you say that's not appealable to the

5  grievance procedure; right?

6       A.  Yes.

7       Q.  Is there anything in this Section 11.4 about

8  removal of probationary employees that says they don't

9  get a disciplinary conference?

10           ATTORNEY TEETOR:  Objection.

11      A.  No.  It just says that the removal should not

12  be appealable to the grievance procedure.

13      Q.  Did you -- well, let me back up.

14           After you made the decision to fire Jerry

15  Darst based upon the hearsay of what other people told

16  you and your own personal observations, did you ever

17  talk to Jerry Darst to get his side of the story

18  before firing him?

19      A.  No, sir, he never returned to work.

20      Q.  All right.  There's this modern invention

21  called telephones where you could call him to get his

22  explanation for the alleged shortcomings that you were

23  relying upon to fire him.  Did you ever call him to

24  get his explanation?

25      A.  No, sir.  I had the union contact him and try



 1  to get his union -- his probationary time continued so
 2  that way I could fairly evaluate him.  And Jerry
 3  declined.
 4      Q.  All right.  So I think the answer to my
 5  question is yes, but after you made the decision to
 6  fire Jerry Darst, you did not call him to get his side
 7  of the story on any of these alleged shortcomings you
 8  were relying upon to fire him; is that right?
 9      A.  Correct.  Once the determination was made,
10  there would have been no need to get an explanation.
11      Q.  Okay.  Prior to making that determination, did
12  you ever call or speak with Jerry Darst to get his
13  side of the story so you could fairly and accurately
14  decide whether to fire him?
15      A.  No, sir, I tried to do that through union,
16  Rick Smith, and Jerry declined.
17      Q.  No, you said that you went through Rick Smith
18  to extend his probationary period.  You didn't go
19  through Rick Smith to get Jerry's side of the story on
20  the alleged shortcomings and see if he would dispute
21  them with any sort of objective evidence; right?
22      A.  Correct.  I did tell Rick Smith about the
23  shortcomings, and he relayed that to Jerry Darst.
24      Q.  Did you say, "Rick, give me his side of the
25  story so I can see what he says"?



SHERIFF SCOTT FITCH                           September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                          90

 1        A.  No, I asked him what Jerry said, and he
 2   relayed to me that Jerry was not willing to extend his
 3   probationary period.  That I was going to be forced to
 4   make a decision based off his employment that he had
 5   had up to that time.
 6        Q.  All right.  So you never tried to schedule a
 7   disciplinary conference among yourself, Rick Smith as
 8   the union rep, and Jerry Darst; right?
 9             ATTORNEY TEETOR:  Objection.
10        A.  Correct.
11        Q.  You just relayed, through Rick Smith, an offer
12   to extend the probationary period, and that was it?
13             ATTORNEY TEETOR:  Objection.  You can answer.
14        A.  Correct.
15        Q.  I'm going to go ahead and mark Exhibit 8.  And
16   I'll screen share with you.  Can you see Exhibit 8,
17   Sheriff?
18             (Exhibit 8, Written Reprimand to Marty Hutton,
19   was marked for identification.)
20        A.  Could you enlarge that also, please?
21        Q.  Sure, absolutely.  Can you see Exhibit 8?
22        A.  Yes, sir.
23        Q.  Do you recognize Exhibit 8?
24        A.  Yes.
25        Q.  What is Exhibit 8?



1       A.  It appears to be a written reprimand to Marty

2   Hutton for an offense of the rules of conduct for

3   basically -- let's see -- position while on

4   duty -- for failing to do his duties.

5       Q.  Was this an instance of Marty Hutton being

6   unprofessional?

7       A.  No.  No, this was him not doing his job.

8           There was an individual with a warrant for his

9   arrest, and Marty had numerous opportunities to arrest

10  him and allowed the individual to go into his house,

11  creating an officer safety issue.

12      Q.  Okay.  Now, you categorized it as a Group III

13  offense.  Do you see that?

14      A.  Yes, sir.

15      Q.  Section 17 of the rules of conduct.  Do you

16  see that?

17      A.  Yes.

18      Q.  Willful neglect in the performance of assigned

19  duties; is that right?

20      A.  Yes.

21      Q.  And if we go back to Exhibit 7, which is the

22  code of conduct, and we look at Group III offenses,

23  that's terminable on a first offense; right?

24      A.  Yes.

25      Q.  All right.  And you did not terminate Marty



SHERIFF SCOTT FITCH                                   September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                    92

 1    Hutton, did you?
 2         A.   No, sir.
 3         Q.   How old is Marty Hutton?
 4         A.   I have no idea how old Marty Hutton is.
 5         Q.   Have you ever met Marty Hutton in person?
 6         A.   Yes.
 7         Q.   How many times?
 8         A.   Sir, I don't know.  Multiple.
 9         Q.   All right.  Over a hundred?
10         A.   Maybe.
11         Q.   I mean, you've worked with him in person for
12    how long?
13         A.   For a few months.
14         Q.   Okay.  And during that time, you know, give or
15    take, how many times have you seen him in person, best
16    estimate?
17         A.   Probably three or four times a week.
18         Q.   All right.  For several months?
19         A.   Yes.
20         Q.   And you're telling me you don't know Marty
21    Hutton's age?
22         A.   No, sir.
23         Q.   All right.  How many times have you seen Jerry
24    Darst in person?
25         A.   40, maybe.



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                93

```
 1        Q.  Okay.  Do you know how old -- sorry, finish
 2   your answer.  You said you saw him 40 times in person?
 3        A.  Yeah, approximately.
 4        Q.  All right.  Do you know Jerry Darst's age?
 5        A.  No, sir, I don't.
 6        Q.  You have no clue?
 7        A.  I know he's older than Marty Hutton, if that's
 8   what you're asking.
 9        Q.  Okay.  But you couldn't -- you couldn't give
10   me a guess on Jerry Darst's age?
11        A.  Fifties.  Sir, if you recall right, I barely
12   knew my girlfriend's age.  And I live with her.  So
13   it's hard for me to -- I don't go around wondering how
14   old somebody is.
15        Q.  Okay.  So, bottom line, you don't know how old
16   Jerry Darst is?
17        A.  Not exactly, no.  Never sent him no birthday
18   cards or cakes or anything like that.
19        Q.  I'm going to go ahead and mark what we'll call
20   Exhibit 9.
21            (Exhibit 9, Written Reprimand to Ian Fennell,
22   was marked for identification.)
23   BY ATTORNEY STARLING:
24        Q.  Can you see Exhibit 9, Sheriff?
25        A.  Could you one time put that up for me, please?
```



SHERIFF SCOTT FITCH                                      September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                      94

 1   There you go.  Yes.
 2        Q.  All right.  Do you recognize Exhibit 9?
 3        A.  It's a written reprimand to former employee
 4   Ian Fennell.
 5        Q.  And it looks like it's a Group III offense of
 6   insubordination; right?
 7        A.  Yes, sir.
 8        Q.  And this was done on September 11th of 2024;
 9   correct?
10        A.  Yes, sir.
11        Q.  So did you continue to use the classification
12   of Group I, II and III offenses from that code of
13   conduct policy to this day?
14        A.  It would have been applicable to this, yes.
15        Q.  All right.  So your office has continued to do
16   discipline as Group I, II, or III offenses; fair?
17        A.  I believe the new contract that took effect
18   April 1st -- but yes, I do -- it's very similar, if
19   not the exact same, yes, sir.
20        Q.  And then you have different levels of step or
21   progressive discipline, based on the type of offense?
22        A.  Yes, sir.
23        Q.  Namely, whether it's Group I, II or III;
24   right?
25        A.  Correct.



1    Q.  So that's continued to this day, that sort of

2   progressive discipline policy that we saw in the code

3   of conduct; right?

4    A.  Correct.

5    Q.  So what happened here with Ian Fennell that

6   resulted in an insubordination reprimand?

7    A.  If I may -- I know it was through

8   insubordination.  He failed to do something that he

9   was told by a supervisor.  Oh, this is when he was

10  working a security detail that he was required to be

11  in a marked cruiser and uniform.  And he instead drove

12  his unmarked task force vehicle to the detail.

13   Q.  Okay.  And that resulted in an insubordination

14  violation?

15   A.  Correct.

16   Q.  Do you know how old Ian Fennell is?

17   A.  No, sir.

18   Q.  No idea?

19   A.  Maybe 40.  I don't know.  Again, I'm just

20  guessing.

21   Q.  How many times have you seen Ian Fennell in

22  person?

23   A.  A bunch.

24   Q.  What's "a bunch"?

25   A.  Sir, I don't know.  I don't count how many



 1  times I meet people.  A lot.  I don't know.  I don't

 2  know.  If you're looking for a numerical number as to

 3  that, I can't say.

 4      Q.  More or less than 50?

 5      A.  More.

 6      Q.  More or less than a hundred?

 7      A.  More.

 8      Q.  How long have you worked with him?

 9      A.  A couple years.

10      Q.  And how many times would you see him in person

11  in a week during those couple of years?

12      A.  He worked a lot at nights or with the task

13  force.  So, I don't know, maybe at least once a week,

14  twice a week, maybe.

15      Q.  Okay.  And you don't know how old Ian Fennell

16  is?

17      A.  Not exactly, sir.

18      Q.  Why did you only give him a written reprimand

19  for a Group III offense of insubordination?

20      A.  Like I stated earlier, I want to try to give

21  guys an opportunity to improve.  And I sat down and I

22  talked with Ian before.  And this is one of them

23  situations where I elected to go to a written

24  reprimand.  I thought it would correct the behavior.

25      Q.  I mean, isn't following orders as a police



1   officer a huge issue?

2       A.  It can be.  Depends on the orders.

3       Q.  Well, it's extremely important to follow all

4   lawful orders from a superior officer; right?

5       A.  Yes.

6       Q.  And Ian Fennell didn't do that here, right?

7       A.  Correct.  He stated he wasn't sure if he was

8   allowed to drive his personal vehicle or marked

9   cruiser.  Or not personal vehicle.  I'm sorry.  Task

10  force vehicle.  Unmarked.

11      Q.  All right.  Fair enough.  But you classified

12  it as insubordination, did you not?

13      A.  Correct.

14      Q.  If you thought it wasn't serious because of

15  the underlying content, you didn't have to classify it

16  as insubordination, did you?

17      A.  Wouldn't have had to.

18      Q.  All right.  I'm going to screen share what

19  we'll mark Exhibit 10.

20          (Exhibit 10, Termination Letter to Jerry

21  Darst, was marked for identification.)

22  BY ATTORNEY STARLING:

23      Q.  Do you recognize Exhibit 10?

24      A.  Yes, sir.

25      Q.  What is Exhibit 10?



1     A.  It's essentially a letter from me to Mr. Jerry

2   Darst terminating his employment from the Meigs County

3   Sheriff's Office dated July 10th of 2023.

4     Q.  All right.  So you fired Jerry Darst on

5   July 10, 2023; correct?

6     A.  Yes, sir.

7     Q.  When did you make the decision before this?

8     A.  It would have probably been, if not the same

9   day, the day prior.  Maybe two days, at the most.

10     Q.  All right.  I want to go down to this

11   paragraph I'm going to highlight here as the fourth

12   from last.  It says, "In discussing your work

13   performance with staff that worked with you during

14   your time at MCSO" -- which I take is the acronym for

15   your office -- "it was reported that your work

16   performance was unsatisfactory.  Some of the

17   deficiencies listed were dependability,

18   professionalism, lack of motivation, poor attitude,

19   timeliness of reports, and uniform appearance."  Do

20   you see that?

21     A.  Yes, sir.

22     Q.  All right.  We didn't talk about dependability

23   before, so I want to talk about it now.  Do you see

24   where "dependability" is listed there?

25     A.  Yes, sir.



1      Q.  Was that another reason why you allegedly

2   terminated Jerry Darst?

3      A.  Yeah, I didn't think I defined it as

4   dependability.  But, yeah, when I was talking about

5   Jerry being available for calls instead of taking what

6   should be a 20-minute call and turning it into an

7   hour-long call, his coworkers couldn't depend on him

8   to be there for backup or to handle his fair share of

9   calls.

10     Q.  Anything else you meant by "dependability"?

11     A.  No, sir.

12     Q.  Was part of the reason you fired Jerry Darst

13  because he was out on medical leave?

14     A.  No, sir.

15     Q.  Was part of the reason that you fired Jerry

16  Darst that he was out on medical leave for too long?

17     A.  No, sir.

18     Q.  Okay.  Sheriff, did you ever refer to Jerry

19  Darst as "Grandpa"?

20     A.  Not that I ever recall.

21     Q.  You said not that you recall.  Are you saying

22  it's possible, or are you affirmatively testifying it

23  never happened?

24     A.  Sir, I don't recall.  It doesn't sound like

25  something -- I think -- I think I'm probably older



1   than Jerry.  I don't even know.  But I don't think

2   that would be something I'd call him would be

3   "Grandpa."

4        Q.  So the best you can give me is, "I don't

5   recall."  You can't say, "There's no way I ever said

6   that"?  All you're saying is, "I don't recall"?

7        A.  Correct.

8        Q.  All right.  Did you ever call Jerry Darst "Old

9   Colonel"?

10       A.  Can you repeat that?

11       Q.  Did you ever call Jerry Darst "Old Colonel"?

12       A.  "Old Colonel"?  No, sir, not that I ever

13  recall, no.

14       Q.  All right.  So, again, I got to be clear with

15  you.  Are you saying you don't recall, or are you

16  telling me, "There's no way I ever said that"?

17       A.  I'm saying I don't recall.  "Old Colonel"

18  doesn't sound like anything I would ever call anyone.

19  Because, number one, "colonel" isn't even a recognized

20  law enforcement -- typically a recognized law

21  enforcement rank.  And I don't go around calling

22  people "old" or "young" or any of those natures.

23           But to answer your question fairly, I do not

24  recall.  Is it humanly possible?  Possibly.  But I

25  surely don't recall that, and it doesn't sound like



SHERIFF SCOTT FITCH                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                    101

 1  anything I would ever say.

 2      Q.  All right.  Did you ever call Jerry Darst

 3  "Old-Timer"?

 4      A.  Not that I recall.

 5      Q.  All right.  Again, I got to be clear with you.

 6  Are you saying, "I don't recall," or, "There's no way

 7  I ever said that"?

 8      A.  I'm saying I don't recall.

 9      Q.  Did you ever hear anyone else employed by your

10  office refer to Jerry Darst as "Grandpa"?

11      A.  No, sir.

12      Q.  Did you ever hear anyone else employed by your

13  office refer to Jerry Darst as "Old-Timer"?

14      A.  No, sir.

15      Q.  Did you ever hear anyone else employed by your

16  office refer to Jerry Darst as "Old Man"?

17      A.  No, sir.

18      Q.  Did you ever hear anyone else employed by your

19  office refer to Jerry Darst's age at all?

20      A.  No, sir.

21      Q.  All right.  Now, we talked about Grandpa,

22  Old Colonel and Old-Timer for you.  But did you ever

23  refer to Jerry Darst's age, ever, to anyone else?

24      A.  No, sir.

25      Q.  Did you ever have a conversation in your



 1  office with Jerry Darst where you told him, "Don't you

 2  think it's about time to hang it up, old man"?

 3      A.  Absolutely not.

 4      Q.  Did you ever talk to Jerry Darst about

 5  retiring?

 6      A.  No, sir.

 7      Q.  Have you ever talked to any of your deputies

 8  about retiring?

 9      A.  I had a conversation -- I had an employee come

10  to me and ask me -- told me that he was going to

11  retire since I've been sheriff.  That was

12  Lieutenant Gilkey.

13      Q.  Okay.  Anyone besides Lieutenant Gilkey?

14      A.  No.  He told me he was retiring and gave me a

15  date.  I don't recall that date.  And he filed the

16  paperwork and ultimately retired.

17      Q.  All right.  Why don't we take a ten-minute

18  break, and I might be close to done here, okay?

19      A.  Okay.  Thank you, sir.

20      Q.  Let's come back 12:35-ish.

21          (Off the record.)

22          ATTORNEY STARLING:  Thank you, Sheriff Fitch,

23  for your time today.  I don't have any other

24  questions, subject to whether your counsel might ask

25  you questions.



 1              THE WITNESS:  Okay.  Thank you, sir.

 2              ATTORNEY TEETOR:  I'll talk into your

 3    microphone so we don't get any feedback for Michele.

 4              Sheriff, I have no questions.  You do have the

 5    right to review this transcript once it is transcribed

 6    to make sure that what you said was taken down

 7    accurately.  I'll suggest you exercise that right, but

 8    you can waive it if you want.  But just let the court

 9    reporter know one way or the other.

10              THE WITNESS:  Okay.  On the advice of my

11    counsel, I would like to review it, please, at the

12    time and place it's available.

13              ATTORNEY STARLING:  Then I think we're done

14    for now.  So, thank you, Sheriff.

15              THE WITNESS:  Thank you, sir, and thank you,

16    ma'am, for taking the notes.

17              THE REPORTER:  Sure thing.

18              Any orders before we go?

19              ATTORNEY STARLING:  Yeah, I'll order standard

20    delivery.  I do electronic.  You know, the PDF or

21    there's an e-tran that you do.  I'll do electronic.

22              ATTORNEY TEETOR:  I will take a copy, please.

23              (The deposition of Sheriff Scott Fitch

24    concluded at 12:40 p.m., and witness will read.)

25



1                  REPORTER'S CERTIFICATE

2

3          I, Michele A. Durig, a Notary Public within

4    and for the State of Ohio, duly commissioned and

5    qualified, the officer before whom the foregoing

6    proceedings were taken, do hereby certify that the

7    foregoing transcript is a true and correct record of

8    the proceedings; that said proceedings were taken by

9    me stenographically and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14             This transcript of proceedings is certified

15   by me this 18th day of September, 2025.

16

17

18   _____

19   Michele A. Durig, RPR, Court Reporter
     My notary commission expires July 5, 2028

20

21

22

23

24

25



SHERIFF SCOTT FITCH                                September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                              105

```
 1    Reference No.: 13427334

 2

 3    Case:  JERRY DARST vs MEIGS COUNTY, OHIO

 4
           DECLARATION UNDER PENALTY OF PERJURY
 5
           I declare under penalty of perjury that
 6    I have read the entire transcript of my Depo-
      sition taken in the captioned matter or the
 7    same has been read to me, and the same is
      true and accurate, save and except for
 8    changes and/or corrections, if any, as indi-
      cated by me on the DEPOSITION ERRATA SHEET
 9    hereof, with the understanding that I offer
      these changes as if still under oath.
10

11           _____

12           Sheriff Scott Fitch

13

14           NOTARIZATION OF CHANGES

15                (If Required)

16

17    Subscribed and sworn to on the _____ day of

18

19    _____, 20_____ before me,

20

21    (Notary Sign)_____

22

23    (Print Name)                    Notary Public,

24

25    in and for the State of _____
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   Reference No.: 13427334
     Case:  JERRY DARST vs MEIGS COUNTY, OHIO
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Sheriff Scott Fitch
```



SHERIFF SCOTT FITCH                                    September 05, 2025
JERRY DARST vs MEIGS COUNTY, OHIO                                   107

```
 1   Reference No.: 13427334
     Case:  JERRY DARST vs MEIGS COUNTY, OHIO
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Sheriff Scott Fitch
```



__Exhibits__

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT1
  3:10
  19:10,12,
  23 20:3

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT2
  3:11
  34:3,5,8,
  10 83:10

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT3
  3:12
  39:18,21
  40:1

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT4
  3:14
  53:11,13,
  18 54:17
  55:17,25
  56:6

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT5
  3:14
  64:5,22,
  25 65:3,5
  67:15
  69:23

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT6
  3:16
  68:7,9,17

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT7
  3:17
  72:12,14,
  18,20
  91:21

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT8
  3:18
  90:15,16,
  18,21,23,
  25

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT9
  3:19
  93:20,21,
  24 94:2

13427334 Sh
eriff.
Scott Fitch
.EXHIBIT10
  3:20
  97:19,20,
  23,25

1
  19:10,12,
  23 20:3
  34:17
  68:23

10
  97:19,20,
  23,25

98:5

101
  49:3

10th
  98:3

11.4
  86:22
  87:15
  88:7

11:25
  64:9

11th
  94:8

12
  84:17,23

12:35-ish
  102:20

14
  53:22
  54:3

14th
  55:23

15
  13:7

17
  79:1
  91:15

18
  70:16

1st
  94:18

_____

2

2
  34:3,5,8,
  10,20
  83:10

2.05.13
  75:4

2.05.21
  76:4

2.05.26
  76:18

2.05.36
  77:10

2.05.6
  73:25
  75:1

20-minute
  99:6

20-year
  37:17

2010
  13:7

2021
  34:5,16

2022
  22:15,17
  53:9,22
  54:3
  55:23
  69:7
  70:16

2023
  17:22,24
  21:7
  22:18
  72:1
  86:11
  98:3,5

2024
  17:18
  22:10,11
  34:5,16
  94:8

2025
  7:24
  17:20,24

21
  34:16

41:9

22
  62:17
  69:6

22nd
  17:22,24
  22:15
  53:9 60:2
  61:22

23
  21:7
  22:12
  62:18

24
  7:24,25

2nd
  21:6
  22:17

_____

3

3
  39:18,21
  40:1

30
  13:20

30-some
  47:13

311.04
  69:17

34
  80:11
  85:15

3rd
  21:7

_____

4

4
  53:11,13,



18 54:17
55:17,25
56:6

**4/24/17**
72:23

**40**
92:25
93:2
95:19

**40620**
12:18

**45769**
12:19

**47**
12:25

**4th**
14:24

———————
        **5**
———————

**5**
64:5,22,
25 65:3,5
67:15
69:23
70:11

**50**
96:4

———————
        **6**
———————

**6**
68:7,9,17

———————
        **7**
———————

**7**
72:12,14,
18,20
91:21

———————
        **8**
———————

**8**
90:15,16,
18,21,23,
25

———————
        **9**
———————

**9**
83:9,11,
18,22
86:23
93:20,21,
24 94:2

**9.1**
84:10

**9.3**
84:15

**9.6**
85:1
86:17,23

**90s**
13:18

**97**
45:10
60:3

———————
        **A**
———————

**abilities**
24:8

**above-named**
69:15

**absence**
41:2

**absenteeism**
56:13
57:5,13,
18

**absolutely**
54:14
58:17
74:9
83:14
86:9
90:21
102:3

**abuse**
5:22 6:10
57:5

**accurate**
20:1,2
65:10
71:7

**accurately**
44:24
89:13
103:7

**acronym**
98:14

**Acted**
29:1

**action**
7:11
84:18

**actions**
83:21

**additional**
36:12

**additionally**
11:21

**address**
12:15

**adjustment**
86:1

**administration**
21:13
73:13

**admonished**
48:15

**advance**
12:3

**advice**
103:10

**advised**
32:23
38:19

**affecting**
12:13

**affidavit**
16:4,12,
16,25

**affirm**
69:15

**affirmatively**
11:1
99:22

**age**
92:21
93:4,10,
12
101:19,23

**agent**
52:8,18
86:21

**aggravate**
84:23

**agree**
52:13
79:11
80:20
81:1,5,9,
13

**agreement**
25:16
34:12
86:17
87:16

**ahead**
19:20
39:25
46:12
68:6
72:11
75:15
82:3,9,19
90:15
93:19

**Alex**
5:25

**allegation**
14:25

**allege**
5:23

**alleged**
5:22,24
26:16
28:12
29:21,24
48:18
50:12
52:10
56:16
57:1,2
58:4 64:1
76:24
81:7,10,
14 85:6
88:22
89:7,20

**allegedly**
29:3 30:7
33:10
47:15
48:12
49:16
51:7
61:25
62:8
74:17
76:8,21
99:1



allergies
  12:4

allowed
  91:10
  97:8

Amendment
  14:24

apologize
  12:3

apparent
  38:21

appeal
  41:14

appealable
  88:4,12

appealed
  39:15
  41:11

appearance
  26:9
  27:25
  43:18,21
  44:11
  47:4,10,
  12 48:20
  58:20
  63:2 64:4
  74:22
  75:14,18,
  19 76:4,
  16 98:19

appearances
  51:3

appeared
  69:18

Appearing
  45:1

appears
  54:16
  55:23
  65:13

68:21
70:13
72:22
91:1

applicable
  94:14

application
  64:25
  65:6 79:3

applied
  38:17
  77:6
  80:22

applies
  75:23
  83:2

apply
  76:7,20
  82:20,22
  83:5

appoint
  18:3

appointed
  17:21
  18:1
  22:14
  27:14
  51:18
  52:19
  53:7 54:4
  65:20
  69:15,25
  85:16
  87:14

appointing
  69:9

appointment
  68:24
  69:2,6

appreciativ
e
  32:17

approach
  61:17

approached
  37:3
  85:18

appropriate
ly
  44:23

approved
  37:6

approximate
  7:22

approximate
ly
  13:7
  24:22
  54:5 93:3

April
  94:18

arbitrated
  39:9
  40:13

arbitration
  39:11,21
  40:9,13
  41:11

arbitrator
  41:6

areas
  46:22

arrest
  91:9

arrested
  15:15

arrests
  45:3

Article
  34:20
  83:9,11,
  18,22

assigned
  44:21
  91:18

Association
  34:14

assume
  16:18
  65:19
  66:5,17

assuming
  21:16

atrocious
  47:4

attached
  11:18

attention
  63:22
  78:24

attitude
  27:24
  43:19,22
  44:11
  45:2
  46:9,14
  47:24
  48:1,12,
  16,20
  61:10,13
  74:22
  98:18

attorney
  19:15
  32:24
  33:16
  34:7
  39:24
  44:16
  53:15
  57:3,16
  64:6,8,11
  68:11
  72:17
  74:6,15

82:1,7,17
  86:19
  87:1
  88:10
  90:9,13
  93:23
  97:22
  102:22
  103:2,13,
  19,22

auditor's
  18:6

August
  21:6,7
  22:17
  72:1

authority
  69:10,16

award
  40:13,16,
  19 41:12

aware
  17:5
  29:23
  80:15

awkward
  15:10

——————

B

——————

back
  5:5 9:7
  13:18
  22:12
  28:10
  35:15
  39:13
  59:14
  64:9
  79:15
  83:1
  88:13
  91:21



102:20

**background**
  21:18

**backing**
  36:11

**backup**
  99:8

**bad**
  27:22
  61:13

**bags**
  59:18

**barely**
  93:11

**bargaining**
  25:16
  34:12,24
  84:1
  86:17
  87:16

**based**
  32:5,6
  33:3,14
  56:14
  88:15
  90:4
  94:21

**basically**
  6:10
  16:25
  20:15
  25:13
  29:13
  42:5 91:3

**basics**
  49:2

**basis**
  45:5,12

**BCI**
  5:10

**behalf**

11:12

**behavior**
  58:9
  96:24

**behavioral**
  48:19
  50:13

**belt**
  47:8

**benefit**
  80:13

**Benevolent**
  34:14

**Bentz**
  12:18

**big**
  46:21
  48:6
  53:24
  58:2

**bigger**
  83:12

**Bill**
  19:2,4
  20:4,6
  23:7,13
  27:9,11,
  16 28:7
  62:3

**birthday**
  93:17

**bit**
  18:15

**biweekly**
  52:1

**boots**
  76:12

**boss**
  55:10

**bothering**

63:18

**bottom**
  55:16
  93:15

**Brandy**
  20:5
  23:7,16
  28:17,18,
  22 29:7,9
  30:6,14

**break**
  10:4,8,10
  64:7
  102:18

**briefing**
  62:12

**bright**
  10:2

**bring**
  7:1

**bringing**
  6:24

**brought**
  6:14 32:2

**built**
  13:6

**bunch**
  48:23
  95:23,24

————————

————————
        **C**
————————

**cakes**
  93:18

**Caleb**
  14:15,20

**call**
  8:20
  11:10
  39:18

45:24
46:24
47:3
53:11
60:23
64:5 68:6
88:21,23
89:6,12
93:19
99:6,7
100:2,8,
  11,18
101:2

**called**
  19:16
  88:21

**calling**
  100:21

**calls**
  27:24
  36:10,12
  44:21,22,
  23 46:19
  99:5,9

**Campbell**
  20:7

**Candice**
  12:21,24

**candy**
  59:19

**capability**
  55:13

**capable**
  56:3

**capacity**
  8:4

**captain**
  18:21,23
  25:1 27:2
  62:3,9

**caption**
  40:8

**car**
  47:7
  59:20,23

**cards**
  93:18

**career**
  53:6

**careful**
  10:16

**carried**
  76:13

**carries**
  64:4

**case**
  5:13,14,
  16,17,21
  6:5,9 8:9
  11:12,17,
  21 14:5,
  14,15
  16:2,13,
  16 17:7
  35:12

**cases**
  6:1

**categorized**
  91:12

**category**
  74:5
  75:4,8

**caused**
  6:10 7:13

**caveats**
  10:5

**cease**
  84:16

**Cemetery**
  12:18

**center**
  46:25



certificate
  66:1,3,8

certified
  36:24
  37:8,13,
  18

cetera
  79:5

chain
  19:4

Champlin
  24:1
  38:5,7,
  12,22
  41:22

chance
  85:21,22

change
  9:11
  46:15
  61:16
  86:2

charges
  18:11

chart
  19:12,24

cheaper
  14:18

check
  27:23
  70:7,14

checked
  29:11

chip
  59:18

chose
  85:25
  86:18

circumstanc
es

49:2

citations
  45:3

citizens
  26:11
  61:2
  63:11

civil
  16:2

civilian
  35:1

claim
  14:24
  47:12
  81:1

claimed
  85:18

claiming
  57:15

claims
  6:9

clarificati
on
  22:12

classificat
ion
  78:16
  94:11

classified
  97:11

classify
  13:23
  97:15

clean
  47:5
  66:21,24
  67:3

cleaned
  59:16

clear

12:8
80:18
100:14
101:5

clearing
  12:3

client
  11:13

clients
  6:15

close
  102:18

clue
  93:6

coach
  80:2,14
  85:25

coaching
  57:24
  58:3

code
  69:17
  72:14
  73:2,3,
  15,16
  75:23
  77:18
  79:20
  80:21
  82:6,14,
  21 83:4
  84:22
  91:22
  94:12
  95:2

collective
  25:15
  34:11
  86:16
  87:16

Collins
  5:25

colonel
  100:9,11,
  12,17,19
  101:22

command
  19:4,5

commission
  68:25
  69:21

Commissione
rs
  18:2

common
  7:18,19
  39:15

commonly
  49:9

communicati
ons
  26:23
  27:1,6

complained
  26:13

complete
  7:7 10:10
  76:25

Completed
  70:16

completely
  10:18,19
  32:19

completenes
s
  77:7

Completing
  44:23

concerned
  73:14

concurred
  48:22

condition
  47:9

conduct
  72:14,24
  73:2,3,
  15,17
  75:23
  77:18
  80:21
  82:6,15,
  22 83:4
  84:22
  91:2,15,
  22 94:13
  95:3

conduct's
  79:21

conference
  85:4,9,23
  86:14
  87:4,10
  88:9 90:7

conferences
  86:25

confidence
  63:16

confusing
  6:5

considerati
on
  42:7

considered
  59:17

constantly
  29:14

constitute
  74:13,18

constitutio
nal
  15:1,3

consult



84:8

**contact**
32:12,20
33:20
88:25

**contacted**
32:22
33:18
36:23
38:18

**content**
97:15

**continue**
37:19
70:19
94:11

**continued**
89:1
94:15
95:1

**continues**
87:22

**continuity**
52:23

**contract**
34:5,15,
18 35:4,
10 83:8,
10,11
84:3,11,
21 94:17

**control**
73:1

**conversatio
n**
85:22
101:25
102:9

**conversatio
ns**
26:20
61:20

62:1,7,10
85:20

**convicted**
15:18
67:7,11

**convictions**
70:20,25

**copies**
27:3

**copy**
103:22

**correct**
8:13
28:16
35:2,13
44:12,25
55:2 58:9
60:7
66:9,19
68:1,5
69:7,8
70:14,22
71:2,21
72:2,3
75:3,25
76:2 77:9
79:20
80:2,23
81:3,25
82:6,20
83:22,23
84:25
85:20
89:9,22
90:10,14
94:9,25
95:4,15
96:24
97:7,13
98:5
100:7

**counsel**
102:24
103:11

**count**
95:25

**county**
5:6,7,10,
16 6:3,7
7:18 8:2,
16 13:18
14:6,10,
21 17:12,
14 18:2,
7,16
19:13,25
20:21,24
21:1,4,
19,20,22,
23 22:2,
8,22
24:5,9,25
25:15
29:18
31:25
32:9 33:4
34:12
35:5 37:2
38:6,10
39:1,5,
15,22
40:10,14
41:7,11,
19,22
42:21
43:3,16
46:22
47:1,3
48:7
50:24
51:1,21
52:4
53:25
55:4
59:14
60:1 61:1
64:25
65:7
66:4,25
68:20

69:3
70:1,25
71:14
72:15,22
73:4 74:4
75:20,24
87:13
98:2

**couple**
10:5
24:23
25:8 62:2
96:9,11

**courses**
54:12
55:7

**court**
7:15,17,
19 9:6
10:15,25
11:15
15:22
16:2 17:2
39:15
51:3
103:8

**cover**
34:11

**covered**
35:9 84:3

**coworkers**
6:20 99:7

**crack**
10:2

**crappy**
45:21

**create**
15:9
46:15

**creating**
91:11

**crime**
15:19
67:7,8,11

**criminal**
70:13,24

**cruiser**
47:6
59:3,22
95:11
97:9

**cues**
10:24

**culture**
46:15,17
52:24
61:17

**cups**
59:18

**current**
12:15
37:24
65:25

**cut**
75:16

---

**D**

---

**daily**
45:5,12

**Darst**
16:13,17,
18 17:7
20:18,20
24:5,20,
21,25
25:6
26:2,20,
23 27:3,
7,10
28:8,18,
25 30:15,
21 31:8,



18,23
32:3,12,
20,22
33:2,9,24
35:6,9,19
36:16,19,
22 37:11
38:2,16,
17,18,20,
23,25
39:8
40:22
41:5
42:8,12,
17,21
43:12
45:6,17
47:22,25
48:11,15,
19 49:4,
11,16,20,
25 50:6,
10,13,17
51:7,14
52:10,14
56:18
57:2,4,
15,22
60:13
64:14
65:18
66:3,14,
23 67:10
69:2,21
70:14
71:21
74:3,12,
17,25
75:8
76:7,20
79:8,12,
17,22
80:1,3,
11,22
81:1,7,
11,14
82:16

83:24
85:10
86:18
88:15,17
89:6,12,
23 90:8
92:24
93:16
97:21
98:2,4
99:2,12,
16,19
100:8,11
101:2,10,
13,16
102:1,4

**Darst's**
21:17
22:7 23:2
26:5,16,
24 27:11,
14 28:11,
23 29:17,
21,25
30:4,22
31:1
36:24,25
39:4
40:12
43:2
44:15
58:19
59:3,22
67:1
68:9,19
70:24
71:3,5,17
93:4,10
101:19,23

**date**
7:22 37:8
45:20,23
49:20
50:2
51:14
53:22

55:22,25
59:2,5
61:3,23,
24 62:21
69:6
70:16
84:17
86:10,12
102:15

**dated**
98:3

**dates**
22:3 39:3
51:10
60:16

**day**
17:18
45:12
70:3
94:13
95:1 98:9

**days**
41:9
45:10
47:13
59:15
60:3
80:11
81:11
85:15
98:9

**deal**
41:14

**dealing**
63:8

**debris**
47:7

**December**
53:22
54:3
55:23

**decide**
89:14

**deciding**
42:8

**decision**
23:2,3,4
24:5
25:16
33:13
42:21
43:12
86:7
88:14
89:5 90:4
98:7

**declaration**
16:22,24
17:6

**declined**
89:3,16

**defendant**
5:11
13:13,14

**defense**
81:14

**deficiencie
s**
57:6
80:16
98:17

**define**
72:2,4

**defined**
77:22
99:3

**delivery**
103:20

**denied**
40:20

**department**
14:23
21:22
31:6 48:9
51:19,20

52:24

**Departmenta
l**
76:18

**depend**
99:7

**dependabili
ty**
98:17,22,
24 99:4,
10

**depending**
53:1
77:24

**Depends**
97:2

**deposed**
4:23

**deposing**
9:25

**deposition**
5:13 6:2
8:14,22
9:18,20
11:11
13:17
19:9

**depositions**
5:3 8:18

**deputies**
15:2,4
19:7 32:1
34:2,25
45:11
48:3
50:25
86:3
102:7

**deputies'**
34:13

**deputy**



15:6
20:21
21:10
22:8 24:8
26:5
28:19
30:23
31:7
32:18
35:23,24
36:1,5
38:11,21
43:2,15
44:21
45:4 53:6
54:25
55:3
60:22
65:8,11
68:3,24
69:3 74:4

**deputy's**
62:12

**describe**
46:7 49:1
63:7 64:2

**description**
60:17

**deserve**
63:21

**detail**
95:10,12

**detailed**
49:11

**details**
30:10
38:14
40:17
49:8
59:7,8
77:1

**determination**

32:8
89:9,11

**determines**
85:2

**determining**
43:6

**difference**
20:16
50:25
56:9
57:1,17
58:2,3

**differentiate**
67:13

**direct**
78:24

**directly**
18:20
31:5

**dirty**
47:6
59:11,12,
17,20
76:12,13

**discharged**
84:12

**disciplinary**
77:11
79:21
80:15
83:20
84:18
85:3,4,9,
22 86:13,
25 87:4,
10 88:9
90:7

**discipline**
40:21
50:9

52:22
55:8
58:7,10,
12,16
71:13,19,
22,25
72:3,5,9
77:24
78:4
79:16,23
81:19
82:6,11
83:18,19,
22 84:22
94:16,21
95:2

**disciplined**
57:18
84:13

**disciplining**
54:13
56:3 58:1

**discovery**
11:10

**discuss**
28:18

**discussed**
25:5
29:22,25
32:25
42:2

**discussing**
30:3
42:11,17
98:12

**discussion**
58:22

**dismissed**
14:5

**dispatchers**
35:1

**disposition**
14:9

**dispute**
66:18
89:20

**distinction**
57:20

**distinguish**
57:8

**docket**
11:20

**document**
41:8
47:21
56:6

**documentation**
48:14
50:9
71:13,18

**documentations**
52:6

**documents**
27:4
68:22
71:3

**dog**
36:24,25
37:7,17,
18

**dollars**
39:12

**Don**
23:7,18
30:17,20
31:9,11,
17

**Donnie**
20:9

**double-checking**
49:13

**doubt**
80:14

**drive**
97:8

**driver's**
66:12,15

**driving**
66:21,24
67:1,4

**dropped**
13:22,24

**drove**
95:11

**duties**
44:21
67:21
68:3
91:4,19

**duty**
41:2
75:5,9,20
91:4

──────────

**E**

──────────

**e-tran**
103:21

**earlier**
7:23
43:17
57:21
59:8
60:20
61:14
64:3
80:13,25
82:25
83:24
85:17,24



96:20

**early-on**
65:6

**easy**
4:23

**effect**
41:25
42:6
84:17
94:17

**effective**
84:17

**effectively**
10:24

**effort**
79:3

**elaborate**
42:2

**elected**
17:13,17,
19 52:17
80:2
96:23

**electronic**
15:9
103:20,21

**elevate**
58:12

**Ellis**
14:15,20

**emails**
29:20

**emotional**
5:22 6:10
7:13

**employed**
5:10 17:9
22:17
29:17
35:6

47:14
66:4,6
70:1
71:20
101:9,12,
15,18

**employee**
27:18
35:13
38:15
55:1 58:4
78:9
83:25
84:11
85:2,5
87:5,11
94:3
102:9

**employees**
6:17 55:9
70:4
82:23
83:2,6
86:24
87:20,25
88:8

**employer**
34:23
38:9,19
40:21
41:1
52:21
85:1

**employment**
22:7,19,
20 23:2
24:25
26:3,24
32:9
35:20
39:4
44:15
72:4
78:19
81:25

90:4 98:2

**end**
32:4 47:2
62:17

**ended**
7:9 22:8
39:4

**enforcement**
12:17
15:21
20:23
21:18
22:5 49:3
100:20,21

**enlarge**
90:20

**ensure**
69:22
70:7

**enter**
39:17

**entire**
43:2 49:1

**entitled**
83:18,22

**equipment**
37:5

**equivalent**
19:6
65:16

**errors**
27:23
30:8,9
49:14

**essentially**
98:1

**established**
57:10
82:25
83:24

**estimate**
92:16

**ethic**
29:1,5
43:18,22
44:11
45:3
60:8,18
74:23

**evaluate**
25:25
32:5,14
33:8 89:2

**evaluated**
25:21

**evaluation**
25:18
33:2

**evidence**
89:21

**exact**
62:21
86:12
94:19

**examples**
28:1,3,6,
11 29:10
31:11
45:16
46:6
51:10
61:12
78:21,22
79:2

**exception**
20:4

**exclusive**
34:24

**excuse**
11:20
12:4

**exercise**
103:7

**exhausted**
58:22

**exhibit**
19:9,10,
12,23
20:3
34:3,5,8,
10 39:18,
21 40:1
53:11,13,
18 54:17
55:17,25
56:6
64:5,19,
22,25
65:3,5
67:15
68:7,9,
14,17
69:23
72:12,14,
18,20
83:10
90:15,16,
18,21,23,
25 91:21
93:20,21,
24 94:2
97:19,20,
23,25

**exhibited**
45:17
61:13

**expectation
s**
48:10

**experience**
14:3

**explain**
9:10
31:12



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
Index: explained..found

explained
    33:18

explanation
    54:22
    81:21
    82:23
    85:6
    88:22,24
    89:10

explanations
    80:18

express
    47:25

expressed
    47:21

extend
    25:23
    32:13
    33:6,12
    89:18
    90:2,12

extended
    39:2

extending
    84:7

extension
    32:18

extra
    36:10

extremely
    97:3

eyesight
    40:3

―――――――――

        F

―――――――――

facility
    36:24

fact

43:13
    76:11

factors
    43:6

facts
    16:7
    33:17

failed
    22:23
    45:6
    58:12
    95:8

failing
    91:4

failure
    79:4

failures
    57:1,2

fair
    8:20 9:14
    10:12
    20:14
    42:18,19
    60:6
    70:10
    71:16
    77:8 79:9
    84:24
    94:16
    97:11
    99:8

fairly
    89:2,13
    100:23

fall
    7:25
    74:25
    75:8
    79:13

falls
    77:25
    84:23

falsely
    77:3

familiar
    17:3

fashion
    75:11

fast
    80:8

fault
    14:12

federal
    7:15 17:2

feedback
    103:3

feel
    9:22
    43:14

felony
    18:12
    67:7,11

female
    6:15

Fennell
    93:21
    94:4
    95:5,16,
    21 96:15
    97:6

field
    51:23
    57:25

Fifties
    93:11

file
    63:10,21
    68:9,19,
    22,24
    70:24
    71:4,5,8,
    14,17

filed
    7:14,20
    8:10
    11:12,20
    16:13,16
    17:7
    102:15

filing
    13:22
    41:24
    77:3

find
    11:11

fine
    10:4 12:6
    15:13
    64:9

finish
    10:17,18
    75:15
    93:1

fire
    24:5
    42:8,21
    86:7,18
    88:14,23
    89:6,8,14

fired
    24:13
    98:4
    99:12,15

firing
    64:14
    72:1
    74:25
    88:18

fit
    74:4

Fitch
    54:1
    102:22

five-

64:6

fix
    29:15

flirting
    6:16

folks
    20:11

follow
    68:3 73:1
    79:16,20
    82:5,14
    86:16
    97:3

fool
    63:19

FOP
    39:21
    40:9

force
    84:16
    95:12
    96:13
    97:10

forced
    90:3

form
    58:13
    72:9
    73:12
    83:20

formal
    71:19,22

formed
    43:11

forward
    25:2
    61:16

found
    14:12
    52:19



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
Index: four-step..hash

| | | | | |
|---|---|---|---|---|
| **four-step** 78:4 | **functions** 51:11 | 28:7 62:3 102:12,13 | 38:10 40:4 45:3 47:9,10 76:16 | **guess** 14:8 22:12 26:24 72:8 93:10 |
| **fourth** 78:18 79:25 81:17,24 98:11 | **funds** 18:7 | **Gilkey's** 27:16 | **grades** 22:24 | |
| | **future** 13:8 | **girlfriend** 7:2 12:21 | | **guessing** 95:20 |
| **Frank** 18:21,23 19:1 23:7,11 24:18,19 25:6,9 26:1,15, 19,23 27:6,13, 21 28:10 62:3 | ——————— **G** ——————— **Gallia** 20:24 21:20 22:1 37:2 38:6,10, 25 39:5, 7,15,22 40:9,14 41:7,10, 18,22 | **girlfriend' s** 93:12 **give** 7:22 8:24 10:3 28:1,11 29:9 31:11 39:18 45:20,23 46:3 49:15,24 51:10 | **graduate** 65:16,22 **grammatical** 27:22 30:8 49:14 **grammatical ly** 44:24 **Grandpa** 99:19 100:3 101:10,21 | **guilty** 18:11 **gun** 47:8 **guys** 25:12 53:2 96:21 ——————— **H** ——————— |
| **Frank's** 26:4 | **gave** 6:1 9:19 | 59:1,5 60:11,16, | **grievance** 40:20 | **handle** 46:19 |
| **free** 9:22 | 29:13 37:9 42:4 | 17 61:3, 12 62:21 | 88:5,12 | 63:3 99:8 |
| **frivolous** 41:25 | 54:15 57:21 | 64:20 74:10 | **grievant** 40:21 | **handler** 37:4,23, |
| **front** 54:17 87:17 | 62:16 63:17 69:21 | 80:12,13 85:5 89:24 | 41:2 **grieved** | 24 **Handling** 44:23 |
| **FTO** 51:22,24 52:5 | 79:12 102:14 | 92:14 93:9 96:18,20 | 39:8 **ground** | **hang** 102:2 |
| **full** 63:22 | **gear** 76:13 | 100:4 **giving** | 8:20 **group** | **happened** 18:8 47:2 |
| **full-time** 27:18 34:25 35:1 | **general** 24:21 46:1 | 5:12 11:7 12:1 13:16 | 55:9 77:13,14, 17,19,21, 22,25 | 62:14 95:5 99:23 |
| **fully** 9:15,16 56:3 80:15 | **generalities** 28:5 **Gilkey** 19:2,4 | 38:14 **Golsby** 15:6 **good** | 78:1,3,7, 11,14,21 79:13 81:2 91:12,22 | **happy** 42:5 **hard** 93:13 |
| **function** 51:8 | 20:4,6 23:7,13 27:9,11 | 29:1 31:6,7 36:5 | 94:5,12, 16,23 96:19 | **hash** 67:18 |



**hashmark**
65:15
66:11

**hashmarks**
67:22

**heads**
10:22

**hear**
9:5 14:19
101:9,12,
15,18

**heard**
9:16

**hearing**
48:22

**hearsay**
88:15

**Heater**
23:24
36:20,22,
23 37:10,
15,16
38:1

**heavy-handed**
52:22
54:12
55:8

**helpful**
20:17

**hey**
51:13
59:2

**high**
46:21
65:15,21

**highlight**
98:11

**highlighting**
67:17

**hire**
38:16,20

**hired**
21:6,9,
11,14
52:4
65:19
87:25

**history**
67:2
70:13

**hold**
10:2,11
23:9

**home**
12:15

**honestly**
24:20
63:17

**horrible**
28:24
29:3 30:7
38:15

**hour-long**
99:7

**house**
91:10

**huge**
57:20
97:1

**huh-uh**
10:23

**humanly**
100:24

**hundred**
92:9 96:6

**Hutton**
15:5
54:17,23
55:13
56:3,9,22

57:13,17
90:18
91:2,5
92:1,3,4,
5 93:7

**Hutton's**
57:1
92:21

———————

I

———————

**Ian**
93:21
94:4
95:5,16,
21 96:15,
22 97:6

**idea**
61:23
87:12
92:4
95:18

**identification**
19:14
34:6
39:23
53:14
65:1
68:10
72:16
90:19
93:22
97:21

**identified**
56:17

**ideology**
60:22
61:17

**II**
77:13,17,
21,25
94:12,16,

23

**III**
77:14,17,
22 78:1
91:12,22
94:5,12,
16,23
96:19

**implement**
46:18

**implemented**
51:24
72:23

**important**
97:3

**impressed**
31:7

**impression**
63:18

**improperly**
77:3

**improve**
96:21

**improvements**
49:10

**inaccurate**
9:21

**incapable**
52:9

**incident**
5:7,18
49:21
50:3
56:13
60:17

**included**
18:11

**including**
52:15

78:19
81:18

**incomplete**
9:21

**incorrect**
9:21

**indicted**
18:10

**individual**
5:9,19
69:15,18
70:20
91:8,10

**individuals**
7:4 8:2
33:1

**Inefficiency**
79:2

**information**
30:9

**infraction**
77:25

**infractions**
52:10

**initial**
13:22

**initially**
13:21,24,
25 14:2

**injury**
27:5

**input**
43:1,9

**inquired**
27:11

**Inquisition**
10:1

**inside**
59:18



62:11,12

**instance**
11:18
13:12
45:23
46:13
91:5

**instances**
13:14
46:2 51:7
56:7,15
59:1
60:11
61:13
63:6
64:1,16

**instructed**
33:19

**instructions**
9:14 11:3

**instructor**
37:17

**insubordination**
94:6
95:6,8,13
96:19
97:12,16

**insurance**
14:18

**interact**
61:1
63:1,4

**interacting**
26:10
63:11

**interaction**
5:18 6:11
46:8

**interior**
59:20

**intervening**
84:18

**invention**
88:20

**investigation**
18:6,9

**isolated**
56:18

**issue**
9:22 48:6
57:10,11
80:3,5
91:11
97:1

**issued**
69:24
79:18,23
81:5,9,13

**issues**
29:21
46:2,5
47:12,16,
21,24
48:19
50:13
56:17
57:13,23
58:4 79:7
85:19

**Issuing**
45:3

**items**
68:2

———————————

**J**

———————————

**January**
17:20,24
62:17

**jeopardy**
33:6

**Jerry**
16:13,17,
18,20
17:7
20:18,20
21:17
22:7,13,
16 23:2
24:5,12,
20,24
25:2,6
26:2,5,
16,20,23,
24 27:4,
7,10,11,
14,18
28:8,11,
18,23,25
29:16,21,
25 30:4,
15,21,22
31:1,8,
18,23
32:3,20,
22 33:2,
9,11,20,
21,24
35:6,9,19
36:4,16,
19,22,24,
25 37:1,
3,9,13,
18,20,22,
24 38:2,
10,14,16,
17,18,20,
23,25
39:4,8,12
40:12,22
41:5,15,
17,23,24
42:5,8,
12,17,21
43:2,12
44:15
45:6,17
46:8,16,

23 47:13,
15,22,25
48:11,15,
19 49:4,
11,16,20,
25 50:6,
10,13,17
51:7,14
52:4,10,
14 56:17
57:2,4,
15,22
58:19
59:2,22
60:13,20
61:13,17,
21 62:11,
19 63:5,
12 64:14
65:18
66:3,14,
23 67:1,
10 68:9,
19 69:2,
21 70:14,
23 71:3,
5,17,21
73:5,6,15
74:3,12,
17,25
75:7
76:7,20
77:3
79:8,12,
17,22,25
80:11,22
81:1,7,
11,14
82:10,16
83:24
85:10,15,
18,25
86:14,18
88:14,17
89:2,6,
12,16,23
90:1,2,8

92:23
93:4,10,
16 97:20
98:1,4
99:2,5,
12,15,18
100:1,8,
11 101:2,
10,13,16,
19,23
102:1,4

**Jerry's**
24:7
25:20
26:9,13
32:6
35:25
46:14
48:23
57:6
75:19
89:19

**job**
20:13
21:8
24:8,14
25:20,25
26:5,16
27:12,15
28:12,19,
20,23
30:22,24
31:1,4,13
32:6
33:5,8
35:25
36:2
38:10
51:15
64:25
65:6 68:3
79:3 91:7

**JR**
23:22
35:20,22,



23 36:2,
15

**judge**
8:8 11:23

**judgment**
8:8,10
14:13

**July**
22:11,18
70:16
72:1
86:11
98:3,5

**jury**
11:23

————————

**K**
————————

**K-9**
36:23
37:1,4,
13,17,23,
24 51:5

**Keith**
18:14
21:13
38:15,17,
19 72:23

**kind**
35:24
37:9
41:14
55:13
57:19,24
63:17

**King**
20:5,6
23:7,16
28:17,18,
22 29:7,9
30:6,14

**knew**

20:25
21:20
26:12
63:16
93:12

**knowledge**
20:23
24:3
66:14,23
67:1,10,
12 71:10,
11,23

————————

**L**
————————

**label**
53:24

**lack**
30:9 63:6
64:1 79:3
98:18

**lacked**
26:10
63:5

**ladies'**
6:15

**larger**
74:7

**late**
27:22
29:15
49:22
50:20,23
51:4,7,
11,16

**laughing**
38:13

**law**
12:16
15:21
20:22
21:18

22:4 49:3
63:16
100:20

**lawful**
97:4

**lawsuit**
7:12 8:7
13:10,13,
15,22
14:1

**lawsuits**
41:25

**lawyers**
8:9,20

**laying**
59:19

**Lazy**
36:7

**leadership**
52:20
54:12

**learn**
37:14

**leather**
76:12

**leave**
25:3
41:2,15
57:5 60:3
61:22
99:13,16

**led**
74:12
81:2

**lesser**
18:11

**letter**
34:11
97:20
98:1

**levels**
94:20

**license**
66:12,15

**lieutenant**
19:2
20:6,7,8
102:12,13

**lieutenants**
19:6
20:5,9,10
35:1

**lights**
10:2

**liking**
6:16

**limited**
25:21
32:4

**list**
44:7
65:10

**listed**
20:5,10
40:15
43:21
44:10
46:5 56:6
67:6
73:22,24
74:25
98:17,24

**listing**
66:20

**listings**
67:14
68:2

**live**
12:20
93:12

**lived**

13:5,6

**Lives**
20:23

**located**
21:22
46:25

**location**
51:15

**locations**
21:25

**long**
5:15 8:14
13:5
17:16
21:24
22:4
38:25
55:3
92:12
96:8
99:16

**longer**
22:21

**looked**
47:8 59:2

**lot**
14:3 31:4
51:20
77:1 80:5
96:1,12

————————

**M**
————————

**made**
23:1
25:17
27:18
42:20
86:7
88:14
89:5,9



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
Index: main..months

**main**
29:8

**maintain**
79:4

**Major**
21:15

**majority**
56:7

**make**
8:25 10:2
11:1
15:13
22:23
24:16
27:19
32:8
33:13
43:15
49:10
72:10
74:7
83:12
90:4 98:7
103:6

**making**
22:24
45:3
89:11

**man**
6:15
20:18
101:16
102:2

**man-to-man**
53:4

**management**
55:7

**manner**
30:13
44:22

**Marietta**
5:16,21

6:5,7,9
7:18

**mark**
19:9
32:24
34:3
64:5,19
68:6
90:15
93:19
97:19

**marked**
19:13
34:6
39:22
53:13
65:1
68:10
72:15
90:19
93:22
95:11
97:8,21

**Marty**
15:5
54:17,22
55:13
56:3,22
57:1,13,
17 90:18
91:1,5,9,
25 92:3,
4,5,20
93:7

**Matt**
24:1
38:4,7,9,
22 41:22
42:4

**MCSO**
98:14

**means**
10:17,21
16:9

**meant**
31:12
99:10

**medical**
41:2
99:13,16

**meet**
96:1

**meeting**
19:18
33:19

**Meigs**
5:10 8:2
14:10,21
17:12,14
18:2,16
19:12,25
20:21
21:1,4,
18,22
22:8,21
24:5,9,25
25:15
29:18
31:25
32:9 33:4
34:12
35:5
42:21
43:3,16
51:20
52:4
53:25
55:3 60:1
64:25
65:7
66:4,24
68:20
69:3
70:1,25
71:14
72:14,21
73:4 74:4
75:20,24
87:13

98:2

**member**
32:18
87:13

**memory**
12:13
13:19
41:13
83:10

**mentioned**
26:15
29:3
30:8,18
31:20
34:1
35:18
57:5
60:20
62:22

**messages**
29:24

**messy**
59:3,10,
11,12

**met**
69:22
70:4,8
72:6 92:5

**method**
57:25
58:8

**Michele**
103:3

**microphone**
103:3

**mid**
13:18

**mid-'90s**
5:5

**Middleport**
21:21

**minor**
77:19

**minute**
39:19
64:20

**minutes**
51:1,16

**misconduct**
73:21,24
77:20
85:6

**misdemeanor**
67:8,11

**mistaken**
50:22

**misuse**
18:6

**MJ**
15:5

**model**
52:2

**modern**
88:20

**Mohler**
20:9
23:8,18
30:17,20
31:9,11,
17

**moment**
74:10

**money**
14:17
41:15

**month**
37:11
54:3 56:2

**months**
8:15
32:14



56:19
84:17,23
92:13,18

**motion**
8:10

**motions**
11:18

**motivation**
98:18

**motorcycle**
5:20

**move**
13:8
61:16

**moved**
20:12

**multiple**
24:24
47:5
48:2,9
59:15
85:20
92:8

---

**N**

---

**named**
13:21,24
14:2,4,6
20:18

**nature**
39:14
43:19
49:1
77:19

**natures**
100:22

**neat**
47:8
76:11

**necessarily**
72:2

**needed**
12:16
37:6 47:5
48:7
49:6,10

**needing**
59:23

**negatively**
12:12

**neglect**
91:18

**Nelsonville**
5:14,17
14:7

**newly**
52:19
87:25

**nice**
63:13

**nights**
96:12

**Nodding**
10:22

**non-probationary**
54:25
55:7 76:1

**nondefinitive**
37:9

**nondescript**
60:5 61:7
62:19

**nonverbal**
10:24

**normal**
45:4

**notarized**
17:1

**notes**
15:8,9
103:16

**notion**
58:15

**November**
17:18,22,
24 22:15
53:9 60:2
61:22
62:17
69:6

**number**
10:6 22:2
79:1 96:2
100:19

**numerical**
96:2

**numerous**
91:9

**nylon**
76:13

---

**O**

---

**oath**
11:7
69:19
70:2

**objection**
44:16
57:3,16
74:6,15
82:1,7,17
86:19
87:1
88:10
90:9,13

**objective**
89:21

**observations**
33:3 43:3
88:16

**observe**
47:11

**observed**
32:5,6
47:25
48:20
50:14
52:1,2
58:23
59:22
60:18
61:4
63:8,11

**observing**
85:19

**occasion**
59:22

**occasions**
62:2

**occurred**
5:7 14:10
61:20

**offense**
78:7,11,
14,18
79:25
81:6,10,
18,24
91:2,13,
23 94:5,
21 96:19

**offenses**
77:14,17
78:4,15,
22 79:13
81:2
91:22
94:12,16

**offer**
32:17
85:5
90:11

**office**
5:8 6:14,
25 7:1,2
18:6,16
19:13,25
20:22
21:2,5,21
22:22
24:6
25:1,15,
20 32:1,
10 33:4
34:13
35:5
38:11
39:1,5,22
40:10,14
41:7,11
42:22
43:16
46:20,24,
25 50:23
51:21
52:5,21
53:25
55:4
56:20
60:1,21
61:15
62:10,11,
13 65:1,
12 66:16
68:20
69:4 70:1
71:1,14,
20 72:15,
22 73:4
75:11,20,
24 87:13
94:15
98:3,15
101:10,



13,16,19
102:1

**officer**
12:17
15:21
21:18
22:5
51:23
65:25
81:20
91:11
97:1,4

**officers**
52:3

**official**
8:4

**oftentimes**
14:2

**Ohio**
5:6,14,16
6:7 12:18
34:14
37:9 52:2
65:25
66:11,15
69:17

**Old-timer**
101:3,13,
22

**older**
40:3 93:7
99:25

**one's**
58:8

**ongoing**
56:10,18,
19

**opinion**
24:15
26:4,6
27:14,16,
17 37:17

46:23
49:4
74:4,19
81:20

**opponent**
41:18

**opportuniti
es**
91:9

**opportunity**
11:11
25:25
32:14
33:8
52:14
54:19
85:5,11,
13 96:21

**opposed**
14:19
46:20
58:1
60:24
61:1

**order**
103:19

**orders**
96:25
97:2,4
103:18

**organizatio
nal**
19:12,24

**originally**
14:4

**outcome**
39:11

**outdated**
20:1

**outlines**
72:24
83:19

**owned**
37:1

———————

P

———————

**pages**
68:12,16
71:4

**paid**
14:17

**paper**
70:2

**paperwork**
25:2
102:16

**paragraph**
98:11

**parenthesis**
79:2

**part**
9:5,9
40:20
51:17
63:2
99:12,15

**participate**
23:4 24:4

**participate
d**
24:10

**parties**
11:19

**patrol**
34:14
59:3,14

**patrolling**
46:21

**pauses**
15:7

**pay**

14:19
39:13
78:12,16
84:11
85:3

**PDF**
103:20

**Peace**
65:25

**penalties**
11:8

**penalty**
16:10

**pending**
10:6

**people**
13:25
14:3 24:4
42:11
43:10,11
48:5
52:25
54:13
63:1,2,4,
9,20
88:15
96:1
100:22

**perfectly**
12:6,9
15:13

**performance**
24:8,14
25:20,25
26:5,13,
16 27:12,
15 28:12,
19,20,23
29:2
30:22,24
31:2
32:7,15
33:8

35:25
36:3
43:5,18
44:10,19
45:14,17
46:6
48:18
50:12
56:17
58:4
73:25
74:5,14,
18 75:1
79:4,5,8
91:18
98:13,16

**performance
s**
52:1

**period**
25:14,24
32:3,13
33:7,13
39:2
54:10
84:7,19
87:20,22
88:1
89:18
90:3,12

**perjury**
11:8
16:10

**Perry**
23:22
35:20,22
36:2,15

**person**
16:1
35:18
36:18
38:4
92:5,11,
15,24



93:2
95:22
96:10

**personal**
  33:3 43:3
  76:4
  88:16
  97:8,9

**personally**
  6:2,4
  15:2
  48:19
  50:13
  58:23
  69:18

**personnel**
  68:9,19,
  22,24
  70:24
  71:3,5,8,
  14,17
  75:23

**philosophy**
  60:22

**physician**
  25:3

**place**
  12:16
  35:5 52:5
  62:8
  73:6,15,
  17 103:12

**plaintiff**
  13:10

**plans**
  13:8

**played**
  7:5,7 8:1

**playing**
  6:12,25

**pleas**
  7:18,19

39:15

**pled**
  18:10

**point**
  47:11
  86:7

**points**
  67:19

**police**
  21:21
  96:25

**policies**
  73:1,8

**policy**
  72:21
  75:23
  79:21
  80:21
  82:6,15,
  22 83:1,5
  94:13
  95:2

**political**
  41:18

**Pomeroy**
  12:18

**poor**
  26:16
  27:24
  28:12
  38:20
  43:17,21
  44:10,19
  45:13,17,
  24 46:6,
  14 48:12
  50:7,10
  74:21
  98:18

**poorly**
  26:11
  48:24

49:25
50:3 74:3

**portion**
  69:10

**portions**
  80:15

**position**
  68:4
  69:16
  84:12
  85:3 91:3

**positions**
  20:3,12
  37:3

**possess**
  65:25
  66:11

**possibly**
  37:3
  100:24

**posting**
  67:14

**potentially**
  35:19

**prank**
  6:12,13,
  25 7:5,7
  8:1

**precede**
  56:22

**preceded**
  57:13

**predecessors**
  87:9

**presence**
  69:19

**present**
  62:3
  63:12

**pressed**
  47:8
  76:15

**pretty**
  8:18
  27:21
  48:8
  74:20

**preventing**
  11:25

**previous**
  5:1,3
  17:23
  18:5
  21:12
  37:2 38:9
  56:14
  70:3
  73:13

**previously**
  51:21
  61:6
  74:21
  79:7
  85:14

**primary**
  31:25

**prior**
  9:19
  18:13
  21:18,22
  27:13
  56:7,10
  65:19
  66:6
  71:23
  84:22
  87:14
  89:11
  98:9

**proactive**
  45:2
  46:16
  48:3

60:24,25

**probation**
  22:24
  24:16
  27:19
  43:15
  72:10
  87:20

**probationary**
  25:14,24
  32:3,13
  33:7,12
  35:13
  52:8,18
  55:6 57:9
  72:7 76:1
  81:20
  82:22
  83:5,25
  84:7
  86:21,24
  87:5,11,
  19 88:1,8
  89:1,18
  90:3,12

**problem**
  48:1
  56:10

**problems**
  29:24

**procedure**
  72:21
  86:3
  88:5,12

**procedures**
  73:2,9

**proceed**
  8:25

**process**
  78:5 80:9



**professional**
37:16
45:1,2
48:4
63:13,14,
15 76:15

**professionalism**
26:10
43:23
44:11
62:22
63:3,5,7,
24 64:2
74:23
75:19
98:18

**professionally**
72:24

**program**
51:22,23,
25 52:5

**progressive**
58:15
77:23
78:4
79:16,21
81:19
82:5
83:19
94:21
95:2

**promoted**
20:11

**prosecutor**
49:9

**provided**
59:8

**providing**
84:18

**public**
48:5

**punctual**
45:1

**purchased**
37:2,5

**pursuant**
69:16

**put**
47:20
93:25

**Pyles**
5:25

───────────

**Q**
───────────

**qualification**
65:18

**qualifications**
65:7,11
67:18,25
69:22
70:5,8

**question**
4:22 8:24
9:5,10,
11,20
10:6,18,
25 37:25
57:7
81:23
82:13,14
89:5
100:23

**question-and-answer**
8:23

**question-answer**
9:3

**questioning**
10:9

**questions**
9:15 44:4
80:20
82:13
102:24,25
103:4

**quote**
82:11

───────────

**R**
───────────

**raise**
9:22

**raised**
53:4

**range**
61:5
62:16

**rank**
19:6,7
20:16
100:21

**reach**
25:22

**reached**
37:10

**reaching**
37:14

**reactive**
46:16
61:1

**read**
9:7 11:22
40:8
48:21
74:8,11

**readily**
71:6

**reads**
53:22

**realize**
9:19

**reappointing**
70:7

**reason**
38:21
51:17
65:21
66:7,18
67:3
99:1,12,
15

**reasons**
42:12,24
44:2,6,14
50:3
64:13,16
74:24
79:12
85:4

**recall**
5:5 16:3
26:17,18,
21 27:8
28:2,3,6,
13,16
29:8
30:18
31:10,14
36:17,25
38:24
39:10
42:10,14
43:25
45:24
46:3
50:15
60:9
62:6,9,23
64:15
86:10

**reads** 93:11
99:20,21,
24 100:5,
6,13,15,
17,24,25
101:4,6,8
102:15

**receive**
71:21

**received**
71:19

**recency**
8:17

**receptive**
61:18

**Recognition**
34:21

**recognize**
19:23
53:18
65:3
68:13
72:18
90:23
94:2
97:23

**recognized**
100:19,20

**recognizes**
34:23

**recommend**
37:22,23

**recommends**
52:3

**record**
39:18
64:10
66:21,24
67:2,4
70:13,20
80:19
102:21



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
Index: recorded..Rick

recorded
    78:8

reduce
    47:1

reduced
    84:11
    85:2

reduction
    78:16

refer
    76:3
    99:18
    101:10,
    13,16,19,
    23

reference
    5:6,22
    24:7 25:1
    27:4

referring
    8:16

reflected
    20:3

refrain
    38:14

refresh
    83:9

regard
    44:4

regimented
    51:22

relation
    6:22

relayed
    89:23
    90:2,11

relied
    42:25

reluctant
    46:17

relying
    70:3
    88:23
    89:8

remainder
    17:23

remember
    42:16
    60:6
    86:11

Remind
    53:7

remote
    46:22

removal
    88:8,11

removed
    84:12
    88:1

rep
    90:8

repeat
    9:6 80:25
    100:10

report
    29:21,25
    45:21
    49:9,15,
    21,24
    50:2,7,10
    63:11,21
    77:4

reported
    75:20
    76:23
    98:15

reporter
    9:6
    10:15,25
    11:15
    103:9,17

reporting
    46:4 49:3
    75:5,9

reports
    26:11
    27:22
    28:24
    29:3,12,
    14,17
    30:4,6
    44:24
    48:21,22,
    23 49:12,
    13 51:25
    52:1 63:9
    74:21,22
    75:10
    76:18,22
    77:1,7
    98:19

representat
ion
    31:6 71:8

representat
ive
    31:24,25
    34:24

represented
    34:2 84:1

reprimand
    53:13,20
    54:16,22
    56:4
    57:11
    78:8
    79:19
    81:6
    82:11
    90:18
    91:1
    93:21
    94:3 95:6
    96:18,24

reprimands

58:13
    71:13,18
    80:6
    84:16

reproach
    72:25

requested
    32:11

required
    41:1 45:5
    50:25
    79:5
    95:10

requirement
s
    72:7

resident
    14:21
    20:24

resort
    58:9

respect
    48:5
    79:17,21

respond
    32:16
    38:12
    46:19,25

responded
    33:10

Responding
    44:22

response
    5:8 45:24
    47:2 48:6
    82:13

responsibly
    72:25

restroom
    64:7

result
    35:9

resulted
    95:6,13

retained
    32:9
    43:15

retire
    102:11

retired
    102:16

retiring
    102:5,8,
    14

return
    27:5 41:1

returned
    29:15
    88:19

review
    56:5
    103:5,11

reviewed
    48:23

reviewing
    80:21

Revised
    69:17

revisit
    9:23

Rick
    20:9
    23:20
    31:20,22,
    24 32:11,
    16 33:9,
    15,23
    84:6
    89:16,17,
    19,22,24
    90:7,11



rights
   15:1,3

Road
   12:18

roads
   59:14

Robert
   5:11

room
   62:12

ruined
   37:18

ruled
   8:12

rules
   8:20
   52:15
   73:1
   91:2,15

runs
   36:23

rushing
   80:7

—————————

          S

—————————

safety
   91:11

sat
   96:21

satisfactory
   22:23
   26:7
   27:17
   31:3,4,12
   32:7 33:5
   45:9
   48:24
   60:14,19

scene
   51:2

schedule
   90:6

scheduled
   85:4

school
   65:15,21

Scott
   21:15
   54:1

screen
   19:16,21
   39:25
   40:1
   53:11
   64:23
   68:7
   72:11
   90:16
   97:18

scroll
   68:13

scrolling
   34:15

seal
   12:16

search
   5:12

section
   73:25
   75:1,17
   76:4,17
   77:6,10
   84:10,15
   85:1
   86:17,22,
   23 87:15,
   19 88:7
   91:15

security
   95:10

self-
explanatory
   44:20

send
   27:3

senior
   35:24

sense
   9:1 11:1
   15:13

sentences
   77:2

September
   94:8

sergeants
   19:7
   20:10
   34:25

series
   80:19

serve
   69:3

served
   17:17,22

serves
   13:19
   41:13

serving
   17:25

session
   8:23 9:4

settled
   14:11,14

settlement
   14:9

severe
   77:21

severity
   53:1

shaking
   10:22

share
   19:6,8,21
   28:15,16
   34:3
   35:16
   39:25
   40:1
   53:10,11
   64:23
   68:7
   72:12
   90:16
   97:18
   99:8

sharing
   19:16

sheriff
   4:22 8:2,
   5 14:11
   17:13,17,
   18,19,21
   18:1,4,5,
   13 21:10
   24:8 26:5
   27:13
   28:19
   29:18
   30:23
   32:18
   36:1 38:6
   39:7
   40:1,5
   41:19,22
   43:2,16
   44:22
   45:4
   46:16
   47:14
   51:18
   52:19
   53:6,8
   54:1,7
   55:5,17

56:8,11,
   14 57:7,
   14 60:4,
   23 64:12,
   24 65:7,
   8,11
   66:4,25
   68:3,25
   69:3,25
   70:6
   71:24
   72:23
   74:4
   80:12
   85:16
   86:1
   87:14
   90:17
   93:24
   99:18
   102:11,22
   103:4,14

sheriff's
   5:8 17:23
   18:16
   19:13,25
   20:21
   21:2,5,21
   22:22
   24:6
   25:1,15,
   19 32:1,9
   33:4
   34:13
   35:5
   38:11
   39:1,5,22
   40:10,14
   41:7,11
   42:22
   43:16
   51:21
   52:5
   53:25
   55:4
   56:20



60:1
61:15
62:12
65:1
68:20
69:4 70:1
71:1,14
72:15,22
73:4
75:20,24
87:13
98:3

**shift**
35:24
36:9
45:12
51:1

**shine**
47:5

**shined**
76:12

**shoes**
43:14
47:5,6

**shooting**
5:6

**short**
48:25

**shortcomings**
81:7,10,
14 88:22
89:7,20,
23

**shortly**
13:21
22:9

**show**
12:7 13:1
15:12

**showed**
37:20

50:20

**shows**
70:19

**sick**
57:5

**side**
88:17
89:6,13,
19,24

**sign**
17:1

**signature**
55:17,20,
21 69:9,
12

**signed**
16:12,15
17:6
55:25
69:19
70:2 78:9

**signing**
69:14

**silence**
15:10

**similar**
27:21
28:24
73:11
94:18

**sir**
4:24 6:8
7:21
9:13,17,
24 10:20
11:2,5,9,
24 12:2,
11,14,23
13:3,9,11
15:3,11,
17,20,23,
25 16:3,

5,11,14,
21 17:4,
8,9,10,15
18:17,19,
25 19:11,
19,22,24
20:15
21:3
22:1,6,
12,23
23:5,12,
14 24:3,
11 25:7,
11 26:17,
21,25
27:8
28:5,9,21
29:19,23
30:1,5,
16,19,25
31:10,16,
19 33:25
34:4,9,22
35:3,8,
11,14
36:17
38:3,6,24
39:2,10
40:7,11,
15,25
41:4,13,
20 42:1,
14,19,23
43:8,25
44:3,13,
18 45:19,
22,25
46:4
47:19,23
48:13,17
49:17,19,
23 50:1,
5,8,11,16
51:9,12,
17 52:12
53:17,19,
21,23

54:2,9,19
55:15,19,
24 56:1,
5,23
58:25
59:4,6,9
61:5,9,
11,24
63:25
64:15,18
65:2,4,
13,23
67:9,12,
23 68:8,
15,21
69:1,13,
20 70:9,
12,15,18
71:15
73:18
74:2 75:6
76:6,9,19
77:9,12,
15 78:6,
10,17,20,
23 79:6,
10,14
80:10,24
81:4,8,
12,16
82:24
83:3,7,
12,17
84:2,5,9,
14,20
85:8,11,
24 86:15
87:3,6,
18,21
88:19,25
89:15
90:22
91:14
92:2,8,22
93:5,11
94:7,10,
19,22

95:17,25
96:17
97:24
98:6,21,
25 99:11,
14,17,24
100:12
101:11,
14,17,20,
24 102:6,
19 103:1,
15

**sit**
37:20
46:18,23
60:21,23

**sitting**
31:15
53:3
54:17
57:8

**situation**
5:12

**situations**
96:23

**skipped**
81:17,24
82:15

**sloppy**
26:9
27:25

**slow**
23:9
27:23

**small**
40:2

**Smith**
20:9
23:20
31:20,22,
24 32:11,
16 33:9,
15,23



SHERIFF SCOTT FITCH
JERRY DARST vs MEIGS COUNTY, OHIO

September 05, 2025
Index: sneeze..supplied

84:6
89:16,17,
19,22
90:7,11

**sneeze**
12:8

**sole**
34:24

**sort**
89:21
95:1

**sound**
17:2
99:24
100:18,25

**sounds**
36:21
41:10
77:5

**Spanish**
10:1

**spare**
40:17

**speak**
89:12

**Special**
5:8

**specific**
7:11
28:1,3,6,
11 29:9
31:11
42:24
43:20
44:1,6,14
45:16,19
46:2,6,12
49:24
51:10,11
59:1
60:11,15,
16 61:12,

24 63:6
64:16

**specifically**
25:12
28:10
31:1
43:10
45:15,24
49:17
86:17

**specifics**
29:7,14
42:4,10
43:17
50:15

**spoke**
24:7
38:15
41:21

**staff**
19:2 20:6
98:13

**standard**
103:19

**standards**
79:5

**stands**
8:7 51:22

**STARLING**
19:15
34:7
39:24
53:15
64:8,11
68:11
72:17
93:23
97:22
102:22
103:13,19

**start**
23:1

24:18
51:1
54:13
68:23
79:1

**started**
17:19
54:7

**starting**
66:6
80:20

**state**
7:14,16,
17 18:6
37:8 52:2

**stated**
61:14
64:3
80:13
85:24
96:20
97:7

**statement**
16:7,8

**status**
27:3

**stays**
59:16

**step**
80:9 82:5
84:24
94:20

**steps**
79:25

**Steve**
23:24
36:19,20,
22,23
37:10,12,
15,16
38:1

**Stewart**
18:21,23
19:1
23:7,11
24:18,19
25:1,6,9
26:1,15,
19,23
27:2,7,
13,21
28:10
62:3

**Stewart's**
62:10

**stop**
35:15

**stopped**
7:1

**story**
88:17
89:7,13,
19,25

**straight**
81:17,24
82:15

**strangers**
7:7

**street**
63:10

**stress**
7:13

**stressful**
51:19

**strongly**
38:19

**structure**
20:13

**struggling**
49:8

**stuff**
47:8

**stylistic**
30:9

**stylistically**
44:25

**subject**
11:8
102:24

**submit**
76:22

**sue**
8:4 14:22
42:5

**sued**
6:2,4
14:23
38:21

**suffer**
40:5

**suggest**
103:7

**suing**
7:9 41:23

**summary**
8:8,10

**summer**
22:11

**superior**
97:4

**supervisor**
35:25
95:9

**supervisors**
25:19
26:12
32:6 33:4
43:1
48:23

**supplied**
27:4



supporting
 41:17

supposed
 51:14

supposedly
 30:3

surely
 52:13
 100:25

suspended
 41:9
 84:12
 85:2

suspending
 81:11

suspension
 58:14
 78:12,15
 81:15

sustained
 40:20

swear
 21:14
 69:14

switch
 64:12

sworn
 16:7,9

System
 77:11

———————

T

———————

taking
 10:15
 99:5
 103:16

talk
 10:17
 18:15

24:19
25:4,5,12
27:9
30:20
31:22
35:22
36:22
37:21
38:7
61:14
63:4 86:4
88:17
98:22,23
102:4
103:2

talked
 13:12,16,
 17 24:24
 25:9 26:1
 28:8
 30:14
 31:17
 33:15,24
 36:15,19
 38:2,4,23
 42:11,15,
 16 49:10
 57:12,22,
 24 58:19
 60:8
 61:10
 64:14,17
 67:24
 75:17,18
 84:6
 96:22
 101:21
 102:7

talking
 18:22
 25:19
 35:18
 52:11,25
 53:3 55:9
 99:4

talks
 77:13
 87:19

tardiness
 43:18,21
 44:10
 52:16
 74:21

tardy
 26:11
 49:16
 50:17,24

task
 95:12
 96:12
 97:9

teach
 80:2,14
 85:25

teaching
 58:6,8

Team
 5:8

teased
 6:14

TEETOR
 44:16
 57:3,16
 64:6
 74:6,15
 82:1,7,17
 86:19
 87:1
 88:10
 90:9,13
 103:2,22

telephones
 88:21

telling
 73:16
 82:21
 92:20

100:16

ten
 51:1

ten-day
 78:15
 81:15

ten-minute
 64:7
 102:17

tenure
 43:2
 56:2,14,
 22 80:5

tenured
 55:3

term
 17:23,25
 58:16

terminable
 91:23

terminate
 23:2
 24:20
 40:22
 43:12
 80:8
 91:25

terminated
 22:19,21
 24:17
 39:6 41:6
 44:14
 73:5,7,
 16,17
 85:3 99:2

terminating
 25:6
 26:2,20
 35:19
 42:12,17
 79:12
 98:2

termination
 24:23
 39:9,16
 40:14
 58:14
 72:4,8
 74:13
 78:19
 81:2,18,
 24 82:16
 86:5
 97:20

terms
 30:3
 57:10

testified
 15:22
 16:1
 43:17
 54:8
 85:14,17

testify
 57:21

testifying
 99:22

testimony
 11:7,14
 12:1
 54:15
 80:25
 83:1

text
 29:24

thing
 12:2
 16:25
 49:7
 103:17

things
 10:23
 15:8
 28:25
 43:19



45:4,7,11
52:7 53:1
59:19
61:17
64:3
74:17

**thinking**
42:17

**thoroughnes
s**
74:22

**thought**
24:12
27:25
77:3
82:25
96:24
97:14

**thousand**
39:12

**three-day**
78:12

**three-
minute**
6:11

**throat**
12:3,8

**Thursday**
37:12

**time**
5:13 6:18
7:2 8:1
9:20 10:4
20:1
25:18,21
27:12,23
31:5
32:4,8
35:6
36:10,25
39:3
44:25
47:2,11

48:6
51:8,19,
20 52:4
53:1
54:6,7,10
57:14
60:3,5
61:3,7,21
62:16,19,
21 63:19,
21 71:22
73:5,6
76:22
80:5,8
84:19
85:15
88:1 89:1
90:5
92:14
93:25
98:14
102:2,23
103:12

**timeliness**
74:21
77:6
98:19

**timely**
30:12
44:22
49:12
75:11

**times**
4:25 5:2,
15 13:16
15:7,24
16:1
24:19,22,
23,24
25:5,8
47:5
48:2,9
60:16
63:8
72:25

92:7,15,
17,23
93:2
95:21
96:1,10

**title**
21:8

**titles**
20:13

**today**
8:7 11:7
12:1,13
28:15
31:15
52:11
64:14,17
102:23

**told**
25:13,17,
22 31:9
32:2 33:2
36:18
47:4,15
48:2,8
49:6
50:19
58:23
74:20
85:19
88:15
95:9
102:1,10,
14

**top**
18:18
53:24
75:22

**topic**
9:23 25:9
42:3

**topics**
64:12

**touched**

75:13

**towed**
5:19

**trained**
37:11,21

**training**
36:24
37:20
51:3,5,
23,24
52:20
57:25
66:1

**transcribed**
103:5

**transcript**
11:15,16
12:7 13:1
15:12
103:5

**transforms**
52:23

**trash**
47:6

**treat**
48:5 63:1

**treated**
53:5

**trial**
11:22
14:19

**true**
71:7

**Trussell**
21:15

**truthful**
12:1
76:24,25

**turmoil**
54:7

turn
34:17

**turning**
44:25
99:6

**Tylun**
20:7

**type**
94:21

**types**
73:21,24

**typically**
100:20

_____

U
_____

**uh-huh**
10:23
58:21
60:10

**ultimately**
14:4
18:10
21:14
23:3
25:16
29:11
39:13
42:20
102:16

**uncertain**
22:2

**unclean**
59:11

**underlying**
97:15

**underneath**
18:20,23

**understand**
9:9,12
11:4,6,23



15:11
41:10
44:4
58:16
77:5
80:17
82:12

understandi
ng
77:16

understood
9:16
32:19

uniform
47:7
75:14,18
76:11,14
95:11
98:19

union
25:23
31:24,25
32:18,24
33:16,21
34:2,5,
13,15,18,
21,24
35:4,10
83:8,10,
11 84:1,
3,8,10,21
88:25
89:1,15
90:8

unit
84:1

unlike
56:22

unmarked
95:12
97:10

unprofessio
nal

91:6

unreasonabl
y
10:11

unsatisfact
orily
72:6

unsatisfact
ory
24:15
25:20
29:2
73:25
74:5,14,
18 75:1
79:4,8
98:16

updated
27:2

upheld
39:16

useable
17:2

─────────
V
─────────

vacancy
18:3

valid
66:11,15

variety
11:16

vehicle
59:13,15
95:12
97:8,9,10

verbal
57:19,22
58:13
78:8
79:18

80:6 81:5
82:10

verbally
10:22
30:2
58:1,4
85:18

versus
58:6

vested
69:16

view
45:7,18
72:8

viewed
26:4

violated
14:25
15:3

violating
52:15

violation
95:14

visibility
46:21
48:8

visible
60:25

vision
61:15

Volcheck
32:24
33:18,19

voluntarily
32:13
33:21

─────────
W
─────────

wait

46:24
60:23

Waiting
8:8

waive
103:8

walk
63:10

walk-in
63:9

Walker
12:21

wanted
25:22
37:20
48:2,3
53:5
60:20
61:16

wanting
60:24

warned
48:15

warning
58:1,5

warnings
57:19,22

warrant
5:12 91:8

wash
59:23

Washington
5:6,7,16
6:3,7
7:18 8:16
13:18
14:6

ways
11:16
86:2

week
17:19
37:12
92:17
96:11,13,
14

weekly
51:25

weeks
14:10
80:4

well-versed
8:18

whatsoever
59:7

whys
22:21

wife
5:19

Willful
91:18

witnesses
9:25

wondering
93:13

Wood
18:14
21:13
38:15,19
72:23

woods
38:17

work
12:9
21:1,4
27:5
29:1,5
31:5
37:19
43:18,21
44:11



45:3,12
50:20
51:8
56:20
60:8,18
74:23
88:19
98:12,15

**worked**
21:20,24
35:23
47:14
60:3
61:7,21
62:20
66:24
70:25
80:4,11,
22 85:15
92:11
96:8,12
98:13

**working**
7:3 20:22
36:9
66:15
95:10

**worthy**
43:14

**wrappers**
59:19

**write**
47:18
48:11
50:6
52:14

**writing**
47:20
52:9
55:13

**written**
11:15,16,
19 26:12
48:25

49:25
50:3
53:13,20
54:16,22
56:4
57:11
58:13
71:12,18
78:8
79:18
80:6 81:6
82:10
84:16
90:18
91:1
93:21
94:3
96:18,23

**wrong**
30:3
52:15

**wrongdoing**
55:14

**wrote**
45:20

———————
**Y**
———————

**year**
7:24
25:14
87:23

**years**
13:7,20
22:2,16
96:9,11

**young**
100:22

———————
**Z**
———————

**Zach**
5:25

**Zoom**
9:4 10:14
19:9,17





# Meigs County Sheriff's Office
## ORGANIZATION CHART

**SCOTT FITCH**
SHERIFF

**FRANK STEWART**
CAPTAIN

COMMUNICATIONS

INVESTIGATIONS

**ON-DUTY SUPERVISOR**
SHERIFF'S OFFICE

ROAD

**TYLUN CAMPBELL**
SERGEANT

**DISPATCHERS**
MEIGS 911

**BILL GILKEY BRANDY KING**
LIEUTENANTS

**DETECTIVES**
TASK FORCE/JFS

**RICK SMITH**
SERGEANT

**DON MOHLER**
SERGEANT

**DEPUTIES**
EVENING SHIFT

**DEPUTIES SRO'S**
DAYSHIFT

**DEPUTIES**
MIDNIGHT SHIFT

EXHIBIT
1

MCSO 00143



2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

08/11/2022
1603-02
21-MED-01-0015
21-MED-01-0016
21-MED-01-0017
41976

# AGREEMENT BETWEEN

## MEIGS COUNTY SHERIFF'S OFFICE

## AND THE

## OHIO PATROLMEN'S BENEVOLENT ASSOCIATION

**Effective April 1, 2021 through March 31, 2024**

**SERB CASE NO(S). 2021-MED-01-0016; 0034; 0017**

EXHIBIT

2

MCSO 00144

# TABLE OF CONTENTS

ARTICLE 1 AGREEMENT ............................................................................................... 1

ARTICLE 2 UNION RECOGNITION ............................................................................ 1

ARTICLE 3 DUE CHECK-OFF ...................................................................................... 1

ARTICLE 4 MANAGEMENT'S RIGHTS ...................................................................... 3

ARTICLE 5 UNION REPRESENTATION ...................................................................... 4

ARTICLE 6 NO STRIKE/NO LOCKOUT ...................................................................... 6

ARTICLE 7 LABOR/MANAGEMENT MEETINGS ...................................................... 6

ARTICLE 8 GRIEVANCE PROCEDURE ....................................................................... 7

ARTICLE 9 DISCIPLINE ............................................................................................... 10

ARTICLE 10 SENIORITY .............................................................................................. 11

ARTICLE 11 FILLING OF POSITIONS ........................................................................ 12

ARTICLE 12 LAYOFF AND RECALL .......................................................................... 13

ARTICLE 13 HEALTH AND SAFETY .......................................................................... 14

ARTICLE 14 WORK RULES .......................................................................................... 14

ARTICLE 15 HOURS OF WORK ................................................................................... 15

ARTICLE 16 OVERTIME ............................................................................................... 16

ARTICLE 17 REPORT-IN AND CALL-IN WORK ...................................................... 17

ARTICLE 18 SICK LEAVE ............................................................................................ 17

ARTICLE 19 LEAVES AND LEAVES OF ABSENCE ................................................. 21

ARTICLE 20 VACATIONS…………………………………………………………….23

ARTICLE 21 HOLIDAYS .............................................................................................. 25

ARTICLE 22 INSURANCE ............................................................................................ 26

MCSO 00145

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

ARTICLE 23 WAGES ................................................................................................................ 26

ARTICLE 25 SEVERABILITY ................................................................................................ 29

ARTICLE 26 WAIVER IN CASE OF EMERGENCY .............................................................. 29

ARTICLE 27 EMPLOYEE RIGHTS ........................................................................................ 29

ARTICLE 28 VEHICLES ........................................................................................................ 30

ARTICLE 29 UNIFORMS ....................................................................................................... 30

ARTICLE 30 SUBSTANCE TESTING AND ABUSE .............................................................. 31

ARTICLE 31 TRAINING ........................................................................................................ 33

ARTICLE 32 WAIVER OF STATE CIVIL SERVICE AND RELATED LAWS ..................... 33

ARTICLE 33 DURATION OF AGREEMENT ........................................................................ 33

ARTICLE 34 PART-TIME OFFICERS ................................................................................... 34

SIGNATURE PAGE ................................................................................................................ 35

MCSO 00146

# ARTICLE 1 AGREEMENT

Section 1.1    This agreement is made and entered into by the Sheriff of Meigs County, hereinafter referred to as the "Employer," subject to the approval of the Meigs County Commissioners and the Ohio Patrolmen's Benevolent Association, hereinafter referred to as the "Union." This Agreement has as its purpose: to comply with Ohio Revised Code Section 4117, to establish the wages, hours, and other terms and conditions of employment for all employees in the bargaining unit.

# ARTICLE 2 UNION RECOGNITION

Section 2.1    The Employer recognizes the Union as the sole and exclusive representative for the purpose of negotiating wages, hours, terms, and other conditions of employment for those employees of the Employer in the bargaining unit. Wherever used in this Agreement, the term "bargaining unit" shall be deemed to include all employees included in the bargaining units, described in the State Employment Relations Board Case Numbers 96-REP-07-135, 96-REP-07-136 and 01-REP-11-0285. For purposes of this Agreement, the bargaining units are deemed as follows:

Full-time Deputies
Full-time Sergeants and Lieutenants
Full-time Civilian Dispatchers

Section 2.2    All positions and classifications not specifically established herein as being included in the bargaining unit shall be excluded from the bargaining unit.

Section 2.3    In the event a new classification is created, the Sheriff shall meet with the Union concerning the new classification specification, and shall negotiate as to whether or not the new classification will be included in the bargaining unit. If the Employer and the Union cannot agree, they shall jointly petition the State Employment Relations Boards concerning only the new position in question. The decision by the State Employment Relations Board shall be final and binding on both parties.

# ARTICLE 3 DUE CHECK-OFF

Section 3.1    The Employer and the Union agree that membership in the Union is available to all employees occupying classifications as has been determined by this Agreement to be appropriately within the bargaining units upon the successful completion of their probationary period.

Section 3.2    The Employer agrees to deduct regular Union membership dues twice each month from the pay of any employee eligible for membership in the bargaining unit upon receiving written authorization signed individually and voluntarily by the employee. The signed payroll deduction form must be presented to the Employer by the employee. Upon receipt of the proper authorization, the Employer will request the Auditor to deduct Union dues from the payroll check during the next pay period that Union dues deduction is normally made.

Section 3.3      The rate at which dues are to be deducted and a list of employees who have authorized deductions shall be certified to the Employer by the Treasurer of the Union by January 2nd of each year. One (1) month advance notice must be given the payroll clerk prior to making any changes in an individual's dues deduction.

Section 3.4      Each eligible employee's written authorization for dues deduction shall be honored by the Employer for the duration of this Agreement. An employee may only revoke his or her authorization for dues deduction by giving written notice to the Union and Employer with proof of service during the sixty (60) to thirty (30) day period prior to the expiration of this collective bargaining Agreement.

Section 3.5      The total amount of dues deduction and a list of all employees whose dues have been deducted shall be transmitted to the Union Treasurer within ten (10) days following the date when the deduction was made.

Section 3.6      It is specifically agreed that the Employer assumes no obligation, financial or otherwise, arising out of the provisions of this article, and the Union hereby agrees that it will indemnify and hold the Employer harmless from any claims, actions or proceedings by any employee arising from deductions made by the Employer pursuant to this article.

Section 3.7      It is agreed that neither the employees nor the Union shall have a claim against the Employer for errors in processing of deductions unless a claim of error is made to the Employer in writing within sixty (60) days after the date such an error is claimed to have occurred. If it is found an error was made, it will be corrected at the next pay period that the Union dues deduction would normally be made by deducting the proper amount. Payroll collection of dues shall be authorized for the exclusive bargaining agent only, and for no other organization attempting to represent the employees within the bargaining unit as herein determined.

Section 3.8      In the event a deduction is not made for any Union member during any particular month, the Employer, upon written verification from the Union, will make the appropriate deduction from the following pay period in which dues are normally deducted, if the deduction does not exceed the total of two (2) months' regular dues from the pay of any Union member.

The Employer will not deduct more than one (1) month's regular dues for more than one (1) consecutive month.

Section 3.9      The Employer shall be relieved from making such individual dues deductions upon:

A.      Termination of employment;
B.      Transfer to a job other than one covered by the bargaining unit;
C.      Layoff from work;
D.      An agreed unpaid leave of absence; or
E.      Revocation of the check-off authorization in accordance with the terms of this Agreement.

2

Section 3.10    The Employer shall not be obligated to make dues deductions from any employee who, during any dues month involved, shall have failed to receive sufficient wages to equal the dues deductions.

## ARTICLE 4 MANAGEMENT'S RIGHTS

Section 4.1    Except to the extent expressly modified by the provisions of this Agreement, the Employer reserves and retains solely and exclusively all of his legal rights to manage the operations of the Sheriff Department, Meigs County, Ohio, as such rights existed prior to the execution of this or any other previous agreement with the Union. The rights of the Employer shall include, but shall not be limited to, his rights to determine the facts which are the basis of management decisions; to establish, change, or abolish policies, practices, rules, or procedures for the conduct of the Sheriff Department, its employees, and its service to the citizens of Meigs County, Ohio, consistent with the provisions of this Agreement. Such management rights shall also include, but shall not be limited to the following:

A.    The right to determine and from time to time re-determine the number, locations, and relocations and types of its employees or to discontinue any performance by employees of the County of Meigs;

B.    To select and determine the number and types of employees required, including the right to select, hire, promote, transfer, evaluate, and to assign such work to such employees in accordance with the requirements determined by the Employer;

C.    To establish training programs and requirements for employees within the Sheriff's Department;

D.    To establish the hours of work, work schedules, and assignments; to transfer, promote, or demote as provided by applicable statutory law, for just cause; or to layoff, terminate, or otherwise relive employees from duty;

E.    To continue, alter, make, delete, and enforce reasonable rules for the maintenance of discipline;

F.    To suspend, discharge, or otherwise take such measures as the Employer may determine to be necessary for the orderly and efficient operation of the Sheriff's Department of Meigs County, Ohio;

G.    To determine the Department budget and uses thereof;

H.    To maintain the security of records and other pertinent information;

I.    To determine and implement necessary actions in emergency situations;

J.    To manage and determine the location, type, and number of physical facilities, equipment, programs, and the work to be performed;

K.    To determine when a job vacancy exists, the duties to be included in all job classifications, and the standards of quality and performance to be maintained; and

L.    To determine the Department's goals, objectives, programs, and services and to utilize personnel in a manner designed to effectively meet these purposes.

Section 4.2    The Employer on its behalf hereby retains and reserves unto itself all rights, power, authority, duty, and responsibility confirmed on and vested in it by the laws and Constitution of the State of Ohio and/or the United States or America.

The exercise of any such right, power, authority, duty, or responsibility by the Employer and the adoption of such rules, regulations, policies as it may deem necessary, and as they apply to employees represented by the Union, shall be limited only by the specific express terms of this Agreement.

## ARTICLE 5 UNION REPRESENTATION

Section 5.1    Union Visitation    The Employer agrees that no more than two (2) non-employee officers or representatives of the Union shall be admitted to the Meigs County Sheriff's Department facilities and site during working hours upon advance notice to the Employer. Such visitations shall be to participate in the adjustment of grievances and/or to attend other meetings covered herein. Union visitations shall not disrupt the Employer's work schedule.

Section 5.2    The Employer shall recognize up to two (2) employees selected by the Union to act as Union representatives for the purpose of processing grievances. These two (2) employees shall be the Local Director and one (1) steward designated by the Union. The Union agrees that to the extent possible, Union representatives will not be from the same unit.

Section 5.3    The Local Director and/or steward may investigate and process grievances, and attend grievance step meetings with the Employer during regular working hours without loss of pay subject to the other provisions of this Agreement. Such investigations and processing of grievances shall be with proper regard to the Employer's operational needs, and such total grievance processing time shall not exceed eight (8) hours per month per each employee authorized under this article to process grievances. No Union representative shall be entitled to pay while processing grievances or attending grievance step meetings during any hours in which the employee was not otherwise scheduled to work.

Section 5.4    Rules governing the activity of the Union representatives are as follows:

A.    The representatives must obtain, in advance, authorization of his/her immediate supervisor before beginning Union activities;

B.    The representatives shall identify the reason for the request at the time Union activity is requested;

C.    The representatives shall not conduct Union activities in any work area without notifying the supervisor in charge of the area of the nature of the Union activity; and

D.    The representatives shall cease Union activities immediately upon the reasonable order of the supervisor of the area in which Union activity is being conducted or upon the reasonable order of the Union representative's immediate supervisor. If the Employer alleges that any Union representative is violating or abusing the rules of this section, he shall notify the Local Director. Upon such notice, a conference will be scheduled to resolve the matter prior to initiating any disciplinary action.

Section 5.5    One (1) duly elected delegate or alternate to the annual conventions of the Union may be granted time off without pay for the purposes of participating in such conventions.

The Union shall give the Employer advance notice of which member will be attending each convention. Such unpaid personal leave will be approved, subject to manpower requirements of

4

the Department, upon receipt of the ten (10) days advance written notification by the Local Director.

Section 5.6    The Union shall provide to the Employer an official roster of its officers and representatives within thirty (30) days of the effective date of this Agreement. This roster will be updated within thirty (30) days of any change, and shall include the following:

A.    Name;
B.    Address;
C.    Home telephone number; and
D.    Union office held.

Employees shall not be permitted to function as Union representatives until the Union has presented the Employer with written certification of that person's selection.

Section 5.7    The Employer agrees to grant one (1) designated Union official one (1) scheduled shift off without pay per two (2) month time period for the purposes of attending Director's meetings. Such unpaid leave will be granted, subject to the manpower requirements of the Department, and subject to the following conditions:

A.    Under no circumstances will the Employer be required to approve such unpaid leave, if by doing so the Employer would be requested to incur overtime or additional costs for a replacement employee;
B.    In order to provide coverage, employees will be permitted to trade shifts subject to subsection A; and
C.    The Union agrees to give at least seven (7) calendar days' advance notification to the Employer indicating the name of the Union official requesting such leave, the shift involved, and any arrangement for trading shifts.

Section 5.8    Bulletin Boards

A.    The Employer shall provide the Union with a bulletin board for the purpose of posting Union notices, leaflets, and information.

B.    All Union notices which appear on the bulletin board shall be posted and removed by the Director or steward and shall relate to items of interest to the employees. Union notices relating to the following matters may be posted without the necessity of receiving the Employer's prior approval and must be posted on the designated bulletin board:

    1.    Union recreational and social affairs;
    2.    Notice of Union meetings;
    3.    Union appointments;
    4.    Notice of Union elections;
    5.    Results of Union elections;
    6.    Reports of nonpolitical standing committees and independent nonpolitical arms of the Union; and

5

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

    7.      Publications, rulings, or policies of the Union.

    All other notices of any kind not covered in Subsection 1 through Subsection 7 above must receive prior approval of the Employer or its designated representative.

C.     Union literature shall not contain libelous, scurrilous, or derogatory attacks upon the Employer or other County officials, or employees, named or unnamed. Literature distributed or displayed inside or upon the facilities of the Sheriff's Department shall not contain opposition to or the promotion of a candidate for public office.

D.     Any employee found violating the provisions of this article shall be subject to appropriate disciplinary action. Any violation of the provisions of this article by the Union or any representative thereof may result in suspension, revocation of its bulletin board privileges, and/or removal of the Union bulletin boards.

## ARTICLE 6 NO STRIKE/NO LOCKOUT

Section 6.1    The Employer and the Union recognize that a strike would create a clear and present danger to the public health, safety, and welfare, and that the Agreement provides machinery for the orderly resolution of grievances. The Union, therefore, agrees that there shall be no interruption of services by the employees because of any work slowdown, sick call, strike, sympathy strike, or other concerted effort which affects the Employer or its operations during the term of this Agreement or any extensions thereof.

Section 6.2    The Employer agrees that neither it, its officers, agents, or representatives, individually or collectively, will authorize, instigate, cause, aid, or condone any lockout of bargaining unit members during the term of this Agreement unless those employees have violated Section 6.1 of this article.

Section 6.3.    If any members of the bargaining unit, either individually or collectively, engage in a work slowdown, walkout, or any other concerted effort resulting in interruption of services, the Union shall publicly denounce such violation, disclaim approval, and order all member participants to return to work immediately. Should the employees fail to immediately return to work or the Union fail to publicly denounce and disclaim approval of such violation, the Employer shall have the option of canceling any article, section, or subsection of this Agreement. Any employee who participates or promotes such strike activities as previously outlined shall be subject to immediate discipline, including discharge, and only the question of whether or not he or she did, in fact, participate in or promote such action shall be subject to appeal.
Section 6.4    Nothing in this article shall be construed to limit or abridge the Employer's right to seek other available remedies provided by law to deal with any unauthorized or unlawful strike.

## ARTICLE 7 LABOR/MANAGEMENT MEETINGS

Section 7.1    In the interest of sound labor/management relations, the Union and the Employer will meet at agreeable dates and times for the purposes of discussing those matters as outlined in Section 7.2 below. No more than two (2) employee representatives of the Union, three (3)

MCSO 00152

representatives of the Employer and one (1) non-employee representative of the Union shall be permitted to attend such meetings.

Section 7.2     The Union shall furnish an agenda at least five (5) working days in advance of the scheduled meeting with a list of the matters to be taken up in the meeting and the names of those Union representatives who will be attending. The purpose of such meeting shall be to:

A.     Discuss the administration of this Agreement;
B.     Notify the Union of changes made by the Employer which may affect bargaining unit members of the Union.
C.     Discuss grievances which have not been processed beyond. the final step of the grievance procedure when such discussions are mutually agreed to by the parties;
D.     Disseminate general information of interest to the parties;
E.     Give the Union representative the opportunity to share the view of their members and/or make suggestions on subjects of interest to their members;
F.     Discuss ways to improve efficiency and work performance; and
G.     Consider and discuss health and safety matters.

Local Union employee representatives attending labor/management meetings shall not suffer a loss in pay for time spent in such meetings if held during the employee's regularly scheduled hours of work.

## ARTICLE 8 GRIEVANCE PROCEDURE

Section 8.1     The term "grievance" shall mean an allegation by a bargaining unit employee that there has been a breach, misinterpretation, or improper application of this Agreement. It is not intended that the grievance procedure be used to effect changes in the articles of this Agreement nor those matters not covered by this Agreement.

Section 8.2     It is mutually agreed that the prompt presentation, adjustment, and/or answering of grievances is desirable in the interest of sound relations between the employees and the Employer. Therefore the following rules apply to the processing of grievances:

A.     All grievances must be processed at the proper step in the progression in order to be considered at any subsequent steps of the grievance procedure.
B.     Any employee may withdraw a grievance at any point by submitting in writing a statement to that effect, or by permitting the time requirements at any step to lapse without further appeal.
C.     Any grievance not answered by management within the stipulated time limits shall be considered answered in the negative and may be advanced by the employee to the next step in the grievance procedure.
D.     The number of days indicated at each level shall be considered as maximum. The time limits may, however, be extended or the steps herein waived by mutual agreement of the parties concerned, expressed in writing.
E.     If any grievance is not initiated at the first step within ten (10) working days after the employee knew of the event or condition upon which it is abased, or with reasonable

diligence should have known of such event or condition, the grievance shall be considered waived, shall no longer be deemed a grievance, and may not be processed as such.

F.     "Working days" as used in this article shall mean Monday through Friday, and shall not include Saturdays, Sundays, or days indicated as holidays pursuant to this Agreement unless calendar days are so specified.

Section 8.3     A grievance may be brought by any employee of the bargaining unit. Where a group of bargaining unit employees desire to file a grievance involving a situation affecting each employee in the same manner, one (1) employee selected by such group may process the grievance as a group grievance provided each employee desiring to be included in the group grievance signs said grievance. In a group grievance, only one (1) of the grievants shall be guaranteed no loss of pay during processing steps provided by this article. If more than one (1) employee's testimony is necessary at an arbitration hearing held pursuant to this procedure, and the testimony is scheduled during the employee's regularly scheduled work shift, the employee shall be released for such testimony in paid status and shall return to work following completion of the testimony. No employee shall be entitled to pay for attending grievance hearing during hours in which the employee was not otherwise scheduled to work.

Section 8.4     All written grievances should contain the following information and must be filed using the grievance form mutually agreed to by the Union arid the Employer:

A.     Aggrieved employee's name and signature;
B.     Aggrieved employee's classification;
C.     Date grievance was filed in writing;
D.     Date and time grievance occurred;
E.     Where grievance occurred;
F.     Description of incident giving rise to the grievance; and
G.     Articles and sections of Agreement alleged to be violated.
H.     Resolution requested.

Section 8.5     The following procedures shall be followed in the processing of any grievance:

Step 1: In order for a grievance to receive consideration it must be presented in writing to the Sheriff or his Designee by the employee, with the steward if the employee desires, within ten (10) working days of the occurrence of the event upon which the grievance is based or with reasonable diligence the grievant should have known of such event or condition. If the Sheriff is unavailable and has not named a Designee, the time frame for filing or processing a grievance shall be held in abeyance until the Sheriff becomes available or names a Designee.

Upon receipt of the written grievance, the Sheriff or his Designee will schedule a meeting with the employee, and Director or designee if the employee desires, to be held within five (5) working days of receipt of the grievance to discuss the grievance. The Director may request a non-employee representative of the OPBA to attend the meeting. The Sheriff or his designee shall give a written answer within five (5) working days following the meeting.

MCSO 00154

Step 2: Arbitration    If the grievance is not satisfactorily settled at Step 1, the Union may request that the grievance be submitted to arbitration. The Union's request for arbitration must be submitted to the Sheriff within twenty-one (21) calendar days following the Sheriffs reply to the grievance at Step 1 or the grievance shall be considered resolved and the matter shall not be submitted to arbitration.

On the date a grievance is submitted to arbitration, the Union or the Employer shall also submit written request to the Federal Mediation and Conciliation Service (FMCS) for a list of nine (9) arbitrators from Ohio to be sent to each party for the purpose of selecting one (1) arbitrator to hear the case. The parties shall alternately strike the names of the arbitrators until only one (1) name remains. The party requesting the arbitration shall strike the first name. Either party may once reject the remaining name and request from the FMCS another list of nine (9) names until a mutually agreeable arbitrator is selected.

The arbitrator shall limit his decision to a specific issue outlined in a submission agreement and strictly to the interpretation, application, or enforcement of the specific articles and sections of this Agreement. The arbitrator shall be without power or authority to make any decision:

A.    Contrary to, inconsistent with, or modifying or varying in any way the terms of this Agreement or applicable law;
B.    Concerning the establishment of wage rates not negotiated as part of this Agreement;
C.    Granting any right or relief on any alleged grievance occurring at any time other than the contract period in which such right originated, or make any award based on rights arising under any previous agreement, grievances, or practices; or
D.    Contrary to, inconsistent with, changing, altering, limiting, or modifying any practice, policy, rules, or regulations presently or in the future established by the Employer so long as such a practice, policy, rule, or regulation does not conflict with the Agreement.

In cases of discharge or of suspension, the arbitrator shall have the authority to recommend modification of said discipline. In the event of a monetary award, the arbitrator shall limit any retroactive settlement to the date the employee knew or should have known of the occurrence of the event or condition upon which the grievance is based in accordance with Section 9.2(E). of this article. Monetary awards resulting from suspensions or discharges shall be limited to the period of time or portion thereof during which the affected employee was suspended or discharged.

The arbitrator will make his award within thirty (30) days of the close of the hearing or within thirty (30) days after the filing of post-hearing briefs.

Unless contrary to law, the decision of the arbitrator shall be final and binding upon management, the Union, and any employee involved in the matter.

The costs and fees of the arbitrator shall be borne by the losing party. In the event that the arbitrator's decision fails to grant the requested award of either party and represents a "split decision," the cost and fees of the arbitrator shall be borne equally by the parties. The arbitrator shall be requested to rule on the assignment of costs at the time of presentation of the award. The expenses of any non-employee witness shall be borne, if any, by the party calling them. The fees

of the court reporter shall be paid by the party asking for one; such fees shall be split equally if both parties desire a reporter, or request a copy of any transcripts.

If the arbitrator decides the grievance is non-arbitrable or decides for the Union on arbitrability but against the Union on the merits, the Union should be considered the losing party.

## ARTICLE 9, DISCIPLINE

Section 9.1. No employee shall be reduced in pay or position, suspended, discharged, removed, or otherwise disciplined except for just cause. Forms of disciplinary action are limited to:

A.    Documented warning;
B.    Written reprimand;
C.    Suspension without pay;
D.    Reduction; or
E.    Discharge from employment.

Except in cases of serious misconduct, discipline shall be applied in a corrective, progressive and uniform manner.

Section 9.2. If the supervisor or other representative of the Meigs County Sheriff has reason to reprimand an employee, it shall be done in a manner that will not embarrass the employee before other employees or the public.

Section 9.3. Written reprimands shall cease to have force and effect twelve (12) months following their effective date providing there is no intervening disciplinary action taken during that time period.

Section 9.4. All record of suspension shall cease to have force and effect twenty-four (24) months following the date of the suspension providing there is no intervening written notice of disciplinary action during the twenty-four (24) month period.

Section 9.5. An employee shall be given a copy of any written reprimand or other written disciplinary action entered on his personnel record.

Section 9.6. Whenever the Employer determines that an employee may be suspended, reduced in pay or position, or terminated for disciplinary reasons, a disciplinary conference will be scheduled to give the employee an opportunity to offer an explanation of the alleged misconduct. The Employer shall determine who will conduct the disciplinary conference.

Not less than seventy-two (72) hours prior to the scheduled starting time of the disciplinary conference, the Employer will provide to the employee a written outline of the charges that may form the basis for the disciplinary action, together with written notification of the date, time and place of the hearing. The Employee must choose to:

MCSO 00156

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

A.  Appear at the conference to present an oral or written statement in his defense;
B.  Appear at the conference and have one (1) Union representative present an oral or written statement in defense of the employee; or
C.  Elect in writing to waive the opportunity to have a disciplinary conference.

The employee shall notify their choice at or before the disciplinary conference. The employee may choose both A and B, either A or B, or C. Failure to make such election will be deemed a waiver of the employee's rights to the disciplinary conference. The Employer will decide what discipline, if any, is appropriate.

Section 9.7. Any employee who has been disciplined will be given a written statement describing the reason or reasons for which he or she has been suspended or discharged. In the case of suspension, he or she will be advised of the duration of the suspension.

Section 9.8. For all disciplinary conferences, the affected employee, at his option, shall be permitted the opportunity to have a Union attorney and/or employee representative present.

Section 9.9. All grievances involving disciplinary action of a suspension, demotion or dismissal shall be filed directly at Step 2 of the grievance procedure.

Section 9.10. Verbal warning and written reprimands may be appealed only up through Step 2 of the grievance procedure and shall not be arbitrable. If a verbal warning or written reprimand is used as a basis for further disciplinary action, such warning or reprimand will be incorporated into the higher level of discipline.

All modifications in this Article for the April 1, 2021 – March 31, 2024 CBA shall be applied prospectively following execution.

## ARTICLE 10 SENIORITY

Section 10.1  Two (2) types of seniority are established under this Agreement as follows:

A.  "Classification seniority" is the employee's length of continuous service in his current classification, from his last date of entry into the classification.
B.  "Total seniority" is the employee's total length of continuous full-time service with the Employer from his most recent date of hire.

Section 10.2  An employee's seniority will terminate:

A.  If the employee quits;
B.  If the employee retires;
C.  If an employee is discharged; or
D.  If the employee is laid off for a period of more than eighteen (18) consecutive months.

Section 10.3  The Employer will provide the Union with one (1) copy of a seniority list within fourteen (14) calendar days after the effective date of this Agreement and immediately following

11

the hiring of any bargaining unit employee[s], showing the seniority of each employee in the bargaining unit by classification, and by total seniority. Any employee shall have ten (10) working days after the list is prepared and posted in the Department to protest his position on that list. If no challenge is received, the list shall be deemed accurate for the remainder of the posting period.

Section 10.4    Whenever seniority is the determining criteria to any terms and conditions contained in this collective bargaining Agreement and two (2) or more employees are tied as to the length of their applicable seniority, the following listed seniority rights shall prevail:

A.     If two (2) or more employees have the same classification seniority, total seniority shall prevail.
B.     If two (2) or more employees have the same total seniority, the oldest employee, by age, shall prevail.

## ARTICLE 11 FILLING OF POSITIONS

Section 11.1    Whenever the Employer determines a job vacancy exists in the bargaining unit which it desires to fill, a notice of such opening, stating the job classification, job description, qualifications, and rate of pay, shall be posted on the bulletin board for seven (7) calendar days. During this period, anyone wishing to apply for the open position shall submit a written application to the Sheriff. The Sheriff shall not be obligated to consider any applications submitted after the posting period.

Section 11.2    A vacancy is defined as a job opening as a result of a promotion, transfer, resignation, discharge, termination of employment, a newly created position, or an increase in the number of jobs available in an existing classification. Whenever the Employer determines it necessary to fill such vacancies, the vacancy shall be posted in accordance with this article.

Section 11.3    All timely filed applications shall be reviewed and the position shall be awarded to the most qualified applicant, with first consideration given to qualified in-house applicants. If two (2) or more applicants have equal qualifications, the position shall be awarded to the employee applicant with the greatest seniority. The Employer maintains the right to determine who is best qualified; however, the Union may contest through the grievance procedure such choice of candidates. The Union shall bear the burden to prove that a candidate not receiving an appointment is the best qualified.

Promotions from the Deputy rank to the Sergeant rank shall be by a competitive examination process as identified herein.  The first part of the competitive examination shall be a written test. Candidates who fail this written test shall not be considered for promotion and shall not take part in any further examination processes.  The passing score shall at least be seventy percent (70%) and notice will be provided prior to the examination.  Candidates who pass this written test shall then proceed to the second part of the competitive examination – the verbal interview.  The verbal interview shall be conducted by a panel to be selected by the Sheriff.  The candidates with the top three (3) scores from the verbal interview shall be presented to the Sheriff along with the scores of both their verbal interview and written examination.  Should there be a tie among verbal interview scores, such shall be broken by giving preference to the candidate with the highest written

MCSO 00158

examination score. The Sheriff shall promote from among these top three (3) candidates of the verbal interview. The list shall be valid for one (1) year from the date the position is filled. Each candidate for promotion from the Deputy rank to the Sergeant rank shall be required to have three (3) years of experience as a Full-Time Deputy in the Meigs County Sheriff's Office. Such shall be computed at the date the notification of vacancy is posted.

Section 11.4    The probationary period for a newly-hired employee shall begin on the first day for which the employee receives compensation for the new classification from the Department and shall continue for a period of one (1) calendar year. The probationary period for a newly promoted employee shall begin on the effective day of the promotion and shall continue for a period of one hundred twenty (120) calendar days. The Employer shall give the individual hired, promoted, or transferred assistance to enable him to qualify for his new position. A newly-hired employee may be removed any time during his probationary period. New-hire probationary removals shall not be appealable to the grievance procedure.

A promoted employee who fails to meet the qualifications of the new position during his probationary period shall be placed in his former classification at his previous rate of pay and without loss of seniority.

Section 11.5    If a current employee is promoted by the Employer to a higher classification, his new pay rate will become effective immediately upon assignment to the classification. The position should be awarded within fourteen (14) calendar days after the end of the posting period. If the Employer is unable to fill the position within fourteen (14) days, the Employer will notify the Union.

## ARTICLE 12 LAYOFF AND RECALL

Section 12.1    The Employer will notify the Union at least fourteen (14) days in advance of its intent to reduce the work force. At the time of the notice, the Employer will provide the Union with a current updated seniority list.

Section 12.2    Order of Reduction    Whenever a reduction in the work force occurs, layoffs shall occur based upon the total seniority of all bargaining unit members of classifications covered in this Agreement. The Employer shall not have the discretion to determine in which classification the layoff shall occur but rather the least senior member of the combined classifications covered by this Agreement shall be laid off first. Additional lay-offs shall continue based upon the least total seniority. Before the lay-off of any bargaining unit member, all casual, temporary, new hire probationary, and part-time employees within all of the classifications covered by this Agreement shall be terminated or laid off first.

Section 12.3    Recall Rights    Employees displaced from their classification through a reduction in work force shall be recalled or returned to vacancies which (1) thereafter occur in their classification in the order of their classification seniority (most classification senior employee recalled first), or (2) thereafter occur in a lower-rated classification within the Employer's bargaining unit work force for which the recalled employee is qualified by having state-required

13

certifications necessary to perform the work, in order of their total seniority (most senior employee recalled first).

Such vacancies in the classification or other lower similarly rated classification shall not be posted and filled from within, nor shall the Employer hire from outside until such time as all qualified employees have exhausted their recall rights. Employees shall retain recall rights for a period of eighteen (18) calendar months from their effective date of displacement.

Section 12.4   Recall Notice   Written notice of recall form layoff shall be sent to the employee's last known address by the Employer, by certified mail, return receipt requested. Failure of an employee to contact the Employer within five (5) calendar days after receipt of a recall notice shall constitute a forfeiture of an employee's right to recall.

Section 12.5   Reduction Severance Pay     Employees displaced by a work force reduction shall be entitled, on their last date of employment, to all wages, vacation, and compensatory time pay provided by this Agreement which is due to such employees.

Section 12.6   Employee Appeals   Employees displaced pursuant to the provisions of this Article shall have recourse rights based solely upon the provisions of this Agreement. No provisions of the Ohio Revised Code or the Ohio Administrative Code shall apply.

## ARTICLE 13 HEALTH AND SAFETY

Section 13.1   The Employer and employees agree to maintain in safe working conditions all facilities, vehicles, and equipment furnished by the Employer to carry out the duties of each bargaining unit position.

Section 13.2   Adequate first aid equipment will be provided.

Section 13.3   Any employee subjected to an unsafe or unhealthy working condition shall have the right to file a grievance against any such condition provided such condition is not resolved as a result of the labor/management meeting prescribed herein.

Section 13.4   The Employer agrees to provide a vehicle which is adequate for the transportation of prisoners. In case of transporting multiple persons or persons of the opposite sex, a corrections officer or additional employee will be allowed to accompany the employee doing the transport when deemed necessary by the Sheriff or his designee.

Section 13.5.   The Employer agrees to schedule at least two (2) road patrol deputies per shift, twenty-four (24) hours a day.

## ARTICLE 14 WORK RULES

Section 14.1   The Union recognizes that the Employer, in order to carry out its statutory mandates and goals, has the right to promulgate work rules, regulations, policies, and procedures consistent with the Employer's statutory authority to regular the personal conduct of employees, and the conduct of the Employer's operations, services, programs, and business.

Section 14.2    It is the Employer's intention that work rules, policies, and directives should be interpreted and applied uniformly under similar circumstances within the group or groups of employees to whom such rules, policies, and directives are directed. Rules adopted by the Employer shall not be applied in violation of the express terms of this Agreement. The Union may challenge the reasonableness of such rules through the grievance procedure.

Section 14.3    Except in cases of emergency, such work rules, policies, and procedures will be provided to a Union-designated employee official and posted five (5) days in advance of their effective date.

Section 14.4    The Employer may, in an emergency situation, implement a work rule, policy, or procedure to rectify a situation. However, upon request of the Union, the Employer agrees to meet and confer with the Union regarding those implemented work rules, policies, or procedures.

Section 14.5    This article shall not be interpreted in any manner to relieve an employee of his responsibilities to follow normal rules and procedures of good conduct which can reasonably be expected of any public employee regardless of whether such rules and procedures have been reduced to writing.

## ARTICLE 15 HOURS OF WORK

Section 15.1    This article is intended to define the normal hours of work for bargaining unit employees in order to determine eligibility for overtime. Nothing in this article shall be construed as a guarantee of work hours or as a restriction on Management's rights as specified in the management rights article herein.

Section 15.2    The work period shall begin at 12:01 A.M. on Saturday and continue for fourteen (14) consecutive calendar days (three hundred thirty-six [336] consecutive hours) ending at 12:00 midnight the second following Friday.

Section 15.3    Each employee's work schedule shall be determined by the Employer. The normal work schedule for full-time bargaining unit employees shall consist of eighty-two (82) hours of work performed during the fourteen (14) day work period.

Section 15.4 Scheduling of shifts and days off shall be determined considering operational demands and, as far as is practicable, in accordance with classification seniority. Senior employees shall, as far as is practicable, be entitled to preference. During December and June of each calendar year, each employee shall submit in writing to the Sheriff or designee, a shift preference, listing a first preference, listing a first preference and one (1) alternate, and a days off preference, listing a first preference and one (1) alternate. Shift preference shall assume priority over days off preference if there is a conflict. Deputies' shifts and days off shall be scheduled as soon as practicable after receipt by the Sheriff of shift bids.

Section 15.5     To the extent practicable, employees shall not begin work prior to their normal scheduled starting time nor work beyond their normal scheduled quitting time unless overtime has been approved by the Employer.

## ARTICLE 16 OVERTIME

Section 16.1     Bargaining unit employees shall receive overtime pay for all hours worked in an overtime status, subject to the provisions of this article. Overtime status shall be defined as assigned and approved hours actually worked in excess of eighty-five (85) hours per fourteen (14) consecutive calendar day work period.

Section 16.2   For purposes of determining an employee's eligibility for overtime, all hours actually worked by the employee will be included. All other hours for which the employee is compensated but does not actually work shall not be included in determining eligibility for overtime.

Section 16.3     Employees shall be entitled to overtime payment for job-related court appearance occurring outside the employee's regularly scheduled work shift. The employee shall be entitled to payment for actual time spent in court or no less than one (1) hour of pay for each required court appearance, including appearances before the grand jury.

Section 16.4     Overtime shall not be awarded for attending any type of schooling except for mandatory in-service training.

Section 16.5     Payment for overtime hours shall be one and one-half (1½) the employee's regular hourly rate.

Section 16.6     The Employer shall make a concerted effort to equally distribute overtime opportunities by seniority, insofar as is practicable, among qualified employees in each classification. This shall be accomplished by offering the voluntary overtime in the following sequence:

1.     Offered on a rotating basis by seniority to an employee who is present and going off duty;
2.     Offered on a rotating basis by seniority to an employee who is scheduled to work on the shift following the overtime shift.

In the event that the overtime cannot be voluntarily filled as set forth above, it shall be assigned on a rotating basis to employees going off shift and employees coming onto the shift and each employee shall be required to work four (4) hours of overtime if scheduled to an eight (8) hour shift or five (5) hours of overtime if scheduled to a ten (10) hour shift. No employee shall be required to work more than twelve (12) hours if scheduled to an eight (8) hour shift or fifteen (15) hours if scheduled to a ten (10) hour shift in a twenty-four (24) hour period, except in cases of emergency.

Before anyone is forced to fill the shift all employees that are qualified to work overtime will be contacted and given thirty (30) minutes to respond for the overtime opportunity. The overtime opportunity will be awarded to the officer with the most seniority.

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

Section 16.7    To the extent practicable, employees shall obtain advance approval from the Sheriff or designee before working any overtime.

Section 16.8    Employees shall be allowed the options of pay or compensatory time for overtime hours worked as follows:

A.    Effective upon the implementation of this Agreement, compensatory time may be accumulated up to one hundred twenty (120) hours.

B.    As an employee exhausts his/her accrued compensatory time, he/she may accrue further compensatory time not to exceed one hundred twenty (120) hours. Any employee who accrues compensatory time in excess one hundred twenty (120) hours shall be promptly paid for any overtime worked at the applicable rate.

C.    Compensatory time utilized must be approved in advance by the employee's supervisor who may require at least three (3) working days' advance notice. Not less than one (1) hour of compensatory time shall be taken on any one (1) day.

D.    Compensatory time accrues at one and one-half hours for each hours of overtime worked.

E.    Upon separation from employment, each employee shall be compensated for any accrued but unused compensatory time to his credit at the then applicable rate of pay.

## ARTICLE 17 REPORT-IN AND CALL-IN WORK

Section 17.1    Any employee who accepts and authorized request to work during hours outside his regularly scheduled time, excluding court duty, shall be paid in the following manner after reporting to his regular work assignment:

A.    An employee called while at home and required to begin work any time more than one (1) hour prior to his regularly scheduled shift shall be guaranteed a minimum of two (2) hour of pay at his regular rate of pay for such work in addition to his regularly scheduled shift pay.

B.    An employee requested to begin work any time within the one (1) hour immediately preceding the start of his regular shift shall be paid only for the time actually worked.

## ARTICLE 18 SICK LEAVE

Section 18.1    All employees will receive sick leave at the rate of 4.6 (four and six-tenths) hours for each eighty (80) hour in active pay status.

Section 18.2    Service for sick leave credit includes all hours in active pay status, including regular non-overtime hours worked, paid vacation, paid sick leave, etc., but not unpaid leave, unpaid suspension, or layoff.

Section 18.3    Sick leave shall be granted to an employee, upon approval by the Employer, for the following reasons:

A.    Illness, injury, or pregnancy-related condition of the employee.

17

B.     Exposure of an employee to a contagious disease which could be communicated to and jeopardize the health of other employees.

C.     Examination of the employee, including medical, psychological, dental, or optical examination, by an appropriate practitioner, when such an examination cannot be scheduled during non-work hours.

D.     Death of a member of the employee's immediate family. Such usage shall be limited to a reasonably necessary time, not to exceed five (5) days. One (1) of the days must be the date of the funeral.

E.     Illness, injury, or pregnancy-related condition of a member of the employee's immediate family where the employee's presence is reasonably necessary for the health and welfare of the employee or affected family member.

F.     Examination including medical, psychological, dental, or optical examination of a member of the employee's immediate family by an appropriate practitioner where the employee's presence is reasonably necessary.

<u>Section 18.4</u>    Employees will be charged for sick leave only for days upon which they would otherwise been scheduled to work. Sick leave shall be charged in minimum units of one (1) hour.

<u>Section 18.5</u>    The unused sick leave of an employee shall accumulate on an unlimited basis.

<u>Section 18.6</u>    Sick leave may be granted to an employee upon approval of the Employer and shall be in accordance with the following:

A.     All employees who are too sick or injured to report to duty, shall report this fact to the supervisor in charge not less than two (2) hours prior to the time they are scheduled to report to work on each day of absence, unless emergency conditions make it impossible. Failure to do so may result in denial of sick leave and/or appropriate disciplinary action.

B.     Such reports will contain the nature of the sickness or injury and whether attended by a physician or not.

C.     If the length of absence from duty cannot be determined, the employee shall call his supervisor subsequent to each working day to allow for proper manpower adjustments.

D.     All employees shall inform the employee's supervisor of the place where the employee can be contacted.

E.     Within twenty-four (24) hours following return to work, all employees who use sick leave shall be required to sign and supply to their supervisor a statement indicating the legitimacy and the reason for use of sick leave.

F.     All employees having any serious contagious disease which is or may potentially be subject to being quarantined in their families shall immediately notify their supervisor and shall not report to work until released to do so by the proper authority.

G.     Where sick leave of three (3) consecutive days or more is requested to care for a member of the immediate family, the Employer may require a physician's certificate to the effect that the presence of the employee is necessary to care for the ill person. Immediate family shall be defined as: mother, father, sister, brother, spouse, and child.

MCSO 00164

H.   For absences due to personal illness of three (3) consecutive days or more, the Employer may require a physician's certificate to the effect that the employee was unable to perform his or her duties, and that the employee is now able to return to work.

I.   Employees failing to comply with sick leave rules and regulations may not be paid. The Employer may initiate investigations when an employee is suspected of abusing sick leave privileges.

J.   The Employer may require an employee to take an examination, conducted by a licensed physician, to determine the employee's physical and mental capability to perform the duties of his position. If found not qualified, the employee may be placed on a job he or she can perform or on sick leave or disability separation. The cost of such examination shall be paid by the Employer.

Section 18.7   At the time of their retirement from active service with the Employer, employees with ten (10) or more years of service with the Employer shall receive a cash payment of one quarter (1/4) their accumulated but unused sick leave credit figured on a maximum accumulation of one hundred and twenty (120) days (thirty [30] days maximum). Such payment will be made only once to an employee, will be based on the employee's rate of pay at the time of retirement, and shall eliminate all sick leave credit accrued but unused at the time payment is made. Such payment shall be received within thirty (30) days following the date of retirement, provided the employee notifies the Sheriff in writing, on or before his date of retirement. For purposes of this provision retirement shall be considered that criteria established for retirement from active service with the Employer at the time of separation under the Public Employees Retirement Service (PERS). In the event of death of an employee, the payment will be made to the employee's beneficiary or to the employee's estate.

Section 18.8   Leave Donation Program      The Meigs County Sheriff's Office has an Employee Leave Donation Program that exists to assist fulltime non-probationary employees who are terminally ill with a non-occupational illness or injury, or who have a terminally ill spouse or child.

A.   Program Eligibility

1.   Only fulltime non-probationary employees who have exhausted all other paid leave including sick leave, vacation leave, personal leave and compensatory time are eligible to receive leave donations.

2.   Employees must use ten (10) consecutive days of paid leave or already be on leave without pay before they are eligible to receive leave donations. To be eligible for the program, employees must request and receive this Sheriff's approval for a leave of absence without pay for medical reasons. The Sheriff may authorize an exception to this rule when an employee is continuing to work partial hours while sharing care of a terminally ill spouse or child.

3.   Eligibility ceases immediately if the employee becomes eligible or is eligible for any other retirement or disability program.

B.   Program Regulations

19

1. Employees are eligible to receive a maximum of six (6) months (1040 hours) for personal benefit. Employees are eligible to receive three (3) weeks (120 hours) for any one eligible dependent.
2. Employees cannot accrue vacation leave or personal leave through donations.
3. There is no wage rate attachment for any leave donation. The receiving employee receives his base rate of pay for a maximum of eighty (80) hours per pay period. Employees who receive leave donations receive them in maximum increments of eighty (80) hours. The Sheriff's Administrative assistant ensures that the receiving employee's attendance records reflect "contributed leave" for time the employee receives through the program.
4. The Sheriff decides eligibility for the program and his decision is final. All leave rules and procedures remain in effect for employees using leave donations. Falsification of any document is cause for discipline including dismissal and for requiring restitution of any donations already received by the employee.
5. At the conclusion of a leave of absence without pay, in which the employee has received leave donations, the employee must return to work or the Sheriff may deem the employee absent without leave according to the leave without pay for illness or injury policy.

C.   Program Application

1. An employee who meets eligibility requirements must complete a memorandum requesting application to the Employee Leave Donation Program. Along with the memorandum, the employee must submit a physician's statement verifying the terminal nature of the injury or illness and the need for the employee's presence for care of the spouse or child. The employee must submit a physician's statement biweekly after initial acceptance to the program.
2. If the employee is unable to complete the application due to incapacitation, the employee's relative or agent may submit an application for him. A physician's statement must accompany any application to the program.
3. Upon receipt of an application for assistance through the Employee Leave Donation Program, the supervisor forwards the paperwork to the Personnel Director through the chain-of-command.
4. The Sheriff ensures that all eligibility requirements are met. The Sheriff notifies the employee or the employees' agent of his decision when he approves or disapproves the application.
5. Fulltime non-probationary employees who want to contribute leave must fill out an Employee Leave Request form, checking the type of leave they wish to donate and the number of hours they wish to donate. Employees must donate a minimum of eight (8) hours. Compensatory time donations are not allowable. Employees must write, "Employee Leave Donation" on the top of the form along with the employee's name that they want to receive the leave donation. Employees submit this form to the Sheriff through the chain-of-command. Contributions are irrevocable.

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

6. The Sheriff's administrative assistant deducts the leave credit from the contributing employees' leave balance and adds it to the balance of the employee receiving the donation.

## ARTICLE 19 LEAVES AND LEAVES OF ABSENCE

Section 19.1    Leave Without Pay    Employees may be granted the following types of unpaid leaves of absence:

A.    Medical Leave: A physically incapacitated employee may request a medical leave. A medical leave may be granted for a period of up to two (2) years (which includes Family and Medical Leave) when the medical disability continues beyond accumulated sick leave rights and provided the employee is either:

1. Hospitalized or institutionalized;
2. On a period of convalescence following hospitalization or institutionalization authorized by a physician at the hospital or institution; or
3. Is declared incapacitated for the performance of the duties of his or her position by a licensed physician designated by the Employer.

It is the employee's responsibility to request a medical leave and such leave is not granted automatically when the employee's sick leave has expired. Time spent on disability leave and/or Family and Medical Leave prior to a disability separation shall be considered part of the two (2) year time period.

B.    Disability Leave: An employee may request a leave of absence without pay for disability purposes by submitting such request in writing to the Employer, subject to the rules for leaves of absence in this Agreement. The term of a disability leave and Family and Medical Leave may run concurrently.

An employee is entitled to unpaid disability leave if declared incapacitated for the performance of the duties of his position by a licensed physician designated by the Employer. It is the employee's responsibility to request a disability leave since such leave is not granted automatically when the employee's sick leave has expired.

When an employee is ready to return to work, he shall furnish a statement by his attending physician certifying the employee is able to return to work.

In all other respects the employee is subject to the rules for leaves of absence in Article 21 of this Agreement.

C.    Personal Leave: The Employer may grant a leave of absence to any employee for a maximum duration of six (6) months for any personal reasons of the employee. Such a leave may not be renewed or extended beyond six (6) months. The employee shall include all pertinent information relating to the need for a personal leave of absence with his request for leave.

MCSO 00167

D.    <u>Authorization for Leave:</u> The authorization of a leave of absence without pay is a matter or administrative discretion. The Employer shall decide in each individual case if a leave of absence is to be granted. No leave of absence shall be granted for the purpose of working another job. A leave of absence shall be requested on the standard Request for Leave form.

E.    <u>Sick Leave Credit and Vacation Credit During Leave:</u> An employee on leave of absence without pay does not earn sick leave or vacation credit. However, the time spent on authorized leave of absence is to be counted in determining length of service for purposes of extended vacation eligibility or other purposes where tenure is a factor.

F.    <u>Abuse of Leave:</u> If a leave of absence is granted for a specific purpose, and it is found the leave is not actually being used for such purpose, the Employer may cancel the leave and direct the employee to report for work by giving written notice to the employee.

G.    <u>Reinstatement From Leave:</u> Upon completion of a leave of absence, the employee is to be returned to the position formerly occupied, or to a similar position if the employee's former position no longer exists. Any replacement in the position while an employee is on leave is to be on a temporary basis, unless otherwise determined by the Employer. An employee may contact the Employer prior to the expiration of said leave, and be granted a reasonable extension for a justifiable cause, within the various maximum time limits established under this article. An employee's request for extension of leave and the Employer's response shall be in writing.

H.    <u>Insurance Premiums During Leaves:</u> Except as specifically provided in Section 21.2-Family and Medical Leave, where an employee has requested and been granted a medical leave, disability leave, or a personal leave for medical reasons, the Employer shall continue its contribution to the employee's health insurance benefit program for three (3) additional insurance premium payments following the date of approval of the leave, at rates in accordance with the terms of Article 24-Insurance, provided the employee makes advance arrangements with the Employer for the payment of the employee's share of the costs.

<u>Section 19.2</u>    <u>Family and Medical Leave (FML)</u>

A.    The parties agree to comply with the Family and Medical Leave Act of 1993 and the Employer may promulgate policies in furtherance of the Family and Medical Leave Act that are not inconsistent with this article.

<u>Section 19.3</u>    <u>Leaves With Pay</u>    Employees may be granted the following types of paid leaves of absence:

A.    <u>Jury Duty Leave:</u>    A fee or expense reimbursement paid to an employee for serving on any municipal, County, or federal jury, shall be remitted to the Employer and said employee's regular pay will not be adjusted by reason of service performed, unless such duty is performed totally outside of normal working hours. An employee released from jury duty prior to the end of his scheduled workday shall report to work for the remaining hours, except that an employee who is required to service a jury for a period of six (6) or more

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

hours abutting his regularly-scheduled afternoon shift shall not be required to report for work that day and shall suffer no loss of pay as a result. However, employees who take their afternoon shift off shall be required to turn in 'to the Employer any jury duty pay received. If the employee works their full afternoon shift, the employee may keep jury duty pay in addition to regular pay earned.

The Employer shall not pay an employee who appears in court for criminal or civil cases when the employee is plaintiff or defendant. However, in situation in which the employee is subpoenaed to appear as a witness and as a good citizen of the community, payment of lost wages will be made under Section 21.1 of this article.

B.   <u>Military Leave:</u> All employees who are members of the Ohio National Guard, the Ohio Defense Corps, the State and Federal Militia or members of other reserve components of the Armed Forces of the United States are entitled to leave of absence from their respective duties without loss of pay for such time as they are in the military service on field training or active duty for periods not to exceed a total of one hundred seventy-six (176) hours in any one calendar year. The employee is required to submit to the Employer an order or statement from the appropriate military commander as evidence of such duty. There is no requirement that the service be in one (1) continuous period of time. Employees who are members of those components listed above will be granted emergency leave for mob, riot, flood, civil defense, or similarly duties when so ordered by the Governor to assist civil authorities. Such leave will be without pay if it exceeds authorized paid military leave for the year. The leave will cover the official period of the emergency. This provision in no way abrogates a veteran's present or future rights.

C.   The Employer will provide the employee on a monthly basis with documentation detailing the accrued amount of paid leave to the employee's credit for each type of leave. An employee may request to see the current paid leave status any time during the month.

## <u>ARTICLE 20 VACATIONS</u>

<u>Section 20.1</u>   <u>Vacation Crediting</u>    All fulltime employees will be entitled to vacation leave with pay as follows:

<u>Years of Service</u>
After one (1) year
Eight (8) or more years
Fifteen (15) or more years Twenty-five (25) or more years

<u>Bi-weekly Rate</u> 3.1 hours 4.6 hours 6.2 hours 7.7 hours

<u>Annual Rate</u>
80 hours - 2 weeks 120 hours - 3 weeks 160 hours - 4 weeks 200 hours - 5 weeks
Vacation leave shall accrue at the above rates of appropriate hours each biweekly pay period.

23

Years of Service shall include all Full-Time and Part-Time employment as an employee with the Meigs County Sheriff's Office as well as all Full-Time and Part-Time employment as an employee with the State of Ohio and/or any political subdivision of the state. An employee who has retired in accordance with the provisions of any retirement plan offered by the state shall not have prior service with the state, any political subdivision of the state, or a regional council of government established in accordance with Chapter 167. of the Revised Code counted for the purpose of computing vacation leave.

Section 20.2    Vacation Usage    Vacation may be taken in units of not less than one (1) day. An employee shall have the right to take prescheduled vacations according to his or her classification seniority, subject to the scheduling requirements of the Department and in accordance with the selection procedure of Sections 22.3 and 22.4 of this article.

Section 20.3  Non-Prescheduled Vacations An employee requesting a one (1) day non-prescheduled vacation must submit his request to his immediate supervisor at least three (3) workdays prior to commencement of such leave. Any request of a vacation of more than one (1) day must be submitted one (1) workweek prior to commencement of such leave. All vacation requests are subject to the approval of the Employer. This provision may be waived at the discretion of the Employer.

Section 20.4    Vacation Scheduling    The order of selecting a prescheduled vacation shall be by classification seniority, and non-prescheduled vacations shall be on a first come/first served basis. No more than two (2) employees covered hereunder on each respective shift in different classifications nor more than one (1) employee per shift in a single classification shall be permitted vacation leave at any one time unless authorized by the Employer. In order to be granted preference hereunder, requested prescheduled vacation time must be submitted to the employee's immediate supervisor by April 15 of each calendar year.

Section 20.5    Vacation Accumulation      Effective    upon    the    implementation    of    this Agreement, vacation leave shall be taken by an employee between the year in which it was accrued and the employee's next anniversary date of employment unless this period is less than twelve (12) months, in which case the vacation shall be taken between the year in which it was accrued and the next calendar year (i.e., 1998). Employees who have multiple years' accumulation of vacation at the implementation date of this Agreement, shall not lose such accumulation and shall be permitted to carry over such excess leave until it is utilized. However, in no event shall any employee with existing multiple years of accumulation be permitted to carry over more vacation than the employee had to their credit at the effective date of this Agreement.

Section 20.6    Recall to Duty        Employees on vacation may be recalled to duty only for true emergency situations.

Section 20.7    Holidays Occurring During Vacation Holidays enumerated in this Agreement shall not be charged to an employee's vacation leave.

Section 20.8  Separation Pay  Upon separation from the Employer's payroll, an employee shall be entitled to compensation at his current rate of pay for all lawfully accrued and unused vacation

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

leave to his credit at the time of separation up to three (3) years' maximum accumulation. In case of death of an employee, such unused vacation leave shall be paid to his or her estate or to a designated beneficiary.

Section 20.9  Personal Days  An employee shall receive one (1) personal day for achieving perfect attendance during a ninety (90) day calendar day period.  An employee shall receive two (2) additional personal days for achieving perfect attendance in a three-hundred sixty five (365) calendar day period.  An employee shall receive a maximum of three (3) personal days in a three-hundred sixty five (365) calendar day period.  Personal days shall be paid at the employee's regular rate of pay based upon their regularly scheduled work hours on the date the personal day is taken. Personal days off must be used within three-hundred sixty five (365) calendar days of when they are earned and will not accumulate. Personal leave days not scheduled or used shall be forfeited.

Perfect attendance shall be defined an employee working his scheduled shift and/or utilizing sick time, personal days as described in Section 20.9, compensatory time, and/or vacation leave when such leave/time is scheduled with at least seventy-two (72) hours' notice by the employee.

Section 20.10  Personal Day Request  Employees must submit a written request for personal leave at least 24 hours, but not sooner than twenty-one (21) calendar days, in advance of the date requested. Personal days off may only be taken with the approval of the Employer. Such approval will not be unreasonably withheld. All requests shall be subject to operational needs. Shorter notice for requests may be made in emergency situations (i.e., not avoidable by reasonable care by the employee).

## **ARTICLE 21 HOLIDAYS**

Section 21.1    All employees shall be entitled to at least eight (8) hours of holiday pay for each of the following holidays:

New Year's Day
Martin Luther King Day
Presidents' Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veterans' Day
Thanksgiving Day
Christmas Day

Section 21.2    Effective upon execution of this Agreement, all employees who are required to work on any of the holidays set forth above shall be compensated at one and one-half (1 ½) times their regular rate of pay for all hours worked on those days plus the at least eight (8) hours of holiday pay. An employee required to work on a holiday shall be paid holiday pay for each hour of his regularly scheduled shift. A regular eight (8) hour shift earns eight hours of holiday pay; a regular ten (10) hour shift earns ten hours of holiday pay etc.

MCSO 00171

## ARTICLE 22 INSURANCE

**Section 22.1**. The Employer shall continue to provide all employees in the bargaining unit with health insurance at the present or substantially equivalent benefit levels, both single and family coverage, subject to the provisions of the following:

For each plan year (August 1 through July 31) during the term of this Agreement for medical/prescription benefits, the Employer shall continue to contribute to each employee's HRA account, annually, in the amount of fifty percent (50%) of the family deductible up to a maximum of $4,000 for employees with family coverage and fifty percent (50%) of the single deductible for employees with single coverage. This shall be paid at the commencement of each plan year. Such annual plan year contributions shall be limited to the extent that such contribution does not push the HRA account of a family coverage employee over the family deductible for that plan year and does not push the HRA account of a single coverage employee over the single deductible for that plan year. In such cases, the Employer shall contribute up to said maximum deductible amounts. For example, if after a plan year, an employee with family coverage has $8,000.00 in his HRA and the family deductible for the next year is $10,000.00, the Employer shall contribute $2,000.00 in that employee's account at the beginning of the plan year instead of $4,000.00.

An employee with family coverage incurring costs applicable to their deductible in excess of $4,000 up to $5,000 shall provide a copy of the invoice to the County Auditor so that the County Auditor may remit payment directly to the provider ("direct payment"). Alternatively, an employee with family coverage may remit payment to the provider and be reimbursed for out-of-pocket monies expended toward their deductible in excess of $4,000 up to $5,000 upon submitting a copy of the paid invoice/receipt to the Sheriff or his designee. There is no direct payment, reimbursement, or a combination thereof under the single coverage plan. Maximum direct payment, reimbursement, or a combination thereof per plan year for family coverage, is $1,000. Additionally, if charges are paid, or are to be paid, in the subsequent plan year for services rendered during the previous plan year, the employee's HRA amount for assessing the Employer's contribution for such subsequent plan year shall be less such charges and the Employer's contribution shall be increase in the amount of such charges. The parties stipulate that the full balance of each employee's HRA account carries over from year-to-year and shall not be forfeited to the Employer, such shall be subject to law.

Employees with family coverage shall pay 15% of the health insurance premium (medical/prescription, vision and dental). Employees with single coverage shall pay fifteen percent (15%) of the health insurance premium (medical/prescription vision and dental).

**Section 22.2**. The Employer shall continue to provide all employees in the bargaining unit life insurance at the present or substantially equivalent benefit levels. Employees shall pay fifteen percent (15%) of the premium.

## ARTICLE 23 WAGES

**Section 23.1**. The following pay scale will be used to compensate Deputies:

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

| Deputy Completed Years | Effective 4/1/21 | Effective 4/1/22 | Effective 4/1/23 |
|---|---|---|---|
| 0 years | $16.21 | $16.57 | $16.94 |
| 1 year | $16.44 | $16.81 | $17.19 |
| 2 years | $16.63 | $17.00 | $17.38 |
| 3 years | $17.00 | $17.38 | $17.77 |
| 4 years | $17.39 | $17.78 | $18.18 |
| 5 years | $17.77 | $18.17 | $18.58 |
| 6 years | $18.16 | $18.57 | $18.99 |
| 7 years | $18.54 | $18.96 | $19.39 |
| 8 years & greater | $18.92 | $19.35 | $19.79 |

The increases above for Deputies represent retroactive and across the board general wage increases of 2.25% effective 4/1/21; across the board general wage increases of 2.25% effective 4/1/22; and across the board general wage increases of 2.25% effective 4/1/23.

**Section 23.2**. Sergeants shall be paid the following hourly rate:

| Sergeant Completed Years | Effective 4/1/21 | Effective 4/1/22 | Effective 4/1/23 |
|---|---|---|---|
| 0 years | $21.33 | $21.81 | $22.30 |
| 1 year | $21.86 | $22.35 | $22.85 |
| 2 years | $22.40 | $22.90 | $23.42 |
| 3 years & greater | $22.97 | $23.49 | $24.02 |

The increases above for Sergeants represent retroactive and across the board general wage increases of 2.25% effective 4/1/21; across the board general wage increases of 2.25% effective 4/1/22; and across the board general wage increases of 2.25% effective 4/1/23.

Lieutenants shall be paid five percent (5%) above the top pay rate for the Sergeants effective and retroactive to 4/1/21.

Section 23.3. The parties recognize that dispatching duties are not under the authority of the Sheriff at the time of execution of this CBA. In the event that dispatching duties return under the authority of the Sheriff's Office, the parties will negotiate appropriate wage rates at that time.

Section 23.4. Longevity Pay. The base wage rate of each bargaining unit employee with five years of service with the Meigs County Sheriff's Office shall be increased in accordance with his or her years of service pursuant to the following scale. Increases within such scale shall be applied effective the pay period of the employee's anniversary date.

MCSO 00173

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

| Meigs County Sheriff's Office Years of Service | Hourly Rate Increase Effective 4/1/21 |
|---|---|
| 5 years | $.44 |
| 6 years | $.51 |
| 7 years | $.59 |
| 8 years | $.66 |
| 9 years | $.74 |
| 10 years | $.82 |
| 11 years | $.90 |
| 12 years | $.98 |
| 13 years | $1.05 |
| 14 years | $1.13 |
| 15 years | $1.21 |
| 16 years | $1.28 |
| 17 years | $1.36 |
| 18 years | $1.44 |
| 19 years | $1.52 |
| 20 years | $1.59 |
| 21 years | $1.67 |
| 22 years | $1.75 |
| 23 years | $1.82 |
| 24 years | $1.90 |
| 25 years | $1.98 |
| 26 years | $2.06 |
| 27 years | $2.13 |
| 28 years | $2.21 |
| 29 years | $2.29 |
| 30 years & greater | $2.36 |

The increase to the longevity scale retroactive and effective 4/1/21 represents a $.05 increase to each step of the scale.

## ARTICLE 24 PERS PICKUP - SALARY REDUCTION METHOD

Section 24.1    The Employer agrees to adopt a resolution permitting the Meigs County Auditor to pick-up through the salary reduction method the contributions of bargaining unit employees to the Public Employees Retirement System (PERS). The Employer shall then, if required by PERS, request approval from the Internal Review Service of the plan to ensure that such picked up contributions are deductible from the employees' gross salaries for federal tax purposes.

Section 24.2    Upon receipt of approval from PERS and/or a favorable IRS private letter ruling, if required, the Employer will request the Meigs County Auditor to report the employees'

MCSO 00174

contributions to the pension fund as picked up by the Employer. The Union agrees that this method of "pick-up" is one which requires no additional outlay of monies by the Employer and agrees that the "pick-up" shall not be effective until after the Employer receives approval from PERS and the favorable IRS ruling, if required.

## ARTICLE 25 SEVERABILITY

Section 25.1   Should any portion of this Agreement contained herein be declared invalid by operation of law or by a court of competent jurisdiction, such invalidation of said part or portion shall not invalidate the remaining portions hereof and they shall remain in full force and effect. In addition, within twenty (20) calendar days following the effective date of such declaration of invalidity, the parties shall meet in an attempt to modify such provision to comply with the applicable law.

## ARTICLE 26 WAIVER IN CASE OF EMERGENCY

Section 26.1   In case of a publicly declared emergency, defined as acts of God, or civil disorder declared by the President of the United States, the Governor of the State of Ohio, the Meigs County Sheriff, or the Federal or State Legislature, the following conditions of this Agreement may be suspended by the Employer:

Time limits for management's replies on grievances; and
All work rules and/or agreements and practices relating to the assignment of all employees.

Section 26.2   Upon termination of the emergency, should valid grievances exist, they shall be processed, in accordance with the provisions outlined in the grievance procedure, and shall proceed from the point in the grievance procedure to which they (the grievance[s]) had properly progressed.

## ARTICLE 27 EMPLOYEE RIGHTS

Section 27.1   Before an employee may be charged with any violation the Rules and Regulations for a refusal to answer questions, he shall be advised that his refusal to answer questions will be the basis of such a charge.   Any employee who is ordered to be questioned as a suspect in any administrative investigation shall be advised of his *Garrity* rights. Prior to any questioning, the employee shall be informed of the nature of the investigation and whether disciplinary action may result. Prior to any administrative interview, an employee shall be permitted a reasonable opportunity of up to forty-eight (48) hours to consult with an OPBA employee representative and/or an attorney and have them present in the interview before being required to answer questions.

Section 27.2   Questioning or interviewing of an employee in the course of an internal investigation will be conducted at hours reasonably related to the employee's shift, unless operational necessities require otherwise. Interviewing sessions shall be for reasonable periods of time, and time shall be provided for rest periods and attendance to physical necessities. Such sessions shall not normally be tape recorded; however, in the event the Employer elects to record the session, the employee may also record such session.

MCSO 00175

Section 27.3     An employee will be informed of the nature of any investigation of himself at that time prior to any questioning. If the employee being questioned is, at that time, a witness and not under investigation, he shall be so advised.

Section 27.4     An employee may reasonably request an opportunity to review his personal file, and add memoranda to the file clarifying any documents contained in the file. A request for copies of items included in the file shall be honored. All items in an employee's file with regard to complaints and investigations will be clearly marked with respect to final disposition.

Section 27.5     Any complaint which may potentially lead to disciplinary action against an employee shall be set forth in writing and include the information which is the basis of said complaint.

Section 27.6.  Should an employee die, all of his/her accrued paid time off shall be liquidated at the employee's hourly rate at the time of death and paid to the employee's estate.  This shall include:  vacation time, compensatory time, personal days, and any unpaid wages.

 Section 27.7. The Employer shall make an audio recording of any administrative interview.  A copy of the recording will be provided to the employee, the OPBA, or both.

Section 27.8     When an anonymous complaint is made against an employee and if after an investigation there is no corroborative evidence of any kind, then the complaint shall be classified as unfounded and no further action shall be taken.

Section 27.9   Any employee who is charged with violating Sheriff's Office Rules and Regulations shall be provided copies of the investigatory records at the time the employee is given notice of the charges prior to the Pre-Disciplinary Conference as outlined in Article 9, Discipline.

All modifications in this article for the April 1, 2021 – March 31, 2024 CBA shall be applied prospectively following execution.

## ARTICLE  28 VEHICLES

Section 28.1     All full-time Deputies, Sergeants, Lieutenants, and Detectives employees assigned to road patrol will be provided a Sheriff's Department vehicle to drive to and from work and shall maintain this privilege for the duration of this Agreement under the same terms and conditions as they currently exist. All other Deputies shall be assigned a vehicle at the discretion of the Sheriff.

All employees hired after April 1, 2018 shall be required to either live in Meigs County or in the State of Ohio within thirty-five (35) miles of the Meigs County line in order to be provided such vehicle.

## ARTICLE 29 UNIFORMS

MCSO 00176

Section 29.1    Effective upon commencement of employment, the Employer shall provide, at the same level as provided as of the effective date of this Agreement, uniforms and equipment for those bargaining unit employees required by the Employer to wear specific uniforms. The Employer shall determine the appropriate uniform if required to be worn by the employee; an employee shall be required to be in proper uniform upon reporting for duty.

Articles of clothing and equipment purchased by the Employer shall become the property of the County upon separation.

Section 29.2    Equipment replacement shall remain the responsibility of the party (employer or employee) who purchases same. It is understood that body armor shall be replaced by the Department in accordance with the manufacturer's specification. Uniform and/or equipment items damaged or destroyed in the line of duty shall be replaced by the Employer at no cost to the employee.

Section 29.3    Equipment and other items not issues or required by the Employer may be utilized or worn only with the permission of the Employer or designee.

Section 29.4    The Employer shall make available to each employee on an annual basis a uniform and equipment stipend of four hundred dollars ($400). The stipend may be utilized by each employee to purchase uniform and equipment items. Any amount of the stipend not utilized by December 31 of each calendar year may be carried (limited rollover) over and added to the subsequent year's annual stipend.  Any money not used within this time shall be returned to the County.

The uniform and equipment stipend for new employees shall be $850.00 upon hire, which shall be made immediately available to the employee.


## ARTICLE 30 SUBSTANCE TESTING AND ABUSE

Section 30.1 Testing

A.    The parties recognize the Employer's right, where not inconsistent with this Agreement:
To set standards of selection for employment.

        To require employees to submit to periodic physical examinations including blood and urine tests for alcohol, illegal drugs, or the misuse of legal drugs upon reasonable suspicion as defined in Section 32 at the Employer's expense.

B.    Drug/alcohol testing may be conducted on employees upon reasonable suspicion. Reasonable suspicion that an employee used or is using a controlled substance or alcohol in an unlawful or abusive manner may be based upon, but not limited to:

Observable phenomenon, such as direct observation of drug or alcohol use or possession and/or the physical symptoms of being under the influence of a drug or alcohol;

A pattern of abnormal conduct or erratic behavior, including abnormal leave patterns;

Arrest or conviction for a drug or alcohol-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug or alcohol possession, use, or trafficking;

Information provided either by reliable and credible sources or independently corroborated;

Evidence that an employee has tampered with a previous drug test;

Facts or circumstances developed in the courts of an authorized investigation of an accident or unsafe working practice.

C.      The parties recognize that it is the joint responsibility of both management and the Union:

To provide a drug free workplace, and agree to meet periodically during the life of the Agreement to discuss the implementation of this objective.

Any employee tested in accordance with Section A above may elect to also be tested at a laboratory of their choice at their own expense, at the time the sample or specimen is taken.

The rehabilitation of employees who are experiencing misuse, abuse, or addiction problems shall be attempted prior to the imposition of disciplinary action. Employees will be permitted to return to work after a licensed physician releases them to return to work and certifies they have completed the recommended prescribed treatment program.

When leaves of absence are indicated as necessary to such rehabilitation, the effected employee may utilize any accumulated available leave prior to resorting to leave without pay.

Any test results derived from tests administered above remain confidential for all purposes other than the imposition of disciplinary action.

<u>Section 30.2</u>     The Employer and the Union recognize the value of counseling and assistance programs to those employees who have personal problems which interfere with their ability to work productively.

Participation in the assistance program shall be voluntary, except for those employees not terminated for a drug or alcohol misuse or abuse violation. Employees who test positive, shall be required to participate in an employee assistance program. Seeking and/or accepting assistance to alleviate an alcohol, drug or other behavioral or emotional problem will not in and of itself jeopardize an employee's job security.

MCSO 00178

Employee participation in this assistance program shall be scheduled outside the employee's scheduled workday. If scheduling does not permit this, employees can use unused sick leave or vacation leave.

Records regarding treatment and participation in an employee assistance program shall be confidential, and the records shall not be maintained in the employee's personnel file.

Expenses incurred for treatment, assistance, and/or hospitalization will be provided under the employee's health insurance, whenever possible. Participating employees will be advised of the extent of insurance coverage for the appropriate treatment, should they so request.

## ARTICLE 31 TRAINING

Section 31.1    The Employer and the Union agree that the training and development of employees within the bargaining unit is a matter of importance. Consequently, the Employer will, as funds permit, make available to all employees the training he deems necessary for the performance of the employees presently assigned duties.

## ARTICLE 32 WAIVER OF STATE CIVIL SERVICE AND RELATED LAWS

Section 32.1   No section of the civil service laws contained in Ohio Revised Code sections 124.01 through 124.56 shall apply to employees of the bargaining unit, and it is expressly understood that the Ohio Department of Administrative Services and the State Personnel Board of Review shall have no authority or jurisdiction at it relates to employees in the bargaining unit, except as prohibited by Ohio Revised Code § 4117.08(B). Further, where a topic or issue is addressed in this Agreement, it will be understood that the language of the Agreement will prevail over any conflicting language including statutory language which is not specifically addressed in this Agreement but related to the topic or issue.

## ARTICLE 33 DURATION OF AGREEMENT

Section 33.1.  Except as otherwise provided herein, this Agreement shall be effective April 1, 2021 and shall remain in full force and effect until 12:00 midnight, March 31, 2024.  Written notice of the intent to negotiate a successor Agreement shall be given no earlier than ninety (90) calendar days prior to the expiration date, nor late than sixty (60) calendar days prior to the expiration of this Agreement.  Such notice shall be given in accordance with Ohio law. The parties shall commence negotiations within two (2) calendar weeks upon receiving notice of intent.

The parties waive application of R.C. 4117.14(G)(11) to the negotiations for the collective bargaining agreement following this agreement and agree that R.C. 4117.14(G)(11) shall not apply to those negotiations.

Section 33.2.    The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right to make demands and proposals on any subject matter not removed by law from the area of collective bargaining and that the understandings and

MCSO 00179

agreement arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unequivocally waives the right, and each agrees that the other shall not be obligated to bargain collectively or individually with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge of either or both parties at the time they negotiated or sired this Agreement.

Section 33.3. This Agreement supersedes all previous agreement (either written or oral) between the Sheriff, its employees and the Union.

## ARTICLE 34 PART-TIME OFFICERS

Section 34.1    The County may utilize one part-time officer for every two bargaining unit members. The part-time officer must be certified under the laws of the State of Ohio and properly trained and qualified pursuant to the standards existing in the Meigs County Sheriff's Office.

Section 34.2    Part-time officers will not be utilized to perform any reimbursed extra duty overtime unless first offered to full-time officers, this includes volunteer work.

Section 34.3    All unscheduled overtime opportunities will first be offered to all full-time officers before it being filled by the utilization of part-time officers.

Section 34.4    Before any full-time officers may be laid off, all part-time officers shall first be laid off and all full-time officers shall be called back to work before any part-time officers. A part-time officer is not to be utilized to fill in any shift during a lay-off.

Section 34.5    All part-time officers will initially be paid at the entry-level rate of pay for full-time officers, regardless of their experience.

Section 34.6    All special duty callouts and regularly scheduled special duty work (i.e. EV Tech, Traffic investigations, Detective duties), and all work that is funded by specialty grants (i.e. DUI enforcement) will be offered first to full-time employees.

MCSO 00180

2021 – 2024 Final Agreement Between Meigs Co. Sheriff's Office & OPBA

## SIGNATURE PAGE

**FOR THE MEIGS COUNTY SHERIFF:**

Sheriff Keith Wood

Commissioner Shannon Miller

Commissioner Tim Ihle

Commissioner Jimmy Will

**FOR OHIO PATROLMEN'S BENEVOLENT ASSOCIATION:**

/s/Mark Volcheck

Mark Volcheck, OPBA Attorney

Rick Patterson, Sergeant

Rick Smith, Deputy

**APPROVED AS TO FORM:**

Ben Albrecht, Labor Counsel

35

FMCS Case No. 180911-08228

---------------------------------------------------------------------------X

In the Matter of the Arbitration between:
Fraternal Order of Police,
Ohio Labor Council, Inc.,

                                        Union,

            -and-


Gallia County Sheriff's Office,

                                        Employer.

---------------------------------------------------------------------------X

BEFORE: James McKeever, Esq. Arbitrator

APPEARANCES
For the Union:
Tonya M. Sapp, Esq.,
Fraternal Order of Police,
Ohio Labor Council, Inc.
222 East Town Street
Columbus, Ohio 43216

For the Employer:
David A. Riepenhoff, Esq.,
Samantha K. McGuire.
Fishel Downey Albrecht & Riepenhoff LLP
7775 Walton Parkway, Suite 200
New Albany, Ohio 43054

OPINION & AWARD

On or about August 27, 2018, the Fraternal Order of Police, Ohio
Labor Council, Inc. ("Union") filed a Request for Arbitration contesting the
termination of Jerry Darst ("Grievant"), a Deputy Sheriff employed by the
Gallia County Sheriff's Office ("Employer") ("GCSO"). Pursuant to Article 8.8
of the parties' Collective Bargaining Agreement ("CBA"), the undersigned
was selected to serve as the Arbitrator in this matter (JE A, p. 10-11).

The within charges allege that Grievant failed to follow a direct order
with respect to entering his payroll data in a timely manner; failed to

1

EXHIBIT

**3**

GCSO DARST 00269

properly maintain his canine training records; and was insubordinate to his superior officers when he was directed to return his police dog, which the Employer asserts constituted an act of "gross misconduct."

The hearing was conducted on January 3, 2019 at the County Court House located at Gallipolis, Ohio. The parties were represented by counsel and had a full opportunity to present evidence and arguments in support of their respective positions.

On or about January 29, 2019, the Union submitted its post-hearing brief to the Arbitrator. Subsequently, after a request for an extension, which was granted with the consent of the Union, the Employer submitted its post-hearing brief to the Arbitrator on February 14, 2019. Thereafter, the undersigned exchanged each post-hearing brief with the parties.

The evidence and arguments, as well as the legal authority presented by the parties, have been fully considered in rendering this Opinion and Award.

**ISSUE:**

At the commencement of the hearing, the Union proposed the following issue for arbitral resolution:

"Was the Grievant terminated for just cause and were the principles of progressive discipline followed? If not, what shall be the remedy?"

The Employer declined to stipulate to the Union's proposed issue and proposed the following issue instead:

"Was Grievant discharged for just cause? If not, what shall be the remedy?"

Because the parties were unable to stipulate to the issue, the undersigned was granted jurisdiction to determine same. After studying the record and considering the evidence, the undersigned finds the issue for arbitral determination to be as follows:

2

Was the Grievant discharged for just cause? If not, what shall be the remedy?"

## RELEVANT CONTRACT LANGUAGE

### Article 9.2 Discipline and Investigations

No employee shall be disciplined except for just cause.

Except in instances where the employee is found guilty of gross misconduct, the Employer shall apply discipline in a progressive, corrective, and uniform manner. Normal progressive discipline for the same or similar incidents shall consist of an oral warning, written reprimand, short term suspension, and either a long term suspension, demotion, or discharge.

The Employer agrees not to suspend, demote, or discharge an employee without first conducting a hearing. This hearing is to be held between the Employer, the employee's representative, the employee, and a Labor Council representative, if the employee so desires. The employee will receive a written statement of charges prior to the hearing. Hearings, where practical, shall be conducted at hours reasonably related to the employee's shift, such as during, immediately before, or immediately after working hours, except where the situation dictates otherwise. If possible, an employee shall be given at least twenty-four (24) hours' notice before a written reprimand is to be given.

## RELEVANT POLICIES

### Canine Operations:

Policy Number 7.10

The Gallia County Sheriff uses trained and controlled canines in support of law enforcement operations where the dog's superior sense of smell, hearing and physical capabilities, can efficiently and effectively aid in the accomplishment of tactical objectives.

### Administration and Management:

The officer-handler is responsible for maintaining and assuring the accuracy and completeness of procurement, health, operational, incident reports, and training records relating to the canine team. Team records are reviewed at least semi-annually by the Chief Deputy or designee. As part of this semi-annual review, the need for additional training for both officer-handler and canine is considered and scheduled as needed.

3

**Insubordination:**

Policy Number: 3:06

Employees of <u>The Gallia County Sheriff</u> understand the command and rank structure of the agency, and carry out duties and responsibilities with a positive attitude, as directed by their supervisors, within policy guidelines. Any form of insubordination, unless otherwise justified, is not tolerated, and is subject to disciplinary action.

## DEFINITION:

-*Chain of Command*-A system whereby authority passes down from the top through a series of leadership positions or ranks in which each is accountable to the one directly superior.

-*Insubordination*-Any act of defiance, disobedience, dissension, or resistance to authority or instruction.

**Payroll:**

The policy regarding the payroll procedure was contained in an email, which stated that payroll must be submitted on 8am of the Monday following the end of each time period (Employer Exhibit 1).

STATEMENT OF FACTS:

The facts of this case, with very few exceptions, are not in dispute.

Grievant is a Deputy Sheriff who has been employed with the GCSO since February 2010. In 2013, Grievant became a K-9 Officer and was assigned a dog, named "Thunder," who lived with the Grievant and his family.

Matthew Champlin is the Sheriff of the GCSO and was the Grievant's superior officer during the time in question ("Sheriff Champlin").

Troy Johnson is the Chief Deputy at the GCSO and was one of the Grievant's superior officers ("Chief Johnson").

Coit Darst (no relation to Grievant) is a Sergeant at the GCSO and was also one of the Grievant's superior officers ("Sergeant Darst").

The GSCO is the law enforcement agency for Gallia County, Ohio and Sheriff Champlin is the chief law enforcement officer for the County. The

4

GCSO is considered a "Para-Military" organization and the chain of command at the GCSO from the top-down is as follows: Sheriff → Chief Deputy → Lieutenants → Sergeants → Deputies.

On March 9, 2017, Grievant was issued a verbal reprimand for non-compliance with his uniform requirement.

On July 18, 2017, Grievant was issued a written reprimand for leaving seized drugs in his police vehicle for six days instead of logging them into evidence.

In February of 2017, Sheriff Champlin determined that the Grievant's dog was insufficiently trained for patrol work and advised Grievant that his dog was to be taken out of service for patrol work and would only to be used for narcotics work until further notice. Thereafter, Sheriff Champlin sent Grievant and his dog to a training program with the Ohio State Highway Patrol. Sheriff Champlin also instructed Grievant to complete training records for his dog because the training records are sometimes used as evidence in a criminal trial. Subsequently, Grievant and his dog completed the training with the Ohio State Highway Patrol and the dog was returned to patrol duty as well as narcotics work.

In February of 2018, Chief Johnson reported that Grievant failed to properly enter his payroll information by the required deadline. When Grievant was asked about this issue, he stated that he simply "forgot." Thereafter, on February 15, 2018, Sheriff Champlin determined that Grievant failed to follow a "Direct Order" with respect to entering his payroll data and scheduled the matter for a Pre-Disciplinary Conference on February 27, 2018 (County Exhibit 5).

On or about February 28, 2018, Grievant was injured on the job and went out on medical leave.

The Pre-Disciplinary Conference regarding Grievant's failure to enter his payroll information was postponed.

5

On or about March 5, 2018, and while Grievant was out on leave, Sheriff Champlin reviewed Grievant's K9 training records and found them to be deficient with respect to documenting the "weather conditions, weights of drugs used during drug detection training," and other issues. Sheriff Champlin stated that he also suspected that Grievant had "inflated" his training hours. Consequently, Sheriff Champlin determined that Grievant's dog needed to be taken out of service again because the training records related to the dog were insufficient and could potentially compromise a criminal prosecution.

Thereafter, on March 7, 2018, Sheriff Champlin directed Chief Johnson to retrieve Grievant's dog and Grievant's K-9 patrol vehicle from Grievant's home (County Exhibits 8, 14.). That afternoon, Chief Johnson called Grievant and told him on the telephone that he needed to deliver a letter to him from the GCSO at his home. However, Chief Johnson did not tell Grievant what the letter contained, nor did he tell Grievant that he was coming to take his dog and his patrol car. Later that same day, Chief Johnson and Sergeant Darst drove to the Grievant's home. When they arrived, Grievant came out of his house and approached Chief Deputy Johnson, who handed Grievant the letter from Sheriff Champlin, which directed Grievant to tender possession of the dog and his patrol car. After reading the letter, Grievant became upset and thrust the letter back at Chief Johnson and asked if he was being fired. Chief Johnson told Grievant he was not and that the issue had to do with training the dog. Chief Johnson testified that at or about this time, Chief Johnson testified that Grievant stated: "I am sick of this bullshit" and called Chief Johnson and Sheriff Champlin "no good fuckers," and a "dirty son of a bitch." Grievant then walked into his house and called his union representative, who was still on the phone when he came back out of his home moments later with the telephone in his hand. Chief Johnson stated that Grievant then called him and Sheriff Champlin "dirty," and said that

6

GCSO DARST 00274

they had been out to get him from the very beginning and then told Chief Johnson and Sergeant Darst to "get the fuck off of [his] property."

At or about this time, Chief Johnson spoke to Grievant's wife who said she understood the issue and went inside the house with Grievant to get the dog.

In the interim, Grievant's son, Justin, who was outside working on his truck during the entire episode, walked toward his pickup truck and picked up a handgun. Justin then leaned on his truck with his hand behind his back and stood there staring at Sergeant Darst (County Exhibit 14, p. 7). Sergeant Darst ordered Justin to put the gun away and go inside. After several commands, Justin put the handgun in his back pocket, although Sergeant Darst believed that he kept his hand on the gun the whole time.

A short time later, Grievant's wife emerged from the home with the dog, which she took to urinate in the yard and then placed in the back of the patrol car (County Exhibit 17). Grievant's wife then retrieved the dog's food and medicine from the house and gave it to Chief Johnson. Chief Johnson testified that at or about this time, Justin said that taking the dog was "like taking a family member" and that "I want you to know what it is like to lose a family member."

After approximately 15 to 20 minutes, Chief Johnson and Sergeant Darst left Grievant's home with the dog and the patrol car. Subsequently, Chief Johnson reported that Grievant's patrol car contained excessive hair and odors, which he said was a violation of office policy.

Several days later, the GCSO asked Sergeant Darst to deliver paperwork to Grievant's residence. However, Sergeant Darst testified that he felt unsafe going back to Grievant's home and asked that another officer deliver the paperwork.

Subsequently, Sheriff Champlin found that based on Grievant's statements to Chief Johnson and Sergeant Darst, Grievant had violated GCSO Policy number 3.06 on insubordination (County Exhibit. 17).

GCSO DARST 00275

Nevertheless, Sheriff Champlin asked an attorney for the GCSO to conduct an investigatory interview with the Grievant, which occurred in June 2018. During the interview, Grievant admitted the importance of properly documenting his payroll and his canine records. He also admitted to what had transpired at his house on March 7, 2018. However, Grievant said he only called the Chief Johnson a "dirty son of a bitch" and did not remember calling Chief Johnson or Sheriff Champlin "dirty fuckers," or telling Chief Johnson and Sergeant Darst to get off his property.

On July 18, 2018, Sheriff Champlin held a pre-disciplinary Conference with Grievant wherein Grievant was charged with violating of GCSO Policy Number 7.10 regarding Canine Operations and Policy Number 3.06, with regard to Insubordination (Joint Exhibit B). Grievant was also given notice of another pre-disciplinary meeting regarding the payroll issue. However, the Union agreed to move forward with the pre-disciplinary conference on all the issues. Thereafter, Grievant attended the conference with his Union representative and was afforded an opportunity to respond to the charges (County Exhibits 19 and 22).

Following the pre-disciplinary conference, Sheriff Champlin sustained each of the charges (JE C.).

On July 20, 2018, Grievant was terminated.

On August 27, 2018 the Union filed a Notice of Intent to Arbitrate.

## POSITION OF THE PARTIES
**Union:**

The Union contends that the Employer failed to meet its burden of proof with respect to whether Grievant violated any policies of the Employer regarding payroll and the maintenance of his K9 records. The Union also contends that the Employer failed to prove that Grievant's conduct on March 7, 2018, constituted gross misconduct and that discharge was an appropriate

8

penalty. Consequently, the Union requests that the grievance be sustained and that Grievant be returned to work with back pay and benefits.

With regard the issue of payroll, the Union asserts that although Grievant conceded that he submitted his overtime after the deadline for the payroll entry, the policy concerning the procedure, which was only contained in an email, does not state that an employee can or will be disciplined if they fail to enter their payroll data in a timely manner. As such, the Union contends that a violation with respect to entering payroll data does not warrant any discipline. Additionally, the Union submits that although the Employer concluded that Grievant violated the payroll policy on February 13, 2018, the Employer did not issue any discipline until July 20, 2018, which was five months later and therefore untimely. The Union contends that although Chief Johnson testified that no discipline was issued until February 13, 2018 because Grievant was out on an injury leave, the evidence shows that Grievant was not injured until February 28, 2018, which provided sufficient time for the Employer to impose discipline before Grievant went out on leave. Accordingly, the Union contends that this was a "pile-on" charge created by the Employer in order to support the penalty of termination and should therefore be dismissed.

With respect to the issue of Grievant failing to maintain his K9 training records, the Union submits that this charge should be dismissed because Sheriff Champlin concluded that Grievant was guilty of the policy violations long before he conducted an internal investigation or held a pre-disciplinary hearing with Grievant to hear his side of the story. Additionally, the Union contends that Sheriff Champlin never informed Grievant that there were any problems with his training logs after his dog was certified as proficient by the State of Ohio. Moreover, the Union asserts that Sheriff Champlin failed to forewarn Grievant that if he did not complete the training logs the way the Sheriff wanted them completed, that Grievant would be disciplined. Thus, the Union contends that because Sheriff Champlin

9

concluded that Grievant was guilty of the policy violations before he conducted an internal investigation to obtain all the facts, and because Grievant was as not put on notice as to possible consequences for failing to maintain the training logs, discipline for this issue is inappropriate.

With respect to the incident that occurred at Grievant's home on March 7, 2018, the Union does not deny that Grievant called his superior officers a "dirty son of a bitch" after he learned that they had come to his home to take his dog and his patrol car. However, the Union asserts that this incident, which took place less than a week after Grievant suffered an on-duty injury, occurred before Sheriff Champlin spoke to Grievant about the alleged deficiencies in his training logs, which was purportedly the reason that Sheriff Champlin determined that the dog and Grievant's patrol car should be returned. Thus, Grievant had no notice of the issue until Chief Johnson and Sergeant Darst appeared at his home. The Union also submits that although Chief Johnson had called Grievant before he arrived at Grievant's home on the day in question, Chief Johnson failed to warn Grievant as to why he was coming. As such, Grievant was unaware that they were coming to take his dog and his patrol car until he was handed the letter. Thus, the Union submits that after reading the letter, Grievant went into "shock" and reacted inappropriately because he was upset that they were taking away his dog, which had lived with him for the last two years, without any warning. The Union also contends that Grievant was on prescription medicine at the time of the incident, which affected his ability to respond appropriately. Further, the Union submits that Grievant never told Chief Johnson that he could not have the dog and notes that the dog was actually returned to Chief Johnson after Grievant's wife had an opportunity to walk the dog and pack his food and medicine, which took only 15 to 20 minutes. Thus, the Union submits that although Grievant did not respond appropriately, at least initially, the incident only escalated because Sheriff Champlin and Chief Johnson failed to warn Grievant that they were coming

10

GCSO DARST 00278

to his home to take his dog and his patrol car, which they had to opportunity to do when Chief Johnson spoke to Grievant on the telephone earlier in the day.

Accordingly, in conclusion, the Union submits that the Employer failed to prove that Grievant violated any policies with respect to entering his payroll data and the maintenance of his K9 records. The Union also submits that in light of all the facts relevant to the incident that occurred on March 7, 2018, the Employer failed to prove that Grievant's conduct constituted gross misconduct and that the penalty of discharge was excessive. As such, the Union requests that the grievance be sustained.

**The Employer:**

The Employer submits that it has established that Grievant was terminated for just cause. The Employer argues that Grievant's termination was within the Employer's rights and consistent with the parties' CBA and established labor principles. Specifically, the Employer contends that Grievant failed to follow a direct order with respect to timely submitting his payroll data, failed to abide by the Employer's policy regarding Canine Operations and failed to abide by its policy prohibiting insubordination. The Employer contends that all of its policies were reasonable and in effect at the time of Grievant's conduct and that there is no dispute that Grievant was aware of each of these policies.

With respect to the payroll issue, the Employer contends that Grievant violated a direct order concerning the deadline to submit payroll, which occurred less than one month after Chief Johnson had reiterated the order to Grievant. The Employer notes that Grievant offered no justifiable excuse for failing to follow the order other than to say "he forgot." As such, discipline is warranted.

With respect to the K-9 training records, the Employer contends that Grievant was aware that his job description required him to generate detailed reports regarding the training on his police dog, and that Policy 7.10

11

regarding Canine Operations emphasized that the handler was responsible for assuring the accuracy and completeness of training records for the canine team. The Employer submits that Grievant was previously instructed on how to complete the records and was actually provided with an illustration by Sheriff Champlin, which put Grievant on notice as to what was expected. Therefore, Grievant had no excuse not to comply. The Employer notes that maintaining complete and accurate records is critical to a successful prosecution and that Grievant's failure to maintain accurate records could have jeopardized the County's ability to obtain a conviction. The Employer also submits that Grievant's prior canine certification by the state is irrelevant to this issue because the subject records were generated after Grievant's certification.

With regard to the charge of insubordination, the Employer submits that Grievant was not only insubordinate toward Chief Johnson and Sergeant Darst when he failed to comply with a direct order to turn over the dog, but that his behavior constituted an act of gross misconduct when he cursed at his supervisors and told at them to "get the fuck off his property." The Employer submits that although Chief Johnson was ultimately able to retrieve the dog, this did not occur until Grievant's wife went inside to get the dog, which was nearly 15 to 20 minutes after Grievant was directed to do so. Additionally, the Employer submits that Grievant's language toward his supervisors was not only extremely unprofessional, but that his behavior was so extreme that it incited his adult son to menace and threaten Chief Johnson and Sergeant Darst with a gun, which was unacceptable.

With respect to penalty, the Employer contends that termination is appropriate in this case. Specifically, the Employer submits that Grievant's behavior was extreme and inexcusable, and the fact that he was not told in advance that his superiors were coming to take the dog, does not mitigate his misconduct. The Employer submits that although the dog lived with Grievant, the dog was not his property, which Grievant was well aware of.

12

GCSO DARST 00280

Therefore, any emotional attachment Grievant may have had with the dog should not be considered as a mitigating factor for his inappropriate behavior toward his superiors.

Further, the Employer submits that the nature of law enforcement mandates that Grievant is expected obey the chain of command and maintain a high standard of conduct, which is expected of all law enforcement officers. However, the Employer contends that the fact that Grievant refused to acknowledge during the investigatory interview that it was inappropriate or unprofessional for him to have called the Chief Johnson a "dirty son of a bitch," demonstrates Grievant's lack of respect for the chain of command, which further supports the penalty of termination.

With regard to the investigation, the Employer claims that although Sheriff Champlin may have had an opinion about Grievant's conduct before the Grievant was interviewed, the charges and penalty were not issued until after an attorney conducted the investigation and after Grievant was interviewed. Thus, there was no evidence of any predetermination with respect to the charges brought against Grievant.

Finally, the Employer contends that it has retained the right to discharge its employees for just cause and that the parties' CBA specifically allows the Employer to dispense with progressive discipline and terminate an employee for gross misconduct (JE A, p. 13, Article 9.2). The Employer acknowledges that with respect to the payroll issue and the training records, a short-term suspension would have been appropriate. However, because Grievant had a verbal reprimand and a written reprimand already in his file, and because Grievant's insubordination was such a serious offense, which has an even greater effect in law enforcement agencies, Grievant should be terminated.

**Discussion:**

The Employer in this case has the burden of demonstrating that it had just cause to discipline the Grievant with respect to Grievant's failure to

13

GCSO DARST 00281

enter his payroll on time, his failure to maintain adequate records for the training of his canine and for his acts of insubordination against his superior officers on March 7, 2018.

With respect to the payroll issue, there is no dispute that Grievant failed to enter his payroll on at least one occasion in February 2018. There is also no dispute that Grievant knew he was required to do so, or that the rule was reasonable. Although the Union argued that the rule was not contained in an actual policy, but rather only an email, this fact does not excuse Grievant from failing to comply with the rule. Nevertheless, because Grievant was not put on notice that his failure to comply with the rule would result in discipline, I find that any penalty more than a warning not to do it again, is unwarranted. I also find that Employer's excuse for not addressing this issue in February 2018, before Grievant went out of a medical leave, is without merit. Specifically, the facts show that Grievant failed to enter his payroll on February 15, 2018, and then did not go out on medical leave on until February 28, 2018, which was more than enough time for the Employer to address this issue sooner.

Regarding the issue of the canine records, again, there is no dispute that Grievant was aware of the Employer's policy with respect to accurately maintaining his canine records, and that he failed to do so. Although the Union argued that Sheriff Champlin concluded that Grievant was negligent before the investigation regarding this issue was complete, this point is meaningless because the subsequent investigation, which was conducted by an outside attorney for the Employer, also found the records to be incomplete. Therefore, the Union's argument with respect to predetermination is without merit. Additionally, there is no dispute that the Employer's policy regarding the maintenance of canine records was reasonable in light of the fact that the records are sometimes used in criminal prosecutions. Further, the Employer has shown that Grievant was previously instructed on how to complete the records and was actually provided with a demonstration on how to maintain

14

GCSO DARST 00282

the records by Sheriff Champlin before this issue arose. As such, I find that Grievant had no excuse for failing to maintain the records accurately. However, because Grievant was not put on notice that his records from 2017 were insufficient until they were reviewed for a second time in March 2018, I find that a written reprimand and compulsory retraining for this issue is a sufficient penalty.

With respect to Grievant's conduct on March 7, 2018, there is no dispute that Grievant called Chief Johnson a "dirty son of a bitch." Although Grievant testified that he did not recall saying he was also a "dirty fucker," or telling Chief Johnson and Sergeant Darst to get off his "fucking property," the fact that Grievant did not remember making these statement is not the same as a denial. Thus, I credit the testimony of Chief Johnson and Sergeant Darst with respect to these asserted facts. As such, I agree with the Employer that Grievant's behavior toward his superiors on this date was egregious and inexcusable. I also find that Grievant's behavior constituted an act of gross misconduct. Nevertheless, I agree with the Union that it would have been better practice if Chief Johnson had told Grievant that he was coming to his home to retrieve his dog and his patrol car when he spoke to him on the telephone because doing so would have likely defused the situation before Chief Johnson arrived. However, despite Grievant's emotional attachment to the dog, these facts do not mitigate Grievant's conduct, particularly since Grievant is a trained police officer who should have known how to control himself when faced with a difficult situation. Additionally, I further find that the fact that Grievant was allegedly on prescription pain medication at the time, does not mitigate Grievant's conduct, particularly since the pain medication would likely have made him less agitated.

Nevertheless, after considering the totality of the circumstances and the arbitral authority submitted by the parties, I find that the penalty of termination was too severe in this instance. Significantly, although I agree with the Employer that insubordination cannot be tolerated in a police

15

organization, and that respect for the chain of command in such an organization is essential, the incident at issue did not occur during a police operation in the community, but at the Grievant's home, which did not adversely affect the public's confidence in the GCSO. Additionally, no other employees were present at the time Grievant made these statements, which did not undermine the authority of Grievant's superiors with respect to any other employees. Moreover, although the Employer claims that Grievant defied a direct order, the facts show that Grievant never said he was not going to surrender the dog, which he did after the dog was walked and his food and medication were retrieved from his home, which, by all accounts, took approximately 15 to 20 minutes after Chief Johnson arrived at Grievant's home. Accordingly, I find that a twenty-one (21) day suspension, to be served upon Grievant's return from his medical leave, is a sufficient penalty. I note the penalty imposed herein is not inconsistent with the discipline imposed on another deputy at the GCSO who received a 3-day suspension for cursing at his superior officer.

Finally, contrary to the Employer's contentions, I do not find that Grievant incited or encouraged the conduct of his son, which although inappropriate, was not caused by the Grievant.

For all of the foregoing reasons, I issue the following:

AWARD

The grievance is sustained in part, and denied in part.

The Employer had just cause to discipline the Grievant, Jerry Darst, but did not have just cause to terminate him. As a remedy, Grievant will serve a twenty-one (21) day suspension upon his return from his medical leave of absence.

The arbitrator shall retain jurisdiction over any dispute that arises over the implementation of this award.

Dated: April 25, 2019

16

GCSO DARST 00284

Suffolk County, New York

James McKeever
*James McKeever*
James McKeever, Esq., Arbitrator

I, James McKeever, affirm that I am the individual described herein and who executed the within Opinion and Award.

Dated: April 25, 2019

17

GCSO DARST 00285



# Meigs County Sheriff's Office
## Sheriff Scott Fitch
**104 East Second Street**
**Pomeroy, OH 45769**



Phone: (740) 992-3371　　　　　　　　　　　　　　　　　　Fax: (740) 992-2654

December 14th, 2022

Written Reprimand

Employee's name: Marty Hutton

Classification: Deputy

Department: Road Patrol

Type of Violation: Absenteeism (Sick leave abuse)

Group 1 Offense, Section 2 of the Rules of Conduct- Failure to properly "report off" work for any absence or failure to timely notify the proper party or absence.

Description of Violation:

Violation: 2.05.12 Absenteeism- "Employees shall not establish patterns of unexcused OR excessive absenteeism or be absent without leave". On Tuesday, December 6th, 2022 Lt. Bill Gilkey met with Captain Stewart and advised that at approximately 1430 hours Deputy Marty Hutton had called off of work for his regularly scheduled evening shift, 1500-2300 on 12/6/2022. Marty Hutton failed to call off work in the time frame agreed to by the Union Contract of 2 hours prior to his shift. This call off was in conjunction with his regular days off. Violation of CBA Section 18.6(A).

Additionally, On October 8th, 2022 Deputy Marty Hutton submitted a time off request for October 29th, 2022 for his regularly scheduled shift, 1500-2300 hours. This time off request was denied by Sgt. Brandy King on October 9th, 2022 for the reason being that there was already another deputy under the same classification off on that shift, at that time. Marty Hutton then proceeded to call off work sick on October 29th, 2022 at approximately 0228 hours for his shift on Saturday, October 29th, 2022, 1500-2300. This call off was also in conjunction with his regular days off.

This written reprimand is being issued as a corrective measure in an effort to improve your conduct. This written reprimand will cease to have force and effect after 12 months from the date of issuance if no intervening discipline during that period occurs. Any further violations could result in more severe disciplinary actions.

_Scott Fitch_
Signature of Sheriff

_12-14-22_
Date

_Capt. F_
Signature of Captain

_12-14-22_
Date

_Dep. Hutton_
Signature of Employee

_12-14-22_
Date

**I hereby acknowledge receipt of this written reprimand

**EXHIBIT**
**4**

MCSO 00533



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH

104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

The Meigs County Sheriff's Office is accepting applications for full-time Deputy Sheriff.
Qualifications:

-Must be a high school graduate or equivalent
-Must possess a current Ohio Peace Officer Training certificate
-Must possess a valid Ohio Drivers License
-Have a clean driving record
-Must not have been convicted of any felony crime or serious misdemeanor crime
Duties
-Patrol areas of the county for detection and prevention of criminal activity
-Responding to calls for service
-Conducting criminal investigations
-Completing reports
-Filing of charges
-Making arrests
-Collecting, preserving and submitting evidence
-Serving civil process papers
-Testifying in court
-Maintaining assigned vehicle
-Maintaining certifications
-Maintaining annual firearm qualifications
-Other duties as assigned by supervisor

EXHIBIT

5

MCSO 00182

# 𝔄𝔭𝔭𝔬𝔦𝔫𝔱𝔪𝔢𝔫𝔱 𝔬𝔣 𝔇𝔢𝔭𝔲𝔱𝔶 𝔖𝔥𝔢𝔯𝔦𝔣𝔣

## 𝔆𝔬𝔪𝔪𝔦𝔰𝔰𝔦𝔬𝔫

The State of Ohio, Meigs County, ss.

KNOW YOU, On this date, you are hereby appointed as a peace officer to serve as a **Deputy Sheriff** for the **Meigs County Sheriff's Office** pursuant to 311.04 of the Revised Code.

As such, you shall swear or affirm the following:
I, **Jerry Darst**, do solemnly swear or affirm that I will support the Constitution and Laws of the United States of America, the Constitution and Laws of the State of Ohio, and the Laws and Ordinances of Meigs County and to the best of my ability will discharge the duties of the office of Deputy Sheriff.

_____
Signature of Appointee

_November 22ⁿᵈ, 2022_
Date of Appointment

By signing below, I hereby swear or affirm that the above named individual is appointed to the above position pursuant to the authority vested in me by 311.04 of the Revised Code, and that the individual has personally appeared before me and signed this oath in my presence.

_____
Signature of Appointing Authority

Sheriff Scott Fitch
Typed / Printed Name of Appointing Authority and Title

Sworn to and subscribed before me this 22ⁿᵈ day of November 2022 in the county of Meigs and the State of Ohio.

_____
Signature of Notary/ Attorney/ Clerk of Courts



AMANDA M. LARKINS
NOTARY PUBLIC
STATE OF OHIO
MY COMMISSION EXPIRES
9/21/2027

MCSO 00476

**EXHIBIT**
**6**

**Meigs County Sheriff's Office**

## RECEIPT FOR POLICY & PROCEDURES MANUAL

I, _Jerry D Dart II_, hereby acknowledge receipt for one (1) copy of the Meigs County Sheriff's Office Policy & Procedures Manual.

It is understood that this manual is entrusted to me for safekeeping, study, and compliance. I will study, learn, and comply with the instructions contained. The updating, maintenance, and safe storage of this manual are my responsibility.

This information contained in this manual will not be released or distributed to individuals outside of the facility other than by those authorized to do so pursuant to a valid records request or otherwise pursuant to the direction of the Sheriff.

I will retain this manual in my possession or safekeeping and will not allow it to be copied or reproduced in any manner. Further, I will immediately report to my supervisor any attempt made by those outside of the facility to borrow, acquire a copy, view, or use this manual.

I affirm my commitment to honor this agreement this _28th_ day of _July_, 2022.

_Jerry D Dart II_
Printed name

_(signature)_
Signature

_(signature)_
Printed name of Witness

_____
Witness' Signature



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

7/17/2023

RE: Issued Property

Jerry,

The following items are what I have you signed out for. The firearms are on a separate list that Andy keeps in the armory since he issues those out. I have not confirmed with Andy what holsters and firearms he has you down for, however everyone is issued the duty weapon, off duty weapon, holsters, AR w/ mags, and shotgun. Give me a call if you have any questions.

-Outer Carrier with panels
-Key Fob/Office Keys
-Cell Phone
-Tablet OE1451H1
-Handheld Radio w/ Lapel Mic and Charger
-Taser/Holster
-Misdemeanor Tickets
-Traffic Tickets
-Uniforms
-Uniform brass
-Uniform apparel
-Gun Holsters
-Sig P320
-Sig P365
-Shotgun
-AR
-Any other items received that are the property of the Meigs County Sheriff's Office

Captain Frank Stewart



# MEIGS COUNTY SHERIFF'S OFFICE

### SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

7/17/2023

RE: Issued Property

Jerry,

The following items are what I have you signed out for. The firearms are on a separate list that Andy keeps in the armory since he issues those out. I have not confirmed with Andy what holsters and firearms he has you down for, however everyone is issued the duty weapon, off duty weapon, holsters, AR w/ mags, and shotgun. Give me a call if you have any questions.

- -Outer Carrier with panels 2
- -Key Fob/Office Keys
- -Cell Phone
- -Tablet OE1451H1
- -Handheld Radio w/ Lapel Mic and Charger
- -Taser/Holster
- -Misdemeanor Tickets
- -Traffic Tickets
- -Uniforms
- -Uniform brass
- -Uniform apparel
- -Gun Holsters
- -Sig P320
- -Sig P365
- -Shotgun
- -AR w/ 5 mags + pouch
- -Any other items received that are the property of the Meigs County Sheriff's Office

*Received: Lt. W. Lilly*
*Witness: _____ 5310*
*7/21/23*

*Body Cam*

*Captain Frank Stewart*
*1- T-Shirt*
*2 BDU Pants*
*√ Dress Pant*
*√ Long Sleeve w/Brass*
*√ Short Sleeve w/Brass*

*1-Hat w/Brass*
*1-New w/tags long*
*1-New w/tags short*
*2 Long BDU*
*2 Short BDU*

*Undershirt*
*for Carrier*
*Uniform 2 long 2 short*
*2-Tie w/Brass*
*2 Badges*
*2- Dept ID's*
*1- Union Card*

MCSO 00479

 **DAVE YOST**

OHIO ATTORNEY GENERAL

 Civilian Identification
Office 877-224-0043
Fax 866-750-0214

**July 18, 2022**

**Meigs County Sheriff's Office**
**104 East Second Street**
**Pomeroy, Ohio 45769**

## CRIMINAL HISTORY RECORD CHECK
### NO BCI CONVICTIONS ON FILE
### AUTHENTICATION NO. BMT002581752

The Ohio Bureau of Criminal Investigation (BCI) has completed a criminal history record check on the applicant listed below.

When authorized by law, an individual may have their criminal history sealed. In the event that an applicant has a sealed record, certain parties are permitted to receive such information to determine whether an applicant is legally disqualified from performing specific work.

Sealed records are disclosed based upon the **Reason Fingerprinted**, as submitted on the background check transaction and listed below. Sealed criminal histories will be provided in a manner consistent with the reason that the records are requested, regardless of the destination of the result.

There are no convictions on file with this office for this applicant.

| | |
|---|---|
| **Name:** | DARST, JERRY II |
| **Date of Birth:** | February 26, 1971 |
| **SSN:** | XXX-XX-1777 |
| **BCI Completion Date:** | July 18, 2022 |
| **Reason Fingerprinted:** | Law Enforcement/Criminal Justice (LAW) |

This letter is valid for one year from the record check completion date. This letter may be photocopied by the prospective employer and retained by the applicant.

Joseph A. Morbitzer
Superintendent
Ohio Bureau of Criminal Investigation

*Pursuant to Ohio Revised Code section 109.57(E)(2), BCI is authorized to provide only information relating to criminal convictions and guilty pleas. BCI is also only permitted to provide information regarding juvenile adjudications if the adjudication meets specific criteria listed in Ohio Revised Code section 109.57(E)(2) & (3).*

 **DAVE YOST**

OHIO ATTORNEY GENERAL

 Civilian Identification
Office 877-224-0043
Fax 866-750-0214

**July 18, 2022**

**Meigs County Sheriff's Office**
**104 East Second Street**
**Pomeroy, Ohio 45769**

### CRIMINAL HISTORY RECORD CHECK
### AUTHENTICATION NO: BMT002581752
### ICN: E2022199000000096739

A criminal history record check was conducted on the applicant listed below.

There are no convictions on file for this applicant.

| | |
|---|---|
| **Applicant Name:** | DARST, JERRY II |
| **Date of Birth:** | February 26, 1971 |
| **Social Security Number:** | XXX-XX-1777 |
| **Completion Date:** | July 18, 2022 |
| **Reason Fingerprinted:** | Law Enforcement / Criminal Justice (LAW) |

Joseph A. Morbitzer
Superintendent
Ohio Bureau of Criminal Investigation

*Pursuant to Ohio Revised Code section 109.57(E)(2), BCI is authorized to provide only information relating to criminal convictions and guilty pleas. BCI is also only permitted to provide information regarding juvenile adjudications if the adjudication meets specific criteria listed in Ohio Revised Code section 109.57(E)(2) & (3).*

# Jerry N Teresa Darst

**Email:**                        jdarstj1@yahoo.com
**Phone:**                        +1 740-612-7566

---

Experience

**Chief Probation Officer**
Gallia county juvenile court
Oct 1999 - Present

**Chief of Police**
Cheshire Village
Jun 2005 - Present

**Chief Range Officer**
Bridgeport Equipment and Tool
Dec 2018 - Present

**Security Officer**
Holzer Health System
Nov 1998 - Present

**K9 Handler**
Gallia County Sheriff
Feb 2012 - Present

**Correction Officer**
Gallia county jail
Jul 1995 - Present

**Gallia County Sheriff's Office**
Jul 1995 - Present

**Firearms Instructor**
Bridgeport Equipment and Tool
Oct 2018 - Present

---

Education

**University of Rio Grande and Rio Grande Community**

MCSO 00482

## MEIGS COUNTY SHERIFF'S OFFICE
## Policies and Procedures

| **Subject:** Rules of Conduct | **Policy** 2.05 |
|---|---|
| **Issue Date: 4/24/2017** | **Revised: 9/27/17** |
| **Approval Authority** <br><br> **Title and Signature:** | **SHERIFF** |

**POLICY:**

Meigs County Sheriff's Office employees shall conduct themselves professionally, responsibly and above reproach at all times. Employees shall follow the content of the rules and policies established by this agency.

**DEFINITIONS:**

Employee(s): means any full or part-time paid personnel as well as special deputies, volunteers and any other person who is representing or affiliated with the Meigs County Sheriff's Office.

**PROCEDURES:**

The General Orders developed here to pertain to the system established to enforce employee discipline.

**2.05.1    Code of Conduct and Appearance**

**CODE OF CONDUCT**:

All sworn personnel are granted a public trust, which requires they demonstrate the highest degree of integrity. To be worthy of this trust and to ensure that their professional conduct is above reproach, sworn employees of the Meigs County Sheriff's Office must conform to the Law Enforcement Code of Ethics, Canon of Police Ethics and other rules of conduct.

These Rules of Conduct apply to all employees. The rules are standards of behavior expected of professional law enforcement employees of the Meigs County Sheriff's Office, whether commissioned deputies or non-deputized employees. The term "employee" is also intended to include special deputies.

In the following section of this general order, Disciplinary Offenses include examples of conduct, which the Sheriff considers to be a non-exclusive list of illustrative examples. The examples listed do not represent all possible violations.

A violation of any of these standards may result in some type of discipline. Any employee may be terminated for a serious violation of any of these standards.

**EXHIBIT**

**7**

MCSO 00127

**2.05.2   VIOLATION OF RULES**

Employees shall not commit any acts or omit any acts, which constitute a violation of any Code of Ethics, Rules of Conduct, or any standard operating procedure, or of any other written or oral directive or practice established by the Meigs County Sheriff's Office for safe, efficient, or effective operations.  A violation of certain rules may result in termination of the employee's employment.  In the event of a violation it shall be presumed that the employee was familiar with the rules, regulations, orders, and other authoritative instructions of the Office.

**2.05.3   UNBECOMING CONDUCT**

Employees shall conduct themselves at all time, both on and off duty, in such a manner as to reflect most favorably on the Sheriff's Office.  Conduct unbecoming an officer shall include that which damages or has the probable expectation of damaging the public image, integrity, or reputation of the office, that which reflects discredit upon the employee as a member of the Sheriff's Office, or that which impairs the operation or efficiency of the Sheriff's Office or an employee.  Such offenses need not be specifically defined or set forth in this manual. Employees shall be disciplined or discharged for an offense of unbecoming conduct. Examples of such conduct include, but are not limited to:

a. Fraud in securing employment

b. Filing a false, incomplete, or misleading report, or record;

c. Giving a knowingly false or misleading location, description of event, or other information

   during a radio, telephone, or verbal and/or written report.

d. Conviction of any crime or the entry of a plea *of no lo contend ere*;

e. Misuse of government funds or property;

f. Fighting and /or arguing that is disruptive and /or unbecoming;

g. Abusive language or language that is unbecoming to the Office of Sheriff.

**2.05.4   OBSERVANCE OF CIVIL AND CRIMINAL LAWS**

A. Employees shall obey all laws of the United States and of any state or jurisdiction they may be located in.

B. A conviction of the violation of any law shall be prima facie evidence of a violation of this section.

C. Employees shall report, in writing, to the Sheriff, any illegal actions, either civil or criminal involving them as soon as they have knowledge of such action being commenced.

**2.05.5   NEGLECT OF DUTY**

Employees shall perform all duties assigned to them in the Meigs County Sheriff's Office.  While on duty, the employees' assigned duties, responsibilities, and obligations toward their position within the Sheriff's Office, shall be considered primary importance.  On-duty personnel shall not engage in non-emergency personal matters, social activities, personal business, or any other activities which would cause them to neglect or be inattentive to their duties.  Employees may be disciplined or discharged for neglect of duties.

MCSO 00128

**2.05.6     UNSATISFACTORY PERFORMANCE**

Employees shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions.  Employees shall perform their duties in a manner, which will maintain the highest standards of efficiency in carrying out the functions and objectives of the office.  Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of law required to be enforced: the failure to take appropriate action: or absence without leave.  In addition to other indicta of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations, a written record of infractions of policies, procedures, rules, regulations, directives, orders, or practices of the Sheriff's Office.

**2.05.7     TRUTHFULNESS**

1. No employee shall lie, knowingly give misleading or incomplete information, or otherwise falsify any verbal, written, typewritten or electronically processed communication in official reports or statements furnished to any person or organization when it is reasonable to expect that such communication is to be relied upon in any matter due to the employee's affiliation with the office.

2. Upon the order of the Sheriff, the Sheriff's designee or a superior, employees shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the sheriff's office, which may be asked of them.  Any attempt to be untruthful or to evade an issue by an employee will result in irreparable damage to the employee's reputation and destroy public and official confidence in that employee and the entire agency.  A finding by the Sheriff or his designee of dishonesty shall result in discipline or discharge.

**2.05.8     INSUBORDINATION; CONFLICTING OR ILLEGAL ORDERS**

1. Employees shall willfully observe and execute lawful and written rules, directives, duties, policies, procedures, and practices of the Meigs County Sheriff's Office.

2. Employees shall also subordinate their personal preferences and work priorities to the lawful verbal and written rules, duties, policies, procedures, and practices of this office, as well as to the lawful orders and directives of supervisors and superior command personnel of this office. This includes orders relayed from a supervisor by a member of the same or lesser rank.  Direct, tacit, or constructive refusal to comply constitutes insubordination.  Insubordination shall result in discipline, including discharge.

3. Employees who are given a conflicting order shall bring this fact to the attention of the supervisor who issued the later order.  If the conflict is not resolved at that time, the most recent order will be obeyed.  An employee shall not receive disciplinary action for disobeying the earlier order.

4. No employee shall issue an order, which in contrary to law, or which requires an employee to commit and illegal act.

5. Employees shall not obey any order which they know or should know would require them to commit any illegal act.

**2.05.9    NON-DISCRIMINATION AND HARASSMENT**

The Meigs County Sheriff's Office is committed to providing a facility that is safe and free from unlawful discrimination and harassment.  Unlawful discrimination or harassment is behavior directed toward an employee because of their membership in a protected class such as race, color, religion, sex, national origin, age, or disability.  Employees shall not base the performance of duties and responsibilities on an individual's race, color, religion, sex, national origin, age, ancestry, disability, genetic information or military status.  Unlawful discrimination and harassment is inappropriate and illegal and will not be tolerated.  All forms of unlawful discrimination and harassment are governed by this policy and must be reported and addressed in accordance with this policy.

**Definitions.**

Unlawful discrimination occurs when individuals are treated less favorable in their employment because of their membership in a protected classification.  An employer may not discriminate against an individual with respect to the terms and conditions of employment, such as promotions, raises, and other job opportunities, based upon that individual's membership in that protected class.

Harassment is a form of discrimination. Harassment may be generally defined as unwelcome conduct based upon a protected classification.  However, harassment becomes unlawful where:

1. Enduring the offensive conduct becomes a condition of continued employment.

2. The conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

By way of example, sexual harassment is one type of unlawful harassment.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when:

1. Submission to the conduct is made either explicitly or implicitly a term or condition of an individual's employment.

2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. Harassment on the basis of an employee's membership in any protected classification (as set forth above) is unlawful, will not be tolerated, and must be reported.

4. Unlawful discrimination and harassment does not generally encompass conduct of a socially acceptable nature. However, some conduct that is appropriate in a social setting may be inappropriate in the work place.  A victim's perceived acquiescence in the behavior does not negate the existence of unlawful discrimination or harassment.  Inappropriate conduct that an employee perceives as being "welcome" by another employee may form the basis of a legitimate complaint.

**Off Duty Conduct**

Unlawful discrimination or harassment that affects an individual's employment may extend beyond the confines of the workplace. Conduct that occurs off duty and off premises may also be subject to this policy.

Employees are prohibited from engaging in any harassing activity. Harassing activity includes, but not limited to words, actions, gestures, conduct, behavior, or visual materials that are, or that could be construed or perceived by other persons as, harassing, hostile, intimidating, or offensive. Sexual harassment in any form (including verbal and physical) is strictly prohibited. Employees shall report to a superior officer any incidents of possible harassment of which the member has knowledge.

**Complaint Procedure**

Any employee who feels they have been subjected to unlawful discrimination or harassment by a fellow employee, supervisor, or other individual otherwise affiliated with the sheriff's office shall immediately report the conduct, in writing, to the Sheriff or Major, each of whom shall have the authority and responsibility to work directly with an outside agency to investigate and take appropriate action concerning the complaint.

**Retaliation**

Anti-discrimination law prohibits retaliatory conduct against individuals who file a discrimination charge, testify, or participate in any way in an investigation, proceeding, or lawsuit under these laws. No supervisor or employee shall retaliate against any individual for filing a complaint, reporting harassment, participating in an investigation or engaging in any other protected activity. Any employee subjected to retaliatory conduct shall report the conduct immediately to the Sheriff or Major. Disciplinary action for filing a false complaint in not a retaliatory act.

**Corrective Action**

If it is determined that unlawful discrimination, harassment, or retaliation has taken place, appropriate corrective action will be taken, up to and including termination. Any individual exhibiting retaliatory or harassing behavior towards an employee who exercised a right under this policy, or who is a close personal friend or family member of someone who exercised a right under this policy, will be subject to discipline, as will any employee who has knowledge of unlawful conduct and allows that conduct to go unaddressed.

**2.05.10   REPORTING CRIMINAL ACTIVITY**

Employees shall report to their supervisor or superior officer all information acquired concerning any type of criminal activity brought to their attention. In the event such information is confidential, the employee may, via the chain of command, request to speak with any superior without divulging the confidential information. Failure to report any illegal activity or crime constitutes malfeasance and shall result in discipline, including discharge.

**2.05.11   USE OR POSSESSION OF DRUGS AND ALCOHOL**

  1. Employees must never possess or use any controlled substances unless, in the treatment of the employee by a physician or dentist, the employee receives prescription for the medication.

When an employee has a prescription for medication that could limit or impair his ability to function, physical or mentally, they must immediately notify their supervisor. The notification must include providing the supervisor with a written list of the type of medication, length of time to be taken and the dosage.

2. Employees must never purchase or consume intoxication beverages while in uniform or in clothing that identifies them as a Meigs County Sheriff's Office employee except as part of a documented investigation. Other than for the purpose of performing their official duties, employees on duty or in uniform shall not enter or visit any bar, lounge, parlors, club, store or any other establishment whose primary purpose is the sale or on-premise consumption of alcoholic beverages. Employees shall not report for duty, or be on duty, while having any detectable level of intoxicants/alcohol/drugs, or with an odor of intoxicants within six (6) hours of reporting to duty.

3. Employees, while off duty, must never consume intoxicating beverages to the extent that it results in impairment, intoxication, obnoxious or offensive behavior that discredits them, the Sheriff's Office, or renders the employee unfit to report for their next regular shift.

**2.05.12   ABSENTEEISM**

Employees shall not establish patterns of unexcused or excessive absenteeism or be absent without leave. Employees shall not under any circumstances be absent from duty without first obtaining permission.

**2.05.13   REPORTING FOR DUTY**

Employees shall report for duty at the time and place required by assignment or orders and shall be physically and mentally fit to perform their duties. They shall be physically and mentally prepared and correctly uniformed and equipped to assume their duties. Judicial subpoenas shall constitute an order to report for duty under this section.

**2.05.14   EMPLOYMENT OUTSIDE OF OFFICE**

Employees may engage in off-duty employment subject to the submission or a written request to and subsequent approval by the Sheriff.

Approval may be denied where it appears that the outside employment might: (1) render the employee unavailable during an emergency, (2) physically or mentally exhaust the employee to the point that their performance might be affected, (3) require that special consideration be given to scheduling the member's regular duty hours, or (4) bring the office into disrepute or impair the operation or efficiency of the Sheriff's Office or employee.

**2.05.15   COOPERATION/ASSISTANCE/INTERFERENCE**

Cooperation between the ranks and units of the Sheriff's Office is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation within the office. Employees will strive for full coordination of effort and cooperation in internal activities and in official relationships with other organizations.

Employees are required to take appropriate law enforcement action toward aiding a fellow officer or member exposed to danger or a situation where danger might be impending, or when

a request for assistance is either made or recognized as such. Failure to do so is malfeasance and shall result in discipline or discharge.

Employees shall not intervene or interfere with any work task assigned to another employee or to another agency. Employees shall not independently initiate or undertake any investigation or other official activity, which is not part of the employees assigned duties without first receiving permission from a superior officer.

**2.05.16 ASSOCIATION/LOITERING**

Employees shall not associate with known criminals except to further a legitimate law enforcement purpose or where unavoidable because of other family relationships of the member.

Employees shall not congregate or loiter in any place or in any manner as to bring discredit to the employee(s) or to the Sheriff's Office.

Employees shall not frequent any establishment known to have a reputation for the illegal sale of intoxicants, unruly behavior of patrons or is under investigation unless in the course of conducting an approved investigation.

**2.05.17 ETHICS**

1. Employees shall not involve themselves in activities, ventures, or enterprises, which create or have the potential of creating conflicts of interest with the duties and obligations of their positions as employees of the Sheriff's Office. Employees shall not have any unlawful interest in a public contract.

2. Employees shall not solicit or accept from any person, business, or organization any gift (including money, tangible or intangible personal property, food, beverage, loan, promise, service, discount, ticket, or entertainment) for the benefit of the employee or the Sheriff's Office without authorization from the Sheriff. This does not include specific restaurants that make it a practice to give a discount or free drink to all peace officers as an appreciation gesture when that officer is eating at their establishment.

3. Employees shall not attempt to influence the decision of government officials in matters relating to purely personal advantage.

4. Employees shall not use their position to secure, nor accept, anything of value. For example: tickets, discounts, goods, services, etc. This does not include specific restaurants that make it a practice to give a discount or free drink to all peace officers as an appreciation gesture when that officer is eating at their establishment.

5. Employees shall not disclose confidential information, or use confidential information to influence a governmental decision or to advance personal, financial, or other private interest. For Example: disclosure of details regarding any criminal or internal investigation; disclosure of information gained through LEADS or NCIC, or etc.

6. Employees shall at all times impartially perform assigned duties, enforce law, and provide service to the public.

**2.05.18 ENDORSEMENTS AND REFERRALS**

Employees shall not recommend or suggest in any manner, except in the transaction of personal business, the employment or procurement of a particular product, professional service, or commercial service (such as attorney, ambulance service, towing service, bondsman, mortician, etc.). In the case of ambulance or towing service, when such service is necessary and the person needing the service is unable or unwilling to procure it or requests assistance, officers shall proceed in accordance with established departmental procedures.

Employees shall not authorize the use of their names, photographs, or official titles, which identify them as officers or employees, in connection with testimonials or advertisement of any commodity or commercial enterprise, without the approval of the Sheriff.

**2.05.19 CITIZEN COURTESY/COMPLAINTS**

A. Employees shall display courtesy and respect to the public, superior officers, subordinates, and associates. Employees shall be tactful in the performance of their duties, shall control their tempers, and exercise the utmost patience and discretion and shall not engage in argumentative discussions even in the face of extreme provocation. In the performance of their duties, employees shall not use coarse, violent, profane, or insolent language or gestures, and shall not express any prejudice concerning race, sex, religion, politics, national origin, lifestyle, or similar personal characteristics.

B. Employees shall carry their badges and identification cards on their person at all times, except when impractical or dangerous to their safety or to an investigation. They shall furnish their name and badge number to any person requesting that information, when they are on duty or while holding themselves out as having an official capacity, except when the withholding of such information is necessary for the performance of official duties or is authorized by proper authority.

C. Employees shall courteously and promptly record in writing any complaint made by a citizen against any member of the Sheriff's Office. Employees may attempt to resolve the complaint, but shall never attempt to dissuade any citizen from lodging a complaint against any member or the Office.

D. When any person applies for assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner and shall be properly and judiciously acted upon consistent with established departmental procedures.

**2.05.20 PUBLIC STATEMENTS AND APPEARANCES**

Employees shall not publicly criticize or ridicule the Sheriff's Office, its policies or other employees by speech, writing or other expression, where such speech, writing or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Office. Interferes with the maintenance of discipline or is made with reckless disregard for truth or falsity.

Employees shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information or any other matters of the Office while holding themselves out as

representing the Office in such matters without proper authority. Employees, when representing the Office, may lecture on "law enforcement" or other related subjects only with the prior approval of the Sheriff.

## 2.05.21  PERSONAL APPEARANCE

Refer to Policy 3.01 (Appearance and Grooming) of the Meigs County Sheriff's Office Policy and Procedures.

## 2.05.22  POLITICAL ACTIVITY

Employees shall be permitted to:

1. Register and vote in any election.
2. Express opinions as individuals privately and publicly on political issues and candidates.
3. Attend political conventions, rallies, fund-raising functions and similar political gatherings.
4. Actively engage in any nonpartisan political functions.
5. Sign political petitions as individuals.
6. Make financial contributions to political organizations.
7. Serve as election judges or clerks or in a similar position to perform nonpartisan duties as prescribed by state or local laws.
8. Hold memberships in a political party and participate in its functions to the extent consistent with the law and consistent with this Section.
9. Otherwise participate fully in public affairs, except as provided by law, to the extent that such endeavors do not impair the neutral and efficient performance of official duties, or create real or apparent conflicts of interest.

Employees are prohibited from:

1. Using their official capacity to influence, interfere with or affect the result of an election.
2. Assuming active roles in the management, organizations, or financial activities of partisan clubs, campaigns, or parties.
3. Serving as officers of partisan political parties or clubs.
4. Becoming candidates for or campaigning for a partisan elective public office.
5. Soliciting votes in support of or in opposition to, any partisan candidates.
6. Serving as delegates to a political party convention.
7. Endorsing or opposing a partisan candidate for public office in a political advertisement. Broadcast, or campaign literature.
8. Initiating or circulating a partisan nominating petition.
9. Organizing, selling tickets to, or actively participating in a fund-raising function for a partisan political party or candidate.
10. Addressing political gatherings in support of, or in opposition to a partisan candidate.
11. Otherwise engaging in prohibited partisan activities on the federal, state, county, or municipal level.

## 2.05.23  FINANCIAL DISCLOSURE/PAYMENT OF DEBTS

Upon the order of the Sheriff or the Sheriff's designee, employees shall submit financial disclosure statements in accordance with departmental procedures in connection with a complaint in which this information is material to the investigation. These statements are to be maintained by the Sheriff and shall not be available for public disclosure.

Employees shall not undertake any financial obligations which they know or should know they will be unable to meet, and shall pay all just debts when due. An isolated instance of financial irresponsibility will not be grounds for discipline except in unusually severe cases. However, repeated instances of wage garnishment or similar financial difficulty, which disrupts the efficiency of the office, may be cause for disciplinary action. Filing for a voluntary bankruptcy petition shall not, by itself, be cause for discipline. Financial difficulties stemming from unforeseen medical expenses or personal disaster shall not be cause for discipline, provided that a good faith effort to settle all accounts is being undertaken.

## 2.05.24 RESIDENCE/TELEPHONE

Employees shall reside within forty-five (45) minutes travel time of the Sheriff's Office. New employees shall reside within forty- five (45) minutes of the Sheriff's Office within one year of their employment.

Employees shall not use the Sheriff's Office as a mailing address for private purposes. The Sheriff's Office shall not be used on any motor vehicle registration.

Employees shall have a telephone (landline or cell) service at their residence and shall immediately report any changes of telephone number or addresses to the Sheriff or other such persons as may be appropriate.

Departmental county equipment is not to be used for the excessive transmission of private messages.

## 2.05.25 DISSEMINATION OF INFORMATION

Employees shall treat the official business of the Sheriff's Office as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures. Employees may remove or copy official records or reports from a county office only in accordance with established departmental procedures. Employees shall not divulge the identity of persons giving confidential information except as authorized by the Sheriff.

## 2.05.26 DEPARTMENTAL REPORTS

Employees shall submit all necessary reports on time and in accordance with established departmental procedures. Reports submitted by employees shall be truthful and complete, and no employee shall knowingly enter or cause to be entered any inaccurate, false, improper, or incomplete information.

## 2.05.27 PROCESSING PROPERTY AND EVIDENCE

Property or evidence, which has been discovered, gathered, or received in connection with departmental responsibilities, will be processed in accordance with established departmental procedures. Employees shall not covert to their own use, manufacture, conceal, falsify, destroy, remove, tamper, with or withhold any property or evidence in connection with an investigation or other official action, except in accordance with established departmental procedures.

**2.05.28 ABUSE OF PROCESS**

Employees shall not make false accusations of a criminal or traffic charge.

**2.05.29 USE OF DEPARTMENTAL EQUIPMENT**

Employees shall care for and properly use Sheriff's Office equipment only for its intended purpose, in accordance with established departmental procedures, and shall not abuse, damage or lose such equipment. All equipment issued to employees shall be maintained in proper order. In the event that county property is found bearing evidence of damage which has not been reported, it shall be prima facie evidence that the person using the property or vehicle was responsible or accountable.

The approval of the Sheriff, or his designee, shall be required prior to the lending of any departmentally owned equipment.

Employees shall not deface, mar, or otherwise tamper with any Office equipment or property.

Employees shall operate official vehicles in a careful and prudent manner, and shall obey all laws and all departmental orders pertaining to such operation. Loss or suspension of any driving license shall be reported to the Sheriff immediately.

**2.05.30 FIREARMS**

Employees shall carry firearms in accordance with the law and existing departmental procedure regarding firearms.

**2.05.31 USE OF MEDICAL EXAMINATIONS, PHOTOGRAPHS, LINEUPS, AND OTHER**

**TESTS.**

Upon the order of the Sheriff or the Sheriff's designee, employees shall submit to any medical, ballistics, chemical or other tests, photographs, or lineups. All procedures carried out under this subsection shall be specifically directed and narrowly related to a particular internal investigation being conducted by the Office

**2.05.32 TREATMENT OF PERSONS IN CUSTODY**

Employees shall not mistreat persons who are in their custody. Employees shall handle such persons in accordance with law and departmental procedures. Employees shall maintain proper care and control of persons in their custody at all times. Employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and departmental procedures.

Employees shall not make any arrest, search, or seizure, which they know or should know, is not in accordance with law and departmental procedures.

**2.05.33 POSTING OF NOTICES**

Employees shall not mark, mar, or deface any posted notices of the Sheriff's Office. No notices of a derogatory nature will be posted at any time.

**2.05.34 TOBACCO POLICY**

Use of any tobacco products while on duty shall not be used while in any building, vehicle, or at any time while in personal contact with the public is prohibited. This policy does not apply to designated smoking areas at government or other public buildings

**2.05.35 DRUG FREE WORKPLACE POLICY**

As already exists in the Meigs County Employee Personnel Policy Manual, Section VII, and in Article 30 of the Bargaining Unit Contract with the Ohio Patrolman's Benevolent Association.

**2.05.36 DISCIPLINARY SYSTEM**

In general, Group I offenses may be defined as those infraction which are of relatively minor nature and which cause disruption to the organization in terms of a decrease in organization productivity, efficiency, and/or morale. Group I offenses, if left undisciplined by proper authority, will usually cause a temporary adverse impact against the organization unless such acts are compounded over time.

Group II offenses may be defined as those infractions which are of a more serious nature than Group I offenses and which, in turn, cause a more serious and longer lasting disruption to the organization in terms of decreased organizational productivity, efficiency and/or morale. Group II offenses, if left undisciplined by proper authority, can cause serious and longer lasting adverse impact against the organization than the Group I offenses.

Group III offenses may be defined as those infractions, which are of a very serious, or possibly a criminal nature, and which cause a critical disruption to the organization in terms of decreased productivity, efficiency, and/or morale. Group III offense, if left undisciplined by proper authority, may cause long lasting and critically serious adverse impact against the organization.

The following examples of specific offenses are not all inclusive, and are not intended to be binding on the Employer.

<u>**GROUP I OFFENSES**</u>

| | |
|---|---|
| FIRST OFFENSE | Verbal or written reprimand (verbal reprimand-written record to be signed by employee) |
| SECOND OFFENSE | Up to three (3) day suspension without pay |
| THIRD OFFENSE | Up to ten (10) day suspension without pay or reduction in classification |
| FOURTH OFFENSE | Up to and including termination of employment |

Following are examples of Group I Offenses:

1. Failure to properly and completely sign in or out or mark on or off.
2. Failure to properly "report off" work for any absence or failure to timely notify the proper party or absence (e.g. tardiness, etc.)
3. Creating or contributing to unsanitary or unsafe conditions or poor housekeeping.
4. Failure to observe routine safety rules.

MCSO 00138

5. Inattention to the needs of the public.
6. Distracting the attention of others, unnecessary shouting, use of profane or other inappropriate language, misuse of two-way radios, or otherwise causing disruptions on the job.
7. Horseplay, wrestling or other potentially harmful conduct.
8. Interfering with the work performance of other employees.
9. Failure to cooperate with other employees.
10. Neglect of, or careless failure to observe, Employer rules, regulations, policies and procedures.
11. Excessive garnishments.
12. Use or possession of another employee's working equipment or property without approval.
13. Unauthorized use of the Employer's telephone for other than business purposes.
14. Obligating the Employer for any minor expense, service, or performance without prior authorization.
15. Neglect of, or careless failure to care for, Employer property or equipment.
16. Disregarding job duties by neglect of work during work hours.
17. Inefficiency (e.g., lack of application or effort on the job, unsatisfactory performance, failure to maintain required performance standards, etc.)
18. Neglect of, or careless failure to, prepare required reports or documents.
19. Failure of a supervisor to administer discipline as provided herein or to otherwise enforce rules, regulations, policies and procedures of the Employer.

## GROUP II OFFENSES

| | |
|---|---|
| FIRST OFFENSE | Verbal instruction and one (1) to three (3) day suspension without pay |
| SECOND OFFENSE | Up to ten (10) day suspension without pay or reduction in classification |
| THIRD OFFENSE | Up to and including termination of employment |

Following are examples of Group II Offenses:
1. Sleeping during work hours.
2. Reporting to work or working while unfit for duty.
3. Failure to report for overtime work, without proper excuse, after being scheduled to work.
4. Leaving a post of continuous operations prior to being relieved by employee on incoming shift.
5. Willful refusal to sign on or off or clock in or out when required
6. Performing private work on Employer time.
7. Neglect or careless failure to observe official safety rules, or common safety practices.
8. Failure to report accidents.
9. Discourteous treatment of the public.
10. Threatening, intimidating, or coercing other employees.
11. Use of abusive or offensive language toward other employees.
12. The making or publishing of false, vicious, or malicious statements concerning other employees, the Employer or its operations.
13. Willful disregard of the Employer's rules, regulation, policies and procedures.

14. Negligent failure to obey a reasonable order of a supervisor or failure to carry out work assignments, including verbal instructions.
15. Neglect or carelessness in the use of Employer property or equipment.
16. Obligating the Employer for a major expense, service or performance without prior authorization.
17. Unauthorized or improper use of Employer property or equipment.
18. Failure to report equipment damage.
19. A traffic violation or accident while driving an Employer vehicle, which evidences recklessness by the employee.
20. Possession or storage of alcoholic beverages on the Employer's premises.
21. Unauthorized presence on the Employer's property.
22. Habitual neglect of timely completion of required reports or documents.
23. Willful failure to timely complete required reports and documents.


## GROUP III OFFENSES

FIRST OFFENSE                    Up to and including termination.

The following are examples of Group III Offenses.

1. Instigation, leading or participating in any walkout, strike, sit-down, stand-in, sympathy strike, call-in, slow down, refusal to work at the scheduled time for a scheduled shift or other concerted curtailment, restriction or interference with work in or about the Employer's premises in violation of ORC Chapter 4117.
2. Refusal, without legitimate reason, to work during emergency situations or conditions.
3. Signing or altering other employee's time records, altering one's own time records or having one's time records signed or altered by another, without authorization.
4. Knowingly concealing a communicable disease (i.e., TB, etc.), which may endanger others.
5. Carrying or possessing firearms, explosives, or weapons in the work area without authorization or in violation of the Employer's Firearms Policy.
6. Willfully withholding information, which threatens the safety and security of the Employer, its operations, or employees.
7. Willfully demeaning, verbally abusing and/or humiliating another person.
8. Committing an act of discrimination, sexual harassment, or engaging in conduct giving insult or offense on the basis of race, color, sex, age, religion, national origin or disability.
9. Fighting with, or attempting to injure, other employees not consistent with the Employer's Use of Force Policy.
10. Insubordination by refusing to perform assigned work or to comply with the written or verbal instructions of a supervisor.
11. Providing false testimony, statements of information in any official Employer, court, or administrative investigation, hearing or proceeding.
12. Providing false information, making a false statement, committing a fraudulent act, or withholding pertinent information in the employment application process.
13. Engaging in illegal gambling activities.

14. Stealing or similar conduct, including destroying, damaging, concealing or converting any property of the Employer or of other employees.
15. Dishonesty or dishonest actions. Examples of "dishonesty" or "dishonest actions" are: theft, pilfering, making false statements to secure an excused absence or justify an absence or tardiness. These are examples only and do not limit the terms dishonesty and dishonest action.
16. Engaging in political activity as prohibited by ORC Section 124.57.
17. Wanted to willful neglect in the performance of assigned duties.
18. The unlawful manufacture, distribution, dispensation, possession, use or being under the influence of alcohol or a controlled substance which takes place in whole or in part in the workplace and/or a violation of the reporting requirements of the employer's drug free workplace policy.
19. Reporting for duty or remaining on duty while under the influence of alcohol or a controlled substance, testing positive for alcohol or controlled substance, or using alcohol within six (6) hours of reporting for duty.
20. Driving a motor vehicle on duty or Employer business without a valid, applicable operator's license.
21. Failure to obtain, maintain and/or report the loss of required licenses, certifications or other qualifications of an employee's position.
22. Conviction of any violation of law which may adversely affect the public's trust in the employee's ability to perform the duties of the employee's decision.
23. Intentional misuse of Employer or other public funds.
24. Willful neglect or intentional misuse, abuse or destruction of the property, equipment or tolls of the Employer or another employee.
25. Soliciting or accepting a gift, gratuity, bribe, or reward for the private use of the employee, or otherwise using one's position, identification, name, photograph or title for personal gain, or otherwise violating the Employer's Code of Conduct or Ohio's ethics laws for public employees.
26. Engaging in off-duty activities, which the Employer has determined to be an interest or time conflict.
27. Making false claims or misrepresentations in an attempt to obtain any benefit.
28. Misuse or removal of documents or information of a confidential nature or revealing such information without prior and appropriate authorization.
29. Falsifying any report, log, request, or other document.
30. Misuse, removal or destruction of Employer records without prior authorization.
31. Violation of any laws, which the employee is responsible to enforce in his capacity as an employee of the Sheriff's Office.
32. Any conduct which brings discredit to the Sheriff's Office or the employee as a public employee.
33. Associating with known criminals.
34. Refusing to submit to a medical examination or a drug or alcohol test.
35. Refusing to provide testimony during a public hearing or any other official hearing, investigation or proceeding involving the Employer.
36. Refusing to provide testimony or information concerning any investigation.

MCSO 00142



# Meigs County Sheriff's Office
## Sheriff Scott Fitch
**104 East Second Street**
**Pomeroy, OH  45769**



Phone: (740) 992-3371

Fax: (740) 992-2654

December 28th, 2022

Written Reprimand

Employee's name: Marty Hutton

Classification: Deputy

Department: Road Patrol

Type of Violation: Neglect of Duty

Group 3 Offense, Section 17 of the Rules of Conduct- Wanted to willful neglect in the performance of assigned duties.

Description of Violation:

Violation: 2.05.5 Neglect of Duty- "Employees shall perform all duties assigned to them in the Meigs County Sheriff's Office. While on duty, the employees' assigned duties, responsibilities, and obligations toward their position within the Sheriff's Office, shall be considered primary importance". On Tuesday, December 27th, 2022 Marty Hutton went to Holley Rd to attempt to make an arrest on a Domestic Violence suspect for which a warrant had been issued by Meigs County Court. As per the body camera footage, Deputy Hutton exited his vehicle and made contact with the suspect who was outside try to gather his animals. Deputy Hutton asked the subject if he was Brian Phillips who stated that he was. Deputy Hutton attempted to reach into his cruiser to get paperwork to show Brian at which time he proceeded to tell Deputy Hutton that he wasn't giving him paperwork, walked through his front yard from the road and walked into his house. Deputy Hutton proceeded to go to the storm door and open it. Deputy Hutton began telling Brian he needed to talk to him. Brian came back to the door and closed the main door. Deputy Hutton and Deputy Golsby then left the residence.

This written reprimand is being issued as a corrective measure in an effort to improve your conduct. This written reprimand will cease to have force and effect after 12 months from the date of issuance if no intervening discipline during that period occurs. Any further violations could result in more severe disciplinary actions.

_____
Signature of Sheriff

12/28/22
Date

_____
Signature of Captain

12/28/22
Date

_____
Signature of Employee

12/28/22
Date

**\*\*I hereby acknowledge receipt of this written reprimand**

EXHIBIT
**8**

MCSO 00529



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

September 11th, 2024

Written Reprimand

Employee's name: Ian Fennell

Classification: Deputy

Department: Meigs County Sheriff's Office - Assigned to Task Force

Type of Violation: Insubordination 2.05.8

Group 3 Offense, Section 10 of the Rules of Conduct- Insubordination by refusing to perform assigned work or to comply with the written or verbal instructions of a supervisor.

Description of Violation:

1) Employees shall willfully observe and execute lawful and written rules, directives, duties, policies, procedures, and practices of the Meigs County Sheriff's Office. 2) Employees shall also subordinate their personal preferences and work priorities to the lawful verbal and written rules, duties, policies, procedures, and practices of this office, as well as to the lawful orders and directives of supervisors and superior command personnel of this office. This includes orders relayed from a supervisor by a member of the same or lesser rank. Direct, tacit, or constructive refusal to comply constitutes insubordination. To wit: You failed to follow a direct order by a supervisor that you must be in a marked cruiser. You instead, drove your assigned OOCIC Task Force vehicle to the detail and proceeded to work the shift. This is also a direct violation of the Ohio Organized Crime Investigation Commission's policy.

This written reprimand is being issued as a corrective measure in an effort to improve your conduct. This written reprimand will cease to have force and effect after 12 months from the date of issuance if no intervening discipline during that period occurs. Any further violations could result in more severe disciplinary actions.


_Scott Fitch_
Signature of Sheriff

9/11/24
Date


Signature of Captain

9/11/24
Date


Signature of Employee

9-11-24
Date

**I hereby acknowledge receipt of this written reprimand

> **EXHIBIT**
> **9**

MCSO 00483



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

July 10, 2023

Jerry Darst
4270 Kemper Hollow Rd.
Gallipolis, Ohio 45631

Dear Mr. Jerry Darst,

I recently reviewed your employment file with the Meigs County Sheriff's Office. It indicates that you began employment with the Meigs County Sheriff's Office (MCSO) on August 2, 2022. According to the Collective Bargaining Agreement (CBA) between the Meigs County Sheriff's Office and the Ohio Patrolmen's Benevolent Association Article 11: Section 11.4., the probationary period for a newly hired employee shall begin on the first day for which the employee receives compensation for the new classification from the Department and shall continue for a period of one (1) calendar year. The section also states that the employer should give the individual assistance to enable him to qualify for his new position. A newly hired employee may be removed at any time during his probationary period. New hire probationary removals shall not be appealable to the grievance procedure.

This would mean that your probationary period would end on August 1, 2023. As the Sheriff I have the responsibility to review all employees' job performance and decide if their work has been satisfactory during their probationary period and their suitability to be retained for employment.

According to MCSO records it indicates that you have only worked 97 days as of this time during your probationary period to be evaluated. Having limited performance to evaluate is difficult and to compound it most of your days worked were prior to me being appointed as Sheriff. Therefore, I must rely on current supervisors and employees for an accurate evaluation.

In discussing your work performance with staff that worked with you during your time at MCSO it was reported that your work performance was unsatisfactory. Some of the deficiencies listed were dependability, professionalism, lack of motivation, poor attitude, timeliness of reports and uniform appearance.

I appreciate your time at MCSO but based off the evaluation of your work performance while employed at the MCSO during your probationary period, I am terminating your employment with the MCSO, effective immediately.

This determination was not entered into lightly and is final and not open for discussion.

You have 15 days from the date of receipt of this letter to schedule an appointment with Captain Frank Stewart to return all your issued equipment back to MCSO.

**EXHIBIT**

**10**

MCSO 00054



# MEIGS COUNTY SHERIFF'S OFFICE

## SHERIFF D. SCOTT FITCH
104 East Second Street, Pomeroy, OH 45769
Phone: (740) 992-3371 - Fax: (740) 992-2654

If you have any questions, please contact Captain Frank Stewart.


Respectfully,

Scott Fitch
MCSO Sheriff




CC:  Captain Frank Stewart
       Personnel file