1

2            IN THE UNITED STATES DISTRICT COURT

3           FOR THE SOUTHERN DISTRICT OF OHIO

4                     EASTERN DIVISION

5

6    ----------------------------:
                                  :
7    JERRY DARST,                 :
                                  :
8          Plaintiff,             :
                                  :
9      vs.                        :  CASE NO.
                                  :  2:24-cv-01150-SDM-CMV
10   MEIGS COUNTY, OHIO, et       :
     al.,                         :
11                                :
           Defendants.            :
12   ----------------------------:

13

14

             REMOTE ZOOM DEPOSITION OF
15        RULE 30(B)(6) OF MEIGS COUNTY, OHIO

16        Taken:            By the Plaintiff Jerry Darst

17                          Pursuant to Notice

18        Date:             October 3, 2025

19        Time:             Commencing at 1:06 p.m.

20        Place:            Witness appearing via
                            Videoconference
21                          Meigs County Sheriff's Office
                            104 East Second Street
22                          Pomeroy, Ohio  45769

23        Before:           Wendy L. Raymer, RPR, CRR
                            Notary Public - State of Ohio
24                          (Reporting via
                            videoconference Port Clinton,
25                          Ohio)



 1  APPEARANCES:

 2

        On behalf of the Plaintiff Jerry Darst:
 3
            Appearing via Videoconference in Hilliard,
 4          Ohio:

 5          Jason E. Starling, Esq.
                     of
 6          Willis Spangler Starling
            4635 Trueman Boulevard
 7          Suite 100
            Hilliard, Ohio  43026
 8          Phone:  (614) 586-7900
            Email:  Jstsarling@willisattorneys.com
 9

10      On behalf of the Defendants:

11          Appearing via Videoconference in Pomeroy, Ohio:

12          Matthew Teetor, Esq.
                     of
13          Teetor Westfall
            200 East Campus View Boulevard
14          Suite 200
            Columbus, Ohio  43235
15          Phone:  (614) 368-0424
            Email:  Mteetor@teetorlaw.com
16

17                              - - -

18

19

20

21

22

23

24

25



1                          I N D E X

2

3  DONALD SCOTT FITCH                                PAGE

4     Examination by Mr. Starling                      4

5
   EXHIBITS                          MARKED    REFERENCED
6
      Plaintiff's Exhibit 1            7          7
7     Plaintiff's Exhibit 2           10         10

8

9                          - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    (Witness sworn.)

2           MR. STARLING:  All right.  Matt, before we get

3      into it, do you stipulate to the taking of this

4      deposition remotely?

5           MR. TEETOR:  Yes, I do with it.

6           MR. STARLING:  All right.  Thank you.  I

7      appreciate that.

8                    DONALD SCOTT FITCH,

9  of lawful age, a witness herein, being first duly sworn

10 as hereinafter certified, was examined and deposed as

11 follows:

12                    EXAMINATION

13 BY MR. STARLING:

14      Q.   Okay.  Sheriff, I deposed you before in this

15 case; do you remember that?

16      A.   Yes, sir.

17      Q.   Do you remember the beginning when we went

18 over what are called ground rules?

19      A.   Yes, sir, I do.

20      Q.   All right.  I'm not going to repeat all of

21 those then.  I am going to ask you a couple of what they

22 call capacity questions, just to cover my bases here.

23      A.   Okay.

24      Q.   As you recall and as you know, today we're

25 taking this deposition over Zoom.  So it's very



1 important that we don't talk over each other, and that

2 you hear all of my question.  Does that make sense?

3     A.   Yes, sir.

4     Q.   And if you don't understand any part of my

5 question, please tell me, and I'll either repeat it,

6 explain it, or do something to help you.  Does that make

7 sense?

8     A.   Okay.  Yes, sir.

9     Q.   And then if you don't hear any part of my

10 question, please tell me, and I'll either repeat it or

11 have the court reporter read it back to you, okay?

12    A.   Yes, sir.

13    Q.   With those two instructions, is it fair to say

14 that if you answer one of my questions here today, you

15 both heard it and fully understood it?

16    A.   Yes, sir.

17    Q.   All right.  Do you understand that the

18 testimony you give today could be read or played in

19 court to a judge or jury?

20    A.   Yes, sir.

21    Q.   What's your -- I did not turn on a recording

22 and I just did.  It's being recorded via Zoom.  Do you

23 understand that?

24    A.   Yeah.

25    Q.   All right.  Is there anything negatively



1 affecting your memory today?

2        A.   No, sir.

3        Q.   Is there any reason why you could not give

4 truthful testimony today?

5        A.   No, sir.

6        Q.   And you understand you're testifying under

7 oath subject to penalties of perjury?

8        A.   Yes, sir.

9        Q.   All right.  Did your attorney tell you that

10 this is a Rule 30(b)(6) deposition of Meigs County,

11 Ohio?

12       A.   Yes, sir, he did.

13       Q.   All right.  I am going to talk to you briefly

14 about the distinction between that and the prior

15 deposition that I took of you in your personal capacity,

16 okay?

17       A.   Okay.

18       Q.   The Rule 30(b)(6) deposition is technically

19 the deposition of Meigs County, Ohio for whom you are

20 the designated representative; do you understand that?

21       A.   Yes, sir.

22       Q.   And you are speaking on behalf of Meigs

23 County, Ohio on the topics for which I have designated

24 you for this deposition; does that make sense?

25       A.   Yes, sir.



1              (Plaintiff's Exhibit 1 is marked for

2              identification.)

3 BY MR. STARLING:

4      Q.   All right.  I'm going to share with you what

5 we will call Exhibit 1 in this case using the screen

6 share.  Can you see my screen?  Oh, wrong one.  Let me

7 screen share the right one.  There you go.  Can you see

8 my screen share?

9      A.   Yes, sir, I do.

10     Q.   All right.  Do you see Exhibit 1 in there?

11     A.   I'm looking where it says Exhibit 1, yes, sir.

12     Q.   All right.  Do you recognize this Exhibit 1 as

13 the Rule 30(b)(6) deposition notice of Meigs County,

14 Ohio?

15     A.   Yes, sir, I do.

16     Q.   Have you seen Exhibit 1 before?

17     A.   Yes, sir.

18     Q.   All right.  If we continue on, Exhibit 1 has

19 what's called an attachment A; do you see that?

20     A.   Yes, sir, I do.

21     Q.   And if you continue on down, there are Rule

22 30(b)(6) Deposition Topics listed in attachment A; do

23 you see that?

24     A.   Yes, sir.

25     Q.   And there are topics 1 through 9; do you see



1 that?

2      A.   Yes, sir.

3      Q.   Are you designated as the 30(b)(6)

4 representative of Meigs County, Ohio for all nine

5 topics?

6      A.   Yes.

7      Q.   Thank you.  I appreciate that.  Did you do

8 anything to prepare for today's deposition?

9      A.   Mr. Teetor went over this with me and

10 explained to me what the 30(b)(6) hearing was, a

11 deposition, because I was unfamiliar, and he explained

12 to me the topics in which you had outlined in this

13 document.  So I prepared and tried to the best of my

14 ability to obtain the information that you requested or

15 outlined in this document.

16      Q.   Okay.  How long did you spend preparing?

17      A.   It wasn't very long.  I don't know time-wise.

18 I actually spoke with some current employees here in

19 reference to Mr. Darst to try to give you a more

20 descript answer, a more thorough answer, but not more

21 than an hour.

22      Q.   All right.  And can you tell me what you did

23 during that hour and what preparation?

24      A.   I spoke with Staff Lieutenant Bill Gilkey,

25 Captain Frank Stewart, Lieutenant Brandy King,



1 Lieutenant Donny Mohler, and now Lieutenant Rick Smith,

2 and talked with them about what they recall as what I

3 defined as deficiencies in Jerry Darst's performance as

4 a deputy sheriff with Meigs County Sheriff's Office.

5      Q.   Anything else you did to prepare for this

6 deposition?

7      A.   I looked at the --

8           THE COURT REPORTER:  I'm sorry, I could not

9      hear anything that Matt said.  I don't know if you

10     want that on the record.

11          MR. STARLING:  Yeah, it should be on the

12     record, but --

13          MR. TEETOR:  That's why I leaned in, because I

14     have my microphone off.  I have the microphone off

15     on my computer just so we don't get feedback on the

16     Zoom, but I objected just to the extent that -- to

17     the extent the testimony may call for him to talk

18     about what the sheriff and I discussed with respect

19     to the 30(b)(6) deposition.

20          THE COURT REPORTER:  Thank you.

21 BY MR. STARLING:

22     Q.   All right.  Sheriff, without telling me what

23 you specifically discussed with Mr. Teetor regarding

24 this deposition, can you tell me anything else you did

25 to prepare for this deposition?



1      A.   I reviewed all discipline and the personnel

2 files of Mr. Darst, and the internal investigations and

3 the discipline that has been issued as -- during my

4 tenure as the sheriff, and reviewed some of the policies

5 and procedures and job descriptions outlined in this

6 document.

7      Q.   Anything else you did to prepare?

8      A.   No, sir.

9      Q.   All right.  What I'm going to do is use this

10 Exhibit 1 as kind of a roadmap for our discussions.

11      A.   Okay.

12      Q.   I won't necessarily cover every topic or

13 subtopic within those.  I may jump around a bit.  I'm

14 just using this deposition to fill in some gaps, okay?

15      A.   Yes, sir.

16      Q.   All right.  I'd like to go to topic 2, which

17 concerns the disciplinary policies that were in place at

18 the sheriff's office, okay?

19      A.   Yes.

20      Q.   Do you see that topic 2?

21      A.   Yes, sir.

22           (Plaintiff's Exhibit 2 is marked for

23           identification.)

24 BY MR. STARLING:

25      Q.   All right.  I'm going to pull up an Exhibit 2.



1 Give me a moment.  Okay.  Can you see Exhibit 2 on your

2 screen share?

3      A.   Yes, sir, I do.

4      Q.   And Exhibit 2 is the Rules of Conduct at the

5 Meigs County Sheriff's Office that were in place when

6 Jerry Darst was employed by the office; is that correct?

7      A.   Yes, sir.

8      Q.   I want to go down to Section 2.05.36, the

9 Disciplinary System; do you see that?

10     A.   Yes, sir.

11     Q.   And do you see how that categorizes offenses

12 into Group I offenses, Group II offenses, and Group III

13 offenses?

14     A.   Yes, sir.

15     Q.   Is that system still used today at the Meigs

16 County Sheriff's Office?

17     A.   No, it's -- it's been updated.  I mean,

18 there's still degrees of offenses, but it's been kind of

19 more modernized, and went with the Lexipol, which is a

20 case management system as well as a policies and

21 procedures manual system, so it's changed, but it's --

22 it's -- basically states the same.

23     Q.   All right.  So, for instance, to this day,

24 Meigs County Sheriff's Office uses this progressive

25 discipline of first offense, second offense, and so on



1 for Group I offenses?

2      A.   Yes, sir.

3      Q.   And similarly with Group II offenses, to this

4 day Meigs County still uses the progressive discipline

5 of first, second, and so on for Group II offenses?

6      A.   Yes, sir.

7      Q.   And then similarly for Group III offenses, if

8 it is a Group III offense, then that is up to and

9 including termination on the first instance; is that

10 fair?

11      A.   Yes, sir.

12      Q.   All right.  Let's talk about the time period

13 when Jerry Darst worked for Meigs County Sheriff's

14 Office and the disciplinary policies in place then,

15 okay?

16      A.   Yes, sir.

17      Q.   During Jerry Darst's tenure, did the Meigs

18 County Sheriff's Office have to conduct an internal

19 investigation before issuing discipline to an employee?

20      A.   You said during Jerry's tenure or before?

21      Q.   During.

22      A.   Have to?  No.  No, sir.  When I say an

23 internal investigation, that means -- I don't know -- I

24 guess I would need some clarity.  Before any discipline

25 that I've ever issued as in management or supervisor, I



1 do what I would determine as some form of internal
2 investigation.  It may not be as thorough.  It may --
3 because it depends on the allegations, but there is --
4 they definitely get -- every allegation gets looked
5 into.
6     Q.   Okay.  Fair enough.  That's what I'm asking.
7     A.   Yes, sir.
8     Q.   So there's some type of internal investigation
9 in some shape or form, depending on the nature of the
10 alleged misconduct?
11    A.   Yes, sir.
12    Q.   All right.  I'm going to screen share again
13 Exhibit 1, just to give you a frame of reference.  I
14 want to talk about topic 4 now.
15    A.   Okay.
16    Q.   And you see that topic 4 reads, "Any person
17 who worked for you," referencing Meigs County, Ohio,
18 "that defendant Fitch disciplined," and then it has some
19 subtopics there; do you see that?
20    A.   I do.
21    Q.   Earlier today I talked with Captain Frank
22 Stewart about six deputies that currently worked the day
23 shift, okay?
24    A.   Yes, sir.
25    Q.   And I believe those names are Justice King,



1 Aaron Dillard, David Dunfee, Andy Myers, Taylor
2 Cottrill, and Terry Fletcher.  Does that sound about
3 right?
4     A.   Yes, sir.  Also there's Brandy King and Bill
5 Gilkey that works day shift as well.
6     Q.   All right.  Brandy King is a lieutenant on day
7 shift, right?
8     A.   Correct.
9     Q.   And Bill Gilkey is a staff lieutenant on day
10 shift, correct?
11     A.   Correct.
12     Q.   I want to focus on those six deputies that I
13 listed.  Did I accurately list the six deputies who work
14 the day shift for you currently?
15     A.   With the exception of Andy Myers.  He's
16 actually a sergeant, but assigned to day shift, yes.
17     Q.   All right.  I need the answer on behalf of
18 Meigs County, Ohio.  Is there any discipline that has
19 been issued against any of those five deputies and Andy
20 Myers, the sergeant, by you?
21     A.   No, sir.  Oh, with the day shift, all of them,
22 yes.  Aaron Dillard has been disciplined since I've been
23 sheriff.
24     Q.   Is that the only person on the day shift among
25 the five deputies and the sergeant whom you have



1 disciplined?

2     A.   Yes, sir.

3     Q.   All right.  And that answer you just gave me

4 is on behalf of Meigs County, Ohio as the Rule 30(b)(6)

5 representative, correct, sir?

6     A.   Yes, sir.

7     Q.   For Aaron Dillard, what was the discipline

8 that you issued?

9     A.   Three days suspension.  He took a voluntary

10 demotion and was signed -- signed a last chance

11 agreement.  So he was removed as a sergeant and went

12 back to the rank as deputy sheriff, served his

13 suspension, and then the last chance agreement is still

14 in place as we speak today.

15     Q.   All right.  You said voluntary demotion; is

16 that right?

17     A.   Yes, sir.

18     Q.   What does that mean, voluntary versus

19 involuntary?

20     A.   When his -- with his union attorney, Mark

21 Volcheck, it was discussed.  They said that they would

22 take -- he would take a voluntary demotion.  So it was

23 kind of agreed upon.  It wasn't something that I

24 necessarily -- we had to argue about or fight about or

25 litigate, as far as that goes.  It was just something he



1 voluntarily agreed to do.

2     Q.   Okay.  Let's talk about this discipline of

3 Aaron Dillard --

4     A.   Yes, sir.

5     Q.   -- in a little bit more detail.

6     A.   Okay.

7     Q.   So first of all, my understanding is that

8 Captain Stewart did an internal investigation of Aaron

9 Dillard, right?

10     A.   Yes, sir.

11     Q.   And he confirmed that Aaron Dillard had

12 started a romantic relationship with a high school

13 student that he met through a ride-along program; is

14 that fair?

15     A.   Yes, sir.

16     Q.   And Captain Stewart discovered that Aaron

17 Dillard had not only kissed but ended up having sexual

18 intercourse with this high school student; is that

19 correct?

20     A.   Yes, sir.

21     Q.   Based upon that, did you think that Aaron

22 Dillard committed some type of offense in violation of

23 the rules of conduct at the Meigs County Sheriff's

24 Office?

25     A.   Yes, sir, I did.



1      Q.    What offense?

2      A.    Conduct unbecoming of a deputy, neglect of

3 duty, insubordination, and dispensing of information,

4 departmental information.

5      Q.    Were -- can you tell me for each of those

6 offenses whether it was a Group I, Group II, or Group

7 III offense?

8      A.    Directly, the conduct unbecoming would be a --

9 I believe that would be a Group I offense.  The neglect

10 of duty --

11     Q.    Go ahead.

12     A.    The neglect of duty, Group II.  The

13 insubordination could be considered a Group I, II, or

14 III, depending on the level and the topic of the

15 insubordination and the facts surrounding that.  And the

16 dissemination of information is, I believe, a Group I or

17 possibly II.

18     Q.    All right.  In your review of the facts of

19 Aaron Dillard's case, did you consider the

20 insubordination Group I, II, or III?

21     A.    Group II.

22     Q.    All right.  So for Aaron Dillard, we had three

23 Group I offenses -- or I'm sorry, correct me if I'm

24 wrong, a Group I offense, two Group II offenses, and

25 then a Group I offense for the dissemination.  Am I



1 wrong or correct?

2      A.   Correct.

3      Q.   Okay.  So two Group I offenses and two Group

4 II offenses; is that right?

5      A.   Yes, sir.

6      Q.   Before talking to the union attorney, did you

7 make a determination on what was the appropriate level

8 of discipline for Aaron Dillard?

9      A.   Not -- not completely, no, sir.  I had -- I

10 had some ideas, and, again, after reviewing the internal

11 investigation and all Captain Stewart's findings.

12      Q.   All right.  After reviewing the internal

13 investigation and Captain Stewart's findings, what did

14 you think the appropriate level of discipline was?

15      A.   The most severe, termination.  The least

16 severe, a demotion in rank.

17      Q.   So you were considering those two

18 possibilities?

19      A.   Yes, with -- in accordance with the suspension

20 and the loss of rank, or the demotion and the suspension

21 and then the last chance agreement.

22      Q.   Yeah.  I guess what I'm getting at is, after

23 you have the internal investigation by Captain Stewart,

24 how do you reach the three-day suspension, demotion, and

25 last chance agreement over termination?



1      A.    Based off the totality of everything involved,
2  the circumstances, the details, the pertinent
3  information involving the offenses that Aaron Dillard
4  was alleged to have committed, the information he
5  supplied, his cooperativeness, and during the
6  investigation, looking at his career as far as what
7  would be the best -- would the department be better off
8  with Mr. Dillard as a deputy or terminated based off the
9  degree of offense.
10     Q.    And you concluded that the department would be
11 better off having him still there?
12     A.    Yes.
13     Q.    Okay.  Let's go to the six folks working on
14 day shift who are not lieutenants.  So basically Andy
15 Myers, the sergeant, and the five deputies.  I want to
16 talk about their ages, okay?
17     A.    Okay.
18     Q.    Can Meigs County give me their ages?  And I
19 want to start with Justice King.  I need the answer for
20 Meigs County's knowledge on Justice King's age.
21     A.    I cannot -- I have that information.  It was
22 in one of the exhibits that we supplied you on my first
23 deposition.  I don't have that readily right in front of
24 me, and I haven't committed those ages to memory.
25     Q.    Okay.  That's fair.  I'm not trying to engage



1 in, you know, a memory test or something along those

2 lines, a gotcha question.  I just need to know their

3 ages one way or another.  You think it was in a document

4 that you previously discussed in your individual

5 deposition?

6      A.   Yes, sir.

7           MR. TEETOR:  Jason, can you hear me?

8           MR. STARLING:  Yeah, I can.

9           MR. TEETOR:  I just figured this was the best

10      time to interject before we changed topics.  I was

11      unaware of the discipline issued against Aaron

12      Dillard until today.  The last chance agreement was

13      dated June 25th of 2025.  We had supplied a

14      supplementation on June 18th of 2025.  So the

15      discipline was issued after.

16           But after Captain Darst's (sic) deposition,

17      now that I was aware of the discipline issued

18      against Aaron Dillard, I'll supplement his file and

19      the discipline imposed upon him.  I just wasn't

20      aware of that.

21           MR. STARLING:  That's fine.  I appreciate

22      that.  Thank you.

23           Give me a moment, Sheriff.  I'm trying to see

24      if I can get a document that would help you --

25           THE WITNESS:  Okay.



1        MR. STARLING:  -- on the ages.  I'm not trying
2    to engage in gotcha questions.  I just need the
3    information.
4        THE WITNESS:  Thank you, sir.
5 BY MR. STARLING:
6    Q.   Okay.  I don't seem to have a document that
7 would help you on that, so what I think we need to do
8 is, because this was part of the request for the topic,
9 the identities of the individuals who were
10 disciplined or not disciplined, which includes their
11 ages, if you want to take a short break here, why don't
12 we do that so you can grab the ages.  I don't even care
13 if you write them down.  I'm not trying to engage in
14 gotcha, like I said, or a memory test, but I do need the
15 ages.  The ages of the six individuals on the day shift,
16 which are the five deputies, and Andy Myers, the
17 sergeant.
18    A.   Okay.
19    Q.   So why don't we -- how long would you need to
20 look up that information, Sheriff?
21    A.   Five minutes.
22        MR. TEETOR:  Before we do that, you are
23    talking about the individuals who were
24    disciplined -- the topic here is individuals who
25    were disciplined?



1          MR. STARLING:  So there's two relevant topics.

2     If you look at topic 1E, I asked for the identifies

3     of all employees who held job positions at the

4     Meigs County Sheriff's Office.  Identities includes

5     age, as defined in my topics.  So we have it

6     covered there under 1E.  As far as those who were

7     disciplined, like Aaron Dillard, we have that

8     covered under 4A, that topic.

9          MR. TEETOR:  Okay.

10         MR. STARLING:  So it will cover all six,

11    including their ages, between those two topics.  So

12    if the sheriff can take five minutes, you know,

13    let's just --

14         MR. TEETOR:  Sure.

15         MR. STARLING:  -- come back at, I don't know,

16    1:40 to be safe.  If you get back earlier, Sheriff,

17    feel free to just turn on your camera and I'll know

18    you're there and we can start back up.  But like I

19    said, I just need to get the information.

20         THE WITNESS:  Okay.

21         MR. STARLING:  All right.  We'll go off the

22    record while we do that.  I appreciate it.  Thank

23    you.

24         THE WITNESS:  Thank you.

25



1            (A recess was taken from 1:30 p.m. to

2            1:36 p.m.)

3  BY MR. STARLING:

4       Q.   All right.  Sheriff, we're back on the record

5  now.

6       A.   Yes, sir.

7       Q.   Have you had a chance to get the ages of those

8  individuals on the day shift?

9       A.   Yes, sir, I have.

10       Q.   All right.  Let's go through them.  So Justice

11  King, how old is that deputy?

12       A.   22 years of age.

13       Q.   And we're going by ages as of today; is that

14  right?

15       A.   Yes.

16       Q.   All right.  So Justice King is 22 years old,

17  correct?

18       A.   Yes.

19       Q.   How old is Aaron Dillard?

20       A.   Aaron Dillard is 31 years of age.

21       Q.   How old is David Dunfee?

22       A.   23 years of age.

23       Q.   How old is Taylor Cottrill?

24       A.   21 years of age.

25       Q.   How old is Terry Fletcher?



1      A.   27 years of age.

2      Q.   How old is Andy Myers?

3      A.   45 years of age.

4      Q.   Did I miss anyone who is not a lieutenant on

5 day shift, or is that all of them?

6      A.   That was all that I am aware of that we

7 mentioned -- or you mentioned prior.

8      Q.   All right.  Thank you, Sheriff, I appreciate

9 that.

10      A.   You're welcome, sir.

11      Q.   I'm going to screen share again back on

12 Exhibit 1 just to keep everyone oriented.  Do you see

13 Exhibit 1 in front of you?

14      A.   Yes, sir.

15      Q.   All right.  I want to go down to topic 7; do

16 you see that?

17      A.   Yes, sir.

18      Q.   And it says, "The person or persons who

19 replaced plaintiff and/or whom you hired as a deputy

20 sheriff after separating plaintiff's employment."

21           Do you see that?

22      A.   Yes, sir.

23      Q.   All right.  Who was the replacement for Jerry

24 Darst when he was fired from his deputy position?

25           MR. TEETOR:  Objection.



1         THE WITNESS:  Okay.  We don't -- there wasn't

2    actually one person that replaced Jerry Darst.

3    When we have a vacancy at the sheriff's office, we

4    then open up a hiring, whether that's one person or

5    two people or what have you, and we fill that

6    ultimate position.

7         So I would have to -- I would have to say

8    there wasn't -- like I said, there wasn't one

9    deputy that we hired to replace him.  You could, I

10   guess, render it possible that if there was, like

11   the person we hired after Mr. Darst left, I would

12   have to look at this document to see who that would

13   have been.

14 BY MR. STARLING:

15   Q.   I mean, who was that that you hired after

16 separating Jerry Darst's employment?

17   A.   June of --

18        MR. TEETOR:  Keep in mind, Jerry Darst was

19   terminated in July of 2023.

20        THE WITNESS:  Correct.

21        MR. TEETOR:  I thought I heard you say June of

22   '24.

23        THE WITNESS:  No, I meant -- yeah, I'm -- we

24   hired an individual by the name of Samantha Wiedmer

25   in July -- actually July -- I'm sorry, June 12th of



1          '23.  That would have been the next hire after

2          Jerry Darst was terminated.

3    BY MR. STARLING:

4          Q.    How do you spell that last name?

5          A.    W-i-e-d-m-e-r.

6          Q.    And Samantha Wiedmer was hired as a deputy at

7    Meigs County Sheriff's Office?

8          A.    Yes.

9          Q.    How old is Samantha Wiedmer?

10         A.    26.

11         Q.    All right.  So Ms. Wiedmer was the next deputy

12   hired after you separated Jerry Darst's employment,

13   correct?

14              MR. TEETOR:  Ms. Wiedmer was hired June 12th

15         of '23.

16              THE COURT REPORTER:  I'm sorry.

17              MR. STARLING:  I can't hear you, Matt.

18              THE COURT REPORTER:  Yeah, I can't either.

19              MR. TEETOR:  Sorry.  Ms. -- I'm worried that

20         the sheriff is confused.  Ms. Wiedmer was hired on

21         June 12th of 2023 and that predates Jerry Darst's

22         termination.  So I wanted to make sure that you

23         guys were talking about the same thing.

24              THE WITNESS:  Okay.  So the next -- the next

25         person, I didn't know what date without looking.

1      The next person hired was Ian Fennell.  He was

2      hired on 7/17 of '23.

3 BY MR. STARLING:

4      Q.   How do you spell that name, first of all,

5 Sheriff?

6      A.   Ian, last name Fennell, F-e-n-n-e-l-l.

7      Q.   And Mr. Fennell was hired as a deputy with the

8 Meigs County Sheriff's Office?

9      A.   Yes, sir.

10      Q.   On 7/17 of 2023?

11      A.   Yes.

12      Q.   And how old is Mr. Fennell?

13      A.   He's 35.

14      Q.   Okay.  Well, I need an answer from you on

15 behalf of Meigs County, Ohio.  Are you telling me on

16 behalf of the County, under this 30(b)(6) deposition,

17 that Ian Fennell was the person who replaced Jerry Darst

18 because he was the next deputy hired after Jerry Darst's

19 separation of employment?

20          MR. TEETOR:  Objection.  You can answer.

21          THE WITNESS:  Yes.  If that's how you want to

22      look at it, yes.  But, again, we don't replace

23      necessarily -- we just fill the positions as they

24      become vacant.

25



1 BY MR. STARLING:

2     Q.   All right.  Well then, let's walk through it.

3 When you separated Jerry Darst's employment with Meigs

4 County Sheriff's Office, you created a vacancy, correct?

5     A.   Yes, sir.

6     Q.   That you needed to fill, correct?

7     A.   Correct.

8     Q.   And the next person hired to replace that

9 deputy vacancy was Ian Fennell, correct?

10    A.   Correct.

11    Q.   Therefore, you agree with me that Ian Fennell

12 replaced him by filling his vacancy, correct?

13         MR. TEETOR:  Objection.  You can answer.

14         THE WITNESS:  Correct.

15 BY MR. STARLING:

16    Q.   Okay.  Thank you for that, Sheriff.  I

17 appreciate it.

18         All right.  Let's turn to topic 8, okay?

19    A.   Yes, sir.

20    Q.   Can you see it on my screen share?

21    A.   Yes, sir.

22    Q.   Now, topic 8 concerns written and unwritten

23 policies, procedures, and so on regarding

24 nondiscrimination, non-retaliation; do you see that?

25    A.   Yes, sir.



1       Q.    And that includes nondiscrimination based on

2  employee's age, right?

3       A.    Correct.  Yes, sir.

4       Q.    I'm just going to call this the EEO policies

5  or nondiscrimination policies for short; is that fair?

6       A.    Yes, sir.

7       Q.    Let's talk about the time when Jerry Darst

8  worked for Meigs County Sheriff's Office.  Were there

9  EEO policies in place at the sheriff's office?

10      A.    Yes, sir.

11      Q.    What were those policies in place?

12      A.    We had a Meigs County employees' manual that

13 made reference to the EEO policies, and then our

14 collective bargaining agreement also had EEO in there.

15 And the Meigs County Sheriff's Office policies and

16 procedures also referenced EEO policies.

17      Q.    So those documents you identified, did they

18 instruct employees of the Meigs County Sheriff's Office

19 that they were not to discriminate against employees

20 based upon age?

21      A.    Yes, sir.

22      Q.    Were those policies communicated to all

23 employees of Meigs County Sheriff's Office, including

24 yourself?

25      A.    Yes, sir.



1      Q.   Was there any training provided to the

2  employees of Meigs County Sheriff's Office, including

3  yourself, regarding the fact that it is illegal to

4  discriminate against employees based upon age?

5      A.   Currently, or at the time of Mr. Darst's

6  employment?

7      Q.   At any point in time when Mr. Darst worked for

8  the sheriff's office.

9      A.   To my knowledge, I don't know if there was

10  training when he originally got hired or not.  In the

11  couple months he was actively working, since I was --

12  when I became sheriff and was appointed in November of

13  '22, no, there was no training given to the deputies at

14  that time referencing EEO policies.

15      Q.   Were the EEO policies distributed to employees

16  of Meigs County Sheriff's Office, including yourself,

17  with a signed acknowledgment that they had received

18  them?

19      A.   Yes, sir.

20      Q.   All right.  And you understood, as a Meigs

21  County sheriff, that you were not to discriminate

22  against your employees based upon age because that would

23  be illegal, right?

24      A.   Yes, sir.

25      Q.   Are you aware -- or, no, let me back up.



1          Were you aware at the time that Jerry Darst
2 worked for Meigs County, Ohio that discriminating based
3 upon age could not only violate state law, it could
4 violate federal law and the federal constitution?
5      A.   Yes, sir.
6      Q.   All right.  Let's go to topic number 9.  Can
7 you see that?
8      A.   Yes, sir, I do.
9      Q.   It's the defenses asserted in the answers to
10 the complaint.  So that would be not only your answer
11 but also Meigs County, Ohio's answer; is that right?
12     A.   Yes, sir.
13     Q.   I want to talk about the alleged failure to
14 mitigate damages defense.
15     A.   Okay.
16     Q.   And that's the one in topic 9A; do you see
17 that?
18     A.   Yes, sir, I do.
19     Q.   All right.  And this is an answer on behalf of
20 Meigs County, Ohio and yourself as defendants in this
21 case.
22          Is there some job that you, as defendants,
23 contend Jerry Darst should have obtained following his
24 termination of employment with you that you say he
25 didn't obtain?



1          MR. TEETOR:  Objection.

2 BY MR. STARLING:

3      Q.   Does that make sense?

4          MR. TEETOR:  You can answer if you know.

5          THE WITNESS:  Not to my knowledge, no, sir.

6 BY MR. STARLING:

7      Q.   Okay.  So let's just walk through it piece by

8 piece.  I'll try to break it down and make it easier,

9 okay?

10     A.   Okay.

11     Q.   Jerry Darst worked for your office as a

12 deputy; is that right?

13     A.   Correct.

14     Q.   Is there some other deputy job that was open

15 and available that you're aware of, you and the county,

16 that Jerry Darst should have gotten after his

17 termination of employment but didn't because he was lazy

18 looking for jobs or something like that?

19         MR. TEETOR:  Objection.

20         THE WITNESS:  No, sir.

21 BY MR. STARLING:

22     Q.   All right.  Let's back up to topic number 6.

23 Do you see that there?

24     A.   I do, sir.

25     Q.   And that concerns any person who worked for



1 the sheriff's office that you considered disciplining or

2 firing, but you opted for some lesser or no penalty; do

3 you see that?

4     A.    Yes, sir.

5     Q.    Are there any such employees?

6     A.    Currently?

7     Q.    At any point in time?

8     A.    Other than Jerry, Aaron Dillard, yes, sir.

9     Q.    Okay.  So what I'm looking for is, are there

10 any employees that engaged in some type of misconduct

11 and you considered disciplining them, but you either

12 didn't discipline them at all or gave them a lesser

13 penalty?  Does that make sense?

14    A.    Yeah, it makes sense.  I mean, there has

15 been -- there's deputies that have done some minor

16 things wrong that we've addressed, not in the form of

17 discipline, but talking with, and they've all -- they've

18 corrected that behavior so it never progressed to a

19 formal discipline.

20    Q.    Who are those folks?

21    A.    Through memory, because, again, it's not

22 really documented, per se, I've talked to Troy Smith

23 about keeping his vehicle clean.  I talked to Ben Adams

24 about facial hair and personal grooming.  I've talked to

25 Don Mohler, Lieutenant Donny Mohler, in reference to him



1 and his shift having reports done on time.  I've talked

2 to Deputy Calendine in reference to just some issues

3 with keeping -- you know, keeping his car clean and

4 completing his K9 reports and submitting them to me

5 instead of just his lieutenant.  Those are the ones that

6 I recall.

7      Q.   All right.  Let's go through these.  Who is

8 Troy Smith?

9      A.   He's a K9 handler, a deputy sheriff.

10      Q.   How old is Mr. Smith?

11      A.   Mr. Smith is -- and I'm referring to this GAAP

12 report that has everyone's -- all the employee's ages.

13 Here we go.  27.

14      Q.   All right.  And you said you had spoken to him

15 about keeping his vehicle clean?

16      A.   Yes.

17      Q.   How many times had you spoken to him?

18      A.   Just the one time.

19      Q.   What was the issue with his vehicle?

20      A.   With the K9, obviously it's a German Shepherd.

21 They shed a lot, and I was just -- I do random routine

22 spot checks of vehicles, and the area in which the K9

23 was in had a lot of hair inside the vehicle, which to a

24 certain degree is understandable, but I just was talking

25 to him about the need for keeping it clean, because



1 sometimes it would get through the cracks and seep up in

2 through -- or it could potentially, the vehicle itself,

3 the area in which we transport prisoners or the main

4 portion of the vehicle up-front.

5      Q.   Okay.  Anything else you mean by keeping his

6 vehicle clean?

7      A.   No.  No.  The exterior and stuff he usually

8 keeps very clean.

9      Q.   All right.  Let's talk about Ben Adams.  Who

10 is Ben Adams?

11     A.   He's a sergeant that works night shift.

12     Q.   And you said you had spoken to him about

13 facial hair and grooming?

14     A.   Yes, sir.

15     Q.   What do you mean by that?

16     A.   He -- he has a beard.  Our policy allows for a

17 beard, but it has to be neatly shaven and close to the

18 face, and he usually does a really good job.  There was

19 one particular time that he -- his beard was, in my

20 opinion, was getting a little long, and I told him that

21 he should -- he needs to shave it closer.

22     Q.   Okay.  Any other -- anything else that you

23 mean by issues with facial hair and grooming?

24     A.   Nope.

25     Q.   All right.  Let's go to Don Mohler and his



1 shift, okay?

2     A.   Yes, sir.

3     Q.   Who is Don Mohler again?

4     A.   He's a lieutenant that works nights.

5     Q.   And who's on his shift?

6     A.   Tre Wallace and currently Bryer Robertson.

7     Q.   Who is Tre Wallace?

8     A.   He's a sergeant.

9     Q.   And who is Brian (sic) Robertson?

10    A.   He's a deputy sheriff.

11    Q.   How old is Tre Wallace?

12    A.   Tre is -- as of January 1, he was 34.  So I
13 don't have his birth date right in front of me, but he's
14 either 34 or 35.

15    Q.   All right.  How old is Brian Robertson?

16    A.   Just for clarification, it's Bryer, B-r-y-e-r.
17 20 years of age.

18    Q.   And he is a deputy?

19    A.   Yes, sir.

20    Q.   How old is Don Mohler?

21    A.   Again, as of January 1 of 2025, he was 58
22 years of age.

23    Q.   And you said you had spoken to Lieutenant
24 Mohler about his shift getting their reports done on
25 time?



1      A.    Yes, sir.

2      Q.    So were reports by Sergeant Wallace or Deputy
3 Robertson not done on time?

4      A.    No, that wasn't necessarily the case.  There
5 was one where they went on days off, because we were on
6 12-hour shifts.  So sometimes deputies are off up to
7 four days.  So one of the things we have to do in order
8 to have them readily available for courts or people that
9 walk in with public records requests or something of
10 that nature, to supply the prosecutor's office, we have
11 to have them completed if not the day of the report,
12 certainly by the time they go on days off.

13           And there was a particular incident -- and I
14 don't recall the case -- but where the prosecutor's
15 office needed a copy of the report and we wasn't able to
16 find it.  And I spoke with Donny Mohler about that
17 particular report.  What I later found out was deputy --
18 or Sergeant Wallace now actually went home sick.  He had
19 gotten sick during his shift so he wasn't able to
20 complete that report.

21      Q.    Okay.

22      A.    But I inquired -- I inquired about it
23 initially because I thought they didn't have the report
24 done on time.

25      Q.    Okay.  You had mentioned reports, as in



1 plural, not done on time.  Is that the only instance you

2 can think of or were there others?

3     A.   I meant report.  Sorry.

4     Q.   All right.  You said there's a Deputy Cale

5 what?

6     A.   Calendine.  Spelling is C-a-l-e-n-d-i-n-e.

7     Q.   Is there a first name for that person?

8     A.   Kyle, K-y-l-e.

9     Q.   Okay.  And you had spoken to Kyle, Deputy

10 Calendine, about his car being clean and reports?

11     A.   Yes.

12     Q.   Tell me what you mean by that.

13     A.   So Deputy Calendine is also a K9 officer, and

14 it was kind of the same situation.  I just -- because I

15 had already talked to Deputy Adams -- or sorry, Deputy

16 Smith, Troy Smith, I just wanted to make sure that his

17 car -- obviously it had hair in the car in the back area

18 where the dog is, what I call the kennel portion or the

19 cargo area, and just, you know, told him that he had to

20 stay vigilant.

21          It wasn't so much that he had done anything

22 wrong, but just kind of cautioning him to make sure that

23 he keeps that car clean.  That he has to be a little

24 extra vigilant because of the dog.

25     Q.   All right.  And what did you mean by reports,



1 speaking to him about reports?

2     A.   So he had -- there was a particular week where

3 he had had multiple what I would call larger scale

4 investigations.  He had several vehicle pursuits that

5 ultimately led to a couple people bailing out and

6 fleeing the scene, and there was a lot of reporting and

7 documentation of those.  And I wanted to make sure that

8 he was getting those done and to the prosecutor in a

9 timely fashion.

10     Q.   And was he?

11     A.   Yes.

12     Q.   Okay.

13     A.   I just wanted -- when I talked to him, I

14 wanted to make him aware that if he didn't feel that

15 he could do it in his normal work hours, that there

16 would be overtime available for him to do the initial

17 reports because of the importance of him having them

18 done and in the prosecutor's hands in a timely fashion.

19     Q.   Okay.  I appreciate those answers.  Anyone

20 else you can think of that you considered disciplining

21 or you talked to about any issues?

22     A.   No, sir, not -- not directly for -- not for

23 discipline or anything that I can think of, no, sir.

24     Q.   All right.  We'll take out the discipline

25 part.  Anyone else you talked to about issues with their



1 work performance that you can recall?

2     A.   No.  I don't recall who, but I know I made

3 suggestions to guys that -- to shine their shoes or to,

4 you know, sometimes when we transfer uniforms, because

5 the ORC states that we have a certain time of the year

6 where we wear short-sleeved shirts, sometimes of the

7 year we wear long sleeves, and then there's a -- about a

8 six-week period in the spring and in the fall where it's

9 optional, and I leave that up to the shift lieutenant.

10       And some of the guys once in a while will need

11 help putting -- or running the exact location of metals

12 and ribbons and the collar brass and how directions,

13 because it differs from short sleeve to long sleeves.

14 Some things likes that, suggestive, just helping them

15 and teaching them, but nothing disciplinary-wise, no,

16 sir.

17     Q.   Okay.  You said something about suggesting to

18 shine their shoes?

19     A.   Yes.

20     Q.   So there were employees with, what, dirty

21 shoes that you told them to shine?

22     A.   There is -- I've witnessed Lieutenant Bill --

23 Staff Lieutenant Bill Gilkey say that.  I've actually

24 told a few as well.  And usually they respond with a

25 justification or a reason why.  Earlier in the shift



1 that they had been out in a wooded area or a muddy area.

2 The explanations vary, but usually they had a viable

3 reason as to why their shoes wasn't shined.

4      Q.   Did you ever make such a suggestion to Jerry

5 Darst?

6      A.   Yes.  I told -- the meeting I think I

7 testified to in the first deposition, I made mention to

8 him that that was one of the things that was required of

9 a deputy in his personal appearance.

10      Q.   Did you ever ask him why his shoes were dirty?

11      A.   I don't recall specifically.  Probably.  And I

12 think Jerry gave me some explanation that seemed valid

13 at the time.

14      Q.   Okay.  So you think just like those other

15 deputies, he seemed to have a valid reason for why his

16 shoes needed to be shined?

17      A.   At least on one occasion.  The issue I had

18 with Jerry was it was a continuing issue.  Like he --

19 his appearance, including his shoes, was a constant.  He

20 never seemed to fix them permanently.  Most of the --

21 the individuals I spoke of earlier, when I addressed an

22 issue with them, they fixed it and maintained the

23 satisfactory level of appearance or performance,

24 depending on which topic it was.  Jerry, the issue with

25 him was he never seemed to take what we said seriously,



1 or any suggestions, for more than a day or two.

2     Q.   Jerry worked for you how long before he went

3 out on medical leave?

4     A.   I want to say it -- well, he worked actual

5 workdays.  I think calendar days it was like a little

6 over two months.  I think there was like 34 days he

7 actually worked in the office.

8     Q.   And your testimony is that in those 34 days

9 you spoke to him how many times about his shoes?

10    A.   Personally, just one that I recall.

11    Q.   Okay.  And that one instance you spoke to him,

12 Jerry had a valid reason, you said, right?

13    A.   Yes.  I don't recall what that was, but it

14 seemed to be, if my memory serves me, there was some

15 valid reason, yes.

16         MR. STARLING:  All right, Sheriff.  Thank you

17     for your time today.  That's all the questions I

18     have for this 30(b)(6) deposition.

19         I'm glad we were able to get through it

20     relatively quickly.

21         THE WITNESS:  Thank you, sir.  And thank you,

22     ma'am, for your attention as well.

23         THE COURT REPORTER:  You're welcome.

24         And then, Matt, are you going to advise on

25     signature?



1        MR. TEETOR:  Yes.  He'll read.

2        THE COURT REPORTER:  Okay.

3        And then, Jason, are you going to order the

4   transcript?

5        MR. STARLING:  Yeah, same as before, just

6   standard delivery, you know, E-Tran, PDFs.

7        THE COURT REPORTER:  And then, Matt, do you

8   want a copy of transcript?

9        MR. TEETOR:  Yes, please.  Thank you, Wendy.

10

11

12

13                    _____

14                         DONALD SCOTT FITCH

15                    _____

16                         DATE

17                         - - -

18        DEPOSITION CONCLUDED AT 2:01 P.M.

19                         - - -

20

21

22

23

24

25



1                    C E R T I F I C A T E

2 STATE OF OHIO            :
                           :            SS
3 COUNTY OF HAMILTON       :

4          I, Wendy L. Raymer, RPR, CRR, the undersigned,

5 a duly qualified and commissioned notary public within

6 and for the State of Ohio, do hereby certify that before

7 the giving of his aforesaid deposition, DONALD SCOTT

8 FITCH was by me first duly sworn to depose the truth,

9 the whole truth and nothing but the truth; that the

10 foregoing is the deposition given at said time and place

11 by DONALD SCOTT FITCH; that said deposition was taken in

12 all respects pursuant to stipulation of counsel; that I

13 am neither a relative of nor employee of any of the

14 parties or their counsel, and have no interest whatever

15 in the result of the action; that I am not, nor is the

16 court reporting firm with which I am affiliated, under a

17 contract as defined in Civil Rule 28 (D).

18          IN WITNESS WHEREOF, I hereunto set my hand and

19 official seal of office at Cincinnati, Ohio, this 15th

20 day of October, 2025.

21

22

23                                _____

24                                _____

My Commission expires            S/Wendy L. Raymer, RPR, CRR
25 December 6, 2026               Notary Public - State of Ohio



1 1 DEPOSITION ERRATA SHEET

2 Date Taken:  October 3, 2025

3 Case Caption:  JERRY DARST

4 vs. MEIGS COUNTY, OHIO, et al.

5 DECLARATION UNDER PENALTY OF PERJURY

6 I declare under penalty of perjury

7 that I have read the entire transcript of

8 my deposition taken in the captioned matter

9 or the same has been read to me, and

10 the same is true and accurate, save and

11 except for changes and/or corrections, if

12 any, as indicated by me on the DEPOSITION

13 ERRATA SHEET hereof, with the understanding

14 that I offer these changes as if still under

15 oath.

16 Signed on the _____ day of

17 _____, 20___.

18 _____

19 DONALD SCOTT FITCH

20

21

22

23

24

25



1  2 DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24  DONALD SCOTT FITCH

25



1 3 DEPOSITION ERRATA SHEET

2 Page No._____Line No._____Change to:_____

3 _____

4 Reason for change:_____

5 Page No._____Line No._____Change to:_____

6 _____

7 Reason for change:_____

8 Page No._____Line No._____Change to:_____

9 _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24 DONALD SCOTT FITCH

25



**Exhibits**

13575220 Do
nald.
Scott Fitch
.EXHIBIT1
    3:6  7:1,
    5,10,11,
    12,16,18
    10:10
    13:13
    24:12,13

13575220 Do
nald.
Scott Fitch
.EXHIBIT2
    3:7
    10:22,25
    11:1,4

**1**
    7:1,5,10,
    11,12,16,
    18,25
    10:10
    13:13
    24:12,13
    36:12,21

**12-hour**
    37:6

**12th**
    25:25
    26:14,21

**18th**
    20:14

**1:30**
    23:1

**1:36**
    23:2

**1:40**
    22:16

**1E**

22:2,6
_____

**2**

**2**
    10:16,20,
    22,25
    11:1,4

**2.05.36**
    11:8

**20**
    36:17

**2023**
    25:19
    26:21
    27:10

**2025**
    20:13,14
    36:21

**21**
    23:24

**22**
    23:12,16
    30:13

**23**
    23:22
    26:1,15
    27:2

**24**
    25:22

**25th**
    20:13

**26**
    26:10

**27**
    24:1
    34:13

24:15
_____

**3**

**30(b)(6)**
    6:10,18
    7:13,22
    8:3,10
    9:19  15:4
    27:16
    42:18

**31**
    23:20

**34**
    36:12,14
    42:6,8

**35**
    27:13
    36:14
_____

**4**

**4**
    13:14,16

**45**
    24:3

**4A**
    22:8
_____

**5**

**58**
    36:21
_____

**6**

**6**
    32:22
_____

**7**

**7**

7/17
    27:2,10
_____

**8**

**8**
    28:18,22
_____

**9**

**9**
    7:25  31:6

**9A**
    31:16
_____

**A**

**Aaron**
    14:1,22
    15:7
    16:3,8,
    11,16,21
    17:19,22
    18:8  19:3
    20:11,18
    22:7
    23:19,20
    33:8

**ability**
    8:14

**accordance**
    18:19

**accurately**
    14:13

**acknowledgm
ent**
    30:17

**actively**
    30:11

**actual**
    42:4

**Adams**
    33:23
    35:9,10
    38:15

**addressed**
    33:16
    41:21

**advise**
    42:24

**affecting**
    6:1

**age**
    4:9  19:20
    22:5
    23:12,20,
    22,24
    24:1,3
    29:2,20
    30:4,22
    31:3
    36:17,22

**ages**
    19:16,18,
    24  20:3
    21:1,11,
    12,15
    22:11
    23:7,13
    34:12

**agree**
    28:11

**agreed**
    15:23
    16:1

**agreement**
    15:11,13
    18:21,25
    20:12
    29:14

**ahead**



17:11

**allegation**
13:4

**allegations**
13:3

**alleged**
13:10
19:4
31:13

**and/or**
24:19

**Andy**
14:1,15,
19 19:14
21:16
24:2

**answers**
31:9
39:19

**appearance**
41:9,19,
23

**appointed**
30:12

**area**
34:22
35:3
38:17,19
41:1

**argue**
15:24

**asserted**
31:9

**assigned**
14:16

**attachment**
7:19,22

**attention**
42:22

**attorney**

6:9 15:20
18:6

**aware**
20:17,20
24:6
30:25
31:1
32:15
39:14

---

---

B

---

**B-R-Y-E-R**
36:16

**back**
5:11
15:12
22:15,16,
18 23:4
24:11
30:25
32:22
38:17

**bailing**
39:5

**bargaining**
29:14

**based**
16:21
19:1,8
29:1,20
30:4,22
31:2

**bases**
4:22

**basically**
11:22
19:14

**beard**
35:16,17,
19

**beginning**
4:17

**behalf**
6:22
14:17
15:4
27:15,16
31:19

**behavior**
33:18

**Ben**
33:23
35:9,10

**Bill**
8:24
14:4,9
40:22,23

**birth**
36:13

**bit**
10:13
16:5

**Brandy**
8:25
14:4,6

**brass**
40:12

**break**
21:11
32:8

**Brian**
36:9,15

**briefly**
6:13

**Bryer**
36:6,16

---

C

---

**C-A-L-E-N-
D-I-N-E**

38:6

**Cale**
38:4

**calendar**
42:5

**Calendine**
34:2
38:6,10,
13

**call**
4:22 7:5
9:17 29:4
38:18
39:3

**called**
4:18 7:19

**camera**
22:17

**capacity**
4:22 6:15

**Captain**
8:25
13:21
16:8,16
18:11,13,
23 20:16

**car**
34:3
38:10,17,
23

**care**
21:12

**career**
19:6

**cargo**
38:19

**case**
4:15 7:5
11:20
17:19
31:21

37:4,14

**categorizes**
11:11

**cautioning**
38:22

**certified**
4:10

**chance**
15:10,13
18:21,25
20:12
23:7

**changed**
11:21
20:10

**checks**
34:22

**circumstanc
es**
19:2

**clarificati
on**
36:16

**clarity**
12:24

**clean**
33:23
34:3,15,
25 35:6,8
38:10,23

**close**
35:17

**closer**
35:21

**collar**
40:12

**collective**
29:14

**committed**
16:22



19:4,24

**communicated**
29:22

**complaint**
31:10

**complete**
37:20

**completed**
37:11

**completely**
18:9

**completing**
34:4

**computer**
9:15

**concerns**
10:17
28:22
32:25

**concluded**
19:10

**conduct**
11:4
12:18
16:23
17:2,8

**confirmed**
16:11

**confused**
26:20

**considered**
17:13
33:1,11
39:20

**constant**
41:19

**constitution**
31:4

**contend**
31:23

**continue**
7:18,21

**continuing**
41:18

**cooperativeness**
19:5

**copy**
37:15
43:8

**correct**
11:6
14:8,10,
11 15:5
16:19
17:23
18:1,2
23:17
25:20
26:13
28:4,6,7,
9,10,12,
14 29:3
32:13

**corrected**
33:18

**Cottrill**
14:2
23:23

**county**
6:10,19,
23 7:13
8:4 9:4
11:5,16,
24 12:4,
13,18
13:17
14:18
15:4
16:23
19:18

22:4 26:7
27:8,15,
16 28:4
29:8,12,
15,18,23
30:2,16,
21 31:2,
11,20
32:15

**County's**
19:20

**couple**
4:21
30:11
39:5

**court**
5:11,19
9:8,20
26:16,18
42:23
43:2,7

**courts**
37:8

**cover**
4:22
10:12
22:10

**covered**
22:6,8

**cracks**
35:1

**created**
28:4

**current**
8:18

———————
D
———————

**damages**
31:14

**Darst**

8:19 10:2
11:6
12:13
24:24
25:2,11,
18 26:2
27:17
29:7 30:7
31:1,23
32:11,16
41:5

**Darst's**
9:3 12:17
20:16
25:16
26:12,21
27:18
28:3 30:5

**date**
26:25
36:13

**dated**
20:13

**David**
14:1
23:21

**day**
11:23
12:4
13:22
14:5,6,9,
14,16,21,
24 19:14
21:15
23:8 24:5
37:11
42:1

**days**
15:9
37:5,7,12
42:5,6,8

**defendant**
13:18

**defendants**
31:20,22

**defense**
31:14

**defenses**
31:9

**deficiencies**
9:3

**defined**
9:3 22:5

**degree**
19:9
34:24

**degrees**
11:18

**delivery**
43:6

**demotion**
15:10,15,
22 18:16,
20,24

**department**
19:7,10

**departmental**
17:4

**depending**
13:9
17:14
41:24

**depends**
13:3

**deposed**
4:10,14

**deposition**
4:4,25
6:10,15,
18,19,24
7:13,22



8:8,11
9:6,19,
24,25
10:14
19:23
20:5,16
27:16
41:7
42:18

deputies
13:22
14:12,13,
19,25
19:15
21:16
30:13
33:15
37:6
41:15

deputy
9:4 15:12
17:2 19:8
23:11
24:19,24
25:9
26:6,11
27:7,18
28:9
32:12,14
34:2,9
36:10,18
37:2,17
38:4,9,
13,15
41:9

descript
8:20

descriptions
10:5

designated
6:20,23
8:3

detail

16:5

details
19:2

determination
18:7

determine
13:1

differs
40:13

Dillard
14:1,22
15:7
16:3,9,
11,17,22
17:22
18:8
19:3,8
20:12,18
22:7
23:19,20
33:8

Dillard's
17:19

directions
40:12

directly
17:8
39:22

dirty
40:20
41:10

disciplinary
10:17
11:9
12:14

disciplinary-wise
40:15

discipline

10:1,3
11:25
12:4,19,
24 14:18
15:7 16:2
18:8,14
20:11,15,
17,19
33:12,17,
19 39:23,
24

disciplined
13:18
14:22
15:1
21:10,24,
25 22:7

disciplining
33:1,11
39:20

discovered
16:16

discriminate
29:19
30:4,21

discriminating
31:2

discussed
9:18,23
15:21
20:4

discussions
10:10

dispensing
17:3

dissemination
17:16,25

distinction

6:14

distributed
30:15

document
8:13,15
10:6
20:3,24
21:6
25:12

documentation
39:7

documented
33:22

documents
29:17

dog
38:18,24

Don
33:25
35:25
36:3,20

DONALD
4:8

Donny
9:1 33:25
37:16

duly
4:9

Dunfee
14:1
23:21

duty
17:3,10,
12

————————

E

————————

E-TRAN
43:6

earlier
13:21
22:16
40:25
41:21

easier
32:8

EEO
29:4,9,
13,14,16
30:14,15

employed
11:6

employee
12:19

employee's
29:2
34:12

employees
8:18 22:3
29:18,19,
23 30:2,
4,15,22
33:5,10
40:20

employees'
29:12

employment
24:20
25:16
26:12
27:19
28:3 30:6
31:24
32:17

ended
16:17

engage
19:25
21:2,13

engaged
33:10



everyone's
  34:12

exact
  40:11

EXAMINATION
  4:12

examined
  4:10

exception
  14:15

Exhibit
  7:1,5,10,
  11,12,16,
  18 10:10,
  22,25
  11:1,4
  13:13
  24:12,13

exhibits
  19:22

explain
  5:6

explained
  8:10,11

explanation
  41:12

explanations
  41:2

extent
  9:16,17

exterior
  35:7

extra
  38:24

_____

**F**

F-E-N-N-E-
L-L

27:6

face
  35:18

facial
  33:24
  35:13,23

fact
  30:3

facts
  17:15,18

failure
  31:13

fair
  5:13
  12:10
  13:6
  16:14
  19:25
  29:5

fall
  40:8

fashion
  39:9,18

federal
  31:4

feedback
  9:15

feel
  22:17
  39:14

Fennell
  27:1,6,7,
  12,17
  28:9,11

fight
  15:24

figured
  20:9

file
  20:18

files
  10:2

fill
  10:14
  25:5
  27:23
  28:6

filling
  28:12

find
  37:16

findings
  18:11,13

fine
  20:21

fired
  24:24

firing
  33:2

Fitch
  4:8 13:18

fix
  41:20

fixed
  41:22

fleeing
  39:6

Fletcher
  14:2
  23:25

focus
  14:12

folks
  19:13
  33:20

form
  13:1,9
  33:16

formal
  33:19

found
  37:17

frame
  13:13

Frank
  8:25
  13:21

free
  22:17

front
  19:23
  24:13
  36:13

fully
  5:15

_____

**G**

GAAP
  34:11

gaps
  10:14

gave
  15:3
  33:12
  41:12

German
  34:20

Gilkey
  8:24
  14:5,9
  40:23

give
  5:18 6:3
  8:19 11:1
  13:13
  19:18
  20:23

glad
  42:19

good
  35:18

gotcha
  20:2
  21:2,14

grab
  21:12

grooming
  33:24
  35:13,23

ground
  4:18

Group
  11:12
  12:1,3,5,
  7,8 17:6,
  9,12,13,
  16,20,21,
  23,24,25
  18:3

guess
  12:24
  18:22
  25:10

guys
  26:23
  40:3,10

_____

**H**

hair
  33:24
  34:23
  35:13,23
  38:17

handler
  34:9

hands
  39:18

He'll
  43:1



hear
  5:2,9  9:9
  20:7
  26:17

heard
  5:15
  25:21

hearing
  8:10

held
  22:3

helping
  40:14

hereinafter
  4:10

high
  16:12,18

hire
  26:1

hired
  24:19
  25:9,11,
  15,24
  26:6,12,
  14,20
  27:1,2,7,
  18 28:8
  30:10

hiring
  25:4

home
  37:18

hour
  8:21,23

hours
  39:15

——————————
          I
——————————

Ian

27:1,6,17
28:9,11

ideas
  18:10

identificat
ion
  7:2 10:23

identified
  29:17

identifies
  22:2

identities
  21:9 22:4

II
  11:12
  12:3,5
  17:6,12,
  13,17,20,
  21,24
  18:4

III
  11:12
  12:7,8
  17:7,14,
  20

illegal
  30:3,23

importance
  39:17

important
  5:1

imposed
  20:19

incident
  37:13

includes
  21:10
  22:4 29:1

including
  12:9

22:11
29:23
30:2,16
41:19

individual
  20:4
  25:24

individuals
  21:9,15,
  23,24
  23:8
  41:21

information
  8:14
  17:3,4,16
  19:3,4,21
  21:3,20
  22:19

initial
  39:16

initially
  37:23

inquired
  37:22

inside
  34:23

instance
  11:23
  12:9 38:1
  42:11

instruct
  29:18

instruction
s
  5:13

insubordina
tion
  17:3,13,
  15,20

intercourse
  16:18

interject
  20:10

internal
  10:2
  12:18,23
  13:1,8
  16:8
  18:10,12,
  23

investigati
on
  12:19,23
  13:2,8
  16:8
  18:11,13,
  23 19:6

investigati
ons
  10:2 39:4

involuntary
  15:19

involved
  19:1

involving
  19:3

issue
  34:19
  41:17,18,
  22,24

issued
  10:3
  12:25
  14:19
  15:8
  20:11,15,
  17

issues
  34:2
  35:23
  39:21,25

issuing
  12:19

——————————
          J
——————————

January
  36:12,21

Jason
  20:7 43:3

Jerry
  9:3 11:6
  12:13,17
  24:23
  25:2,16,
  18 26:2,
  12,21
  27:17,18
  28:3 29:7
  31:1,23
  32:11,16
  33:8
  41:4,12,
  18,24
  42:2,12

Jerry's
  12:20

job
  10:5 22:3
  31:22
  32:14
  35:18

jobs
  32:18

judge
  5:19

July
  25:19,25

jump
  10:13

June
  20:13,14
  25:17,21,
  25 26:14,
  21



jury
  5:19

Justice
  13:25
  19:19,20
  23:10,16

justification
  40:25

**K**

K-Y-L-E
  38:8

K9
  34:4,9,
  20,22
  38:13

keeping
  33:23
  34:3,15,
  25 35:5

kennel
  38:18

kind
  10:10
  11:18
  15:23
  38:14,22

King
  8:25
  13:25
  14:4,6
  19:19
  23:11,16

King's
  19:20

kissed
  16:17

knowledge
  19:20

30:9 32:5

Kyle
  38:8,9

**L**

larger
  39:3

law
  31:3,4

lawful
  4:9

lazy
  32:17

leaned
  9:13

leave
  40:9 42:3

led
  39:5

left
  25:11

lesser
  33:2,12

level
  17:14
  18:7,14
  41:23

Lexipol
  11:19

lieutenant
  8:24,25
  9:1 14:6,
  9 24:4
  33:25
  34:5
  36:4,23
  40:9,22,
  23

lieutenants

19:14

likes
  40:14

lines
  20:2

list
  14:13

listed
  7:22
  14:13

litigate
  15:25

location
  40:11

long
  8:16,17
  21:19
  35:20
  40:7,13
  42:2

looked
  9:7 13:4

loss
  18:20

lot
  34:21,23
  39:6

**M**

made
  29:13
  40:2 41:7

main
  35:3

maintained
  41:22

make
  5:2,6
  6:24 18:7

26:22
  32:3,8
  33:13
  38:16,22
  39:7,14
  41:4

makes
  33:14

management
  11:20
  12:25

manual
  11:21
  29:12

Mark
  15:20

marked
  7:1 10:22

Matt
  4:2 9:9
  26:17
  42:24
  43:7

means
  12:23

meant
  25:23
  38:3

medical
  42:3

meeting
  41:6

Meigs
  6:10,19,
  22 7:13
  8:4 9:4
  11:5,15,
  24 12:4,
  13,17
  13:17
  14:18
  15:4

16:23
  19:18,20
  22:4 26:7
  27:8,15
  28:3
  29:8,12,
  15,18,23
  30:2,16,
  20 31:2,
  11,20

memory
  6:1 19:24
  20:1
  21:14
  33:21
  42:14

mention
  41:7

mentioned
  24:7
  37:25

met
  16:13

metals
  40:11

microphone
  9:14

mind
  25:18

minor
  33:15

minutes
  21:21
  22:12

misconduct
  13:10
  33:10

mitigate
  31:14

modernized
  11:19



Mohler
9:1 33:25
35:25
36:3,20,
24 37:16

moment
11:1
20:23

months
30:11
42:6

muddy
41:1

multiple
39:3

Myers
14:1,15,
20 19:15
21:16
24:2

—————

N

—————

names
13:25

nature
13:9
37:10

neatly
35:17

necessarily
10:12
15:24
27:23
37:4

needed
28:6
37:15
41:16

negatively
5:25

neglect
17:2,9,12

night
35:11

nights
36:4

non-
retaliation
28:24

nondiscrimi
nation
28:24
29:1,5

normal
39:15

notice
7:13

November
30:12

number
31:6
32:22

—————

O

—————

oath
6:7

objected
9:16

Objection
24:25
27:20
28:13
32:1,19

obtain
8:14
31:25

obtained
31:23

occasion

41:17

offense
11:25
12:8
16:22
17:1,7,9,
24,25
19:9

offenses
11:11,12,
13,18
12:1,3,5,
7 17:6,
23,24
18:3,4
19:3

office
9:4 10:18
11:5,6,
16,24
12:14,18
16:24
22:4 25:3
26:7 27:8
28:4
29:8,9,
15,18,23
30:2,8,16
32:11
33:1
37:10,15
42:7

officer
38:13

Ohio
6:11,19,
23 7:14
8:4 13:17
14:18
15:4
27:15
31:2,20

Ohio's
31:11

open
25:4
32:14

opinion
35:20

opted
33:2

optional
40:9

ORC
40:5

order
37:7 43:3

oriented
24:12

originally
30:10

outlined
8:12,15
10:5

overtime
39:16

—————

P

—————

p.m.
23:1,2

part
5:4,9
21:8
39:25

PDFS
43:6

penalties
6:7

penalty
33:2,13

people
25:5 37:8
39:5

performance
9:3 40:1
41:23

period
12:12
40:8

perjury
6:7

permanently
41:20

person
13:16
14:24
24:18
25:2,4,11
26:25
27:1,17
28:8
32:25
38:7

personal
6:15
33:24
41:9

Personally
42:10

personnel
10:1

persons
24:18

pertinent
19:2

piece
32:7,8

place
10:17
11:5
12:14
15:14
29:9,11

plaintiff



24:19

plaintiff's
7:1 10:22
24:20

played
5:18

plural
38:1

point
30:7 33:7

policies
10:4,17
11:20
12:14
28:23
29:4,5,9,
11,13,15,
16,22
30:14,15

policy
35:16

portion
35:4
38:18

position
24:24
25:6

positions
22:3
27:23

possibiliti
es
18:18

possibly
17:17

potentially
35:2

predates
26:21

preparation

8:23

prepare
8:8 9:5,
25 10:7

prepared
8:13

preparing
8:16

previously
20:4

prior
6:14 24:7

prisoners
35:3

procedures
10:5
11:21
28:23
29:16

program
16:13

progressed
33:18

progressive
11:24
12:4

prosecutor
39:8

prosecutor'
s
37:10,14
39:18

provided
30:1

public
37:9

pull
10:25

pursuits
39:4

putting
40:11

─────────

**Q**

─────────

question
5:2,5,10
20:2

questions
4:22 5:14
21:2
42:17

quickly
42:20

─────────

**R**

─────────

random
34:21

rank
15:12
18:16,20

reach
18:24

read
5:11,18
43:1

readily
19:23
37:8

reads
13:16

reason
6:3 40:25
41:3,15
42:12,15

recall
4:24 9:2
34:6
37:14
40:1,2

41:11
42:10,13

received
30:17

recess
23:1

recognize
7:12

record
9:10,12
22:22
23:4

recorded
5:22

recording
5:21

records
37:9

reference
8:19
13:13
29:13
33:25
34:2

referenced
29:16

referencing
13:17
30:14

referring
34:11

relationshi
p
16:12

relevant
22:1

remember
4:15,17

remotely
4:4

removed
15:11

render
25:10

repeat
4:20 5:5,
10

replace
25:9
27:22
28:8

replaced
24:19
25:2
27:17
28:12

replacement
24:23

report
34:12
37:11,15,
17,20,23
38:3

reporter
5:11 9:8,
20 26:16,
18 42:23
43:2,7

reporting
39:6

reports
34:1,4
36:24
37:2,25
38:10,25
39:1,17

representat
ive
6:20 8:4
15:5

request
21:8



requested
  8:14

requests
  37:9

required
  41:8

respect
  9:18

respond
  40:24

review
  17:18

reviewed
  10:1,4

reviewing
  18:10,12

ribbons
  40:12

Rick
  9:1

ride-along
  16:13

roadmap
  10:10

Robertson
  36:6,9,15
  37:3

romantic
  16:12

routine
  34:21

Rule
  6:10,18
  7:13,21
  15:4

rules
  4:18 11:4
  16:23

running

  40:11

  ───────

  S

  ───────

safe
  22:16

Samantha
  25:24
  26:6,9

satisfactory
  41:23

scale
  39:3

scene
  39:6

school
  16:12,18

SCOTT
  4:8

screen
  7:5,6,7,8
  11:2
  13:12
  24:11
  28:20

Section
  11:8

seep
  35:1

sense
  5:2,7
  6:24 32:3
  33:13,14

separated
  26:12
  28:3

separating
  24:20
  25:16

separation
  27:19

sergeant
  14:16,20,
  25 15:11
  19:15
  21:17
  35:11
  36:8
  37:2,18

served
  15:12

serves
  42:14

severe
  18:15,16

sexual
  16:17

shape
  13:9

share
  7:4,6,7,8
  11:2
  13:12
  24:11
  28:20

shave
  35:21

shaven
  35:17

shed
  34:21

Shepherd
  34:20

sheriff
  4:14 9:4,
  18,22
  10:4
  14:23
  15:12
  20:23

21:20
22:12,16
23:4
24:8,20
26:20
27:5
28:16
30:12,21
34:9
36:10
42:16

sheriff's
  9:4 10:18
  11:5,16,
  24 12:13,
  18 16:23
  22:4 25:3
  26:7 27:8
  28:4
  29:8,9,
  15,18,23
  30:2,8,16
  33:1

shift
  13:23
  14:5,7,
  10,14,16,
  21,24
  19:14
  21:15
  23:8 24:5
  34:1
  35:11
  36:1,5,24
  37:19
  40:9,25

shifts
  37:6

shine
  40:3,18,
  21

shined
  41:3,16

shirts

40:6

shoes
  40:3,18,
  21 41:3,
  10,16,19
  42:9

short
  21:11
  29:5
  40:13

short-
sleeved
  40:6

sic
  20:16
  36:9

sick
  37:18,19

signature
  42:25

signed
  15:10
  30:17

similarly
  12:3,7

sir
  4:16,19
  5:3,8,12,
  16,20
  6:2,5,8,
  12,21,25
  7:9,11,
  15,17,20,
  24 8:2
  10:8,15,
  21 11:3,
  7,10,14
  12:2,6,
  11,16,22
  13:7,11,
  24 14:4,
  21 15:2,
  5,6,17



16:4,10,
15,20,25
18:5,9
20:6 21:4
23:6,9
24:10,14,
17,22
27:9
28:5,19,
21,25
29:3,6,
10,21,25
30:19,24
31:5,8,
12,18
32:5,20,
24 33:4,8
35:14
36:2,19
37:1
39:22,23
40:16
42:21

situation
38:14

six-week
40:8

sleeve
40:13

sleeves
40:7,13

Smith
9:1 33:22
34:8,10,
11 38:16

sound
14:2

speak
15:14

speaking
6:22 39:1

specificall
y
9:23
41:11

spell
26:4 27:4

Spelling
38:6

spend
8:16

spoke
8:18,24
37:16
41:21
42:9,11

spoken
34:14,17
35:12
36:23
38:9

spot
34:22

spring
40:8

staff
8:24 14:9
40:23

standard
43:6

STARLING
4:2,6,13
7:3 9:11,
21 10:24
20:8,21
21:1,5
22:1,10,
15,21
23:3
25:14
26:3,17
27:3
28:1,15

32:2,6,21
42:16
43:5

start
19:19
22:18

started
16:12

state
31:3

states
11:22
40:5

stay
38:20

Stewart
8:25
13:22
16:8,16
18:23

Stewart's
18:11,13

stipulate
4:3

student
16:13,18

stuff
35:7

subject
6:7

submitting
34:4

subtopic
10:13

subtopics
13:19

suggesting
40:17

suggestion
41:4

suggestions
40:3 42:1

suggestive
40:14

supervisor
12:25

supplement
20:18

supplementa
tion
20:14

supplied
19:5,22
20:13

supply
37:10

surrounding
17:15

suspension
15:9,13
18:19,20,
24

sworn
4:1,9

system
11:9,15,
20,21

――――――

T

――――――

taking
4:3,25

talk
5:1 6:13
9:17
12:12
13:14
16:2
19:16
29:7
31:13

35:9

talked
9:2 13:21
33:22,23,
24 34:1
38:15
39:13,21,
25

talking
18:6
21:23
26:23
33:17
34:24

Taylor
14:1
23:23

teaching
40:15

technically
6:18

Teetor
4:5 8:9
9:13,23
20:7,9
21:22
22:9,14
24:25
25:18,21
26:14,19
27:20
28:13
32:1,4,19
43:1,9

telling
9:22
27:15

tenure
10:4
12:17,20

terminated
19:8
25:19



26:2

**termination**
12:9
18:15,25
26:22
31:24
32:17

**Terry**
14:2
23:25

**test**
20:1
21:14

**testified**
41:7

**testifying**
6:6

**testimony**
5:18 6:4
9:17 42:8

**thing**
26:23

**things**
33:16
37:7
40:14
41:8

**thought**
25:21
37:23

**three-day**
18:24

**time**
12:12
20:10
29:7
30:5,7,14
31:1 33:7
34:1,18
35:19
36:25
37:3,12,

24 38:1
40:5
41:13
42:17

**time-wise**
8:17

**timely**
39:9,18

**times**
34:17
42:9

**today**
4:24
5:14,18
6:1,4
11:15
13:21
15:14
20:12
23:13
42:17

**today's**
8:8

**told**
35:20
38:19
40:21,24
41:6

**topic**
10:12,16,
20 13:14,
16 17:14
21:8,24
22:2,8
24:15
28:18,22
31:6,16
32:22
41:24

**topics**
6:23
7:22,25
8:5,12

20:10
22:1,5,11

**totality**
19:1

**training**
30:1,10,
13

**transcript**
43:4,8

**transfer**
40:4

**transport**
35:3

**Tre**
36:6,7,
11,12

**Troy**
33:22
34:8
38:16

**truthful**
6:4

**turn**
5:21
22:17
28:18

**type**
13:8
16:22
33:10

― **U** ―

**ultimate**
25:6

**ultimately**
39:5

**unaware**
20:11

**unbecoming**

17:2,8

**understand**
5:4,17,23
6:6,20

**understanda
ble**
34:24

**understandi
ng**
16:7

**understood**
5:15
30:20

**unfamiliar**
8:11

**uniforms**
40:4

**union**
15:20
18:6

**unwritten**
28:22

**up-front**
35:4

**updated**
11:17

― **V** ―

**vacancy**
25:3
28:4,9,12

**vacant**
27:24

**valid**
41:12,15
42:12,15

**vary**
41:2

**vehicle**
33:23
34:15,19,
23 35:2,
4,6 39:4

**vehicles**
34:22

**versus**
15:18

**viable**
41:2

**vigilant**
38:20,24

**violate**
31:3,4

**violation**
16:22

**Volcheck**
15:21

**voluntarily**
16:1

**voluntary**
15:9,15,
18,22

― **W** ―

**W-I-E-D-M-
E-R**
26:5

**walk**
28:2 32:7
37:9

**Wallace**
36:6,7,11
37:2,18

**wanted**
26:22
38:16
39:7,13,



14

**wear**
  40:6,7

**week**
  39:2

**Wendy**
  43:9

**Wiedmer**
  25:24
  26:6,9,
  11,14,20

**witnessed**
  40:22

**wooded**
  41:1

**work**
  14:13
  39:15
  40:1

**workdays**
  42:5

**worked**
  12:13
  13:17,22
  29:8 30:7
  31:2
  32:11,25
  42:2,4,7

**working**
  19:13
  30:11

**works**
  14:5
  35:11
  36:4

**worried**
  26:19

**write**
  21:13

**written**

28:22

**wrong**
  7:6 17:24
  18:1
  33:16
  38:22

---

**Y**

---

**year**
  40:5,7

**years**
  23:12,16,
  20,22,24
  24:1,3
  36:17,22

---

**Z**

---

**Zoom**
  4:25 5:22
  9:16



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JERRY DARST**, | |
| **PLAINTIFF**, | CASE NO. 2:24-cv-01150-SDM-CMV |
| v. | JUDGE SARAH D. MORRISON |
| **MEIGS COUNTY, OHIO**, *et al.*, | MAGISTRATE JUDGE CHELSEY M. VASCURA |
| **DEFENDANTS**. | |

## PLAINTIFF'S NOTICE OF RULE 30(B)(6) DEPOSITION OF DEFENDANT MEIGS COUNTY, OHIO

Pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 30, Plaintiff Jerry Darst ("Plaintiff") gives notice that his attorneys will take the deposition of Defendant Meigs County, Ohio ("Defendant County") at the time and place stated below:

| | |
|---|---|
| **Person to be Examined:** | **Defendant County**<br>**C/O Counsel for Defendants**<br>**TEETOR \| WESTFALL**<br>**200 East Campus View Boulevard, Suite 200**<br>**Columbus, OH 43235** |
| **Date and Time of Deposition:** | **1:00 pm on October 3, 2025** |
| **Place of Deposition:** | **Remote Zoom Deposition** |

Pursuant to Fed. R. Civ. P. 30(b)(6), Defendant County is required to designate and produce for deposition its officers, directors, or managing agents who will testify as to the organization's knowledge on the topics listed in Attachment A to this Notice. The deposition shall continue from day to day until completed. The deposition will be upon oral examination before a notary public, or an officer authorized to administer oaths, and will be recorded by stenographic means. The deposition will be taken for the purposes of discovery, to perpetuate

**EXHIBIT**

**1**

the testimony of the witness for use at trial, and for all other purposes permitted under the

Federal Rules of Civil Procedure or any other applicable rules.  Finally, pursuant to Fed. R. Civ.

P. 30(b)(4), the parties have stipulated that Plaintiff may take this deposition by remote means.

Respectfully submitted,

By:  /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)
WILLIS SPANGLER STARLING
4635 Trueman Boulevard, Suite 100
Hilliard, Ohio 43026
Telephone: (614) 586-7900
Facsimile: (614) 586-7901
jstarling@willisattorneys.com

*Attorneys for Plaintiff Jerry Darst*

## CERTIFICATE OF SERVICE

I certify that, on October 2, 2025, I caused a copy of this document and any attachments

to be filed with the Clerk of Courts via the Court's electronic filing system, which will provide

notice and a copy of the filing to all counsel of record.

By:  /s/ Jason E. Starling
Jason E. Starling (Ohio Bar No. 0082619)

## ATTACHMENT A

## DEFINITIONS

A.        The terms "Plaintiff" or "Mr. Darst" mean Plaintiff Jerry Darst in this action and all of Plaintiff Jerry Darst's agents or other representatives of whatever capacity.

B.        The terms "you," "your," "yours," and "Defendant County" mean the following: (a) Defendant Meigs County, Ohio, its parent, subsidiary, or affiliated entities; and (b) any agents or other representatives of whatever capacity of Defendant Meigs County, Ohio, and its parent, subsidiary, or affiliated entities.

C.        The term "Defendant Fitch" means Defendant Scott Fitch in this action and all of Defendant Scott Fitch's agents or other representatives of whatever capacity.

D.        The terms "person" or "persons" mean any natural person, corporation, limited liability company, partnership, unincorporated association, estate, trust, or other business or non-profit entity, and any federal governmental entity, state governmental entity, local governmental entity, or other governmental entity.

E.        The term "document" means any information created or stored in any format, including without limitation all non-identical versions and copies.  In the event the original of a document is not available, "documents" means any identical copy of the original.  Any document bearing notations, markings, or writings of any kind differing from the original will be treated as a separate original document.

F.        The term "communication" and any variation or conjugation of that word means any kind of transfer, exchange, receipt, or transmittal of information in any form and through any medium.  It includes, but is not limited to: meetings, telephone conversations, discussions, reports, executive summaries, briefings, oral requests for information, memoranda of conversations, correspondence, data processing, pictures, recordings, voice mail messages, and electronic messages.

G.        The terms "concerning," "regarding," and "relating to," and any variation or conjugation of these words, means directly or indirectly constituting, referring to, alluding to, responding to, mentioning, describing, pertaining to, being connected with, commenting upon, in respect to, about, discussing, showing, contrasting, comparing, contradicting, describing, reflecting, or analyzing.

H.        The terms "identify," "identity," "identification," "describe," and "description" mean:

        1.        In the case of a natural person, to state:

                (a)        His or her full legal name and all known nicknames and aliases;

   (b) His or her known business and home addresses;

   (c) His or her known business and personal telephone numbers;

   (d) His or her known business and personal e-mail addresses; and

   (e) His or her characteristics protected by law (e.g., race, color, religion, sex, military status, national origin, any disabilities, age, ancestry, any protected activity, etc.).

  2. In the case of any corporation, limited liability company, partnership, unincorporated association, estate, trust, or other business or non-profit entity, to state:

   (a) The legal name for the entity;

   (b) The state(s) of incorporation for the entity, if any;

   (c) The address for the entity's principal place of business; and

   (d) The telephone number for the entity's principal place of business.

  3. In the case of a governmental entity, to state:

   (a) The legal name for the entity;

   (b) The name of the agent authorized to accept service of process for the entity;

   (c) The address for the entity's headquarters; and

   (d) The telephone number for the entity's principal place of business.

  4. In the case of parties to a communication, to state:

   (a) The information requested by the subsections above for each party to the communication;

   (b) The exact date of the communication; and

   (c) A general description of the subject matter of the communication.

  I. Use of "each," "any," and "all" anywhere in this document includes both the singular and plural.

4

J.    Use of "and" and "or" anywhere in this document includes both the conjunctive and the disjunctive.

K.    Unless otherwise stated, each topic covers the entire time period extending from the date Plaintiff first began working for you through the present (the "Relevant Period").

## RULE 30(B)(6) DEPOSITION TOPICS

1.    Your organizational structure, including without limitation all details on the following:

> a.    A list and description of all non-management job positions and to which job position it reports.
>
> b.    The job duties for each non-management job position.
>
> c.    A list and description of all management job positions, to which job position it reports, and which job positions report to it.
>
> d.    The job duties for each management job position.
>
> e.    The identities of the employees who held these job positions.

2.    Your unwritten or written policies, procedures, practices, guidelines, rules, directives, instructions, manuals, or handbooks regarding discipline of your employees (collectively, the "Disciplinary Policies"), including without limitation all details on the following:

> a.    All person(s) who have any involvement in disciplining one of your employees and the nature of their involvement.
>
> b.    All factors you consider in deciding what discipline to impose on an employee, if any, including without limitation an identification and explanation of all possible aggravating or mitigating circumstances you have ever considered in imposing discipline on any employee.

5

c.      All steps in the disciplinary process for one of your employees, including without limitation any progressive disciplinary policy.

d.      All documents created as part of the disciplinary process for one of your employees, including without limitation any disciplinary forms.

3.      Any decision to impose any discipline on Plaintiff, including without limitation all details on the following:

a.      The identities of the person(s) involved in making the decision.

b.      The date(s) on which the decision was made.

c.      The date(s) on which the discipline was imposed.

d.      The nature of any discipline imposed.

e.      Any documentation of the discipline, including any disciplinary forms used under your Disciplinary Policies.

f.      All verbal communications regarding this topic.

g.      All written communications regarding this topic.

h.      The identities of all witnesses whom you contend support the decision and what information from these witnesses allegedly supports the decision.

i.      The identities of all documents that you contend support the decision; what information from these documents allegedly supports the decision; the factual basis for any information from these documents that allegedly supports the decision; and the existence, current or former storage locations, and preservation of these documents.

j.      The identities of all tangible things that you contend support the decision; how these tangible things allegedly support the decision; and the

6

existence, current or former storage locations, and preservation of these tangible things.

4. Any person who worked for you that Defendant Fitch disciplined, including without limitation all details on the following:

    a. The identities of the person(s) that Defendant Fitch disciplined.

    b. The nature of the discipline imposed.

    c. All reasons why Defendant Fitch imposed the discipline.

    d. All verbal communications regarding this topic.

    e. All written communications regarding this topic.

    f. The identities, content, meaning, purpose, existence, current or former storage locations, and preservation of all documents that concern this topic.

    g. All your efforts to locate any information or documents reflecting who Defendant Fitch disciplined.

5. Any person who worked for you that Defendant Fitch decided to separate, including without limitation all details on the following:

    a. The identities of the person(s) that Defendant Fitch decided to separate.

    b. All reasons why Defendant Fitch decided to separate the person(s).

    c. All verbal communications regarding this topic.

    d. All written communications regarding this topic.

    e. The identities, content, meaning, purpose, existence, current or former storage locations, and preservation of all documents that concern this topic.

         f.      All your efforts to locate any information or documents reflecting who Defendant Fitch decided to separate.

6.     Any person who worked for you that Defendant Fitch considered disciplining or separating but opted for a lesser or no penalty, including without limitation all details on the following:

         a.      The identities of the person(s) that Defendant Fitch considered disciplining or separating but opted for a lesser or no penalty.

         b.      All reasons why Defendant Fitch considered disciplining or separating but opted for a lesser or no penalty.

         c.      All verbal communications regarding this topic.

         d.      All written communications regarding this topic.

         e.      The identities, content, meaning, purpose, existence, current or former storage locations, and preservation of all documents that concern this topic.

         f.      All your efforts to locate any information or documents reflecting who Defendant Fitch considered disciplining or separating.

7.     The person(s) who replaced Plaintiff and/or whom you hired as a deputy sheriff after separating Plaintiff's employment, including without limitation all details on the following:

         a.      The identity of the replacement and/or new hire.

         b.      The age of the replacement and/or new hire.

         c.      The date(s) on which you hired the replacement o and/or new hire.

         d.      All verbal communications regarding this topic.

         e.      All written communications regarding this topic.

   f.  The identities, content, meaning, purpose, existence, current or former storage locations, and preservation of all documents that concern this topic.

8.  Your unwritten or written policies, procedures, practices, guidelines, rules, directives, instructions, manuals, or handbooks regarding non-discrimination and/or non-retaliation based on any protected class and/or activities, including without limitation based on an employee's age (collectively, the "EEO Policies"), and including without limitation all details on the following:

   a.  The current or former storage locations, preservation, authors, content, meaning, purpose, versions, implementation, and distribution to employees of your EEO Policies.

   b.  The identities of any persons with any responsibility concerning the EEO Policies, and the nature of the person's responsibility.

   c.  The dates of, times of, locations of, participants in, frequency of, and content of any training you, or someone of your behalf, provided to your employees regarding the Age Discrimination in Employment Act, Ohio Revised Code Chapter 4112, the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution, and/or the EEO Policies.

9.  All factual and legal bases for any defenses you asserted in your Answer(s) to Plaintiff's Complaint(s), including without limitation the following:

   a.  If you contend that Plaintiff allegedly failed to mitigate damages, please identify all jobs (a) that you contend were substantially equivalent to the position Plaintiff last held with you; and (b) that you also contend Plaintiff

failed to use reasonable care and diligence in seeking. The terms "substantially equivalent" and "reasonable care and diligence" have the same meaning as used in *Rasimas v. Mich. Dept. of Mental Health*, 714 F.2d 614 (6th Cir. 1983). When identifying any such jobs, please provide the following information: (a) the name of the employer; (b) the job title; (c) a description of the promotional opportunities; (d) the exact annual compensation; (e) a description of the job responsibilities; (f) a description of the working conditions; and (g) the dates on which the job was posted and, if applicable, filled.

**MEIGS COUNTY SHERIFF'S OFFICE**
**Policies and Procedures**

| **Subject:** Rules of Conduct | **Policy** 2.05 |
|---|---|
| **Issue Date:** 4/24/2017 | **Revised:** 9/27/17 |
| **Approval Authority** | |
| **Title and Signature:** | **SHERIFF** |

## POLICY:

Meigs County Sheriff's Office employees shall conduct themselves professionally, responsibly and above reproach at all times. Employees shall follow the content of the rules and policies established by this agency.

## DEFINITIONS:

Employee(s): means any full or part-time paid personnel as well as special deputies, volunteers and any other person who is representing or affiliated with the Meigs County Sheriff's Office.

## PROCEDURES:

The General Orders developed here to pertain to the system established to enforce employee discipline.

**2.05.1    Code of Conduct and Appearance**

**CODE OF CONDUCT**:

All sworn personnel are granted a public trust, which requires they demonstrate the highest degree of integrity. To be worthy of this trust and to ensure that their professional conduct is above reproach, sworn employees of the Meigs County Sheriff's Office must conform to the Law Enforcement Code of Ethics, Canon of Police Ethics and other rules of conduct.

These Rules of Conduct apply to all employees. The rules are standards of behavior expected of professional law enforcement employees of the Meigs County Sheriff's Office, whether commissioned deputies or non-deputized employees. The term "employee" is also intended to include special deputies.

In the following section of this general order, Disciplinary Offenses include examples of conduct, which the Sheriff considers to be a non-exclusive list of illustrative examples. The examples listed do not represent all possible violations.

A violation of any of these standards may result in some type of discipline. Any employee may be terminated for a serious violation of any of these standards.

EXHIBIT

2

MCSO 00127

**2.05.2    VIOLATION OF RULES**

Employees shall not commit any acts or omit any acts, which constitute a violation of any Code of Ethics, Rules of Conduct, or any standard operating procedure, or of any other written or oral directive or practice established by the Meigs County Sheriff's Office for safe, efficient, or effective operations.  A violation of certain rules may result in termination of the employee's employment.  In the event of a violation it shall be presumed that the employee was familiar with the rules, regulations, orders, and other authoritative instructions of the Office.

**2.05.3    UNBECOMING CONDUCT**

Employees shall conduct themselves at all time, both on and off duty, in such a manner as to reflect most favorably on the Sheriff's Office.  Conduct unbecoming an officer shall include that which damages or has the probable expectation of damaging the public image, integrity, or reputation of the office, that which reflects discredit upon the employee as a member of the Sheriff's Office, or that which impairs the operation or efficiency of the Sheriff's Office or an employee.  Such offenses need not be specifically defined or set forth in this manual. Employees shall be disciplined or discharged for an offense of unbecoming conduct. Examples of such conduct include, but are not limited to:

a. Fraud in securing employment

b. Filing a false, incomplete, or misleading report, or record;

c. Giving a knowingly false or misleading location, description of event, or other information

during a radio, telephone, or verbal and/or written report.

d. Conviction of any crime or the entry of a plea *of no lo contend ere*;

e. Misuse of government funds or property;

f. Fighting and /or arguing that is disruptive and /or unbecoming;

g. Abusive language or language that is unbecoming to the Office of Sheriff.

**2.05.4    OBSERVANCE OF CIVIL AND CRIMINAL LAWS**

A. Employees shall obey all laws of the United States and of any state or jurisdiction they may be located in.

B. A conviction of the violation of any law shall be prima facie evidence of a violation of this section.

C. Employees shall report, in writing, to the Sheriff, any illegal actions, either civil or criminal involving them as soon as they have knowledge of such action being commenced.

**2.05.5    NEGLECT OF DUTY**

Employees shall perform all duties assigned to them in the Meigs County Sheriff's Office.  While on duty, the employees' assigned duties, responsibilities, and obligations toward their position within the Sheriff's Office, shall be considered primary importance.  On-duty personnel shall not engage in non-emergency personal matters, social activities, personal business, or any other activities which would cause them to neglect or be inattentive to their duties.  Employees may be disciplined or discharged for neglect of duties.

**2.05.6    UNSATISFACTORY PERFORMANCE**

Employees shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions.  Employees shall perform their duties in a manner, which will maintain the highest standards of efficiency in carrying out the functions and objectives of the office.  Unsatisfactory performance may be demonstrated by a lack of knowledge of the application of law required to be enforced: the failure to take appropriate action: or absence without leave.  In addition to other indicta of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations, a written record of infractions of policies, procedures, rules, regulations, directives, orders, or practices of the Sheriff's Office.

**2.05.7    TRUTHFULNESS**

1. No employee shall lie, knowingly give misleading or incomplete information, or otherwise falsify any verbal, written, typewritten or electronically processed communication in official reports or statements furnished to any person or organization when it is reasonable to expect that such communication is to be relied upon in any matter due to the employee's affiliation with the office.

2. Upon the order of the Sheriff, the Sheriff's designee or a superior, employees shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the sheriff's office, which may be asked of them.  Any attempt to be untruthful or to evade an issue by an employee will result in irreparable damage to the employee's reputation and destroy public and official confidence in that employee and the entire agency.  A finding by the Sheriff or his designee of dishonesty shall result in discipline or discharge.

**2.05.8    INSUBORDINATION; CONFLICTING OR ILLEGAL ORDERS**

1. Employees shall willfully observe and execute lawful and written rules, directives, duties, policies, procedures, and practices of the Meigs County Sheriff's Office.

2. Employees shall also subordinate their personal preferences and work priorities to the lawful verbal and written rules, duties, policies, procedures, and practices of this office, as well as to the lawful orders and directives of supervisors and superior command personnel of this office.  This includes orders relayed from a supervisor by a member of the same or lesser rank.  Direct, tacit, or constructive refusal to comply constitutes insubordination.  Insubordination shall result in discipline, including discharge.

3. Employees who are given a conflicting order shall bring this fact to the attention of the supervisor who issued the later order.  If the conflict is not resolved at that time, the most recent order will be obeyed.  An employee shall not receive disciplinary action for disobeying the earlier order.

4. No employee shall issue an order, which in contrary to law, or which requires an employee to commit and illegal act.

5. Employees shall not obey any order which they know or should know would require them to commit any illegal act.

## 2.05.9   NON-DISCRIMINATION AND HARASSMENT

The Meigs County Sheriff's Office is committed to providing a facility that is safe and free from unlawful discrimination and harassment.  Unlawful discrimination or harassment is behavior directed toward an employee because of their membership in a protected class such as race, color, religion, sex, national origin, age, or disability.  Employees shall not base the performance of duties and responsibilities on an individual's race, color, religion, sex, national origin, age, ancestry, disability, genetic information or military status.  Unlawful discrimination and harassment is inappropriate and illegal and will not be tolerated.  All forms of unlawful discrimination and harassment are governed by this policy and must be reported and addressed in accordance with this policy.

**Definitions.**

Unlawful discrimination occurs when individuals are treated less favorable in their employment because of their membership in a protected classification.  An employer may not discriminate against an individual with respect to the terms and conditions of employment, such as promotions, raises, and other job opportunities, based upon that individual's membership in that protected class.

Harassment is a form of discrimination. Harassment may be generally defined as unwelcome conduct based upon a protected classification.  However, harassment becomes unlawful where:

1. Enduring the offensive conduct becomes a condition of continued employment.

2. The conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

By way of example, sexual harassment is one type of unlawful harassment.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when:

1. Submission to the conduct is made either explicitly or implicitly a term or condition of an individual's employment.

2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment. Harassment on the basis of an employee's membership in any protected classification (as set forth above) is unlawful, will not be tolerated, and must be reported.

4. Unlawful discrimination and harassment does not generally encompass conduct of a socially acceptable nature. However, some conduct that is appropriate in a social setting may be inappropriate in the work place.  A victim's perceived acquiescence in the behavior does not negate the existence of unlawful discrimination or harassment.  Inappropriate conduct that an employee perceives as being "welcome" by another employee may form the basis of a legitimate complaint.

**Off Duty Conduct**

Unlawful discrimination or harassment that affects an individual's employment may extend beyond the confines of the workplace. Conduct that occurs off duty and off premises may also be subject to this policy.

Employees are prohibited from engaging in any harassing activity. Harassing activity includes, but not limited to words, actions, gestures, conduct, behavior, or visual materials that are, or that could be construed or perceived by other persons as, harassing, hostile, intimidating, or offensive. Sexual harassment in any form (including verbal and physical) is strictly prohibited. Employees shall report to a superior officer any incidents of possible harassment of which the member has knowledge.

**Complaint Procedure**

Any employee who feels they have been subjected to unlawful discrimination or harassment by a fellow employee, supervisor, or other individual otherwise affiliated with the sheriff's office shall immediately report the conduct, in writing, to the Sheriff or Major, each of whom shall have the authority and responsibility to work directly with an outside agency to investigate and take appropriate action concerning the complaint.

**Retaliation**

Anti-discrimination law prohibits retaliatory conduct against individuals who file a discrimination charge, testify, or participate in any way in an investigation, proceeding, or lawsuit under these laws. No supervisor or employee shall retaliate against any individual for filing a complaint, reporting harassment, participating in an investigation or engaging in any other protected activity. Any employee subjected to retaliatory conduct shall report the conduct immediately to the Sheriff or Major. Disciplinary action for filing a false complaint in not a retaliatory act.

**Corrective Action**

If it is determined that unlawful discrimination, harassment, or retaliation has taken place, appropriate corrective action will be taken, up to and including termination. Any individual exhibiting retaliatory or harassing behavior towards an employee who exercised a right under this policy, or who is a close personal friend or family member of someone who exercised a right under this policy, will be subject to discipline, as will any employee who has knowledge of unlawful conduct and allows that conduct to go unaddressed.

## 2.05.10 REPORTING CRIMINAL ACTIVITY

Employees shall report to their supervisor or superior officer all information acquired concerning any type of criminal activity brought to their attention. In the event such information is confidential, the employee may, via the chain of command, request to speak with any superior without divulging the confidential information. Failure to report any illegal activity or crime constitutes malfeasance and shall result in discipline, including discharge.

## 2.05.11 USE OR POSSESSION OF DRUGS AND ALCOHOL

1. Employees must never possess or use any controlled substances unless, in the treatment of the employee by a physician or dentist, the employee receives prescription for the medication.

When an employee has a prescription for medication that could limit or impair his ability to function, physical or mentally, they must immediately notify their supervisor. The notification must include providing the supervisor with a written list of the type of medication, length of time to be taken and the dosage.

2. Employees must never purchase or consume intoxication beverages while in uniform or in clothing that identifies them as a Meigs County Sheriff's Office employee except as part of a documented investigation. Other than for the purpose of performing their official duties, employees on duty or in uniform shall not enter or visit any bar, lounge, parlors, club, store or any other establishment whose primary purpose is the sale or on-premise consumption of alcoholic beverages. Employees shall not report for duty, or be on duty, while having any detectable level of intoxicants/alcohol/drugs, or with an odor of intoxicants within six (6) hours of reporting to duty.

3. Employees, while off duty, must never consume intoxicating beverages to the extent that it results in impairment, intoxication, obnoxious or offensive behavior that discredits them, the Sheriff's Office, or renders the employee unfit to report for their next regular shift.

## 2.05.12  ABSENTEEISM

Employees shall not establish patterns of unexcused or excessive absenteeism or be absent without leave. Employees shall not under any circumstances be absent from duty without first obtaining permission.

## 2.05.13  REPORTING FOR DUTY

Employees shall report for duty at the time and place required by assignment or orders and shall be physically and mentally fit to perform their duties. They shall be physically and mentally prepared and correctly uniformed and equipped to assume their duties. Judicial subpoenas shall constitute an order to report for duty under this section.

## 2.05.14  EMPLOYMENT OUTSIDE OF OFFICE

Employees may engage in off-duty employment subject to the submission or a written request to and subsequent approval by the Sheriff.

Approval may be denied where it appears that the outside employment might: (1) render the employee unavailable during an emergency, (2) physically or mentally exhaust the employee to the point that their performance might be affected, (3) require that special consideration be given to scheduling the member's regular duty hours, or (4) bring the office into disrepute or impair the operation or efficiency of the Sheriff's Office or employee.

## 2.05.15  COOPERATION/ASSISTANCE/INTERFERENCE

Cooperation between the ranks and units of the Sheriff's Office is essential to effective law enforcement. Therefore, all employees are strictly charged with establishing and maintaining a high spirit of cooperation within the office. Employees will strive for full coordination of effort and cooperation in internal activities and in official relationships with other organizations.

Employees are required to take appropriate law enforcement action toward aiding a fellow officer or member exposed to danger or a situation where danger might be impending, or when

a request for assistance is either made or recognized as such. Failure to do so is malfeasance and shall result in discipline or discharge.

Employees shall not intervene or interfere with any work task assigned to another employee or to another agency. Employees shall not independently initiate or undertake any investigation or other official activity, which is not part of the employees assigned duties without first receiving permission from a superior officer.

## 2.05.16 ASSOCIATION/LOITERING

Employees shall not associate with known criminals except to further a legitimate law enforcement purpose or where unavoidable because of other family relationships of the member.

Employees shall not congregate or loiter in any place or in any manner as to bring discredit to the employee(s) or to the Sheriff's Office.

Employees shall not frequent any establishment known to have a reputation for the illegal sale of intoxicants, unruly behavior of patrons or is under investigation unless in the course of conducting an approved investigation.

## 2.05.17 ETHICS

1. Employees shall not involve themselves in activities, ventures, or enterprises, which create or have the potential of creating conflicts of interest with the duties and obligations of their positions as employees of the Sheriff's Office. Employees shall not have any unlawful interest in a public contract.

2. Employees shall not solicit or accept from any person, business, or organization any gift (including money, tangible or intangible personal property, food, beverage, loan, promise, service, discount, ticket, or entertainment) for the benefit of the employee or the Sheriff's Office without authorization from the Sheriff. This does not include specific restaurants that make it a practice to give a discount or free drink to all peace officers as an appreciation gesture when that officer is eating at their establishment.

3. Employees shall not attempt to influence the decision of government officials in matters relating to purely personal advantage.

4. Employees shall not use their position to secure, nor accept, anything of value. For example: tickets, discounts, goods, services, etc. This does not include specific restaurants that make it a practice to give a discount or free drink to all peace officers as an appreciation gesture when that officer is eating at their establishment.

5. Employees shall not disclose confidential information, or use confidential information to influence a governmental decision or to advance personal, financial, or other private interest. For Example: disclosure of details regarding any criminal or internal investigation; disclosure of information gained through LEADS or NCIC, or etc.

6. Employees shall at all times impartially perform assigned duties, enforce law, and provide service to the public.

### 2.05.18  ENDORSEMENTS AND REFERRALS

Employees shall not recommend or suggest in any manner, except in the transaction of personal business, the employment or procurement of a particular product, professional service, or commercial service (such as attorney, ambulance service, towing service, bondsman, mortician, etc.). In the case of ambulance or towing service, when such service is necessary and the person needing the service is unable or unwilling to procure it or requests assistance, officers shall proceed in accordance with established departmental procedures.

Employees shall not authorize the use of their names, photographs, or official titles, which identify them as officers or employees, in connection with testimonials or advertisement of any commodity or commercial enterprise, without the approval of the Sheriff.

### 2.05.19  CITIZEN COURTESY/COMPLAINTS

A. Employees shall display courtesy and respect to the public, superior officers, subordinates, and associates. Employees shall be tactful in the performance of their duties, shall control their tempers, and exercise the utmost patience and discretion and shall not engage in argumentative discussions even in the face of extreme provocation. In the performance of their duties, employees shall not use coarse, violent, profane, or insolent language or gestures, and shall not express any prejudice concerning race, sex, religion, politics, national origin, lifestyle, or similar personal characteristics.

B. Employees shall carry their badges and identification cards on their person at all times, except when impractical or dangerous to their safety or to an investigation. They shall furnish their name and badge number to any person requesting that information, when they are on duty or while holding themselves out as having an official capacity, except when the withholding of such information is necessary for the performance of official duties or is authorized by proper authority.

C. Employees shall courteously and promptly record in writing any complaint made by a citizen against any member of the Sheriff's Office. Employees may attempt to resolve the complaint, but shall never attempt to dissuade any citizen from lodging a complaint against any member or the Office.

D. When any person applies for assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner and shall be properly and judiciously acted upon consistent with established departmental procedures.

### 2.05.20  PUBLIC STATEMENTS AND APPEARANCES

Employees shall not publicly criticize or ridicule the Sheriff's Office, its policies or other employees by speech, writing or other expression, where such speech, writing or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Office. Interferes with the maintenance of discipline or is made with reckless disregard for truth or falsity.

Employees shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information or any other matters of the Office while holding themselves out as

representing the Office in such matters without proper authority. Employees, when representing the Office, may lecture on "law enforcement" or other related subjects only with the prior approval of the Sheriff.

## 2.05.21  PERSONAL APPEARANCE

Refer to Policy 3.01 (Appearance and Grooming) of the Meigs County Sheriff's Office Policy and Procedures.

## 2.05.22  POLITICAL ACTIVITY

Employees shall be permitted to:

1. Register and vote in any election.
2. Express opinions as individuals privately and publicly on political issues and candidates.
3. Attend political conventions, rallies, fund-raising functions and similar political gatherings.
4. Actively engage in any nonpartisan political functions.
5. Sign political petitions as individuals.
6. Make financial contributions to political organizations.
7. Serve as election judges or clerks or in a similar position to perform nonpartisan duties as prescribed by state or local laws.
8. Hold memberships in a political party and participate in its functions to the extent consistent with the law and consistent with this Section.
9. Otherwise participate fully in public affairs, except as provided by law, to the extent that such endeavors do not impair the neutral and efficient performance of official duties, or create real or apparent conflicts of interest.

Employees are prohibited from:

1. Using their official capacity to influence, interfere with or affect the result of an election.
2. Assuming active roles in the management, organizations, or financial activities of partisan clubs, campaigns, or parties.
3. Serving as officers of partisan political parties or clubs.
4. Becoming candidates for or campaigning for a partisan elective public office.
5. Soliciting votes in support of or in opposition to, any partisan candidates.
6. Serving as delegates to a political party convention.
7. Endorsing or opposing a partisan candidate for public office in a political advertisement. Broadcast, or campaign literature.
8. Initiating or circulating a partisan nominating petition.
9. Organizing, selling tickets to, or actively participating in a fund-raising function for a partisan political party or candidate.
10. Addressing political gatherings in support of, or in opposition to a partisan candidate.
11. Otherwise engaging in prohibited partisan activities on the federal, state, county, or municipal level.

## 2.05.23  FINANCIAL DISCLOSURE/PAYMENT OF DEBTS

Upon the order of the Sheriff or the Sheriff's designee, employees shall submit financial disclosure statements in accordance with departmental procedures in connection with a complaint in which this information is material to the investigation. These statements are to be maintained by the Sheriff and shall not be available for public disclosure.

Employees shall not undertake any financial obligations which they know or should know they will be unable to meet, and shall pay all just debts when due.  An isolated instance of financial irresponsibility will not be grounds for discipline except in unusually severe cases.  However, repeated instances of wage garnishment or similar financial difficulty, which disrupts the efficiency of the office, may be cause for disciplinary action.  Filing for a voluntary bankruptcy petition shall not, by itself, be cause for discipline.  Financial difficulties stemming from unforeseen medical expenses or personal disaster shall not be cause for discipline, provided that a good faith effort to settle all accounts is being undertaken.

## 2.05.24  RESIDENCE/TELEPHONE

Employees shall reside within forty-five (45) minutes travel time of the Sheriff's Office.  New employees shall reside within forty- five (45) minutes of the Sheriff's Office within one year of their employment.

Employees shall not use the Sheriff's Office as a mailing address for private purposes.  The Sheriff's Office shall not be used on any motor vehicle registration.

Employees shall have a telephone (landline or cell) service at their residence and shall immediately report any changes of telephone number or addresses to the Sheriff or other such persons as may be appropriate.

Departmental county equipment is not to be used for the excessive transmission of private messages.

## 2.05.25  DISSEMINATION OF INFORMATION

Employees shall treat the official business of the Sheriff's Office as confidential.  Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures.  Employees may remove or copy official records or reports from a county office only in accordance with established departmental procedures.  Employees shall not divulge the identity of persons giving confidential information except as authorized by the Sheriff.

## 2.05.26  DEPARTMENTAL REPORTS

Employees shall submit all necessary reports on time and in accordance with established departmental procedures.  Reports submitted by employees shall be truthful and complete, and no employee shall knowingly enter or cause to be entered any inaccurate, false, improper, or incomplete information.

## 2.05.27  PROCESSING PROPERTY AND EVIDENCE

Property or evidence, which has been discovered, gathered, or received in connection with departmental responsibilities, will be processed in accordance with established departmental procedures.  Employees shall not covert to their own use, manufacture, conceal, falsify, destroy, remove, tamper, with or withhold any property or evidence in connection with an investigation or other official action, except in accordance with established departmental procedures.

## 2.05.28 ABUSE OF PROCESS

Employees shall not make false accusations of a criminal or traffic charge.

## 2.05.29 USE OF DEPARTMENTAL EQUIPMENT

Employees shall care for and properly use Sheriff's Office equipment only for its intended purpose, in accordance with established departmental procedures, and shall not abuse, damage or lose such equipment. All equipment issued to employees shall be maintained in proper order. In the event that county property is found bearing evidence of damage which has not been reported, it shall be prima facie evidence that the person using the property or vehicle was responsible or accountable.

The approval of the Sheriff, or his designee, shall be required prior to the lending of any departmentally owned equipment.

Employees shall not deface, mar, or otherwise tamper with any Office equipment or property.

Employees shall operate official vehicles in a careful and prudent manner, and shall obey all laws and all departmental orders pertaining to such operation. Loss or suspension of any driving license shall be reported to the Sheriff immediately.

## 2.05.30 FIREARMS

Employees shall carry firearms in accordance with the law and existing departmental procedure regarding firearms.

## 2.05.31 USE OF MEDICAL EXAMINATIONS, PHOTOGRAPHS, LINEUPS, AND OTHER TESTS.

Upon the order of the Sheriff or the Sheriff's designee, employees shall submit to any medical, ballistics, chemical or other tests, photographs, or lineups. All procedures carried out under this subsection shall be specifically directed and narrowly related to a particular internal investigation being conducted by the Office

## 2.05.32 TREATMENT OF PERSONS IN CUSTODY

Employees shall not mistreat persons who are in their custody. Employees shall handle such persons in accordance with law and departmental procedures. Employees shall maintain proper care and control of persons in their custody at all times. Employees shall not use more force in any situation than is reasonably necessary under the circumstances. Employees shall use force in accordance with law and departmental procedures.

Employees shall not make any arrest, search, or seizure, which they know or should know, is not in accordance with law and departmental procedures.

## 2.05.33 POSTING OF NOTICES

Employees shall not mark, mar, or deface any posted notices of the Sheriff's Office. No notices of a derogatory nature will be posted at any time.

**2.05.34  TOBACCO POLICY**

Use of any tobacco products while on duty shall not be used while in any building, vehicle, or at any time while in personal contact with the public is prohibited.  This policy does not apply to designated smoking areas at government or other public buildings

**2.05.35  DRUG FREE WORKPLACE POLICY**

As already exists in the Meigs County Employee Personnel Policy Manual, Section VII, and in Article 30 of the Bargaining Unit Contract with the Ohio Patrolman's Benevolent Association.

**2.05.36  DISCIPLINARY SYSTEM**

In general, Group I offenses may be defined as those infraction which are of relatively minor nature and which cause disruption to the organization in terms of a decrease in organization productivity, efficiency, and/or morale.  Group I offenses, if left undisciplined by proper authority, will usually cause a temporary adverse impact against the organization unless such acts are compounded over time.

Group II offenses may be defined as those infractions which are of a more serious nature than Group I offenses and which, in turn, cause a more serious and longer lasting disruption to the organization in terms of decreased organizational productivity, efficiency and/or morale.  Group II offenses, if left undisciplined by proper authority, can cause serious and longer lasting adverse impact against the organization than the Group I offenses.

Group III offenses may be defined as those infractions, which are of a very serious, or possibly a criminal nature, and which cause a critical disruption to the organization in terms of decreased productivity, efficiency, and/or morale.  Group III offense, if left undisciplined by proper authority, may cause long lasting and critically serious adverse impact against the organization.

The following examples of specific offenses are not all inclusive, and are not intended to be binding on the Employer.

**GROUP I OFFENSES**

| | |
|---|---|
| FIRST OFFENSE | Verbal or written reprimand (verbal reprimand-written record to be signed by employee) |
| SECOND OFFENSE | Up to three (3) day suspension without pay |
| THIRD OFFENSE | Up to ten (10) day suspension without pay or reduction in classification |
| FOURTH OFFENSE | Up to and including termination of employment |

Following are examples of Group I Offenses:

1. Failure to properly and completely sign in or out or mark on or off.
2. Failure to properly "report off" work for any absence or failure to timely notify the proper party or absence (e.g. tardiness, etc.)
3. Creating or contributing to unsanitary or unsafe conditions or poor housekeeping.
4. Failure to observe routine safety rules.

5. Inattention to the needs of the public.
6. Distracting the attention of others, unnecessary shouting, use of profane or other inappropriate language, misuse of two-way radios, or otherwise causing disruptions on the job.
7. Horseplay, wrestling or other potentially harmful conduct.
8. Interfering with the work performance of other employees.
9. Failure to cooperate with other employees.
10. Neglect of, or careless failure to observe, Employer rules, regulations, policies and procedures.
11. Excessive garnishments.
12. Use or possession of another employee's working equipment or property without approval.
13. Unauthorized use of the Employer's telephone for other than business purposes.
14. Obligating the Employer for any minor expense, service, or performance without prior authorization.
15. Neglect of, or careless failure to care for, Employer property or equipment.
16. Disregarding job duties by neglect of work during work hours.
17. Inefficiency (e.g., lack of application or effort on the job, unsatisfactory performance, failure to maintain required performance standards, etc.)
18. Neglect of, or careless failure to, prepare required reports or documents.
19. Failure of a supervisor to administer discipline as provided herein or to otherwise enforce rules, regulations, policies and procedures of the Employer.

## GROUP II OFFENSES

| | |
|---|---|
| FIRST OFFENSE | Verbal instruction and one (1) to three (3) day suspension without pay |
| SECOND OFFENSE | Up to ten (10) day suspension without pay or reduction in classification |
| THIRD OFFENSE | Up to and including termination of employment |

Following are examples of Group II Offenses:
1. Sleeping during work hours.
2. Reporting to work or working while unfit for duty.
3. Failure to report for overtime work, without proper excuse, after being scheduled to work.
4. Leaving a post of continuous operations prior to being relieved by employee on incoming shift.
5. Willful refusal to sign on or off or clock in or out when required
6. Performing private work on Employer time.
7. Neglect or careless failure to observe official safety rules, or common safety practices.
8. Failure to report accidents.
9. Discourteous treatment of the public.
10. Threatening, intimidating, or coercing other employees.
11. Use of abusive or offensive language toward other employees.
12. The making or publishing of false, vicious, or malicious statements concerning other employees, the Employer or its operations.
13. Willful disregard of the Employer's rules, regulation, policies and procedures.

14. Negligent failure to obey a reasonable order of a supervisor or failure to carry out work assignments, including verbal instructions.
15. Neglect or carelessness in the use of Employer property or equipment.
16. Obligating the Employer for a major expense, service or performance without prior authorization.
17. Unauthorized or improper use of Employer property or equipment.
18. Failure to report equipment damage.
19. A traffic violation or accident while driving an Employer vehicle, which evidences recklessness by the employee.
20. Possession or storage of alcoholic beverages on the Employer's premises.
21. Unauthorized presence on the Employer's property.
22. Habitual neglect of timely completion of required reports or documents.
23. Willful failure to timely complete required reports and documents.


## GROUP III OFFENSES

FIRST OFFENSE                Up to and including termination.

The following are examples of Group III Offenses.

1. Instigation, leading or participating in any walkout, strike, sit-down, stand-in, sympathy strike, call-in, slow down, refusal to work at the scheduled time for a scheduled shift or other concerted curtailment, restriction or interference with work in or about the Employer's premises in violation of ORC Chapter 4117.
2. Refusal, without legitimate reason, to work during emergency situations or conditions.
3. Signing or altering other employee's time records, altering one's own time records or having one's time records signed or altered by another, without authorization.
4. Knowingly concealing a communicable disease (i.e., TB, etc.), which may endanger others.
5. Carrying or possessing firearms, explosives, or weapons in the work area without authorization or in violation of the Employer's Firearms Policy.
6. Willfully withholding information, which threatens the safety and security of the Employer, its operations, or employees.
7. Willfully demeaning, verbally abusing and/or humiliating another person.
8. Committing an act of discrimination, sexual harassment, or engaging in conduct giving insult or offense on the basis of race, color, sex, age, religion, national origin or disability.
9. Fighting with, or attempting to injure, other employees not consistent with the Employer's Use of Force Policy.
10. Insubordination by refusing to perform assigned work or to comply with the written or verbal instructions of a supervisor.
11. Providing false testimony, statements of information in any official Employer, court, or administrative investigation, hearing or proceeding.
12. Providing false information, making a false statement, committing a fraudulent act, or withholding pertinent information in the employment application process.
13. Engaging in illegal gambling activities.

14. Stealing or similar conduct, including destroying, damaging, concealing or converting any property of the Employer or of other employees.
15. Dishonesty or dishonest actions. Examples of "dishonesty" or "dishonest actions" are: theft, pilfering, making false statements to secure an excused absence or justify an absence or tardiness. These are examples only and do not limit the terms dishonesty and dishonest action.
16. Engaging in political activity as prohibited by ORC Section 124.57.
17. Wanted to willful neglect in the performance of assigned duties.
18. The unlawful manufacture, distribution, dispensation, possession, use or being under the influence of alcohol or a controlled substance which takes place in whole or in part in the workplace and/or a violation of the reporting requirements of the employer's drug free workplace policy.
19. Reporting for duty or remaining on duty while under the influence of alcohol or a controlled substance, testing positive for alcohol or controlled substance, or using alcohol within six (6) hours of reporting for duty.
20. Driving a motor vehicle on duty or Employer business without a valid, applicable operator's license.
21. Failure to obtain, maintain and/or report the loss of required licenses, certifications or other qualifications of an employee's position.
22. Conviction of any violation of law which may adversely affect the public's trust in the employee's ability to perform the duties of the employee's decision.
23. Intentional misuse of Employer or other public funds.
24. Willful neglect or intentional misuse, abuse or destruction of the property, equipment or tolls of the Employer or another employee.
25. Soliciting or accepting a gift, gratuity, bribe, or reward for the private use of the employee, or otherwise using one's position, identification, name, photograph or title for personal gain, or otherwise violating the Employer's Code of Conduct or Ohio's ethics laws for public employees.
26. Engaging in off-duty activities, which the Employer has determined to be an interest or time conflict.
27. Making false claims or misrepresentations in an attempt to obtain any benefit.
28. Misuse or removal of documents or information of a confidential nature or revealing such information without prior and appropriate authorization.
29. Falsifying any report, log, request, or other document.
30. Misuse, removal or destruction of Employer records without prior authorization.
31. Violation of any laws, which the employee is responsible to enforce in his capacity as an employee of the Sheriff's Office.
32. Any conduct which brings discredit to the Sheriff's Office or the employee as a public employee.
33. Associating with known criminals.
34. Refusing to submit to a medical examination or a drug or alcohol test.
35. Refusing to provide testimony during a public hearing or any other official hearing, investigation or proceeding involving the Employer.
36. Refusing to provide testimony or information concerning any investigation.

MCSO 00142